# EXHIBIT E

7/19/2024
SCOTT HARRISON
DEPOSITION
TRANSCRIPT WITH
EXHIBITS

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-------------------------------------------------------------

Matthew Lee Stewart,

           Plaintiff,

      vs.                          Case Number 2022 CV 4734

Nissan North America Inc.,

and Nissan Motor Acceptance

Corporation,

           Defendants.

-------------------------------------------------------------

Remote Videoconference Deposition of

Scott Thomas Harrison

July 19, 2024

-Video Recorded Remotely by-

In Demand Video Court Reporting

216 South Jefferson Street, Suite 103

Chicago, Illinois 60661

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 2

APPEARANCES

For the Plaintiff:

Lisa L. Clay
Lisa L. Clay, Attorney At Law, LLC
2100 Manchester Road, Suite 1603
Wheaton, Illinois 60187

Shannon M. Foley
Foley Lyman Law Group LLP
1500 Rosecrans Avenue, Suite 500
Manhattan Beach, California 90266

For the Witness and the Defendants:

Peter M. Farley
Melissa M. Weiss
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601

Also present:
Sabrina Mallabarapu

Page 3

EXAMINATION INDEX

| DIRECT | CROSS | REDIRECT | RECROSS |
|--------|-------|----------|---------|
| 5 | -- | -- | -- |

EXHIBIT INDEX

| EXHIBIT | PAGE NUMBER |
|---------|-------------|
| 1 - | 42 |
| 2 - | 45 |
| 3 - | 45 |
| 4 - | 48 |
| 5 - | 61 |
| 6 - | 61 |
| 9 - | 67 |

Page 4

THE RECORDER: Good morning. We are now on the record on Friday, July 19th, 2024. Time is 10 a.m. By agreement of all the parties, we are convened via remote videoconference for a video-recorded deposition in the matter of Matthew Lee Stewart v. Nissan North America, Inc. and Nissan Motor Acceptance Corporation, Case No. 22-cv-4734, in the United States District Court for the Northern District of Illinois, Eastern Division.                    0:00:26

This deposition is being recorded by In Demand Court Reporting, located at 216 South Jefferson Street, Chicago, Illinois 60661, on behalf of the Plaintiff and being taken at the instance of the Plaintiff. The witness today is Scott Thomas Harrison.    0:00:39

Mr. Harrison, my name is Matthew Schulte. I'm a notary public and the video recording device operator for this deposition. At this time, would you please raise your right hand for the oath?        0:00:47

(Witness sworn.)

THE RECORDER: Thank you.

Would the attorneys please state their appearances for the record?                    0:00:57

MS. CLAY: Yes. Good morning. This is Lisa Clay for Plaintiff, and we also have Shannon Foley for Plaintiff.                    0:01:04

Page 5

MR. FARLEY: Hi. Good morning. This is Peter Farley for the Defendants, and also Melissa Weiss and Sabrina Mallabarapu, who is a summer associate at McGuireWoods is also attending.            0:01:15

THE RECORDER: All right. That completes the required information, and we can proceed.

MS. CLAY: Thank you, Matthew.        0:01:23

EXAMINATION

BY MS. CLAY:

Q.  Good morning, Mr. Harrison.

MR. FARLEY: And Lisa, just for the record, we are representing Mr. Harrison for purposes of this deposition.                    0:01:30

MS. CLAY: Thank you for that clarification, Peter. Okay.

BY MS. CLAY:

Q.  Mr. Harrison, have you been deposed before?    0:01:36

A.  Yes.

Q.  Okay. How many times?

A.  Fifteen.

Q.  So you are an old pro. I'm not going to need to spend any time on the ground rules, am I?        0:01:50

A.  I don't believe so.

Q.  Okay. When was the most recent deposition?    0:01:56

A.  February.

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                    (773) 239-6008

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                      (773) 239-6008

Page 6

Q. Okay. And what was the cause of action?

A. It was a dealer dispute situation between my current employer and the dealer.                    0:02:12

Q. Okay.

A. Automotive dealer. For clarification.

Q. And you are currently employed by whom?                    0:02:19

A. Hyundai Motor America.

Q. Okay. Have any of your depositions related to causes of action for discrimination, harassment, or retaliation in the employment context?                    0:02:33

A. No.

Q. Okay. Just a quick refresher on the ground rules I am going to be asking you to follow today.                    0:02:43

You are represented by Counsel, who is in the room with you. He may want to make an objection. So what I'm going to ask you to do is take a little pause before you answer my question.                    0:02:56

Allow me to complete my sentence, take that little pause, make sure that your lawyer doesn't want to say anything, and then answer that question as fully and completely as you can. Do you understand?                    0:03:08

A. Yes.

Q. We need oral responses to testimony. So please make sure that you are giving us "yes"es, "no"s, full sentences, full answers, as opposed to "mm-mm,

Page 7

"uh-huh"s, or nods of the head. Do you understand?                    0:03:24

A. Yes.

Q. Okay. We also don't want you guessing. We're entitled to your best and most truthful testimony. Please don't make things up, decide you're going to throw something at the wall.                    0:03:41

We only want to know what you know, what facts you have, and to the best of recollection, that's what we're expecting you to testify to today. Do you understand?                    0:03:50

A. Yes.

Q. Okay. You are not a current Nissan employee. Correct?

A. Correct.                    0:04:02

Q. But you are represented by Nissan's counsel today?

MR. FARLEY: Yes.

THE WITNESS: Yes.

BY MS. CLAY:

Q. How did that come about?                    0:04:11

MR. FARLEY: I think that involves attorney-client privilege, so I'm going to object to that, instruct the witness not to answer about the circumstances of our retention and representation of him.                    0:04:24

Page 8

I think all you need to know is that we're representing him for this deposition.

BY MS. CLAY:

Q. Mr. Harrison, did you request counsel or were you told that you would be provided counsel?                    0:04:34

MR. FARLEY: I think that's also privileged, Lisa. I think it's not relevant too, so I'm going to instruct him not to answer on that too.                    0:04:44

BY MS. CLAY:

Q. Are you paying for your counsel today, Mr. Harrison?

MR. FARLEY: You can answer that.                    0:04:49

THE WITNESS: No.

BY MS. CLAY:

Q. Okay. Approximately when did you retain counsel?

A. I -- I guess probably a month ago, when I was contacted about this deposition.                    0:05:07

Q. Okay. So you were contacted about the deposition approximately a month ago.

A. Yes.                    0:05:19

Q. Had you been contacted about a deposition prior to that?

A. Can you clarify --

Q. Certainly.                    0:05:31

Page 9

A. -- the question, please?

Q. When is the first time you learned that your deposition had been requested in this case?                    0:05:40

A. Oh. Probably a few months ago. I think that was trying to get -- trying to get it scheduled.                    0:05:47

Q. Okay.

A. So probably -- probably earlier in the second quarter.

Q. Okay. And who notified you of that deposition?                    0:05:56

A. I think it was Melissa.

Q. Okay. Was that a phone call or an email?                    0:06:05

A. Email.

Q. Okay. How many times have you -- sorry, strike that.

As a former employee, I'm just going to ask you a couple of questions about the -- the end of your employment. What happened to cause the end of your employment at Nissan?                    0:06:28

A. I was recruited by Hyundai Motor America and had a better opportunity.

Q. When were you recruited?

A. May of 2021.                    0:06:45

Q. So you were not terminated by Nissan?

A. Correct.

3 (Pages 6 to 9)

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com (773) 239-6008



Page 10

Q. Did you resign your employment? 0:06:54

A. Yes.

Q. Were you part of a RIF or did you have knowledge of an upcoming RIF?

A. I'm sorry. Can you clarify that question? 0:07:04

Q. Sure. When I say "RIF," I mean a reduction in force. At the time you were recruited by Hyundai, were you aware of any upcoming reductions in force at Nissan? 0:07:15

A. No.

Q. Okay. Did you enter into any form of agreement with Nissan as part of your termination?

A. No. 0:07:26

Q. Okay. So prior to the conversation with Melissa Weiss several months ago -- that's the time period that I would like to focus on -- had you spoken to Peter Farley, Melissa Weiss, or anyone at McGuireWoods about this case or any other legal matter at Nissan? 0:07:47

A. No.

Q. Okay. Had you spoken to in-house counsel at Nissan regarding this case or any other legal matter at Nissan? 0:07:57

A. No.

Q. Okay. When you were an employee at Nissan or

Page 11

after you -- your departure, did anyone from Nissan human resources or legal interview you about the hiring process for the fixed operations manager position? 0:08:16

A. No.

Q. Okay. Either during your employment or after, did anyone from Nissan human resources or legal interview you about your interactions with Matt Stewart? 0:08:29

A. No.

Q. Okay. What did you do to prepare for your deposition today?

MR. FARLEY: You can tell them what we -- 0:08:43

THE WITNESS: I had a -- a preparatory meeting with Peter.

BY MS. CLAY:

Q. When was that meeting?

A. Yesterday. 0:08:50

Q. Any other discussions or meetings with Peter or anyone else to prepare?

A. No.

Q. Has your counsel asked you for any documents? 0:09:01

A. No.

Q. Has Counsel asked you to look at any documents?

MR. FARLEY: In the course of the

Page 12

preparation? Or any time? 0:09:14

MS. CLAY: Any time.

MR. FARLEY: You can just answer "yes" or "no" to that.

THE WITNESS: Yes. 0:09:20

BY MS. CLAY:

Q. Okay. Have you been shown any documents?

A. Yes.

Q. Okay. What documents did you review to prepare for today? 0:09:32

MR. FARLEY: That's okay to disclose if you can recall. Not what we discussed but just what you reviewed.

THE WITNESS: Yeah. I -- I looked at a few resumes and a job description for the FOM position. I believe that's about all I looked at. 0:09:46

BY MS. CLAY:

Q. Okay. Do you remember whose resumes you reviewed?

A. Yes.

Q. Can you name them, please? 0:09:54

A. Matthew. Matthew Stewart. Zac Mangrum and Erik --

THE WITNESS: Erik's last name I'm forgetting -- 0:10:10

Page 13

MR. FARLEY: Anderberg.

THE WITNESS: Anderberg. Erik Anderberg.

MS. CLAY: I'm just going to ask Peter not to help his client -- 0:10:17

MR. FARLEY: Yeah, I'm sorry.

MS. CLAY: -- answer questions, please.

MR. FARLEY: I -- it -- it was a slip-up. Apologies. 0:10:20

MS. CLAY: It's okay.

MR. FARLEY: She'll ask --

MS. CLAY: It's okay.

MR. FARLEY: -- she'll ask you to clarify or give you a prompt if you can't remember. Sorry. 0:10:25

BY MS. CLAY:

:50

4 (Pages 10 to 13)

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com (773) 239-6008

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 14



Page 16

Q.  Okay.  Let's talk for a second about you. Can you tell me about your highest level of education, please?                    0:13:00

A.  I have a bachelor's degree from Mankato State University.

Q.  What is your area of study?

A.  It was marketing.                    0:13:11

Q.  Okay.  Any other degrees or certifications?

A.  No.

Q.  Two questions relating to location.  First one.  Where do you currently reside?                    0:13:25

A.  ▬▬▬▬▬▬.

Q.  And what is your address there?

A.  ▬▬▬▬▬▬▬▬▬▬▬▬▬                    0:13:43

Q.  Okay.  Were you residing in Roswell, Georgia when you worked for Nissan?

A.  No.

Q.  Okay.  Where did you reside when you worked for Nissan?                    0:13:55

A.  I first resided in Dallas, Texas.  And then relocated to St. Paul, Minnesota.

Q.  Okay.  Can you give me the approximate dates you lived in Dallas, please?                    0:14:14

A.  February of 2019 to June of 2020.

Q.  Okay.

Page 15

Page 17

A.  And St. Paul, Minnesota, June of 2020 to June of 2021.                    0:14:34

Q.  Okay.  With regard to your current address, any plans to relocate in the next year or so?

A.  Nope.                    0:14:46

Q.  How old were you when you started work at Nissan?

A.  Fifty-three.

Q.  Okay.  I want to talk a little bit about your couple of years as an employee of Nissan.  What led to your being hired by Nissan?                    0:15:17

Did you apply for an open position?  Was someone recruiting you?  How did that all come about?                    0:15:23

A.  I was recruited.

Q.  By whom?

A.  I believe it was a headhunter followed by some phone calls from some individuals that worked at -- at Nissan.                    0:15:37

Q.  Do you recall the names of any of those individuals?

A.  Ted Mengiste.  Billy Hayes.                    0:15:47

Q.  Okay.  Were they recruiting you in a general sense, or did they have a specific position in mind?

A.  Specific position.

Q.  And what was that position?                    0:15:59

5 (Pages 14 to 17)

00000000-0000-0000-0000-000000000000

Page 18

A. It was a -- I don't know if -- I -- I can recall the position, but it was a global position where I was supposed to run one of Nissan's sales organizations somewhere globally.     0:16:19

Q. Does the term "general manager of field strategy" encompass that?

A. Yes.

Q. Okay.

A. That was the title --     0:16:30

Q. And --

A. -- that -- that they gave me. Yes.

Q. Perfect. And that was out of Dallas.     0:16:34

A. Correct.

Q. What were your primary responsibilities in that role?

A. To assist the South Central Region in achieving all of their sales, customer experience, aftersales targets.     0:16:54

Q. Okay. Who did you report to?

A. Bart Buttles.     0:17:01

Q. Was Bart also in Dallas?

A. Yes.

Q. And how do you spell Bart's last name, please?     0:17:08

A. B-U-T-T-L-E-S.

Page 19

Q. Okay. And approximately how many employees did you supervise in that role?     0:17:18

A. Zero.

Q. Okay. And then at some point, you transitioned roles. What -- what happened to give rise to that change?     0:17:27

A. I was -- my position was eliminated, and I was put on a displaced list and interviewed for and accepted the position of area general manager within the Central Region, which required me to relocate to the Minneapolis-St. Paul area.     0:17:52

Q. Okay. So let's talk a little bit about the position elimination. Your general manager of field strategy position was eliminated?     0:18:04

A. Correct.

Q. When?

A. I think I was informed about it in January of 2020. And I was told I needed to find a new role I think by the end of June 2020.     0:18:26

Q. Okay. And the position, the area general manager position, how did you locate that role?

A. I believe an individual from the Central Region reached out to me and communicated that this was an opportunity that I should apply for.     0:18:53

Q. Was that a role that you were offered before

Page 20

you even applied?

A. No.

Q. Okay. So tell me about the recruiting and hiring process for the area general manager role.     0:19:15

A. I believe I had interviews with a few individuals from the Central Region. Mike Nevers, Craig Keeys, Greg Ebbs.     0:19:34

Q. How many interviews?

A. One apiece.

Q. With each of them individually?     0:19:46

A. Correct.

Q. Okay. When were you advised that you had -- that you were being offered the area general manager role?     0:19:58

A. I -- I want to say May of 2020.

Q. Okay. In the area general manager role, where were you required to live?     0:20:17

A. It was requested that I relocate to the -- you know, Minneapolis-St. Paul.

Q. Okay. What did you consider your primary responsibilities in the area general manager role?     0:20:32

A. Primary responsibility was to drive the performance of the Nissan dealers in the territory that I had, which was basically the Upper Midwest for, you know, both sales and aftersales and customer

Page 21

experience.     0:20:53

Q. And was the area general manager role implicated at all by the 2020 reorganization?

MR. FARLEY: Objection to form.     0:21:03

You can answer.

THE WITNESS: I don't believe so.

BY MS. CLAY:

Q. Okay. Who did you report to?     0:21:08

A. I reported directly to Mike Nevers.

Q. And what was Mike Nevers' role?     0:21:21

A. I believe he was the regional general sales manager.

Q. Was your transition from area general manager a demotion or a promotion from general manager?     0:21:44

A. A lateral.

Q. Were you redlined?

MR. FARLEY: Objection to form.     0:21:53

THE WITNESS: Can you clarify that question, please?

BY MS. CLAY:

Q. Do you understand the term "redline"?     0:21:58

A. I -- I'm looking for how Nissan would define "redline." I don't -- I don't know if I understand that.     0:22:08

Q. Okay. When you took the area general manager

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 22

role, as compared to the salary range for general manager of field strategy, redline in -- as I understand it in Nissan terminology would be that you would get to maintain the higher of the salary ranges even though you were going to a position with a lower salary range. So what I --                0:22:34

A. No, I was not --

Q. -- asked you --

A. -- I was not redlined.

Q. Let me finish, please. When I ask you the question were you redlined, I'm asking whether your salary remained the same or -- or was higher in the area general manager role despite the fact that the salary band for that position was lower.          0:22:51

A. No, I was not redlined.

Q. Okay. So what was your salary -- your last salary as general manager of field strategy?          0:23:01

A. I believe it was ███████.

Q. Okay.

A. Annually.

Q. And what was your --                0:23:11

A. With -- with bonus opportunity.

Q. Okay. Just salary, please.

A. Yeah.

Q. What was your salary as area general manager?    0:23:21

Page 23

A. It was the same.

Q. Okay. Okay. You've mentioned a few names and I have a few names I want to get some information about.                0:23:36

In the position -- the area general manager position, did you have any interaction with Craig Keeys?

A. Yes.

Q. What was his role in relation to yours?        0:23:53

A. He was the region vice president.

Q. Okay. Was he part of your reporting hierarchy?                0:24:00

A. Yes. I reported to Mike Nevers. Mike Nevers reported to Craig Keeys.                0:24:08

Q. Okay. Did you have any interactions in your role as area general manager with Greg Ebbs?

A. Yes.                0:24:18

Q. And what were those interactions?

A. Greg was the head of aftersales for the Central Region. So any programs, activities related to aftersales, I would consult and -- and have conversations with Greg.                0:24:37

Q. Was he in a supervisory role over you or some other relationship?

A. I guess Greg was part of the leadership team

Page 24

for the Central Region, but I did not report directly to Greg.                0:24:55

Q. Okay. What about Todd Zannacker? Any interactions with him?

A. Limited interactions. I'm -- I think Todd worked directly for Greg. So maybe some conference calls related to specific aftersales activities.          0:25:18

Q. You testified a moment ago that Mike Nevers was your direct supervisor?

A. Yes.

Q. Okay. Who is Anthony -- I'm going to say this wrong -- LaMantia?                0:25:31

A. LaMantia.

Q. LaMantia. Thank you.

A. Anthony was the regional marketing manager for the Central Region.                0:25:44

Q. Was he part of your reporting hierarchy?

A. No. He reported directly to Craig Keeys and, like Greg, was a part of the leadership team at the Central Region.                0:25:58

Q. Okay. So your total employment time with Nissan was approximately two years?

A. Yes.                0:26:13

Q. During that two years, did you have any role in the calibration process?

Page 25

A. Yes.

Q. What was that role?                0:26:21

A. I participated in the -- actually, I participated in the South Central Region's calibration process in early 2020.

Q. Okay. Let's be specific about first clarifying you had no role in the -- in the calibration process as area general manager?          0:26:48

A. Correct.

Q. Okay. And why would you have a calibration role as general manager and not area manager?          0:26:59

A. It was a -- just a timing situation. I was a part of the South Central Region until May of 2020. And it was an annual process, so it happened, I believe, in the first quarter of 2020.                0:27:13

Q. I'm not sure I'm following. So your -- your time in the general manager position was February of 2019 until approximately June of 2020?          0:27:33

A. May of 2020. Yeah.

Q. Okay.

A. Correct.

Q. And -- so why wouldn't you have been a part of the calibration process for the 2021 calendar year?    0:27:44

A. I -- because I resigned in June of 2021.

Q. When does the --

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                                    (773) 239-6008

Page 26

A.  I don't --

Q.  -- calibration --                          0:27:53

A.  -- I don't --

Q.  -- take place --

A.  -- recall -- I -- I don't recall being involved in a calibration discussion for the Central Region.                          0:27:59

Q.  Okay.  When did the calibration meetings for the South Central Region occur?

A.  First quarter of 2020.                     0:28:09

Q.  Right.  Okay.  And is it your understanding that calibration is generally done in the first quarter of each calendar year?                          0:28:16

A.  During my short time at Nissan, that's when it -- that's when it happened.  I -- I don't -- I don't know exactly if that's the standard cadence.  0:28:27

But it did happen in the first quarter of 2020 for the South Central Region.

Q.  Okay.  And you were not involved in calibration in 2021.                          0:28:35

A.  Correct.

Q.  Okay.  So let's focus on the 2020 calibration process.  Tell me what was required of you in that process as far as reviews, as far as information that you were asked to contribute.            0:28:49

Page 27

A.  I would've been asked for input into the performance and potential of South Central Region employees.

Q.  What would that look like?  Were you providing a ranking?  Were you giving each one of them some sort of numerical score?            0:29:11

Can you give me some specifics about that?

A.  Just feedback on leadership skills, performance, interactions.  No mathematical or numerical scores.                          0:29:26

Q.  And how was that information requested?  Let me -- let me ask a different question.  I -- I think it'll be easier.                          0:29:41

Was this an -- a -- in a meeting form, where you were just talking, or were you provided some sort of written documentation to complete?

A.  This was a meeting hosted by human resources.  And we would go employee by employee and discuss strengths, you know, weaknesses, opportunities for development, future potential.            0:30:08

Q.  Okay.  So let me make sure I'm understanding.  In the calendar -- was it one meeting?  0:30:17

A.  Yes.

Q.  Okay.  So in this single meeting -- HR is running the meeting?

Page 28

A.  Correct.                                   0:30:23

Q.  Okay.  And how is an individual employee introduced?  Are they -- is -- is there a screen and something comes up on a screen?            0:30:31

Are they just -- their name is called out?  How does that whole thing work?

A.  Name is called out.                        0:30:36

Q.  Okay.  Is there a screen related to that name?

A.  No.

Q.  Okay.  So no information provided in any form of visual.                                     0:30:49

A.  I think the only visual was a -- a nine-box sort of rendering of, you know, potential for each employee and where we would place each employee.  0:31:03

Q.  Okay.  And I thought you testified earlier that you did not -- oh, sorry.  You know what?  Strike that.                                        0:31:13

You said you did not supervise employees in the general field strategy position.  Right?

A.  Correct.                                   0:31:20

Q.  Okay.  So you're being asked for information about folks that you don't directly supervise.

A.  Correct.                                   0:31:26

Q.  Okay.  And what information were you being

Page 29

asked?  When you say nine-box rendering, what do you recall about the nine-box?            0:31:34

A.  I would tell you that my contributions at that meeting were limited.  You know, I had not been there very long.  And I, to your point, did not directly supervise.                          0:31:49

So my contributions were primarily interactions with the individuals from the South Central Region.

Q.  Okay.  My question was different.  Thank you for that.  But I'm asking what you recall about the nine-box rendering in terms of what information was being asked about.                          0:32:06

A.  I believe the -- I don't -- I don't remember what the actual boxes represented, but there was a scale of, you know, promotability, immediate promotability or, you know, ability of that individual to ascend to the next level.            0:32:26

Q.  Okay.  Anything else?

A.  Nope.

Q.  Do you recall there being any form of ranking discussed?                                   0:32:40

A.  Not at that meeting.

Q.  Okay.  Do you recall being shown pictures of the employees as they were being talked about?  0:32:52

00000000-0000-0000-0000-000000000000

Page 30

A. No.

Q. Did these discussions address length of service?

A. No.

Q. Did they discuss pay rates?          **0:33:11**

A. No.

Q. Anything else you recall about the metrics discussed during calibration?

A. No.          0:33:22



Q. How many discrimination investigations were you part of during your employment with Nissan?

A. None.          0:34:05

Q. Did you have any role in trainings for discrimination at Nissan?

Page 31

A. No.

Q. Do you have any knowledge of anyone who made complaints of age discrimination during the time that you were employed at Nissan?          0:34:23

A. No.

Q. Are you aware of anyone who made complaints outside the time that you were an employee of Nissan regarding age discrimination?          0:34:33

A. Not until I was contacted by Melissa.

MR. FARLEY: And again, you shouldn't discuss anything that was communicated by counsel for Nissan.          0:34:45

BY MS. CLAY:

Page 32

Page 33

Q. Okay. All right. We're going to talk a little bit about the hiring process generally. And your role in that hiring process. Okay?          0:37:53

So I'm not focused on any particular position. We'll get more specific later on. Okay? I'm asking for your general understanding of the requisition posting and recruitment process within Nissan. Okay?          0:38:06

A. Okay.

9 (Pages 30 to 33)

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 34

Q.  All right.  When you had a role that you wanted to fill, "you" meaning anyone, okay, who starts that process?                          0:38:21

A.  I would -- I would believe that that would be started by the region if there was a opening for any reason with a phone call, meeting, email with HR to discuss what that process looked like.        0:38:42

Q.  Okay.  And is that a process that you ever undertook yourself in either of your roles at Nissan?

A.  Just as the area general manager.  In the --     0:38:54

Q.  Okay.

A.  -- Central Region.

Q.  And as the area general manager, how many times did you have openings that you wished to fill?     0:39:02

A.  One time.

Q.  Was it only the fixed operations manager position?

A.  Correct.                                 0:39:10

Q.  Okay.  So let's -- knowing that there's only that one example, we can short-circuit all of this and go just to that experience.  Okay?        0:39:23

What gave rise to the opening for the senior fixed operations manager role?

A.  I believe the individual that was in that role transferred to a sales position somewhere else

Page 35

within the Central Region.                   0:39:43

Q.  Who was that person?

A.  I don't recall his name.

Q.  Okay.  Do you recall where he went, what -- what role he took?                        0:39:55

A.  I believe he took the -- I think Nissan called it the SOM, sales operations manager, role in --

Q.  Okay.

A.  -- somewhere in Wisconsin.            0:40:05

Q.  Okay.  Was that position something that he was asked to take by members of Nissan management?

A.  No.  I believe he felt it was a -- a developmental opportunity for him.        0:40:25

Q.  Okay.  Your understanding is that he sought out a particular opportunity and applied for it?

A.  Correct.                              0:40:33

Q.  Okay.  And he did that internally?

A.  Correct.

Q.  Okay.  So you -- when you realized there was going to be this opening, what was the next step in the process of getting that job filled?     0:40:46

A.  I believe I reached out to HR to start the recruiting process according to the rules of the -- of the road for HR.

Q.  Okay.  Do you remember who you reached out

Page 36

to?                                 0:41:01

A.  No.

Q.  And when you say HR, is there a specific department within HR?

A.  I think there was a recruiting team that --     0:41:14

Q.  Okay.

A.  -- that we would interact with.

Q.  Do you remember any names of people you interacted with in the recruiting team?        0:41:22

A.  I do not.

Q.  Okay.  Once you notified HR of the opening, what happened next?                      0:41:31

A.  I believe they would send a -- a job description for validation.  And -- and then I would -- probably sent them an email, stating that, yes, this is the correct location and the correct job description for the position.  And then they would post it.      0:41:56

Q.  Okay.  Did you have any role in drafting the job description, or were just reviewing what HR sent you?

A.  Just reviewing.                      0:42:08

Q.  Okay.  Do you recall whether you made any suggestions or changes to the draft that was provided to you by recruiting?

A.  I don't recall specifically, but I don't

Page 37

believe I would've made any edits.        0:42:26

Q.  Okay.  And then you said "And then the job was posted."  Do you mean posted internally, externally, both, or you don't know?        0:42:36

A.  I don't know.

Q.  Okay.  Did you have any say in where the position was posted?

A.  No.                                  0:42:48

Q.  Did you have any say in the length of time that the position was posted?

A.  No.

Q.  Do you recall approximately when you notified HR of this opening?                      0:42:59

A.  I'm sorry.  Could you repeat that?

Q.  Sure.  Do you recall approximately when you notified human resources recruiting that you had an opening you wished to be filled?        0:43:10

A.  Maybe the second quarter of 2020.  I don't recall exactly.

Q.  Okay.  Do you have any recollection of how long it was between you notifying HR that you had an opening and the job actually being posted?        0:43:33

A.  No.

Q.  Was it a week?  Was it a month?

A.  Probably within a week or two.        0:43:46

10 (Pages 34 to 37)

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                (773) 239-6008

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com (773) 239-6008

Page 38

Q. Okay. How long was the field operations manager position vacant before it was filled?

A. I don't recall precisely. I -- you know, I believe the individual that left the position still had some responsibilities for maintaining a relationship with the dealers until the position was filled. 0:44:12

Q. Okay. How long did that obligation remain?

A. Until we -- until we were able to fill the position. 0:44:28

Q. Approximately how long was that?

A. Probably a couple of months. 0:44:35

Q. Okay. Were you frustrated at all by the amount of time it took to fill the position?

A. No. 0:44:46

Q. Okay. How were you notified that a candidate had applied?

A. I don't recall precisely. I think there was a HR application or website that we were supposed to use that notified us of applicants and the interaction with the recruiter that we were interacting with. 0:45:15

Q. Were candidates able to contact you directly?

A. No.

Q. Were you able to review every candidate, or were they screened or prescreened before they were presented to you? 0:45:37

Page 39

A. I'm not sure exactly. There was probably a prescreening process.

Q. Okay. Who does the prescreening? 0:45:55

A. I would -- I'm not sure precisely, but I would assume it was the recruiter that was engaged in that particular opening.

Q. Okay. Do you recall the name of the recruiter or recruiters? 0:46:10

A. No.

Q. Okay. In your experience at Nissan, was it common for someone within Nissan to make recommendations or rankings in terms of who you should consider for a particular role? 0:46:27

A. It wasn't unusual for an individual that had experience with an individual to recommend the supervisor or the hiring manager that, you know, take a look at that particular individual. 0:46:44

Q. Okay. Did that occur with -- did -- did that occur in this circumstance?

A. I believe I was given the name of an individual as somebody that I should definitely interview as part of the process. 0:47:00

Q. Okay. And who was that person?

A. That was Erik Anderberg. 0:47:07

Q. And who gave you that name?

Page 40

A. Greg Ebbs.

Q. What did Greg Ebbs -- or why did Greg Ebbs suggest that you should interview Erik Anderberg? 0:47:20

A. I think Greg had interviewed him for another position previously and was impressed with his resume and felt that he had the right experience for an aftersales role within the Central Region. 0:47:39

Q. Okay. What specifically do you recall Greg Ebbs telling you about Mr. Anderberg?

A. Just that he had similar experience with General Motors and was willing to relocate to Iowa for the position. And again, that he should be, you know, somebody that I should talk to. 0:48:02

Q. Okay. In your experience at Nissan, was it common for employees in a particular role to be approached about changing jobs or be placed in jobs without a formal recruiting or interview process? 0:48:24

A. I think as with any organization I work for, there is a -- you know, part of the developmental process and part of the, you know, employee/supervisor relationship, that there would be discussions about future -- you know, potential, you know, planning for next roles and -- and a career path. 0:48:46

Q. I guess I'm asking a -- a different question. Do you have knowledge -- was it your experience that

Page 41

employees would be approached about roles and be given those roles or -- or moved into those roles without a formal recruiting or interview process? 0:49:09

A. No. I think the -- the Nissan policy required a formal interview and recruiting process.

Q. Okay. Are you familiar with the term "management-directed transfer"? 0:49:28

A. No.

Q. Okay. Have you ever heard the term "management-directed assignment"?

A. No. 0:49:36

Q. Okay. All right. Getting back to the, you know, sort of underlying recruitment process for the fixed operations manager role. 0:49:54

How did the recruiting folks present candidates to you?

A. I believe it was on the -- the website, the HR website or recruiting website. You know, I might've gotten an email saying, hey, you know, the following individuals have applied for your FOM position. 0:50:17

Q. Okay.

A. Or take a look at their resume.

Q. Give me just a second here. Oh. Okay. All right. I'm going to share my screen, and we'll see if you are able to -- okay. Are you able to see the

11 (Pages 38 to 41)

Page 42

document with the title of Table of Contents?   0:51:08

A. Yes.

Q. Okay. Does this refresh your recollection as to how candidates may have been presented to you by HR and recruiting?   0:51:18

A. No.

Q. Okay. Do you recognize this document?

A. No.

Q. Do you recognize the two names on this document?   0:51:28

A. Yes.

Q. Okay.

THE RECORDER: And Lisa, did you want to mark this one?   0:51:35

MS. CLAY: Yeah, let's go ahead and mark it.

THE RECORDER: Okay.

MS. CLAY: We'll call this Harrison Exhibit 1.   0:51:40

THE RECORDER: Got it.

(Exhibit No. 1 marked for identification.)

MR. FARLEY: And just for the record, Mr. Harrison, if a document is marked "Confidential," it's covered by a protective order in this case, so you should keep that information confidential in the course of this deposition and then, you know, not -- not

Page 43

discuss it or reveal it outside of it. Is that okay?   0:52:00

THE WITNESS: Understood.

BY MS. CLAY:

Q. Okay. So we can take this down. Let's just focus on these two names. Zachary Mangrum and Matthew Stewart. When you were -- or strike that.   0:52:16

How were you advised that Zachary Mangrum and Matthew Stewart had applied for the fixed operations manager role?

A. I believe through HR.   0:52:26

Q. Okay. And when you say the -- through the HR website, are you referring to Workday?

MR. FARLEY: Objection to form.   0:52:33

THE WITNESS: I -- I don't remember what it was called. But it was probably a -- a HR-generated email that said the -- the following individuals have applied for your position, go into Workday, I guess, and -- and review.   0:52:49

BY MS. CLAY:

Q. Okay. So --

A. I think that was the process.

Q. As you understand the notification process, you would be instructed by recruiting to go into the system and review materials that were -- that had been uploaded or -- or put into that system.   0:53:06

Page 44

A. Correct.

Q. Okay. And so you received an email indicating that Mr. Mangrum and Mr. Stewart had applied for this role? Yes?   0:53:16

A. I believe so.

Q. Okay. And then what did you do when you received that notification?   0:53:22

A. I would review cover letters, resumes, anything that they had included in their application, and if appropriate, I would request that the recruiter set up a interview.   0:53:38

Q. Okay. So with regard to these two individuals, do you recall what information was -- was accessible to you to review?

A. I believe each individual provided their resume.   0:53:56

Q. Okay. Let's go ahead and share again. Okay. Do you recognize this document?   0:54:13

A. Yes.

MS. CLAY: Let's go ahead and mark this as Harrison Exhibit 2, Bates labeled Nissan 2019 to 2020. Matthew, just for the record, Harrison Exhibit 1 is Bates labeled Nissan 2017. Sorry about that.   0:54:35

THE RECORDER: Got it. Thank you.

MS. CLAY: Okay.

Page 45

(Exhibit No. 2 marked for identification.)

BY MS. CLAY:

Q. Does this refresh your recollection as to the resume you reviewed for candidate Matthew Stewart?   0:54:44

A. Yes.

Q. Okay. And does this refresh your recollection as to the resume you may have reviewed for Mr. Mangrum?   0:54:59

A. Yes.

Q. Okay.

MS. CLAY: entering for the record Harrison Exhibit 3, Nissan 2018. Okay.   0:55:12

(Exhibit No. 3 marked for identification.)

BY MS. CLAY:

Q. Last document, and it's going to take me a second --

MS. CLAY: Actually, you know what? We've been at it for almost an hour, and I've got to do some -- some funky stuff to this Excel spreadsheet to make it viewable.   0:55:24

Why don't we go ahead and take a ten-minute break. Everyone can stretch their legs, get coffee, whatever. When we come back, I'll -- I'll have this Excel document made pretty.   0:55:34

MR. FARLEY: Okay. Thank you.

www.InDemandReporting.com                                    (773) 239-6008

Page 46

MS. CLAY: 11:05.

THE RECORDER: Okay. Going off the record, 10:55 a.m. 0:55:41

(Off the record.)

THE RECORDER: All right. Back on the record, 11:06 a.m.

BY MS. CLAY:

Q. Okay. Mr. Harrison, you have testified that you receive notification to review certain materials in Workday. And this is where technology gets a little tricky. 0:56:02

Obviously Nissan did not want Plaintiff's counsel routing around in their -- their computer files. So we -- we don't know exactly how the information in Workday was available or presented to you when you were actually in that system. 0:56:18

So what I have on the screen is some material that's been represented as having come from that system. I'm not asking you whether you recognize the format of this. 0:56:31

I'm going to be asking you specific things about information on the screen. Are -- are we on the same page about that? I know that's a little convoluted. 0:56:39

A. No, I understand.

Page 47

Q. Okay. So up here, this job application -- okay. And we have Mr. Mangrum. And then when I scroll down, we have -- whoops, sorry -- Mr. Stewart. 0:56:53

And just those two names. Are -- are those the two individuals that you believe formally applied for the fixed operations manager role? 0:57:01

A. In addition to Erik. Yes.

Q. Okay. But Mr. Anderberg isn't listed here. Correct? 0:57:09

A. I do not see his name. Correct.

Q. Okay. And for the -- again, back to the top. Were you aware or did you have access to information about the stage in the interview process that a candidate was in? 0:57:26

A. I don't recall that information.

Q. Okay. What about information regarding whether they were a current employee or an external employee? 0:57:37

A. Yes.

Q. Okay. So you were aware that Mr. Mangrum and -- let me go back down -- Mr. Stewart were both current employees. 0:57:47

A. Yes.

Q. Okay. What about this column, Total Score? Were you made aware of any testing or scoring? 0:57:59

Page 48

A. I don't recall a -- a total score.

Q. Okay. So the total score for Mr. Mangrum is ▮▮ and the total score for Mr. Stewart is also 300? 0:58:12

A. I -- I see the ▮▮ Yes.

Q. Okay. Do you have any -- 0:58:18

THE RECORDER: And Lisa, did you --

BY MS. CLAY:

Q. -- personal knowledge --

THE RECORDER: -- want to make this --

BY MS. CLAY:

Q. -- of what that --

MS. CLAY: Oh, I'm sorry. Go ahead. 0:58:20

THE RECORDER: Sorry. Did you want to make this one 4?

MS. CLAY: Sure. Let's go ahead and mark this as Exhibit 4. 0:58:26

THE RECORDER: Okay.

(Exhibit No. 4 marked for identification.)

BY MS. CLAY:

Q. I apologize, Mr. Harrison. What I'm -- what I'm trying to understand is, do you have any knowledge as to what that 300 would represent? 0:58:37

A. No.

Q. Okay. And again, just testing your knowledge about what information you had about each candidate. 0:58:47

Page 49

Were you aware of their total years of service as reflected -- let me get to it. I want to make sure I'm showing you the right column. 0:58:57

Years of service here. Mr. Mangrum with seven and Mr. Stewart with 19.

A. Only through reviewing their resumes would I have understood that information. 0:59:11

Q. Okay. All right. We can stop looking at that monster. Okay. Okay. Oh. Sorry. We're not quite done with that document. I apologize. 0:59:37

One more. Going back to this column here, Number of Jobs, Jobs Applied. Were you provided this information -- oops, sorry. I don't have the -- the share done yet. Apologies. Okay. 1:00:08

So Jobs Applied. Here for Mr. Mangrum, we have ▮▮ and down here for Mr. Stewart, we have ten. Was that information that was made available to you? 1:00:21

A. No.

Q. Okay. Do you have any idea what this internal policy reference is regarding Mr. Mangrum and the step or disposition? 1:00:34

A. No.

Q. Okay. Okay. So I think you answered this already. But did the Workday system that you've testified to give you access to years of service? 1:00:53

13 (Pages 46 to 49)

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                    (773) 239-6008

00000000-0000-0000-0000-000000000000

Page 50

A. I don't believe so.

Q. Okay. What about time in current position? 1:01:01

A. I don't recall that specifically in the system. Again, that would've been something I would've ascertained from their resume. 1:01:10

Q. Okay. Do you know whether Workday provided information or information was accessible to you regarding the number of positions applied for? 1:01:22

A. I don't recall -- I don't recall the system having that information.

Q. Okay. At the time you were reviewing resumes for Mr. Mangrum and Mr. Stewart, were you aware that Mr. Stewart had been identified as someone who would lose his job if he was not -- if he did not find a -- a new position within Nissan? 1:01:49

A. I believe that communicated during his interview.

Q. Okay. By Mr. Stewart. 1:01:58

A. Correct.

Q. Okay. And you said "interview." Was there one interview or more than one? 1:02:04

A. I believe it was one interview.

Q. Okay. Okay. So as between -- let -- let me ask some general questions. Based on your recollection, what was your impression of Mr. Mangrum's

Page 51

candidacy for the fixed operations role? 1:02:27

A. Very qualified. You know, ten years of, you know, experience in -- in the type of role that we were looking at. And highly motivated to move closer to where his family lived, which was in the Nashville area. 1:03:00

He was -- I believe he was in a position in the Pacific Northwest and -- but good -- good communicator with great experience in -- you know, for the type of role that I was looking for. 1:03:18

Q. Okay. Did you interview Mr. Mangrum?

A. I did.

Q. How many times? 1:03:24

A. Once.

Q. Okay. Do you know when?

A. July, August of that year maybe. 1:03:35

Q. Just a second. Was it just you, or did anyone else interview him?

A. Interviews were one-on-one. I -- I interviewed him. I would guess that he probably interviewed also with Greg Ebbs within the region. 1:04:12

Q. Okay. But the interview that you conducted with him, it was just you?

A. Correct. 1:04:22

Q. Okay. Do you have any notes or records from

Page 52

that interview?

A. I do not. 1:04:28

Q. Okay. Is it your practice to take notes during interviews?

A. Generally, no. 1:04:37

Q. Why not?

A. I -- I can retain the important information in my head. I, you know, don't need to take notes. 1:04:50

Q. Okay. Were you asked to submit any form of feedback to Workday or to recruiting regarding that interview?

A. I believe there was a feedback mechanism in the -- in the Workday system. I don't recall what it was precisely. 1:05:10

Q. Does a numeric ranking between 1 and 4 ring any bells?

A. Yeah. I think -- I think that was probably what it was. 1:05:20

Q. And do you recall --

A. I don't -- I don't recall what the -- I don't recall what a 1 or what a 4 was, though. 1:05:26

Q. Okay. Do you -- do you recall providing any form of feedback to the Workday system regarding Mr. Mangrum's interview? 1:05:33

A. I believe I did. I -- I think that was part

Page 53

of the process. Yes.

Q. Okay. Do you know -- you said you -- you thought he may have interviewed with Greg Ebbs. Do you know of anyone else he may have interviewed with? 1:05:56

A. I -- I do not.

Q. Okay. Did you discuss Mr. Mangrum or Mr. Mangrum's candidacy for the fixed operations position with Greg Ebbs? 1:06:10

A. I don't recall specifically, but I'm sure I did. That would've been a -- a part of the process. 1:06:18

Q. Okay. Did you have any discussions with Todd Zannacker about Mr. Mangrum's candidacy?

A. I don't believe so. 1:06:34

Q. Did you have any discussions with Anthony LaMantia about his candidacy?

A. I don't believe so.

Q. Okay. Going back, you know, kind of 10,000-foot view. When you reviewed Mr. Stewart's resume -- and I'm happy to put it back on the screen if you would like -- what was your assessment of his candidacy? 1:07:17

A. A -- a significant amount of experience, primarily with the credit corporation, and a small window of aftersales 20 years ago.

Q. Okay. Were you interested in pursuing a

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                                     (773) 239-6008

Page 54

candidacy -- or -- were you interested in pursuing Mr. Stewart as a candidate?                1:07:45

A. I think it was a requirement to interview internal candidates for roles. I think that was a Nissan policy.                1:07:57

Q. And when you say "a requirement," do you mean any internal candidate regardless of their qualifications?

A. I believe so.                1:08:10

Q. Okay. Would you have pursued Mr. Stewart as a candidate absent that policy requirement?

A. I think given the limited number of applicants, I would've interviewed him.                1:08:36

Q. When you say "limited number of applicants," you mean just Mr. Mangrum and Mr. Stewart.

A. And Mr. Anderberg as well.                1:08:51

Q. Okay.

A. But three applicants for a role is not a significant number of applicants. Generally speaking.                1:09:01

Q. I -- I'm a little confused about your testimony regarding Mr. Anderberg. I thought you testified earlier that Mr. Ebbs suggested that you should -- you should look at him.                1:09:11

He had not applied for the role at that time. Correct?

Page 55

A. I believe he applied at some point during the summer of 2020. He applied just like the other two individuals.                1:09:24

Q. That's your belief.

A. It's my understanding.

Q. Okay. All right. Going back to Mr. Stewart. Did you interview him?                1:09:40

A. I did.

Q. How many times?

A. One time.

Q. Just you, or were you with other people?                1:09:47

A. Just myself.

Q. Okay. You don't recall interviewing Mr. Stewart with Mr. Ebbs?                1:10:08

A. No. I believe it was just myself.

Q. Okay. You don't review -- or you don't remember interviewing Mr. Stewart with Mr. Ebbs and/or Mr. LaMantia?                1:10:20

A. No. I believe it was just myself.

Q. And you don't recall interviewing Mr. Stewart in combination with Mr. Zannacker?                1:10:31

A. No. Again, I believe it was just myself.

Q. Okay. Do you have any notes or records of the single interview you're recollecting?                1:10:43

A. No.

Page 56

Q. Were you asked to submit feedback or any sort of numeric ranking?

A. As part of the process, yes.                1:10:53

Q. Do you recall doing that for Mr. Stewart?

A. I believe so. Yes.                1:10:58

Q. And I know you testified earlier that you don't recall the -- the ranking system. Going back to Mr. Mangrum. Do you remember approximately what sort of ranking you gave Mr. Mangrum?                1:11:11

A. I don't recall.

Q. Do you recall approximately what sort of ranking you gave Mr. Stewart?

A. I don't recall.                1:11:21

Q. As between the two of them, do you recall a difference in their rankings?

A. Yes. I would've ranked Mr. Mangrum higher than Mr. Stewart.                1:11:32

Q. Okay. Why?

A. Because he, again, had ten years of aftersales field experience, whereas Mr. Stewart did not.                1:11:46

Q. Okay. We'll get to a comparison between these two candidates and Mr. Anderberg in a moment. What discussions did you have with Greg Ebbs about Mr. Stewart?                1:12:00

Page 57

A. I had a conversation with Greg as part of the process for hiring the FOM position. You know, just asking for his feedback.                1:12:14

I think -- again, I believe he had interviewed Mr. Stewart, and he provided some feedback on Mr. Stewart's significant experience in the credit world, calling on dealers, and also cited Mr. Stewart's lack of aftersales experience.                1:12:35

Q. What else do you recall Mr. Ebbs saying about Mr. Stewart?

A. I think he might've mentioned that Mr. Stewart was on a -- a displaced list. I think that's about the only other thing that I would recall. And that he lived in Wisconsin somewhere.                1:12:53

Q. Okay. Was there any additional effort being made to place Mr. Stewart because he was on a displaced list?

A. Not that I'm aware of.                1:13:05

Q. No one ever said to you that you should give his candidacy additional weight or anything of that nature because he was displaced?

A. Nope.                1:13:16

Q. Okay. Do you recall having discussions with Todd Zannacker about Mr. Stewart?

A. I don't recall.                1:13:24

15 (Pages 54 to 57)

www.InDemandReporting.com                                    (773) 239-6008

Page 58

Q. Do you recall having conversations with Anthony LaMantia about Mr. Stewart?

A. I don't recall.

Q. Do you recall notifying Mr. Stewart on a Zoom call that he would not be receiving an offer?    1:13:45

A. No.

Q. I believe you testified that you don't have any recollection of conversations with Mr. LaMantia or Mr. Zannacker about Matt Stewart.    1:14:19

A. Correct.

Q. Okay. Outside of the fixed operations manager position, do you recall ever talking with Mr. Zannacker about Matt Stewart for any other reason?    1:14:35

A. No.

Q. Okay. Same question for Mr. LaMantia. Outside of the fixed operations manager role, do you remember ever speaking with Mr. LaMantia about Matt Stewart?    1:14:48

A. No.

Q. Okay. And then with regard to Mr. Ebbs, I'm just trying to get a sense of the number of conversations you had regarding Matt Stewart. Let's -- let's try to break it down.    1:15:02

When approximately do you believe the first conversation you had with Mr. Ebbs about Matt Stewart

Page 59

took place?

A. I can't recall a specific date, but it would've been prior to my interview with him. With Mr. Stewart.    1:15:24

Q. Okay. And what was the purpose of the call prior to the interview?

A. I believe Greg had more interactions, experience with Mr. Stewart and was giving me some feedback on his background.    1:15:43

Q. When you say giving you some feedback, can you be more specific?

A. Matt Stewart was on a displaced list. He was an -- an employee with NMAC, the credit company, and had been working as a -- in -- in a credit role with NMAC for the last 20-something years.    1:16:10

Q. Did Mr. Ebbs refer to Mr. Stewart as hard to place?

A. No.

Q. Did he reference Matt Stewart as being the bottom 10 percent of FSMs?    1:16:25

A. No.

Q. Did Mr. Ebbs say anything negative about Mr. Stewart's performance?

A. No.    1:16:33

Q. Did Mr. Ebbs say anything negative about Mr.

Page 60

Stewart's candidacy for the fixed operations manager role?

A. A -- just a lack of aftersales experience was the -- the only feedback that he provided. Which was evident on his resume.    1:16:54

Q. Okay. When was the next call you had with Mr. Ebbs regarding Matt Stewart?

A. I don't recall there being a -- another one.    1:17:08

Q. Okay. So you believe you only had the one conversation prior to Mr. Stewart's interview with Mr. Ebbs about Matt Stewart.    1:17:21

A. That's all I recall. Yes.

Q. Okay. And when was that call in relation to the call where Mr. Ebbs suggested that you interview Mr. Anderberg?    1:17:30

A. I don't recall specifically, but it probably would've been around the same time. As I was going through the recruiter progress for the FOM position.    1:17:44

Q. Okay. All right. I'm going to share my screen again. Okay. Do you recognize that mug, Mr. Harrison?    1:18:18

A. I don't recall seeing that document before. No.

Q. No, I'm asking about the photo. Is this you?    1:18:26

A. Oh, that's me. Yes.

Page 61

MR. FARLEY: I think she --

BY MS. CLAY:

Q. Okay.

MR. FARLEY: -- said "mug".    1:18:30

THE WITNESS: Yeah. That's my -- yes, that's my beauty shot. Yes.

BY MS. CLAY:

Q. Yes. Okay. So again, making sure we're clear. I'm going to -- I'm going to be toggling back and forth between this document, which --    1:18:42

MS. CLAY: Let's go ahead and mark this as Harrison Exhibit 5. This is Bates labels Nissan 000659 through 665. Did I just say 5? I think I said 5.    1:18:58

THE RECORDER: Yes.

MS. CLAY: Yeah. We're good.

(Exhibit No. 5 marked for identification.)

BY MS. CLAY:

Q. And then this beauty here, okay, with a different picture -- and I know this is tiny. Let me see if I can get this blown up a little bit. Okay.    1:19:15

MS. CLAY: We'll mark this as Harrison Exhibit 6. This is Nissan 001023 through 27.

(Exhibit No. 6 marked for identification.)

BY MS. CLAY:

Q. So again, you've testified that you had

16 (Pages 58 to 61)

00000000-0000-0000-0000-000000000000

Page 62

access to a Workday system. These are -- are documents that Nissan has produced to us, presumably from that system.                    1:19:36

They're not going to present to us the way you would have been able to view them. I'm going to be asking you questions about the information in these documents, not necessarily what they look like. Okay?    1:19:48

So I'm going to go back to this first one. Is this -- is the information here about the candidates -- did you have access to this sort of data in Workday for the fixed operations manager role?                1:20:04

A. I don't recall specifically. I know there were three candidates in total.

Q. So this says Internal 2, Inactive 2, Active Candidates 1. Do you have any idea what those numbers reflect?                1:20:26

A. I believe that would have reflected post-interview and the decision on whether to proceed with the candidacy or not.

Q. Okay. So --                1:20:45

MR. FARLEY: Lisa, can you blow it up just a bit? I'm trying to see the date in the upper right-hand corner of --                1:20:49

MS. CLAY: Yeah --

MR. FARLEY: -- this document.

Page 63

MS. CLAY: -- I'm blowing it up now.

MR. FARLEY: Okay. There you go. Thank you.    1:20:53

MS. CLAY: Okay?

BY MS. CLAY:

Q. All right. So in the left-hand corner of both of these documents, we have a recruiting start date of 7/15 and a target hire date. Do you see that?    1:21:04

A. Yes.

Q. Okay. Same thing here. I'm going to blow this up a little more. 7/15 and 8/31. Correct?    1:21:15

A. Correct.

Q. Okay. And then let's see if we can find -- over here, Monica Carman. I'm going to -- and I'm going to be toggling here, so we're staying on the same page.                1:21:30

Monica Carman. Does that name ring any bells?

A. It does not.                1:21:38

Q. Okay. What about -- where'd she go -- requester, Christina Mayfield. Does that name ring any bells?                1:21:50

A. Yeah, I remember that name from -- she was part of the HR team.

Q. Okay. Do you know what her role in that team was?                1:22:01

Page 64

A. I think she might've been a -- I think Nissan used the term "business partner."

Q. Okay.

A. She would've interacted with our region and other regions.                1:22:13

Q. Okay. What role specifically do you believe she had in the fixed operations manager requisition?

A. I believe she just -- just would've processed the requisition and, you know, started the process.    1:22:32

Q. Okay. Earlier you testified to being provided a job description. I'm just going to ask you to confirm, and I'll -- I'll leave it on the screen to the best I can.                1:22:44

I'm going to make this a little smaller. Okay. So the job description that appears on the -- this -- I'm circling what we call the Bates number.    1:22:53

So this is page 661 down through 662, 663. I'm going to -- I'm going to scroll through this slowly, and then I'm just going to make sure that this is the job description you recall blessing for the fixed operations manager role.                1:23:10

MR. FARLEY: Objection to form.

BY MS. CLAY:

Q. Okay. So take a moment to look at the job functions, starting up here, all the way down to the

Page 65

bottom of 662. Let me know when you're ready for the scroll to the next page.                1:23:28

A. Okay.

Q. All right. And then finally, coming down, minimum qualifications.

A. Got it.                1:24:03

Q. Okay. Does that refresh your recollection as to the job description that you blessed for the fixed operations manager role?                1:24:11

A. Yes.

Q. Okay. All right. And then scrolling down. Okay. Do you see at the bottom here, internal posting start date 7/15, posting end date.                1:24:36

Did you have any role in determining this time period?

A. No.

Q. Okay. And then it looks like it was posted externally on 8/11 for three days. Did you have any role in determining that time period?                1:24:51

A. No.

Q. Okay. And do you know whether Mr. Stewart and Mr. Mangrum applied internally or externally?    1:25:02

A. I assume they applied internally, as they were employees of Nissan.

Q. Okay. And do you know whether Mr. Anderberg

00000000-0000-0000-0000-000000000000

Page 66

applied internally or externally?                1:25:13
    A.  I would assume he applied externally, as he --
    Q.  Okay.
    A.  -- was an external candidate.  Yep.        1:25:19
    Q.  Okay.  And are we comfortable suggesting that Mr. Stewart and Mr. Mangrum would've applied during the time period 7/15 to 7/30?                1:25:28
    A.  That seems -- seems logical.
    Q.  Okay.  And that Mr. Anderberg would've applied between August 11 and August 14th ?        1:25:38
    A.  That also seems logical.
    Q.  Okay.  And I -- I think I asked you this already.  But you had no role in determining whether these were internal, external, and when the postings were done.                        1:25:53
    A.  Correct.
    Q.  Okay.  And you had no role in the gap between 7/30 and 8/11 between internal and external posting.    1:26:05
    A.  Correct.
    Q.  Okay.  And then up here on page 664 -- again, I only want you testifying to what you have knowledge of -- there are a number of requisition changes.        1:26:24
        Looks as though they were initiated on July 15th, July 21st, August 13, and August 24th.  Do you

Page 67

have any personal knowledge as to any changes that were made to this requisition?                1:26:36
    A.  None.
    Q.  Okay.  And you weren't advised or asked about any changes to the requisition?
    A.  No, I was not.                        1:26:49
    Q.  Okay.  Let's go ahead and stop that.  Okay.  So based on the timing that we've identified from the posting material, does that help refresh your recollection as to when you might have interviewed Mr. Stewart and Mr. Mangrum?                1:27:20
    A.  Don't know the specific timing, but it probably would've been in late July or early August.
    Q.  Okay.  And does that posting help you recollect when you might have interviewed Mr. Anderberg?                        1:27:39
    A.  Would've likely been in August.
    Q.  Okay.  Sharing the screen again.  Okay.  Showing you what's been marked previously as Anderberg Exhibit 9.  Do you recognize this?            1:28:11
    A.  I do.
    (Exhibit No. 9 previously marked for identification.)
BY MS. CLAY:
    Q.  Okay.  In the conversation that you had with Greg Ebbs -- well, the -- the -- strike that.        1:28:23

Page 68

    Based on the timeline we've identified from the postings, does that help refresh your recollection as to when you may have talked with Mr. Ebbs about Mr. Anderberg?                        1:28:38
    A.  I don't recall specifically the date that I had a conversation with Greg about Erik.  But I do recall that Erik had applied for a different role within the Central Region and that Greg was impressed by his qualifications.                1:28:59
    Q.  Okay.  And what about Mr. Anderberg's qualifications impressed Mr. Ebbs?
    A.  I believe Greg mentioned that he was well-spoken and primarily was impressed with the -- you know, while limited to, you know, six to eight years, it was primarily in the aftersales world and working for another OEM, doing a similar role as the FOM role.    1:29:41
    Q.  Does reviewing Mr. Anderberg's resume refresh your recollection as to how many years of experience he had?
    A.  If you scroll down to page 2, I think -- yeah, I think -- in total, I think that's six years of experience.                        1:30:08
    Q.  What are you calculating as his -- or his -- what -- what are you using to calculate his experience?
    A.  June -- I -- I don't know if there's --

Page 69

Cognizant -- I can't see the Cognizant Technology Solutions.                        1:30:25
        Oh.  There you go.  So yeah.  Actually, closer to ten years.
    Q.  And this is ten years of experience doing anything or ten years of experience that is relevant to the field [sic] operations manager position?        1:30:39
    A.  Ten years of experience working with dealers, contacting dealers with an emphasis on that district manager of aftersales role from 2016 to 2018.        1:30:54
    Q.  How much of the experience listed on Mr. Anderberg's resume do you believe directly relates to the field [sic] operations manager role to which you claim he was applying?                1:31:09
    A.  I would put emphasis on the district manager of aftersales, also the market fleet coordinator, and the connected customer specialist roles, because they were all interacting directly with dealership personnel.                        1:31:32
    Q.  Okay.  And what about Maven Market fleet coordinator position do you believe has relevance to the field [sic] operations manager position?        1:31:43
    A.  Primarily just the interaction with the dealer personnel.
    Q.  And what -- oh, sorry.  I went the wrong way.

18 (Pages 66 to 69)

00000000-0000-0000-0000-000000000000

Page 70

My fault. Okay. Going back to Mr. Mangrum. Does Mr. Mangrum have more direct application experience or less?                                    1:32:09

A. My assessment is he would have more.

Q. Okay. And so why was Mr. Mangrum not your top candidate for this position?                1:32:19

A. I believe, ultimately, internally, in discussions with Greg Ebbs, that we felt that Zac was perhaps overqualified for this starter zone and that he would be a better candidate for a future opening within the Central Region.                                1:32:43

Q. Why was Mr. Mangrum overqualified if the job description -- or if the posting required a minimum of six years' experience?

A. The FOM position in Iowa was considered to be a starter district. And we felt that Zac would be better qualified for a metro market opportunity that was going to be opened up.                        1:33:17

I think there was an individual retiring in -- in the Minneapolis-St. Paul market. And we felt that he would be a better candidate for that role.    1:33:26

Q. So tell me how that went down. Did -- did Mr. Mangrum eventually get transferred to the role you just discussed?

A. Eventually. Yes.                                1:33:39

Page 71

Q. Okay. And what happened to Mr. Anderberg?

A. Mr. Anderberg -- we elected to go forward with Mr. Anderberg for this role in Iowa.        1:33:55

Q. Who do you believe was the ultimate decision-maker regarding who to offer that position to?

A. That would be myself.                        1:34:04

Q. Tell me --

A. In consult --

Q. -- all the reason --

A. In consult with Greg Ebbs certainly. But I -- I -- I was the hiring manager.                1:34:14

Q. Okay. Tell me every reason why you chose Mr. Ebbs [sic] over the other two candidates.

MR. FARLEY: Objection to form.

THE WITNESS: Yeah. Could you clarify that question, please?                                1:34:26

BY MS. CLAY:

Q. Sure. When you elected to move forward with Mr. Anderberg for this position, I'd like to know every reason for that decision.                    1:34:37

A. Well, he had recent aftersales experience with General Motors, doing the exact role that we were hiring for. He was a -- a -- indicated a willingness to move to Iowa.                                1:34:57

And had other experience in his resume and --

Page 72

and communicated as such, working directly, whether it be in a training role or a consulting role, but was -- you know, had experience working with dealers.    1:35:14

But primarily, it was his aftersales experience with General Motors.

Q. Did you believe that Mr. Anderberg had done aftersales work in the relevant district?        1:35:34

A. I'm sorry. Could you ask that question again?

Q. What is your understanding of Mr. Anderberg's aftersales work in the Nissan district for which he was being considered prior to his working for Nissan?    1:35:52

A. I'm sorry. I -- that -- I'm confused by that question.

Q. Sure. Do you recall what Mr. Anderberg told you about the General Motors district -- let me pull his resume up. Maybe that'll help us both.    1:36:18

Okay. In his position as district manner -- manager of aftersales, where was Mr. Anderberg working?

A. In North Dakota.                            1:36:34

Q. Okay. And where would his aftersales work for Nissan be?

A. In southern Minnesota and the state of Iowa.    1:36:45

Q. Okay. Was there any overlap at all between the prior position, the GM position, and the Nissan

Page 73

position for which he was being considered?    1:36:57

A. Not from a geography standpoint but from a -- a responsibility standpoint. Absolutely.

Q. I'm -- I'm asking about the geography.    1:37:05

A. Yeah. No overlap in geography as I'm aware.

Q. Okay. Okay. And -- and you suggested earlier that you did interview Mr. Anderberg. Do you recall when that interview took place?        1:37:23

A. Not specifically.

Q. Do you recall whether you offered him the job at the end of that interview?                1:37:31

A. I did not.

Q. You did not, or you don't recall?

A. I did not offer him the job --

Q. Okay.

A. -- during the interview.                    1:37:40

Q. When did you offer him the job?

A. I did not offer him the job. The HR team -- that -- that -- the process at -- at Nissan, if I remember correctly, was to provide the feedback on the candidate.                                    1:37:59

And if -- for -- in the case of Mr. Anderberg, it was, you know, we would like to pursue him, his candidacy, and give him a job offer. Then it went through HR and compensation and an offer letter

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                        (773) 239-6008

Page 74

was generated and was provided to Mr. Anderberg by HR.    1:38:19

Q. Okay. Give me just a second. So would you have any reason to dispute Nissan records that suggested Mr. Anderberg was interviewed on August 11th and received an offer on August 14th ?    1:38:50

A. That timing seems reasonable.

Q. Okay. Do you believe anyone else was involved in the consideration as to who should be hired for the fixed operations manager role other than you and Mr. Ebbs?    1:39:17

A. There was feedback -- I would assume there was feedback from the other two individuals that interviewed Erik. And I -- I would assume that that was positive. But it was primarily Mr. Ebbs and myself.    1:39:37

Q. And by the time you were interviewing Mr. Anderberg, Matt Stewart had already been terminated. Correct?

A. I don't know that.    1:39:49

Q. You don't know whether Matt Stewart was still an employee of Nissan when you made the determination to move forward with Mr. Anderberg's --

A. Correct.    1:40:02

Q. -- candidacy?

A. Correct.

Page 75

Q. Okay. All right. A couple more things here. Okay. Directing your attention to -- can you see -- still see the screen, Mr. Harrison?    1:40:36

A. Yes.

Q. Okay. Nissan 1026. Do you see this total score, 100?

A. Yes.    1:40:47

Q. I believe you testified earlier that you're not aware of what that score reflects?

A. Correct.

Q. Okay. But the other two candidates we looked at had scores of 300?    1:40:59

A. Correct. But I'm not -- I -- that says "Total Score Primary Questionnaire." I don't know if that other scoring was the same. I don't understand the context of that score. So.    1:41:17

Q. Sure. Hold on just a second. Total Score Primary Questionnaire, 300. You see that?    1:41:31

A. Yep.

Q. So are we comparing apples and apples?

A. Looks like it.    1:41:35

Q. All right. Regarding Mr. Anderberg, how was an offer salary determined and by whom?

A. That's part of the HR process. Involves the compensation department.    1:41:52

Page 76

Q. Did you have any role in that process at all?

A. None.

Q. Okay. Do you know even what Mr. Anderberg was offered?    1:42:02

A. I don't recall today what he was offered.

Q. Were you consulted about that number?

A. No.    1:42:13

Q. Okay. Did you see the offer letter before it was sent?

A. I don't recall, but I don't believe so.    1:42:22

Q. Okay. Did you have any discussions with anyone about potential compensation for Mr. Mangrum or Mr. Stewart?

A. No.    1:42:36

Q. Okay. I'm going to read a few statements to you and ask if you agree with them as between Mr. Stewart and Mr. Anderberg. Okay?    1:42:49

Nissan hired Mr. Anderberg rather -- rather than Mr. Stewart because Mr. Stewart's role in sales was for a relatively short period and in the distant past. True or false?    1:43:02

A. I'm going to say "false", based on the fact that it's says "sales."

Q. Okay. True or false? Mr. Anderberg had more experience and more recent experience in aftersales.    1:43:20

Page 77

A. True.

Q. Mr. Anderberg had worked aftersales for General Motors in the same region as the role for which he was hired.    1:43:31

A. True.

Q. I thought you just testified that North Dakota is not the same region as the region he would be working in.

MR. FARLEY: Objection --

THE WITNESS: Not the same --    1:43:42

MR. FARLEY: -- to form.

Oh. Sorry. Go ahead.

THE WITNESS: Not the same district but the same region.    1:43:47

BY MS. CLAY:

Q. Okay. How are you defining "region"?

A. So I was the area general manager and I was responsible for I think four or five districts, which included North Dakota, South Dakota, Nebraska, Iowa, Wisconsin, and Minnesota.    1:44:04

Q. Okay. Let me make sure I got that. North -- North Dakota, South Dakota, Iowa, Minnesota, Wisconsin?

A. Nebraska.    1:44:14

Q. Nebraska. Okay. So region is the larger, the one -- the six states that you just defined.

20 (Pages 74 to 77)

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 78

A. Let -- let me -- I'll correct you. Then again, different OEMs do it differently. But for Nissan, I was the area general manager for that area. 1:44:32
And there were other areas that would roll up into the Central Region.

Q. Okay. But you are defining the Central Region as the six states that you listed. 1:44:46

A. I'm defining the -- I think it was the Minneapolis-St. Paul area as those states.

Q. Okay. So how would you define "region"? 1:45:03

A. Region was the Central Region, which included the states that I just named along with Illinois, Indiana, Ohio, Pennsylvania, and the -- probably others. But a -- a larger, much larger geographic area. 1:45:24

Q. Okay. I think I got it now. Thank you for that. During your time at Nissan, did anyone ever suggest that Nissan factored age into hiring or promoting decisions? 1:45:49

A. No.

Q. Do you personally feel that you were a target of age bias?

A. No. 1:45:57

Q. Did anyone ever suggest to you that Nissan reorganizations were done to shed older workers?

Page 79

A. No.

Q. Did anyone ever suggest to you that Nissan had an up-and-out culture? 1:46:09

A. No.

Q. Did anyone ever suggest to you that you should look for work elsewhere if you hadn't reached a certain level of management by a certain age? 1:46:22

A. No.

Q. I want to go back to your departure from Nissan. You suggested that you were recruited by Hyundai? Yes? 1:46:33

A. Correct.

Q. And you suggested that at the time you were recruited, you were making approximately ▮▮▮▮▮▮

A. Correct. 1:46:45

Q. What role did you take at Hyundai and what is your salary -- or what was your salary when you took the role?

A. I was recruited as the senior group manager for market representation. And I believe my starting salary was ▮▮▮▮▮▮ 1:47:06

Q. Okay. So you took a -- a reduction in pay to leave Nissan. Yes?

A. A slight reduction. Correct. 1:47:15

Q. Why?

Page 80

A. I was excited about the opportunity and the direction and the growth of the Hyundai Motor Company and the prospects that it was going to provide to me in the future. 1:47:34

Q. Were you concerned at all that you had not reached a high enough level of management to be protected from future reorganizations within Nissan? 1:47:48

MR. FARLEY: Objection to form.

THE WITNESS: No.

BY MS. CLAY:

Q. In the two years that you were at Nissan, you yourself were the subject of a -- a job elimination. Correct? 1:48:07

A. Correct.

Q. And that job elimination resulted in a lateral move. Correct?

A. Correct. 1:48:16

Q. Okay. And you're over 40 at the time all of this is happening.

A. Correct. 1:48:21

Q. When did you become aware that Matt Stewart believed he had been targeted for reorganization because of his age?

MR. FARLEY: Objection to form.
And to the extent you know that independent

Page 81

of an attorney, you -- you can -- that he's alleged that, you can testify. But if you don't know apart from an attorney, you should not reveal what's been told to you by an attorney. 1:48:43

THE WITNESS: I'm -- I'm not aware of when -- any specific date.

BY MS. CLAY:

Q. What I'm asking is: When did you become aware of that information? Not -- and -- and taking into account your counsel's admonition regarding the substance of the conversation. 1:49:03
If you learned that information from a lawyer, I'm asking to know when you learned it, not the specifics of the conversation.

A. When I received an email from Melissa, informing me that I was going to be deposed in this particular matter. 1:49:18

Q. Okay. Not before then.

A. Not before then.

Q. Okay. When did you become that Mr. Stewart believed he was being let go or that his employment was being terminated because of his age? 1:49:30

MR. FARLEY: The same objection that I made before.
She's just asking when. 1:49:39

21 (Pages 78 to 81)

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                        (773) 239-6008

Page 82

THE WITNESS: I -- I -- I would say -- I would say I was not aware that he was being terminated because of his age. He was being terminated because he was -- his position was being eliminated.                    1:49:49

BY MS. CLAY:

Q. Oh. I'm sorry. My question was: When did you learn that Mr. Stewart believed he was being let go because of his age?                    1:49:58

A. Oh. Same -- same email that I got --

Q. Okay.

A. -- from Melissa.                    1:50:03

Q. Got it. I asked you a couple of these questions in the context of conversations with Mr. Ebbs. I'm asking globally, any conversations you've ever had with anyone. Okay?                    1:50:17

Did anyone ever tell you that Matt Stewart was, quote, hard to place?

A. No.

Q. Okay. Did anyone ever tell you that Matt Stewart was in the, quote, bottom 10 percent of FSMs?                    1:50:31

A. No.

Q. Okay. Did you reach out to Matt Stewart's then-supervisor to discuss him or his candidacy?

A. No.                    1:50:43

Q. Did Ms. Cicchini reach out to you?

Page 83

A. Excuse me. Who?                    1:50:48

Q. Lisa Cicchini.

A. No.

Q. Did you ever talk to Lisa Cicchini about Matt Stewart at all in any context?                    1:50:58

A. No.

Q. Did you ever discuss Mr. Stewart in any context with Camille Dessaw?

A. No.                    1:51:07

Q. Did you have any conversations with Mr. Stewart with any recruiter -- oh, sorry. Did you have any conversations about Mr. Stewart with any of the recruiters?                    1:51:18

A. No.

Q. In your memory, can you think of any conversation with anyone that you had about Mr. Stewart other than the ones you've testified to today?                    1:51:32

A. No.

Q. Okay.

MS. CLAY: Let's take a quick break. I just want to go back though my notes. I think we're getting close. Let's come back at 12:15.                    1:51:42

THE RECORDER: All right.

MR. FARLEY: Okay.

THE RECORDER: Going off the record, 12:02

Page 84

p.m.                    1:51:46

(Off the record.)

THE RECORDER: Back on the record, 12:15 p.m.

BY MS. CLAY:

Q. All right. Mr. Harrison, just a few more names. The question is the same. Did these -- did any of these people ever contact you to discuss Mr. Stewart generally or to discuss his candidacy for the fixed operations manager role? Okay?                    1:52:10

A. Okay.

Q. Erik Ledieu.

A. No.

Q. Jim Papalexis.                    1:52:17

A. No.

Q. John McBane.

A. No.

Q. Jim DeTrude.

A. No.

Q. Jeff Chambers.                    1:52:27

A. No.

Q. Okay. I'm interested in learning a little bit more about your transition to Hyundai. You said that you were recruited.                    1:52:40

Was there anyone who had left Nissan and was now at Hyundai involved in convincing or enticing you

Page 85

to apply or consider employment with Hyundai Kia?                    1:52:53

A. No.

Q. Who do you currently report to at Hyundai?

A. Michael DePaul.

Q. Is Michael DePaul a former Nissan employee?                    1:53:06

A. No.

Q. Are you working with any former Nissan employees currently?

A. Hyundai has hired a -- you know, fair number of former Nissan employees. So there -- you know, yes, there are Nissan employees at Hyundai.                    1:53:28

Q. Can you give me the names of the individuals that you're aware of?

A. Jose Munoz, Rob Grafton, J.P. Broussard. That's all I --                    1:53:50

Q. Who else?

A. -- can think of.

MR. FARLEY: I think she said, "Who else?" Right?

THE WITNESS: Oh. Gary -- Gary Koval. Michael Orange. That's all I can think of at the moment.                    1:54:23

BY MS. CLAY:

Q. Okay. Do you know approximately how old Jose Munoz is?

22 (Pages 82 to 85)

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com (773) 239-6008

Page 86

A. I would say he's probably in his late fifties. 1:54:36

Q. Okay. How old is Rob Grafton?

A. Same.

Q. J.P. Broussard? 1:54:44

A. Early forties.

Q. Gary Koval?

A. Late forties.

Q. And Michael Orange?

A. Early fifties. 1:54:58

Q. Anyone else you can recall?

A. No.

Q. Okay.

MS. CLAY: All right. I don't have any further questions. 1:55:18

MR. FARLEY: Okay. We'll -- we'll read and sign.

MS. CLAY: Okay. So signature reserved? Anything -- 1:55:25

MR. FARLEY: Yes.

MS. CLAY: -- else or off the record?

MR. FARLEY: Off the record.

MS. CLAY: Okay. Off the record, please. 1:55:30

THE RECORDER: All right. Going off the record, 12:19 p.m.

Page 87

(Off the record.)

In Demand Electronic Court Reporting, Inc www.InDemandReporting.com (773) 239-6008

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 88

CERTIFICATION

I, Matthew D. Schulte, do hereby certify that the foregoing transcript of said deposition is a true, complete and correct report of the entire testimony so given by said witness, together with such other matters and things as counsel for the parties present at the taking of said deposition desire to have appear of record.

I further certify that on July 19, 2024 said witness, SCOTT THOMAS HARRISON was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then was recorded by audio/visual recording device, by me in the presence of said witness and thereafter transcribed into typewriting under my direction and control.

I further certify that I am not counsel for, nor attorney for any of the parties to the aforesaid cause, nor am I related to any of the parties to the aforesaid cause, nor am I interested in any manner in the said cause or in its outcome.

I further certify that the signature to the foregoing deposition was reserved by the witness.

00000000-0000-0000-0000-000000000000

www.InDemandReporting.com                                    (773) 239-6008

Page 89

IN TESTIMONY WHEREOF:  I have hereunto set my hand and affixed my notarial seal:




Matthew D. Schulte

August 5, 2024

In Demand Electronic Court Reporting, Inc    www.InDemandReporting.com                 (773) 239-6008

00000000-0000-0000-0000-000000000000

**A**

**a.m** 4:2 46:3,6
**ability** 29:17
**able** 38:8,21,23 41:25,25 62:5
**absent** 54:11
**Absolutely** 73:3
**Acceptance** 1:12 4:6
**accepted** 19:9
**access** 47:12 49:25 62:1,10
**accessible** 44:14 50:7
**account** 81:10
**achieving** 18:17
**action** 6:1,9 32:10
**Active** 62:14
**activities** 23:20 24:7
**actual** 29:15
**addition** 47:7
**additional** 57:15,20
**address** 16:13 17:3 30:2
**admonition** 81:10
**advised** 20:12 43:7 67:4
**affixed** 89:2
**aforesaid** 88:12,18 88:20
**aftersales** 18:18 20:25 23:19,21 24:7 40:7 53:24 56:20 57:8 60:3 68:15 69:10,16 71:21 72:4,7,11 72:19,21 76:25 77:2
**age** 31:3,8 78:18,22 79:7 80:23 81:22 82:3,8
**ago** 8:17,20 9:4 10:15 24:8 53:24
**agree** 76:16
**agreement** 4:3 10:12

**ahead** 42:15 44:17 44:20 45:21 48:12 48:15 61:11 67:7 77:12
**alleged** 81:1
**Allow** 6:18
**America** 1:11 4:6 6:7 9:20 32:4
**amount** 14:17 38:13 53:22
**and/or** 55:17
**Anderberg** 13:1,2 13:2 39:24 40:3,9 47:8 54:16,21 56:23 60:15 65:25 66:10 67:16,19 68:4 71:1,2,3,19 72:6,15,19 73:7 73:23 74:1,4,17 75:22 76:3,17,18 76:24 77:2
**Anderberg's** 68:10 68:17 69:12 72:10 74:22
**annual** 25:14 30:14
**Annually** 22:20
**answer** 6:17,20 7:23 8:8,12 12:3 13:6 21:5 31:24
**answered** 49:23
**answers** 6:25
**Anthony** 24:11,15 53:14 58:2
**apart** 81:2
**apiece** 20:9
**Apologies** 13:8 49:14
**apologize** 48:20 49:10
**appear** 88:7
**appearances** 2:1 4:22
**appears** 64:15
**apples** 75:20,20
**applicants** 38:19 54:13,14,18,19
**application** 38:18

44:9 47:1 70:2
**applied** 20:1 35:15 38:16 41:20 43:8 43:17 44:3 47:5 49:12,15 50:8 54:24 55:1,2 65:22,23 66:1,2,7 66:11 68:7
**apply** 17:12 19:24 85:1
**applying** 69:14
**approached** 40:16 41:1
**appropriate** 44:10
**approximate** 16:22
**approximately** 8:15,20 19:1 24:22 25:18 37:12 37:15 38:10 56:8 56:11 58:24 79:14 85:24
**archived** 14:17
**area** 16:6 19:9,11 19:20 20:4,13,16 20:21 21:2,13,25 22:13,25 23:5,16 25:8,11 34:10,13 51:6 77:17 78:3,3 78:9,15
**areas** 78:4
**ascend** 29:18
**ascertained** 50:5
**asked** 11:21,23 22:8 26:25 27:1 28:22 29:1,13 35:11 52:9 56:1 66:13 67:4 82:12
**asking** 6:13 14:24 22:11 29:11 33:22 40:24 46:19,21 57:3 60:24 62:6 73:4 81:8,13,25 82:14
**assessment** 53:20 70:4
**assignment** 41:10
**assist** 18:16

**associate** 5:3
**assume** 39:5 65:23 66:2 74:11,13
**attend** 30:11
**attending** 5:4
**attention** 75:2
**attorney** 2:6 81:1,3 81:4 88:18
**attorney-client** 7:22
**attorneys** 4:21
**audio/visual** 88:13
**August** 51:16 66:11 66:11,25,25 67:13 67:17 74:4,5 89:6
**automatically** 14:16
**Automotive** 6:5
**available** 46:15 49:17
**Avenue** 2:12
**aware** 10:8 31:6 47:12,20,25 49:1 50:12 57:18 73:5 75:9 80:21 81:5,9 82:2 85:13

**B**

**B-U-T-T-L-E-S** 18:25
**bachelor's** 16:4
**back** 14:22 41:12 45:23 46:5 47:11 47:21 49:11 53:17 53:19 55:6 56:7 61:9 62:8 70:1 79:9 83:21,22 84:3
**background** 59:9
**band** 22:14
**Bart** 18:20,21
**Bart's** 18:23
**based** 50:24 67:8 68:1 76:22
**basically** 20:24
**Bates** 44:21,23 61:12 64:16
**Beach** 2:13

**beauty** 61:6,18
**behalf** 4:12
**belief** 55:4
**believe** 5:23 12:16 17:16 19:22 20:5 21:6,11 22:18 25:15 29:14 30:17 31:13,21,25 32:6 32:16,25 34:4,24 35:6,12,22 36:13 37:1 38:4 39:20 41:17 43:10 44:5 44:15 47:5 50:1 50:16,22 51:7 52:12,25 53:13,16 54:9 55:1,15,19 55:22 56:5 57:4 58:7,24 59:7 60:9 62:17 64:6,8 68:12 69:12,21 70:7 71:4 72:6 74:7 75:8 76:10 79:20
**believed** 80:22 81:21 82:7
**bells** 52:16 63:17 63:21
**best** 7:4,8 64:13
**better** 9:21 70:10 70:17,21
**bias** 78:22
**Bill** 13:25 15:16
**Billy** 17:21
**bit** 17:9 19:12 33:18 61:20 62:22 84:22
**blessed** 65:8
**blessing** 64:20
**blow** 62:21 63:9
**blowing** 63:1
**blown** 61:20
**Boland** 13:23 15:14
**bonus** 22:22
**bottom** 59:20 65:1 65:12 82:20
**boxes** 29:15
**Brad** 13:23 15:14

**break** 45:22 58:23 83:20
**Broussard** 85:14 86:5
**business** 64:2
**Buttles** 18:20
**by-** 1:21

**C**

**cadence** 26:16
**calculate** 68:24
**calculating** 68:23
**calendar** 25:23 26:13 27:22
**calibration** 24:25 25:4,7,10,23 26:2 26:6,8,12,20,22 30:8
**California** 2:13
**call** 9:12 34:6 42:17 58:5 59:5 60:6,13 60:14 64:16
**called** 28:5,7 35:7 43:15
**calling** 57:7
**calls** 17:17 24:7
**Camille** 83:8
**candidacy** 51:1 53:7,12,15,21 54:1 57:20 60:1 62:19 73:24 74:24 82:23 84:8
**candidate** 38:15,23 45:4 47:14 48:25 54:2,7,11 66:5 70:6,10,21 73:21
**candidates** 38:21 41:16 42:4 54:4 56:23 62:9,13,15 71:13 75:11
**career** 40:23
**Carman** 63:13,16
**case** 1:9 4:7 9:3 10:18,22 42:23 73:22
**cause** 6:1 9:18 88:12,19,20,21
**causes** 6:9

**Central** 18:16 19:10,22 20:6 23:20 24:1,16,20 25:4,13 26:6,9,18 27:2 29:9 33:7 34:12 35:1 40:7 68:8 70:11 78:5,6 78:11
**certain** 14:17 46:9 79:7,7
**certainly** 8:25 71:10
**CERTIFICATI...** 88:1
**certifications** 16:8
**certify** 88:2,9,17,23
**Chambers** 84:19
**change** 19:6
**changes** 36:23 66:23 67:1,5
**changing** 40:16
**Chicago** 1:25 2:21 4:12
**chose** 71:12
**Christina** 63:20
**Cicchini** 82:25 83:2 83:4
**circling** 64:16
**circumstance** 39:19
**circumstances** 7:24
**cited** 57:7
**claim** 69:14
**clarification** 5:14 6:5
**clarify** 8:24 10:5 13:12 21:18 31:17 71:15
**clarifying** 25:7
**Clay** 2:5,6 4:23,24 5:7,9,14,16 7:19 8:3,9,14 11:15 12:2,6,17 13:3,6,9 13:11,14 21:7,20 30:15 31:12,19 32:5,15 33:2,14 42:15,17 43:3,19

44:20,25 45:2,11 45:14,17 46:1,7 48:7,10,12,15,19 61:2,7,11,15,17 61:21,24 62:24 63:1,3,4 64:23 67:23 71:17 77:15 80:10 81:7 82:5 83:20 84:4 85:23 86:14,18,21,23
**clear** 61:9
**client** 13:4
**close** 83:22
**closer** 51:4 69:4
**coffee** 45:22
**Cognizant** 69:1,1
**column** 47:24 49:3 49:11
**combination** 55:21
**come** 7:20 17:13 45:23 46:18 83:22
**comes** 28:4
**comfortable** 66:6
**coming** 65:4
**common** 39:11 40:15
**communicated** 19:23 31:11 50:16 72:1
**communicator** 51:9
**company** 14:22 59:13 80:2
**company's** 31:14 31:22
**compared** 22:1
**comparing** 75:20
**comparison** 56:22
**compensation** 73:25 75:25 76:12
**complaint** 32:21 33:8
**complaints** 31:3,6
**complete** 6:18 27:16 88:4
**completely** 6:21
**completes** 5:5

**computer** 46:13
**concerned** 80:5
**conducted** 51:22
**conference** 24:6
**confidential** 42:22 42:24
**confirm** 64:12
**confused** 54:20 72:13
**connected** 69:17
**consider** 20:20 39:13 85:1
**consideration** 74:8
**considered** 70:15 72:12 73:1
**consult** 23:21 71:8 71:10
**consulted** 76:6
**consulting** 72:2
**contact** 38:21 84:7
**contacted** 8:18,19 8:22 31:9
**contacting** 69:9
**Contents** 42:1
**context** 6:10 75:16 82:13 83:5,8
**contribute** 26:25
**contributions** 29:3 29:7
**control** 88:16
**convened** 4:3
**conversation** 10:14 57:1 58:25 60:10 67:24 68:6 81:11 81:14 83:16
**conversations** 23:22 58:1,8,22 82:13,14 83:10,12
**convincing** 84:25
**convoluted** 46:24
**coordinator** 69:16 69:21
**corner** 62:23 63:5
**corporation** 1:13 4:6 53:23
**correct** 7:13,14 9:25 18:13 19:15

20:11 25:9,21 26:21 28:1,21,24 30:20 34:18 35:16 35:18 36:16,16 44:1 47:9,10 50:19 51:24 54:25 58:10 63:10,11 66:17,20 74:18,23 74:25 75:10,13 78:1 79:12,15,24 80:13,14,16,17,20 88:4
**correctly** 73:20
**counsel** 6:14 7:15 8:4,5,10,16 10:21 11:21,23 31:11 46:13 88:6,17
**counsel's** 81:10
**couple** 9:17 17:10 38:11 75:1 82:12
**course** 11:25 42:24
**Court** 1:1,23 4:8,11
**cover** 44:8
**covered** 42:23
**Craig** 20:7 23:6,14 24:18 33:4,5,11
**credit** 53:23 57:6 59:13,14
**CROSS** 3:3
**culture** 79:3
**current** 6:3 7:12 17:3 47:17,21 50:2
**currently** 6:6 16:11 85:3,8
**customer** 18:17 20:25 69:17
**CV** 1:9

**D**

**D** 88:2 89:5
**Dakota** 72:20 77:7 77:19,19,22,22
**Dallas** 16:20,23 18:12,21
**data** 62:10
**date** 59:2 62:22 63:7,7 65:13,13

68:5 81:6
**dates** 16:22
**days** 65:18
**dealer** 6:2,3,5 69:24
**dealers** 20:23 38:6 57:7 69:8,9 72:3
**dealership** 69:18
**decide** 7:5
**decision** 62:18 71:20
**decision-maker** 71:5
**decisions** 78:19
**Defendants** 1:15 2:15 5:2
**define** 21:22 78:10
**defined** 77:25
**defining** 77:16 78:6 78:8
**definitely** 39:21
**degree** 16:4
**degrees** 16:8
**Demand** 1:23 4:11
**demotion** 21:14
**department** 36:4 75:25
**departure** 11:1 79:9
**DePaul** 85:4,5
**deposed** 5:17 81:16
**deposition** 1:17 4:4 4:10,17 5:13,24 8:2,18,20,22 9:3 9:10 11:11 42:25 88:3,7,24
**depositions** 6:8
**description** 12:15 36:14,16,19 64:11 64:15,20 65:8 70:13
**desire** 88:7
**despite** 22:13
**Dessaw** 83:8
**destroying** 14:11
**determination** 74:21

**determined** 75:23
**determining** 65:14 65:19 66:14
**DeTrude** 84:17
**develop** 32:12
**development** 27:20
**developmental** 35:13 40:19
**device** 4:16 88:13
**difference** 56:15
**different** 14:24 27:12 29:10 40:24 61:19 68:7 78:2
**differently** 78:2
**direct** 3:3 24:9 70:2
**Directing** 75:2
**direction** 80:2 88:15
**directive** 13:16
**directly** 21:9 24:1,6 24:18 28:23 29:6 38:21 69:12,18 72:1
**disclose** 12:11
**discrimination** 6:9 30:10,21,25 31:3 31:8,15,22 32:7 32:11,18,21,22 33:10
**discuss** 27:18 30:5 31:10 34:7 43:1 53:6 82:23 83:7 84:7,8
**discussed** 12:12 29:22 30:8 70:24
**discussion** 26:6
**discussions** 11:18 30:2 40:21 53:11 53:14 56:24 57:23 70:8 76:11
**displaced** 19:8 57:12,16,21 59:12
**disposition** 49:21
**dispute** 6:2 74:3
**distant** 76:20
**district** 1:1,2 4:7,8 33:10 69:9,15

70:16 72:7,11,16 72:18 77:13
**districts** 77:18
**Division** 1:3 4:9
**document** 13:16 14:13,18,25 42:1 42:7,10,22 44:18 45:15,24 49:10 60:22 61:10 62:25
**documentation** 14:22 27:16
**documents** 11:21 11:24 12:7,9 14:11,20 15:2 62:1,7 63:6
**Dodson** 13:25 15:16
**doing** 56:4 68:16 69:5 71:22
**Douglas** 14:4 15:20
**draft** 36:23
**drafting** 36:18
**drive** 2:20 20:22 32:1
**duly** 88:10

---

**E**

**earlier** 9:7 28:16 54:22 56:6 64:10 73:7 75:8
**early** 25:5 67:13 86:6,10
**easier** 27:13
**Eastern** 1:3 4:8
**Ebbs** 20:7 23:16 40:1,2,2,9 51:21 53:3,8 54:22 55:14,17 56:24 57:9 58:20,25 59:16,22,25 60:7 60:11,14 67:25 68:3,11 70:8 71:10,13 74:10,14 82:14
**edits** 37:1
**education** 16:2
**Educational** 30:17
**effort** 57:15

**eight** 68:14
**either** 11:5 15:4 33:15 34:9
**elected** 71:2,18
**eliminated** 19:7,14 82:4
**elimination** 19:13 80:12,15
**email** 9:12,13 34:6 36:15 41:19 43:16 44:2 81:15 82:9
**emails** 14:16
**emphasis** 69:9,15
**employed** 6:6 31:4
**employee** 7:12 9:16 10:25 13:15 14:10 15:4 17:10 27:18 27:18 28:2,15,15 31:7 47:17,18 59:13 74:21 85:5
**employee/superv...** 40:20
**employees** 19:1 27:3 28:19 29:25 32:1 40:15 41:1 47:22 65:24 85:8 85:10,11
**employer** 6:3
**employment** 6:10 9:18,19 10:1 11:5 15:5 24:21 30:11 30:22 81:21 85:1
**encompass** 18:6
**ended** 15:5
**enforce** 32:2,3,11
**enforcement** 32:7
**engage** 32:13
**engaged** 39:5
**enter** 10:11
**entering** 45:11
**enticing** 84:25
**entire** 88:4
**entitled** 7:4
**Erik** 12:23 13:2 39:24 40:3 47:7 68:6,7 74:13 84:11

**Erik's** 12:24
**eventually** 70:23 70:25
**evident** 60:5
**exact** 14:18 71:22
**exactly** 26:16 30:13 37:19 39:1 46:14
**EXAMINATION** 3:1 5:8
**example** 34:20
**Excel** 45:19,24
**excited** 80:1
**Excuse** 83:1
**Exhibit** 3:6,7 42:17 42:20 44:21,22 45:1,12,13 48:16 48:18 61:12,16,22 61:23 67:20,22
**expecting** 7:9
**experience** 18:17 21:1 34:21 39:10 39:15 40:6,10,14 40:25 51:3,9 53:22 56:20 57:6 57:8 59:8 60:3 68:18,22,24 69:5 69:6,8,11 70:2,14 71:21,25 72:3,5 76:25,25
**extent** 80:25
**external** 47:17 66:5 66:15,19
**externally** 37:4 65:18,22 66:1,2

---

**F**

**fact** 22:13 76:22
**factored** 78:18
**facts** 7:8
**fair** 85:9
**false** 76:21,22,24
**familiar** 41:6
**family** 51:5
**far** 26:24,24
**Farley** 2:17 5:1,2 5:11 7:17,21 8:6 8:12 10:17 11:12 11:25 12:3,11

13:1,5,7,10,12
21:4,17 30:12
31:10,16,23 32:8
32:24 33:12 42:21
43:13 45:25 61:1
61:4 62:21,25
63:2 64:22 71:14
77:9,11 80:8,24
81:23 83:24 85:18
86:16,20,22
**fault** 70:1
**February** 5:25
16:24 25:17
**feedback** 27:8
52:10,12,23 56:1
57:3,5 59:9,10
60:4 73:20 74:11
74:12
**feel** 78:21
**felt** 35:12 40:6 70:8
70:16,20
**field** 18:5 19:13
22:2,17 28:20
38:1 56:20 69:7
69:13,22
**Fifteen** 5:20
**fifties** 86:2,10
**Fifty-three** 17:8
**files** 46:14
**fill** 34:2,14 38:8,13
**filled** 35:21 37:17
38:2,6
**finally** 65:4
**find** 19:18 50:14
63:12
**finish** 22:10
**first** 9:2 16:10,20
25:6,15 26:10,12
26:17 58:24 62:8
88:10
**five** 77:18
**fixed** 11:3 34:16,23
41:14 43:8 47:6
51:1 53:7 58:11
58:16 60:1 62:11
64:7,21 65:8 74:9
84:8

**fleet** 69:16,20
**focus** 10:16 26:22
43:5
**focused** 33:20
**Foley** 2:10,11 4:24
**folks** 28:23 41:15
**follow** 6:13
**followed** 17:16
**following** 13:17
15:7 25:16 41:19
43:16
**FOM** 12:15 41:20
57:2 60:18 68:16
70:15
**force** 10:7,8
**foregoing** 88:3,24
**forgetting** 12:24
**form** 10:11 21:4,17
27:14 28:11 29:21
30:12 31:16,23
32:8,24 33:12
43:13 52:9,23
64:22 71:14 77:11
80:8,24
**formal** 40:17 41:3
41:5
**formally** 47:5
**format** 30:16 46:20
**former** 9:16 85:5,7
85:10
**forth** 61:10
**forties** 86:6,8
**forward** 71:2,18
74:22
**four** 77:18
**Friday** 4:2
**frustrated** 38:12
**FSMs** 59:20 82:20
**full** 6:25,25
**fully** 6:20
**functions** 64:25
**funky** 45:19
**further** 86:15 88:9
88:17,23
**future** 27:20 40:22
70:10 80:4,7

**G**

**gap** 66:18
**Gary** 85:20,20 86:7
**general** 17:22 18:5
19:9,13,20 20:4
20:13,16,21 21:2
21:11,13,14,25
22:1,13,17,25
23:5,16 25:8,11
25:17 28:20 33:22
34:10,13 40:11
50:24 71:22 72:5
72:16 77:3,17
78:3
**generally** 26:12
33:18 52:5 54:19
84:8
**generated** 74:1
**geographic** 78:14
**geography** 73:2,4,5
**Georgia** 16:12,14
16:15
**getting** 35:21 41:12
83:21
**give** 13:13 16:22
19:5 27:7 41:23
49:25 57:19 73:24
74:2 85:12
**given** 39:20 41:1
54:12 88:5
**giving** 6:24 27:5
59:8,10
**global** 18:2
**globally** 18:4 82:14
**GM** 72:25
**go** 27:18 33:10
34:21 42:15 43:17
43:23 44:17,20
45:21 47:21 48:12
48:15 61:11 62:8
63:2,19 67:7 69:3
71:2 77:12 79:9
81:21 82:8 83:21
**going** 5:21 6:13,16
7:6,22 8:7 9:16
13:3,18 15:8 22:5
24:11 33:17 35:20
41:24 45:15 46:2

46:21 49:11 53:17
55:6 56:7 60:17
60:19 61:9,9 62:4
62:5,8 63:9,13,14
64:11,14,18,18,19
70:1,18 76:15,22
80:3 81:16 83:25
86:24
**good** 4:1,23 5:1,10
51:8,8 61:15
**gotten** 41:19
**Grafton** 85:14 86:3
**great** 51:9
**Green** 16:14
**Greg** 20:7 23:16,19
23:22,25 24:2,6
24:19 40:1,2,2,4,8
51:21 53:3,8
56:24 57:1 59:7
67:25 68:6,8,12
70:8 71:10
**Gregory** 14:2
15:18
**ground** 5:22 6:12
**group** 2:11 79:19
**growth** 80:2
**guess** 8:17 23:25
40:24 43:17 51:20
**guessing** 7:3

**H**

**hand** 4:18 89:2
**happen** 26:17
**happened** 9:18
19:5 25:14 26:15
36:12 71:1
**happening** 80:19
**happy** 53:19
**harassment** 6:9
32:22 33:8
**hard** 59:16 82:17
**Harrison** 1:18 4:14
4:15 5:10,12,17
8:4,11 42:17,22
44:21,22 45:11
46:8 48:20 60:21
61:12,21 75:3
84:5 88:10

**Hayes** 17:21
**head** 7:1 23:19 52:8
**headhunter** 17:16
**heard** 41:9
**help** 13:4 67:9,14
68:2 72:17
**hereunto** 89:1
**hey** 41:19
**Hi** 5:1
**hierarchy** 23:12
24:17
**high** 32:14 80:6
**higher** 22:4,12
56:16
**highest** 16:2
**highly** 51:4
**hire** 63:7
**hired** 17:11 74:8
76:18 77:4 85:9
**hiring** 11:2 20:4
33:18,19 39:16
57:2 71:11,23
78:18
**Hold** 75:17
**hosted** 27:17
**hour** 45:18
**HR** 27:24 34:6
35:22,24 36:3,4
36:11,19 37:13,21
38:18 41:18 42:4
43:10,11 63:23
73:18,25 74:1
75:24
**HR-generated**
43:15
**human** 11:2,6
27:17 33:1,13
37:16
**Hyundai** 6:7 9:20
10:7 79:11,16
80:2 84:22,25
85:1,3,9,11

**I**

**idea** 49:19 62:15
**identification**
42:20 45:1,13
48:18 61:16,23

www.InDemandReporting.com                                     (773) 239-6008

Page 94

67:22
**identified** 50:13 67:8 68:1
**Illinois** 1:2,25 2:8 2:21 4:8,12 78:12
**immediate** 29:16
**implicated** 21:3
**important** 52:7
**impressed** 40:5 68:8,11,13
**impression** 50:25
**in-house** 10:21
**Inactive** 62:14
**included** 44:9 77:19 78:11
**independent** 80:25
**INDEX** 3:1,6
**Indiana** 78:13
**indicated** 71:23
**indicating** 44:3
**individual** 19:22 28:2 29:17 34:24 38:4 39:14,15,17 39:21 44:15 70:19
**individually** 20:10
**individuals** 13:17 15:7 17:17,20 20:6 29:8 41:20 43:16 44:13 47:5 55:3 74:12 85:12
**information** 5:6 23:3 26:24 27:11 28:11,22,25 29:12 42:24 44:13 46:15 46:22 47:12,15,16 48:25 49:7,13,17 50:7,7,10 52:7 62:6,9 81:9,12
**informed** 19:17
**informing** 81:16
**initiated** 66:24
**input** 27:1
**instance** 4:13
**instruct** 7:23 8:8
**instructed** 43:23
**interact** 36:7
**interacted** 36:9

64:4
**interacting** 38:20 69:18
**interaction** 23:6 38:19 69:23
**interactions** 11:7 23:15,18 24:4,5 27:9 29:8 59:7
**interested** 53:25 54:1 84:21 88:20
**internal** 49:20 54:4 54:7 62:14 65:12 66:15,19
**internally** 35:17 37:3 65:22,23 66:1 70:7
**interview** 11:2,7 39:22 40:3,17 41:3,5 44:11 47:13 50:17,20,21 50:22 51:11,18,22 52:1,11,24 54:3 55:7,24 59:3,6 60:10,14 73:7,8 73:11,16
**interviewed** 19:8 40:4 51:20,21 53:3,4 54:13 57:5 67:10,15 74:4,13
**interviewing** 55:13 55:17,20 74:16
**interviews** 20:5,8 51:19 52:4
**introduced** 28:3
**investigations** 30:21
**involved** 26:6,19 74:8 84:25
**involves** 7:21 75:24
**Iowa** 40:11 70:15 71:3,24 72:23 77:19,22
**it'll** 27:13

J
**J.P** 85:14 86:5
**January** 19:17
**Jeff** 84:19

**Jefferson** 1:24 4:11
**Jim** 84:13,17
**job** 12:15 32:1 35:21 36:13,16,19 37:2,22 47:1 50:14 64:11,15,20 64:24 65:8 70:12 73:10,14,17,18,24 80:12,15
**jobs** 40:16,16 49:12 49:12,15
**John** 84:15
**Jose** 85:14,24
**July** 1:19 4:2 51:16 66:24,25 67:13 88:9
**June** 16:24 17:1,1 19:19 25:18,24 68:25

K
**Kasey** 14:6 15:22
**keep** 14:11 42:24
**Keeys** 20:7 23:7,14 24:18 33:4,5,11
**Kia** 85:1
**Kiernan** 14:4 15:20
**kind** 53:17
**know** 7:7,7 8:1 18:1 20:19,25 21:23 26:16 27:19 28:14,17 29:4,16 29:17 32:2,3,4,10 32:13 37:4,5 38:3 39:16 40:12,19,20 40:22,22 41:13,18 41:19 42:25 45:17 46:14,23 50:6 51:2,3,9,15 52:8 53:2,4,17 56:6 57:2 61:19 62:12 63:24 64:9 65:1 65:21,25 67:12 68:14,14,25 71:19 72:3 73:23 74:19 74:20 75:14 76:3 80:25 81:2,13 85:9,10,24

**knowing** 34:19
**knowledge** 10:4 31:2 40:25 48:8 48:21,24 66:22 67:1
**Koval** 85:20 86:7

L
**L** 2:5,6
**labeled** 44:21,23
**labels** 61:12
**lack** 57:8 60:3
**LaMantia** 24:12,13 24:14 53:15 55:18 58:2,8,15,17
**larger** 77:24 78:14 78:14
**late** 67:13 86:1,8
**lateral** 21:15 80:16
**Law** 2:6,11
**lawyer** 6:19 81:13
**leadership** 23:25 24:19 27:8
**learn** 82:7
**learned** 9:2 81:12 81:13
**learning** 84:21
**leave** 64:12 79:23
**led** 17:10
**Ledieu** 84:11
**Lee** 1:5 4:5
**left** 38:4 84:24
**left-hand** 63:5
**legal** 10:18,22 11:2 11:6
**legs** 45:22
**Leiter** 14:2 15:18
**length** 15:1 30:2 37:9
**let's** 16:1 19:12 25:6 26:22 34:19 42:15 43:4 44:17 44:20 48:15 58:22 58:23 61:11 63:12 67:7 83:20,22
**letter** 73:25 76:8
**letters** 44:8
**level** 16:2 29:18

31:14 32:14 79:7 80:6
**limited** 24:5 29:4 54:12,14 68:14
**Lisa** 2:5,6 4:23 5:11 8:7 42:13 48:6 62:21 83:2,4
**list** 19:8 57:12,17 59:12
**listed** 47:8 69:11 78:7
**little** 6:16,19 17:9 19:12 33:18 46:10 46:23 54:20 61:20 63:10 64:14 84:21
**live** 20:17
**lived** 16:23 51:5 57:14
**LLC** 2:6
**LLP** 2:11,19
**locate** 19:21
**located** 4:11
**location** 16:10 36:16
**logical** 66:9,12
**long** 14:10 29:5 37:21 38:1,7,10
**look** 11:23 27:4 39:17 41:22 54:23 62:7 64:24 79:6
**looked** 12:14,16 34:7 75:11
**looking** 21:22 49:8 51:4,10
**looks** 65:17 66:24 75:21
**lose** 50:14
**lower** 22:5,14
**Lyman** 2:11

M
**M** 2:10,17,18
**maintain** 15:1 22:4
**maintaining** 38:5
**making** 61:8 79:14
**Mallabarapu** 2:24 5:3
**management** 31:20

35:11 79:7 80:6
**management-dir...**
 41:7,10
**manager** 11:3 18:5
 19:9,13,21 20:4
 20:13,16,21 21:2
 21:12,13,14,25
 22:2,13,17,25
 23:5,16 24:15
 25:8,11,11,17
 34:10,13,16,23
 35:7 38:2 39:16
 41:14 43:9 47:6
 58:12,16 60:1
 62:11 64:7,21
 65:9 69:7,10,13
 69:15,22 71:11
 72:19 74:9 77:17
 78:3 79:19 84:9
**Manchester** 2:7
**Mangrum** 12:22
 43:5,7 44:3 45:8
 47:2,20 48:2 49:4
 49:15,20 50:12
 51:11 53:6 54:15
 56:8,9,16 65:22
 66:7 67:11 70:1,2
 70:5,12,23 76:12
**Mangrum's** 50:25
 52:24 53:7,12
**Manhattan** 2:13
**Mankato** 16:4
**manner** 72:18
 88:20
**mark** 42:13,15
 44:20 48:15 61:11
 61:21
**marked** 42:20,22
 45:1,13 48:18
 61:16,23 67:19,22
**market** 69:16,20
 70:17,20 79:20
**marketing** 16:7
 24:15
**material** 46:17
 67:9
**materials** 43:24

46:9
**mathematical** 27:9
**Matt** 11:7 14:8
 15:24 58:9,13,17
 58:22,25 59:12,19
 60:7,11 74:17,20
 80:21 82:16,19,22
 83:4
**matter** 4:5 10:18
 10:22 81:17
**matters** 88:5
**Matthew** 1:5 4:5,15
 5:7 12:22,22
 13:21 15:12 43:5
 43:8 44:22 45:4
 88:2 89:5
**Maven** 69:20
**Mayfield** 63:20
**McBane** 84:15
**McGuireWoods**
 2:19 5:4 10:18
**mean** 10:6 37:3
 54:6,15
**meaning** 34:2
**mechanism** 52:12
**meeting** 11:14,16
 27:14,17,22,24,25
 29:4,23 34:6
**meetings** 11:18
 26:8
**Melissa** 2:18 5:2
 9:11 10:15,17
 31:9 81:15 82:11
**member** 31:20
**members** 35:11
**memory** 83:15
**Mengiste** 17:21
**mentioned** 23:2
 57:11 68:12
**metrics** 30:7
**metro** 70:17
**Michael** 85:4,5,21
 86:9
**Midwest** 20:24
**might've** 41:18
 57:11 64:1
**Mike** 20:6 21:9,10

23:13,13 24:8
**mind** 17:23
**minimum** 65:5
 70:13
**Minneapolis-St**
 19:11 20:19 70:20
 78:9
**Minnesota** 16:21
 17:1 72:23 77:20
 77:22
**mm-mm** 6:25
**moment** 24:8 56:23
 64:24 85:22
**Monica** 63:13,16
**Monohan** 14:4
 15:20
**monster** 49:9
**month** 8:17,20
 37:24
**months** 9:4 10:15
 38:11
**morning** 4:1,23 5:1
 5:10
**motivated** 51:4
**Motor** 1:12 4:6 6:7
 9:20 80:2
**Motors** 40:11
 71:22 72:5,16
 77:3
**move** 51:4 71:18,24
 74:22 80:16
**moved** 41:2
**mug** 60:20 61:4
**Munoz** 85:14,25

**N**

**name** 4:15 12:21,24
 18:23 28:5,7,9
 35:3 39:7,20,25
 47:10 63:16,20,22
**named** 78:12
**names** 13:19 15:10
 17:19 23:2,3 36:8
 42:9 43:5 47:4
 84:6 85:12
**Nashville** 51:5
**nature** 57:21
**Nebraska** 77:19,23

77:24
**necessarily** 62:7
**need** 5:21 6:23 8:1
 52:8
**needed** 19:18
**negative** 59:22,25
**Nevers** 20:6 21:9
 23:13,13 24:8
**Nevers'** 21:10
**new** 19:18 50:15
**nine-box** 28:13
 29:1,2,12
**Nissan** 1:11,12 4:5
 4:6 7:12 9:19,24
 10:9,12,19,22,23
 10:25 11:1,6
 13:15 14:10,13,22
 16:16,19 17:7,10
 17:11,18 20:23
 21:22 22:3 24:22
 26:14 30:11,22,25
 31:4,7,11,14,20
 32:3 33:9,24 34:9
 35:6,11 39:10,11
 40:14 41:4 44:21
 44:23 45:12 46:12
 50:15 54:5 61:12
 61:22 62:2 64:1
 65:24 72:11,12,22
 72:25 73:19 74:3
 74:21 75:5 76:18
 78:3,17,18,24
 79:2,10,23 80:7
 80:11 84:24 85:5
 85:7,10,11
**Nissan's** 7:15 18:3
 32:7,18,21
**NMAC** 59:13,15
**no"s** 6:24
**nods** 7:1
**non-electronic**
 14:20
**Nope** 17:5 29:20
 57:22
**North** 1:11 4:5 32:4
 72:20 77:6,19,21
 77:22

**Northern** 1:2 4:8
**Northwest** 51:8
**notarial** 89:2
**notary** 4:16
**notes** 51:25 52:3,8
 55:23 83:21
**notification** 43:22
 44:7 46:9
**notified** 9:9 36:11
 37:12,16 38:15,19
**notifying** 37:21
 58:4
**number** 1:9 3:7
 49:12 50:8 54:12
 54:14,19 58:21
 64:16 66:23 76:6
 85:9
**numbers** 62:15
**numeric** 52:15 56:2
**numerical** 27:6,10

**O**

**oath** 4:18
**object** 7:22
**objection** 6:15 21:4
 21:17 30:12 31:16
 31:23 32:8,24
 33:12 43:13 64:22
 71:14 77:9 80:8
 80:24 81:23
**obligation** 38:7
**obligations** 32:17
**Obviously** 46:12
**occur** 26:9 39:18
 39:19
**OEM** 68:16
**OEMs** 78:2
**offer** 58:5 71:5
 73:14,17,18,24,25
 74:5 75:23 76:8
**offered** 19:25 20:13
 73:10 76:4,5
**oh** 9:4 28:17 41:23
 48:12 49:9 60:25
 69:3,25 77:12
 82:6,9 83:11
 85:20
**Ohio** 78:13

| | | | | |
|---|---|---|---|---|
| **okay** 5:15,19,24 6:1 6:4,8,12 7:3,12 8:15,19 9:6,9,12 9:14 10:11,14,21 10:25 11:5,10 12:7,9,11,18 13:9 13:11,15,19,20 14:20 15:4,10,11 16:1,8,15,18,22 16:25 17:3,9,22 18:8,19 19:1,4,12 19:20 20:3,12,16 20:20 21:8,25 22:16,19,23 23:2 23:2,11,15 24:3 24:11,21 25:6,10 25:20 26:8,11,19 26:22 27:21,24 28:2,8,11,16,22 28:25 29:10,19,24 30:10,19 33:8,15 33:17,19,21,24,25 34:2,8,11,19,21 35:4,8,10,14,17 35:19,25 36:6,11 36:18,22 37:2,6 37:20 38:1,7,12 38:15 39:3,7,10 39:18,23 40:8,14 41:6,9,12,21,23 41:25 42:3,7,12 42:16 43:1,4,11 43:20 44:2,6,12 44:17,17,25 45:6 45:10,12,25 46:2 46:8 47:1,2,8,11 47:16,20,24 48:2 48:5,17,24 49:8,9 49:9,14,19,23,23 50:2,6,11,18,20 50:23,23 51:11,15 51:22,25 52:3,9 52:22 53:2,6,11 53:17,25 54:10,17 55:6,13,16,23 56:18,22 57:15,23 58:11,15,20 59:5 | 60:6,9,13,19,20 61:3,8,18,20 62:7 62:20 63:2,3,9,12 63:19,24 64:3,6 64:10,15,24 65:3 65:7,11,12,17,21 65:25 66:4,6,10 66:13,18,21 67:4 67:7,7,14,18,18 67:24 68:10 69:20 70:1,5 71:1,12 72:18,21,24 73:6 73:6,15 74:2,7 75:1,2,5,11 76:3,8 76:11,15,17,24 77:16,21,24 78:6 78:10,16 79:22 80:18 81:18,20 82:10,15,19,22 83:19,24 84:9,10 84:21 85:24 86:3 86:13,16,18,23 **old** 5:21 17:6 85:24 86:3 **older** 78:25 **Once** 36:11 51:14 **one-on-one** 51:19 **ones** 83:17 **online** 30:17 **oops** 49:13 **open** 17:12 **opened** 70:18 **opening** 34:5,22 35:20 36:11 37:13 37:17,22 39:6 70:10 **openings** 34:14 **operations** 11:3 34:16,23 35:7 38:1 41:14 43:8 47:6 51:1 53:7 58:11,16 60:1 62:11 64:7,21 65:9 69:7,13,22 74:9 84:9 **operator** 4:17 **opportunities** | 27:19 **opportunity** 9:21 19:24 22:22 35:13 35:15 70:17 80:1 **opposed** 6:25 **oral** 6:23 **Orange** 85:21 86:9 **order** 42:23 **organization** 33:5 40:18 **organizations** 18:4 **outcome** 88:21 **outside** 31:7 43:1 58:11,16 **overlap** 72:24 73:5 **overqualified** 70:9 70:12 _____ **P** _____ **p.m** 84:1,3 86:25 **Pacific** 51:8 **page** 3:7 46:23 63:15 64:17 65:2 66:21 68:20 **Papalexis** 84:13 **parameters** 14:18 **part** 10:3,12 23:11 23:25 24:17,19 25:13,22 30:22 39:22 40:19,20 52:25 53:10 56:3 57:1 63:23 75:24 **participated** 25:3,4 **particular** 33:20 35:15 39:6,13,17 40:15 81:17 **parties** 4:3 88:6,18 88:19 **partner** 64:2 **path** 40:23 **Paul** 16:21 17:1 19:11 20:19 70:20 78:9 **pause** 6:16,19 **pay** 30:5 79:22 **paying** 8:10 **Pennsylvania** 78:13 | **people** 36:8 55:11 84:7 **percent** 59:20 82:20 **Perfect** 18:12 **performance** 20:23 27:2,9 32:1 59:23 **performed** 32:14 **period** 10:16 65:15 65:19 66:8 76:20 **person** 35:2 39:23 **personal** 48:8 67:1 **personally** 78:21 **personnel** 69:19,24 **Peter** 2:17 5:2,15 10:17 11:14,18 13:3 **phone** 9:12 17:17 34:6 **photo** 60:24 **picture** 61:19 **pictures** 29:24 **place** 26:4 28:15 57:16 59:1,17 73:8 82:17 **placed** 40:16 **Plaintiff** 1:7 2:3 4:13,14,24,25 **Plaintiff's** 46:12 **planning** 40:22 **plans** 17:4 **please** 4:18,21 6:24 7:5 9:1 12:21 13:6 16:3,23 18:24 21:19 22:10 22:23 31:18 71:16 86:23 **point** 19:4 29:5 32:10 55:1 **policies** 32:3 **policy** 14:14,15,19 14:25 31:15,22 32:7,11,18,21 33:10 41:4 49:20 54:5,11 **position** 11:3 12:15 17:12,23,24,25 | 18:2,2 19:7,9,13 19:14,20,21 22:5 22:14 23:5,6 25:17 28:20 33:21 34:17,25 35:10 36:17 37:7,10 38:2,4,6,9,13 40:5 40:12 41:20 43:17 50:2,15 51:7 53:7 57:2 58:12 60:18 69:7,21,22 70:6 70:15 71:5,19 72:18,25,25 73:1 82:4 **positions** 50:8 **positive** 74:14 **post** 36:17 **post-interview** 62:18 **posted** 37:3,3,7,10 37:22 65:17 **posting** 33:23 65:12,13 66:19 67:9,14 70:13 **postings** 66:15 68:2 **potential** 27:2,20 28:14 40:22 76:12 **practice** 52:3 **precisely** 38:3,17 39:4 52:14 **preparation** 12:1 **preparatory** 11:13 **prepare** 11:10,19 12:10 **prescreened** 38:24 **prescreening** 39:2 39:3 **presence** 88:14 **present** 2:23 41:15 62:4 88:6 **presented** 38:25 42:4 46:15 **preservation** 13:16 **president** 23:10 **presumably** 62:2 **pretty** 45:24 **previously** 40:5 |

67:19,22
**primarily** 29:7
53:23 68:13,15
69:23 72:4 74:14
**primary** 18:14
20:20,22 75:14,18
**prior** 8:23 10:14
59:3,6 60:10
72:12,25
**privilege** 7:22
**privileged** 8:6
**pro** 5:21
**probably** 8:17 9:4
9:7,7 36:15 37:25
38:11 39:1 43:15
51:20 52:17 60:16
67:13 78:13 86:1
**proceed** 5:6 62:18
**process** 11:3 20:4
24:25 25:5,8,14
25:23 26:23,24
33:18,19,23 34:3
34:7,8 35:21,23
39:2,22 40:17,20
41:3,5,13 43:21
43:22 47:13 53:1
53:10 56:3 57:2
64:9 73:19 75:24
76:1
**processed** 64:8
**produced** 62:2
**programs** 23:20
**progress** 60:18
**promotability**
29:16,17
**promoting** 78:19
**promotion** 21:14
**prompt** 13:13
**prospects** 80:3
**protected** 80:7
**protective** 42:23
**provide** 73:20 80:3
**provided** 8:5 27:15
28:11 36:23 44:15
49:12 50:6 57:5
60:4 64:11 74:1
**providing** 27:5

52:22
**public** 4:16
**pull** 72:16
**purpose** 59:5
**purposes** 5:12
**pursue** 73:23
**pursued** 54:10
**pursuing** 53:25
54:1
**put** 19:8 43:25
53:19 69:15

─────── **Q** ───────

**qualifications** 54:8
65:5 68:9,11
**qualified** 51:2
70:17
**quarter** 9:8 25:15
26:10,12,17 37:18
**question** 6:17,20
9:1 10:5 14:24
21:18 22:11 27:12
29:10 31:18 40:24
58:15 71:16 72:8
72:14 82:6 84:6
**Questionnaire**
75:14,18
**questions** 9:17 13:6
16:10 50:24 62:6
82:13 86:15
**quick** 6:12 83:20
**quite** 49:10
**quote** 82:17,20

─────── **R** ───────

**raise** 4:18
**range** 22:1,6
**ranges** 22:4
**ranked** 56:16
**ranking** 27:5 29:21
52:15 56:2,7,9,12
**rankings** 39:12
56:15
**rates** 30:5
**reach** 82:22,25
**reached** 19:23
35:22,25 79:6
80:6

**read** 76:15 86:16
**ready** 65:1
**realized** 35:19
**reason** 34:6 58:13
71:9,12,20 74:3
**reasonable** 74:6
**recall** 12:12 14:18
15:3 17:19 18:2
26:5,5 29:2,11,21
29:24 30:7,13
35:3,4 36:22,25
37:12,15,19 38:3
38:17 39:7 40:8
44:13 47:15 48:1
50:3,9,9 52:13,19
52:20,21,22 53:9
55:13,20 56:4,7
56:10,11,13,14
57:9,13,23,25
58:1,3,4,12 59:2
60:8,12,16,22
62:12 64:20 68:5
68:7 72:15 73:8
73:10,13 76:5,10
86:11
**receive** 13:16 15:5
46:9
**received** 44:2,7
74:5 81:15
**receiving** 58:5
**recognize** 42:7,9
44:18 46:19 60:20
67:20
**recollect** 67:15
**recollecting** 55:24
**recollection** 7:8
37:20 42:3 45:3,7
50:25 58:8 65:7
67:10 68:2,18
**recommend** 39:15
**recommendations**
39:12
**record** 4:2,22 5:11
42:21 44:22 45:11
46:2,4,6 83:25
84:2,3 86:21,22
86:23,25 87:1

88:8
**recorded** 1:21 4:10
88:13
**RECORDER** 4:1
4:20 5:5 42:13,16
42:19 44:24 46:2
46:5 48:6,9,13,17
61:14 83:23,25
84:3 86:24
**recording** 4:16
88:13
**records** 15:6 51:25
55:23 74:3
**RECROSS** 3:3
**recruited** 9:20,22
10:7 17:14 79:10
79:14,19 84:23
**recruiter** 38:20
39:5,8 44:10
60:18 83:11
**recruiters** 39:8
83:13
**recruiting** 17:13,22
20:3 35:23 36:5,9
36:24 37:16 40:17
41:3,5,15,18 42:5
43:23 52:10 63:6
**recruitment** 33:23
41:13
**recycling** 14:11
**REDIRECT** 3:3
**redline** 21:21,23
22:2
**redlined** 21:16 22:9
22:11,15
**reduction** 10:6
79:22,24
**reductions** 10:8
**refer** 59:16
**reference** 49:20
59:19
**referring** 43:12
**reflect** 62:16
**reflected** 49:2
62:17
**reflects** 75:9
**refresh** 42:3 45:3,6

65:7 67:9 68:2,17
**refresher** 6:12
**regard** 15:9 17:3
31:21 44:12 58:20
**regarding** 10:22
13:17 15:1 31:8
31:14 32:17 47:16
49:20 50:8 52:10
52:23 54:21 58:22
60:7 71:5 75:22
81:10
**regardless** 54:7
**region** 18:16 19:10
19:23 20:6 23:10
23:20 24:1,16,20
25:13 26:7,9,18
27:2 29:9 33:7
34:5,12 35:1 40:7
51:21 64:4 68:8
70:11 77:3,7,7,14
77:16,24 78:5,7
78:10,11,11
**Region's** 25:4
**regional** 21:11
24:15
**regions** 64:5
**related** 6:8 23:20
24:7 28:8 88:19
**relates** 69:12
**relating** 15:6 16:10
**relation** 23:9 60:13
**relationship** 23:24
33:6 38:5 40:21
**relatively** 76:20
**relevance** 69:21
**relevant** 8:7 69:6
72:7
**relocate** 17:4 19:10
20:18 40:11
**relocated** 16:21
**remain** 38:7
**remained** 22:12
**remember** 12:18
13:13 29:14 35:25
36:8 43:14 55:17
56:8 58:17 63:22
73:20

remote 1:17 4:4
Remotely 1:21
rendering 28:14
   29:1,12
reorganization
   21:3 80:22
reorganizations
   78:25 80:7
repeat 37:14
report 18:19 21:8
   24:1 85:3 88:4
reported 21:9
   23:13,14 24:18
   32:2,23 33:1
reporting 1:23 4:11
   23:11 24:17 32:17
   33:6
represent 48:22
representation
   7:24 79:20
represented 6:14
   7:15 29:15 46:18
representing 5:12
   8:2
request 8:4 15:5
   44:10
requested 9:3
   20:18 27:11
requester 63:20
require 14:15
required 5:6 19:10
   20:17 26:23 41:5
   70:13
requirement 30:14
   54:3,6,11
requisition 33:23
   64:7,9 66:23 67:2
   67:5
reserved 86:18
   88:24
reside 16:11,18
resided 16:20
residing 16:15
resign 10:1
resigned 14:21
   25:24
resources 11:2,6

27:17 33:1,13
   37:16
responses 6:23
responsibilities
   18:14 20:21 38:5
responsibility
   20:22 73:3
responsible 77:18
resulted 80:15
resume 40:5 41:22
   44:16 45:4,7 50:5
   53:19 60:5 68:17
   69:12 71:25 72:17
resumes 12:15,18
   44:8 49:6 50:11
retain 8:15 52:7
retaliation 6:10
   32:22
retention 7:24
   14:13,18,25
retiring 70:19
reveal 43:1 81:3
review 12:9 38:23
   43:18,24 44:8,14
   46:9 55:16
reviewed 12:13,19
   45:4,7 53:18
reviewing 36:19,21
   49:6 50:11 68:17
reviews 26:24
RIF 10:3,4,6
right 4:18 5:5
   26:11 28:20 33:17
   34:1 40:6 41:12
   41:24 46:5 49:3,8
   55:6 60:19 63:5
   65:4,11 75:1,22
   83:23 84:5 85:19
   86:14,24
right-hand 62:23
ring 52:15 63:16,20
rise 19:5 34:22
road 2:7 35:24
Rob 85:14 86:3
role 18:15 19:2,18
   19:21,25 20:4,14
   20:16,21 21:2,10

22:1,13 23:9,16
   23:23 24:24 25:2
   25:7,11 30:24
   31:13,21 32:6,12
   32:17 33:19 34:1
   34:23,25 35:5,7
   36:18 39:13 40:7
   40:15 41:14 43:9
   44:4 47:6 51:1,3
   51:10 54:18,24
   58:16 59:14 60:2
   62:11 63:24 64:6
   64:21 65:9,14,19
   66:14,18 68:7,16
   68:16 69:10,13
   70:21,23 71:3,22
   72:2,2 74:9 76:1
   76:19 77:3 79:16
   79:18 84:9
roles 19:5 34:9
   40:23 41:1,2,2
   54:4 69:17
roll 78:4
room 6:15
Rosecrans 2:12
Roswell 16:12,14
   16:15
routing 46:13
rules 5:22 6:13
   35:23
run 18:3
running 27:25

———— S ————

Sabrina 2:24 5:3
salary 22:1,4,6,12
   22:14,16,17,23,25
   75:23 79:17,17,21
sales 18:3,17 20:25
   21:11 34:25 35:7
   76:19,23
saying 41:19 57:9
says 62:14 75:13
   76:23
scale 29:16
scheduled 9:5
Schulte 4:15 88:2
   89:5

score 27:6 47:24
   48:1,2,3 75:6,9,14
   75:16,17
scores 27:10 75:12
scoring 47:25
   75:15
Scott 1:18 4:14
   88:10
screen 28:3,4,8
   41:24 46:17,22
   53:19 60:20 64:12
   67:18 75:3
screened 38:24
scroll 47:2 64:18
   65:2 68:20
scrolling 65:11
seal 89:2
second 9:7 16:1
   37:18 41:23 45:16
   51:17 74:2 75:17
see 41:24,25 47:10
   48:4 61:20 62:22
   63:7,12 65:12
   69:1 75:2,3,5,18
   76:8
seeing 60:22
self-study 30:19
send 36:13
senior 34:22 79:19
sense 17:23 58:21
sent 14:21,22 36:15
   36:19 76:9
sentence 6:18
sentences 6:25
service 30:3 49:2,4
   49:25
set 44:11 89:1
seven 49:5
Shannon 2:10 4:24
share 41:24 44:17
   49:14 60:19
Sharing 67:18
she'll 13:10,12
shed 78:25
short 26:14 76:20
short-circuit 34:20
shot 61:6

showing 49:3 67:19
shown 12:7 29:24
sic 69:7,13,22
   71:13
sign 86:17
signature 86:18
   88:23
significant 53:22
   54:19 57:6
similar 40:10 68:16
single 27:24 55:24
situation 6:2 25:12
six 68:14,21 70:14
   77:25 78:7
skills 27:8
slight 79:24
slip-up 13:7
slowly 64:19
small 53:23
smaller 64:14
Solutions 69:2
SOM 35:7
somebody 39:21
   40:13
sorry 9:14 10:5
   13:5,13 28:17
   37:14 44:23 47:3
   48:12,13 49:9,13
   69:25 72:8,13
   77:12 82:6 83:11
sort 27:6,15 28:14
   41:13 56:1,8,11
   62:10
sought 35:14
South 1:24 4:11
   18:16 25:4,13
   26:9,18 27:2 29:8
   77:19,22
southern 72:23
speaking 54:19
   58:17
specialist 69:17
specific 17:23,24
   24:7 25:6 32:6,10
   32:17 33:21 36:3
   46:21 59:2,11
   67:12 81:6

specifically 36:25 40:8 50:3 53:9 60:16 62:12 64:6 68:5 73:9
specifics 27:7 81:14
spell 18:23
spend 5:22
spoken 10:16,21
spreadsheet 45:19
St 16:21 17:1
stage 47:13
standard 26:16
standpoint 73:2,3
start 35:22 63:6 65:13
started 17:6 34:5 64:9
starter 70:9,16
starting 64:25 79:20
starts 34:2
state 4:21 16:4 72:23
statements 76:15
states 1:1 4:7 77:25 78:7,9,12
stating 36:15
staying 63:14
step 35:20 49:21
Stewart 1:5 4:5 11:8 12:22 13:21 15:12 43:6,8 44:3 45:4 47:3,21 48:3 49:5,16 50:12,13 50:18 54:2,10,15 55:6,14,17,20 56:4,12,17,20,25 57:5,10,12,16,24 58:2,4,9,13,18,22 58:25 59:4,8,12 59:16,19 60:7,11 65:21 66:7 67:11 74:17,20 76:13,17 76:19 80:21 81:20 82:7,16,20 83:5,7 83:11,12,16 84:7
Stewart's 53:18

57:6,7 59:23 60:1 60:10 76:19 82:22
Stocking 14:8 15:24
stop 49:8 67:7
strategy 18:6 19:14 22:2,17 28:20
Street 1:24 4:12 16:14
strengths 27:19
stretch 45:22
strike 9:15 28:17 43:6 67:25
study 16:6
stuff 45:19
subject 80:12
submit 52:9 56:1
substance 81:11
suggest 40:3 78:18 78:24 79:2,5
suggested 54:22 60:14 73:6 74:4 79:10,13
suggesting 66:6
suggestions 36:23
Suite 1:24 2:7,12 2:20
summer 5:3 55:2
supervise 19:2 28:19,23 29:6 32:12
supervisor 24:9 31:25 32:16 39:16
supervisors 31:13
supervisory 23:23
supposed 18:3 38:18
sure 6:19,24 10:6 25:16 27:21 37:15 39:1,4 48:15 49:3 53:9 61:8 64:19 71:18 72:15 75:17 77:21
sworn 4:19 88:10
system 43:24,25 46:16,19 49:24 50:4,9 52:13,23

56:7 62:1,3

---

**T**

Table 42:1
take 6:16,18 26:4 35:11 39:16 41:22 43:4 45:15,21 52:3,8 64:24 79:16 83:20
taken 4:13
talk 16:1 17:9 19:12 33:17 40:13 83:4
talked 29:25 68:3
talking 27:15 58:12
target 63:7 78:21
targeted 80:22
targets 18:18
team 23:25 24:19 32:13 36:5,9 63:23,24 73:18
technology 46:10 69:1
Ted 17:21
tell 11:12 16:2 20:3 26:23 29:3 70:22 71:7,12 82:16,19
telling 40:9
ten 49:16 51:2 56:19 69:4,5,6,8
ten-minute 45:21
term 18:5 21:21 41:6,9 64:2
terminated 9:24 74:17 81:22 82:2 82:3
termination 10:12
terminology 22:3
terms 29:12 39:12
territory 20:23
testified 24:8 28:16 46:8 49:25 54:22 56:6 58:7 61:25 64:10 75:8 77:6 83:17
testify 7:9 81:2 88:11
testifying 66:22

testimony 6:23 7:5 54:21 88:4,12 89:1
testing 47:25 48:24
Texas 16:20
th 66:10 74:3,4
Thank 4:20 5:7,14 24:14 29:10 44:24 45:25 63:2 78:16
then-supervisor 82:23
thing 15:8 28:6 57:13 63:9
things 7:5 46:21 75:1 88:6
think 7:21 8:1,6,7 9:4,11 14:16,16 14:21 19:17,19 24:5 27:12 28:13 30:14 35:6 36:5 38:17 40:4,18 41:4 43:21 49:23 52:17,17,25 54:3 54:4,12 57:4,11 57:12 61:1,13 64:1,1 66:13 68:20,21,21 70:19 77:18 78:8,16 83:15,21 85:17,18 85:21
Thomas 1:18 4:14 88:10
thought 28:16 53:3 54:21 77:6
three 54:18 62:13 65:18
throw 7:6
time 4:2,17 5:22 9:2 10:7,15 12:1,2 14:17 15:1,6 24:21 25:17 26:14 31:3,7 34:15 37:9 38:13 50:2,11 54:24 55:10 60:17 65:15,19 66:8 74:16 78:17 79:13 80:18

timeline 68:1
times 5:19 9:14 34:14 51:13 55:9
timing 25:12 67:8 67:12 74:6
tiny 61:19
title 18:9 42:1
today 4:14 6:13 7:9 7:16 8:10 11:11 12:10 76:5 83:17
Todd 24:3,5 53:11 57:24
toggling 61:9 63:14
told 8:5 19:18 72:15 81:4
top 47:11 70:6
total 24:21 47:24 48:1,2,3 49:1 62:13 68:21 75:5 75:14,17
training 30:16 72:2
trainings 30:10,24
transcribed 88:15
transcript 88:3
transfer 41:7
transferred 34:25 70:23
transition 21:13 84:22
transitioned 19:5
tricky 46:11
true 76:21,24 77:1 77:5 88:3
truth 88:11,11,12
truthful 7:4
try 58:23
trying 9:5,5 48:21 58:21 62:22
two 16:10 24:22,24 37:25 42:9 43:5 44:12 47:4,5 55:2 56:14,23 71:13 74:12 75:11 80:11
type 51:3,10
typewriting 88:15

---

**U**

uh-huh"s 7:1

**ultimate** 71:4
**ultimately** 70:7
**underlying** 41:13
**understand** 6:21
7:1,10 14:25
21:21,23 22:3
43:22 46:25 48:21
75:15
**understanding**
26:11 27:21 32:20
33:9,22 35:14
55:5 72:10
**understood** 43:2
49:7
**undertook** 34:9
**unique** 33:6,7
**United** 1:1 4:7
**University** 16:5
**unusual** 39:14
**up-and-out** 79:3
**upcoming** 10:4,8
**uploaded** 43:25
**upper** 20:24 62:22
**use** 38:19

_____ **V** _____

**v** 4:5
**vacant** 38:2
**validation** 36:14
**vice** 23:10
**video** 1:21,23 4:16
**video-recorded** 4:4
**videoconference**
1:17 4:4
**Videos** 30:18
**view** 53:18 62:5
**viewable** 45:20
**vignettes** 30:18
**visual** 28:12,13
**vs** 1:9

_____ **W** _____

**Wacker** 2:20
**wall** 7:6
**want** 6:15,19 7:3,7
17:9 20:15 23:3
42:13 46:12 48:9
48:13 49:2 66:22

79:9 83:21
**wanted** 34:2
**wasn't** 39:14
**way** 62:4 64:25
69:25
**we'll** 15:8 33:21
41:24 42:17 56:22
61:21 86:16,16
**we're** 7:4,9 8:1
33:17 49:9 61:8
61:15 63:14 83:21
**we've** 45:17 67:8
68:1
**weaknesses** 27:19
**website** 38:18
41:17,18,18 43:12
**week** 37:24,25
**weight** 57:20
**Weiss** 2:18 5:2
10:15,17
**well-spoken** 68:13
**went** 35:4 69:25
70:22 73:25
**weren't** 67:4
**West** 2:20
**Wheaton** 2:8
**where'd** 63:19
**WHEREOF** 89:1
**whoops** 47:3
**willing** 40:11
**willingness** 71:23
**window** 53:24
**Wisconsin** 35:9
57:14 77:20,22
**wished** 34:14 37:17
**witness** 2:15 4:14
4:19 7:18,23 8:13
11:13 12:5,14,24
13:2 21:6,18
30:13 31:17,25
32:9,25 33:13
43:2,14 61:5
71:15 77:10,13
80:9 81:5 82:1
85:20 88:5,10,14
88:24
**work** 17:6 28:6

40:18 72:7,11,21
79:6
**Workday** 43:12,17
46:10,15 49:24
50:6 52:10,13,23
62:1,10
**worked** 16:16,18
17:17 24:6 77:2
**workers** 78:25
**working** 59:14
68:15 69:8 72:1,3
72:12,19 77:8
85:7
**world** 57:7 68:15
**would've** 27:1 37:1
50:4,4 53:10
54:13 56:16 59:3
60:17 64:4,8 66:7
66:10 67:13,17
**wouldn't** 25:22
**written** 27:16
**wrong** 24:12 69:25

_____ **X** _____

_____ **Y** _____

**yeah** 12:14 13:5
14:14 22:24 25:19
31:17 32:9 42:15
52:17 61:5,15
62:24 63:22 68:21
69:3 71:15 73:5
**year** 17:4 25:23
26:13 51:16
**years** 14:19 17:10
24:22,24 49:1,4
49:25 51:2 53:24
56:19 59:15 68:14
68:18,21 69:4,5,6
69:8 80:11
**years'** 70:14
**Yep** 66:5 75:19
**yes"es** 6:24
**Yesterday** 11:17
**Yost** 14:6 15:22

_____ **Z** _____

**Zac** 12:22 70:8,16

**Zachary** 43:5,7
**Zannacker** 24:3
53:12 55:21 57:24
58:9,13
**Zero** 19:3
**zone** 70:9
**Zoom** 58:4

_____ **0** _____

**0:00:26** 4:9
**0:00:39** 4:14
**0:00:47** 4:18
**0:00:57** 4:22
**0:01:04** 4:25
**0:01:15** 5:4
**0:01:23** 5:7
**0:01:30** 5:13
**0:01:36** 5:17
**0:01:50** 5:22
**0:01:56** 5:24
**0:02:12** 6:3
**0:02:19** 6:6
**0:02:33** 6:10
**0:02:43** 6:13
**0:02:56** 6:17
**0:03:08** 6:21
**0:03:24** 7:1
**0:03:41** 7:6
**0:03:50** 7:10
**0:04:02** 7:14
**0:04:11** 7:20
**0:04:24** 7:25
**0:04:34** 8:5
**0:04:44** 8:8
**0:04:49** 8:12
**0:05:07** 8:18
**0:05:19** 8:21
**0:05:31** 8:25
**0:05:40** 9:3
**0:05:47** 9:5
**0:05:56** 9:10
**0:06:05** 9:12
**0:06:28** 9:19
**0:06:45** 9:23
**0:06:54** 10:1
**0:07:04** 10:5
**0:07:15** 10:9
**0:07:26** 10:13

**0:07:47** 10:19
**0:07:57** 10:23
**0:08:16** 11:3
**0:08:29** 11:8
**0:08:43** 11:12
**0:08:50** 11:17
**0:09:01** 11:21
**0:09:14** 12:1
**0:09:20** 12:5
**0:09:32** 12:10
**0:09:46** 12:16
**0:09:54** 12:21
**0:10:10** 12:25
**0:10:17** 13:4
**0:10:20** 13:8
**0:10:25** 13:13
**0:10:36** 13:17
**0:10:43** 13:20
**0:10:50** 13:25
**0:10:56** 14:4
**0:11:03** 14:8
**0:11:22** 14:14
**0:11:36** 14:19
**0:11:56** 14:23
**0:12:07** 15:2
**0:12:27** 15:7
**0:12:32** 15:10
**0:12:37** 15:14
**0:12:42** 15:18
**0:12:47** 15:22
**0:13:00** 16:3
**0:13:11** 16:7
**0:13:25** 16:11
**0:13:43** 16:14
**0:13:55** 16:19
**0:14:14** 16:23
**0:14:34** 17:2
**0:14:46** 17:5
**0:15:17** 17:11
**0:15:23** 17:13
**0:15:37** 17:18
**0:15:47** 17:21
**0:15:59** 17:25
**0:16:19** 18:4
**0:16:30** 18:9
**0:16:34** 18:12
**0:16:54** 18:18

| | | | | |
|---|---|---|---|---|
| **0:17:01** 18:20 | **0:28:09** 26:10 | **0:38:42** 34:7 | **0:51:18** 42:5 | 62:15 |
| **0:17:08** 18:24 | **0:28:16** 26:13 | **0:38:54** 34:10 | **0:51:28** 42:10 | **1:00:08** 49:14 |
| **0:17:18** 19:2 | **0:28:27** 26:16 | **0:39:02** 34:14 | **0:51:35** 42:14 | **1:00:21** 49:17 |
| **0:17:27** 19:6 | **0:28:35** 26:20 | **0:39:10** 34:18 | **0:51:40** 42:18 | **1:00:34** 49:21 |
| **0:17:52** 19:11 | **0:28:49** 26:25 | **0:39:23** 34:21 | **0:52:00** 43:1 | **1:00:53** 49:25 |
| **0:18:04** 19:14 | **0:29:11** 27:6 | **0:39:43** 35:1 | **0:52:16** 43:6 | **1:01:01** 50:2 |
| **0:18:26** 19:19 | **0:29:26** 27:10 | **0:39:55** 35:5 | **0:52:26** 43:10 | **1:01:10** 50:5 |
| **0:18:53** 19:24 | **0:29:41** 27:13 | **0:40:05** 35:9 | **0:52:33** 43:13 | **1:01:22** 50:8 |
| **0:19:15** 20:4 | **0:30:08** 27:20 | **0:40:25** 35:13 | **0:52:49** 43:18 | **1:01:49** 50:15 |
| **0:19:34** 20:7 | **0:30:17** 27:22 | **0:40:33** 35:16 | **0:53:06** 43:25 | **1:01:58** 50:18 |
| **0:19:46** 20:10 | **0:30:23** 28:1 | **0:40:46** 35:21 | **0:53:16** 44:4 | **1:02:04** 50:21 |
| **0:19:58** 20:14 | **0:30:31** 28:4 | **0:41:01** 36:1 | **0:53:22** 44:7 | **1:02:27** 51:1 |
| **0:20:17** 20:17 | **0:30:36** 28:7 | **0:41:14** 36:5 | **0:53:38** 44:11 | **1:03:00** 51:6 |
| **0:20:32** 20:21 | **0:30:49** 28:12 | **0:41:22** 36:9 | **0:53:56** 44:16 | **1:03:18** 51:10 |
| **0:20:53** 21:1 | **0:31:03** 28:15 | **0:41:31** 36:12 | **0:54:13** 44:18 | **1:03:24** 51:13 |
| **0:21:03** 21:4 | **0:31:13** 28:18 | **0:41:56** 36:17 | **0:54:35** 44:23 | **1:03:35** 51:16 |
| **0:21:08** 21:8 | **0:31:20** 28:21 | **0:42:08** 36:21 | **0:54:44** 45:4 | **1:04:12** 51:21 |
| **0:21:21** 21:10 | **0:31:26** 28:24 | **0:42:26** 37:1 | **0:54:59** 45:8 | **1:04:22** 51:24 |
| **0:21:44** 21:14 | **0:31:34** 29:2 | **0:42:36** 37:4 | **0:55:12** 45:12 | **1:04:28** 52:2 |
| **0:21:53** 21:17 | **0:31:49** 29:6 | **0:42:48** 37:8 | **0:55:24** 45:20 | **1:04:37** 52:5 |
| **0:21:58** 21:21 | **0:32:06** 29:13 | **0:42:59** 37:13 | **0:55:34** 45:24 | **1:04:50** 52:8 |
| **0:22:08** 21:24 | **0:32:26** 29:18 | **0:43:10** 37:17 | **0:55:41** 46:3 | **1:05:10** 52:14 |
| **0:22:34** 22:6 | **0:32:40** 29:22 | **0:43:33** 37:22 | **0:56:02** 46:11 | **1:05:20** 52:18 |
| **0:22:51** 22:14 | **0:32:52** 29:25 | **0:43:46** 37:25 | **0:56:18** 46:16 | **1:05:26** 52:21 |
| **0:23:01** 22:17 | **0:33:11** 30:5 | **0:44:12** 38:6 | **0:56:31** 46:20 | **1:05:33** 52:24 |
| **0:23:11** 22:21 | **0:33:22** 30:9 | **0:44:28** 38:9 | **0:56:39** 46:24 | **1:05:56** 53:4 |
| **0:23:21** 22:25 | **0:33:30** 30:12 | **0:44:35** 38:11 | **0:56:53** 47:3 | **1:06:10** 53:8 |
| **0:23:36** 23:4 | **0:33:41** 30:16 | **0:44:46** 38:14 | **0:57:01** 47:6 | **1:06:18** 53:10 |
| **0:23:53** 23:9 | **0:33:52** 30:19 | **0:45:15** 38:20 | **0:57:09** 47:9 | **1:06:34** 53:13 |
| **0:24:00** 23:12 | **0:34:05** 30:23 | **0:45:37** 38:25 | **0:57:26** 47:14 | **1:07:17** 53:21 |
| **0:24:08** 23:14 | **0:34:23** 31:4 | **0:45:55** 39:3 | **0:57:37** 47:18 | **1:07:45** 54:2 |
| **0:24:18** 23:17 | **0:34:33** 31:8 | **0:46:10** 39:8 | **0:57:47** 47:22 | **1:07:57** 54:5 |
| **0:24:37** 23:22 | **0:34:45** 31:11 | **0:46:27** 39:13 | **0:57:59** 47:25 | **1:08:10** 54:9 |
| **0:24:55** 24:2 | **0:35:01** 31:16 | **0:46:44** 39:17 | **0:58:12** 48:3 | **1:08:36** 54:13 |
| **0:25:18** 24:7 | **0:35:20** 31:22 | **0:47:00** 39:22 | **0:58:18** 48:5 | **1:08:51** 54:16 |
| **0:25:31** 24:12 | **0:35:43** 32:4 | **0:47:07** 39:24 | **0:58:20** 48:12 | **1:09:01** 54:19 |
| **0:25:44** 24:16 | **0:35:54** 32:8 | **0:47:20** 40:3 | **0:58:26** 48:16 | **1:09:11** 54:23 |
| **0:25:58** 24:20 | **0:36:04** 32:11 | **0:47:39** 40:7 | **0:58:37** 48:22 | **1:09:24** 55:3 |
| **0:26:13** 24:23 | **0:36:30** 32:18 | **0:48:02** 40:13 | **0:58:47** 48:25 | **1:09:40** 55:7 |
| **0:26:21** 25:2 | **0:36:47** 32:23 | **0:48:24** 40:17 | **0:58:57** 49:3 | **1:09:47** 55:11 |
| **0:26:48** 25:8 | **0:36:58** 33:3 | **0:48:46** 40:23 | **0:59:11** 49:7 | **1:10:08** 55:14 |
| **0:26:59** 25:11 | **0:37:12** 33:6 | **0:49:09** 41:3 | **0:59:37** 49:10 | **1:10:20** 55:18 |
| **0:27:13** 25:15 | **0:37:25** 33:11 | **0:49:28** 41:7 | **000659** 61:12 | **1:10:31** 55:21 |
| **0:27:33** 25:18 | **0:37:35** 33:15 | **0:49:36** 41:11 | **001023** 61:22 | **1:10:43** 55:24 |
| **0:27:44** 25:23 | **0:37:53** 33:19 | **0:49:54** 41:14 | | **1:10:53** 56:3 |
| **0:27:53** 26:2 | **0:38:06** 33:24 | **0:50:17** 41:20 | **1** | **1:10:58** 56:5 |
| **0:27:59** 26:7 | **0:38:21** 34:3 | **0:51:08** 42:1 | **1** 3:8 42:18,20 44:22 52:15,21 | **1:11:11** 56:9 |

| | | | | |
|---|---|---|---|---|
| **1:11:21** 56:13 | **1:22:53** 64:16 | **1:36:34** 72:20 | **1:48:07** 80:13 | **12:15** 83:22 84:3 |
| **1:11:32** 56:17 | **1:23:10** 64:21 | **1:36:45** 72:23 | **1:48:16** 80:17 | **12:19** 86:25 |
| **1:11:46** 56:21 | **1:23:28** 65:2 | **1:36:57** 73:1 | **1:48:21** 80:20 | **13** 66:25 |
| **1:12:00** 56:25 | **1:24:03** 65:6 | **1:37:05** 73:4 | **1:48:43** 81:4 | **14** 66:11 74:5 |
| **1:12:14** 57:3 | **1:24:11** 65:9 | **1:37:23** 73:8 | **1:49:03** 81:11 | **1500** 2:12 |
| **1:12:35** 57:8 | **1:24:36** 65:13 | **1:37:31** 73:11 | **1:49:18** 81:17 | **15th** 66:25 |
| **1:12:53** 57:14 | **1:24:51** 65:19 | **1:37:40** 73:16 | **1:49:30** 81:22 | **1603** 2:7 |
| **1:13:05** 57:18 | **1:25:02** 65:22 | **1:37:59** 73:21 | **1:49:39** 81:25 | **19** 1:19 49:5 88:9 |
| **1:13:16** 57:22 | **1:25:13** 66:1 | **1:38:19** 74:1 | **1:49:49** 82:4 | **19th** 4:2 |
| **1:13:24** 57:25 | **1:25:19** 66:5 | **1:38:50** 74:5 | **1:49:58** 82:8 | |
| **1:13:45** 58:5 | **1:25:28** 66:8 | **1:39:17** 74:10 | **1:50:03** 82:11 | **2** |
| **1:14:19** 58:9 | **1:25:38** 66:11 | **1:39:37** 74:15 | **1:50:17** 82:15 | **2** 3:9 44:21 45:1 |
| **1:14:35** 58:13 | **1:25:53** 66:16 | **1:39:49** 74:19 | **1:50:31** 82:20 | 62:14,14 68:20 |
| **1:14:48** 58:18 | **1:26:05** 66:19 | **1:40:02** 74:23 | **1:50:43** 82:24 | **20** 53:24 |
| **1:15:02** 58:23 | **1:26:24** 66:23 | **1:40:36** 75:3 | **1:50:48** 83:1 | **20-something** |
| **1:15:24** 59:4 | **1:26:36** 67:2 | **1:40:47** 75:7 | **1:50:58** 83:5 | 59:15 |
| **1:15:43** 59:9 | **1:26:49** 67:6 | **1:40:59** 75:12 | **1:51:07** 83:9 | **200,000** 79:21 |
| **1:16:10** 59:15 | **1:27:20** 67:11 | **1:41:17** 75:16 | **1:51:18** 83:13 | **2016** 69:10 |
| **1:16:25** 59:20 | **1:27:39** 67:16 | **1:41:31** 75:18 | **1:51:32** 83:17 | **2017** 44:23 |
| **1:16:33** 59:24 | **1:28:11** 67:20 | **1:41:35** 75:21 | **1:51:42** 83:22 | **2018** 45:12 69:10 |
| **1:16:54** 60:5 | **1:28:23** 67:25 | **1:41:52** 75:25 | **1:51:46** 84:1 | **2019** 16:24 25:18 |
| **1:17:08** 60:8 | **1:28:38** 68:4 | **1:42:02** 76:4 | **1:52:10** 84:9 | 44:21 |
| **1:17:21** 60:11 | **1:28:59** 68:9 | **1:42:13** 76:7 | **1:52:17** 84:13 | **2020** 16:24 17:1 |
| **1:17:30** 60:15 | **1:29:41** 68:16 | **1:42:22** 76:10 | **1:52:27** 84:19 | 19:18,19 20:15 |
| **1:17:44** 60:18 | **1:30:08** 68:22 | **1:42:36** 76:14 | **1:52:40** 84:23 | 21:3 25:5,13,15 |
| **1:18:18** 60:21 | **1:30:25** 69:2 | **1:42:49** 76:17 | **1:52:53** 85:1 | 25:18,19 26:10,18 |
| **1:18:26** 60:24 | **1:30:39** 69:7 | **1:43:02** 76:21 | **1:53:06** 85:5 | 26:22 37:18 44:21 |
| **1:18:30** 61:4 | **1:30:54** 69:10 | **1:43:20** 76:25 | **1:53:28** 85:11 | 55:2 |
| **1:18:42** 61:10 | **1:31:09** 69:14 | **1:43:31** 77:4 | **1:53:50** 85:15 | **2021** 9:23 17:2 |
| **1:18:58** 61:13 | **1:31:32** 69:19 | **1:43:42** 77:10 | **1:54:23** 85:22 | 25:23,24 26:20 |
| **1:19:15** 61:20 | **1:31:43** 69:22 | **1:43:47** 77:14 | **1:54:36** 86:2 | **2022** 1:9 |
| **1:19:36** 62:3 | **1:32:09** 70:3 | **1:44:04** 77:20 | **1:54:44** 86:5 | **2024** 1:19 4:2 88:9 |
| **1:19:48** 62:7 | **1:32:19** 70:6 | **1:44:14** 77:23 | **1:54:58** 86:10 | 89:6 |
| **1:20:04** 62:11 | **1:32:43** 70:11 | **1:44:32** 78:3 | **1:55:18** 86:15 | **2100** 2:7 |
| **1:20:26** 62:16 | **1:33:17** 70:18 | **1:44:46** 78:7 | **1:55:25** 86:19 | **215,000** 22:18 |
| **1:20:45** 62:20 | **1:33:26** 70:21 | **1:45:03** 78:10 | **1:55:30** 86:23 | 79:14 |
| **1:20:49** 62:23 | **1:33:39** 70:25 | **1:45:24** 78:15 | **10** 4:2 59:20 82:20 | **216** 1:24 4:11 |
| **1:20:53** 63:2 | **1:33:55** 71:3 | **1:45:49** 78:19 | **10,000-foot** 53:18 | **21st** 66:25 |
| **1:21:04** 63:7 | **1:34:04** 71:6 | **1:45:57** 78:23 | **10:55** 46:3 | **22-cv-4734** 4:7 |
| **1:21:15** 63:10 | **1:34:14** 71:11 | **1:46:09** 79:3 | **100** 75:6 | **24th** 66:25 |
| **1:21:30** 63:15 | **1:34:26** 71:16 | **1:46:22** 79:7 | **1026** 75:5 | **27** 61:22 |
| **1:21:38** 63:18 | **1:34:37** 71:20 | **1:46:33** 79:11 | **103** 1:24 | |
| **1:21:50** 63:21 | **1:34:57** 71:24 | **1:46:45** 79:15 | **1082** 16:14 | **3** |
| **1:22:01** 63:25 | **1:35:14** 72:3 | **1:47:06** 79:21 | **11** 49:16 66:11 74:4 | **3** 3:10 45:12,13 |
| **1:22:13** 64:5 | **1:35:34** 72:7 | **1:47:15** 79:24 | **11:05** 46:1 | **300** 48:3,3,22 75:12 |
| **1:22:32** 64:9 | **1:35:52** 72:12 | **1:47:34** 80:4 | **11:06** 46:6 | 75:18 |
| **1:22:44** 64:13 | **1:36:18** 72:17 | **1:47:48** 80:7 | **12:02** 83:25 | **30075** 16:14 |
| | | | | **300s** 48:4 |

**4**

**4** 3:11 48:14,16,18
  52:15,21
**40** 80:18
**4100** 2:20
**42** 3:8
**45** 3:9,10
**4734** 1:9
**48** 3:11

**5**

**5** 3:4,12 61:12,13
  61:13,16 89:6
**500** 2:12

**6**

**6** 3:13 61:22,23
**60187** 2:8
**60601** 2:21
**60661** 1:25 4:12
**61** 3:12,13
**661** 64:17
**662** 64:17 65:1
**663** 64:17
**664** 66:21
**665** 61:13
**67** 3:14

**7**

**7/15** 63:7,10 65:13
  66:8
**7/30** 66:8,19
**77** 2:20

**8**

**8/11** 65:18 66:19
**8/31** 63:10

**9**

**9** 3:14 67:20,22
**90266** 2:13

# EXHIBITS TO HARRISON DEPOSITION

# EXHIBITS 1, 2, 3, 4, 5, 6, 9

# Exhibit 1 to Harrison Deposition

# Table of Contents

R00064494 - Senior Fixed Operations Manager, Iowa

| Candidate Name | Candidate ID | Attachments |
|---|---|---|
| 1. Zachary Mangrum | C00035865 | 📎 |
| 2. Matthew Stewart | C00269664 | 📎 |

CONFIDENTIAL

EXHIBIT

1

exhibitsticker.com

Nissan_002017

# Exhibit 2 to Harrison Deposition

# Matthew L. Stewart

S71W32673 Sandie Lane • Mukwonago, WI 53149 • 815-751-2813 •
matthew.stewart@nissan-usa.com

Objective    To contribute to the overall profitable growth of NMAC by utilizing my education and experience.

Experience    **Nissan Motor Acceptance Corporation – Aurora, IL**

Financial Services Manager - March 2003-Present
- Responsible for developing and implementing strategies to assist in reaching district performance goals and commitments
- Primary contact between dealers and NMAC for dealer financing, consumer credit, escalated customer assistance issues and funding resolution
- Responsible for training new F & I managers and office staff
- Responsible for acquiring new commercial credit accounts and completing documentation needed for closing these loans

**Nissan North America, Inc. – Aurora, IL**
Infiniti Motor Division
December 2000 – Present

Distribution/Contests and Incentive Specialist
- Responsible for monthly wholesale and assignment attainment
- Product launch coordination
- Auto show vehicle ordering and shipment coordination
- Monthly RVP Challenge development and tracking
- Special dealer (sales) contests & trip coordination

Dealer Technical Specialist
- Assisted in the diagnosis and repair of problem vehicles.
- Performed Incident Investigation Reports for the Legal Department in product liability cases.
- Represented Infiniti in Better Business Bureau Arbitration's.
- Assess dealership training needs and recommended curriculum for specific technicians based on need.

**KIA Motors America, Inc. – Lombard, IL**
March 1998 – November 2000

District Parts and Service Manager
- Assisted dealers in all facets of dealership fixed operations
- Parts, Service, and Warranty Cost Control
- Represented Kia Motors in arbitration hearings
- Responsible for dealership fixed operations training

Chevrolet Motor Division - Troy, MI

EXHIBIT

2

exhibitsticker.com

Nissan_002019

July 1996 – March 1998

### Reimbursement Assistant Department Manager
- Responsible for review and payment determination of all customer reimbursement requests completed by reimbursement specialists
- Managed a staff of twelve team members; responsible for selection of team members
- Focused on goals for the team pertaining to efficiency and response time

### Reimbursement Specialist
- Researched, prepared, and submitted claims to management for edit and approval
- Appointed to the only North American reimbursement position for Chevrolet Motor Homes Chassis

### Business Analyst
- Responsible for inbound customer calls regarding current products, promotional offers, and service concerns regarding Chevrolet vehicles
- Selected to review cases to be included in NHTSA inquiries
- Served as a team technical specialist to train other team members on technical issues

**Education**  Weber State University – Ogden, UT
BS, AAS, Automotive Technology

CONFIDENTIAL

Nissan_002020

# Exhibit 3 to Harrison Deposition

# Zac Mangrum

## NNA Fixed Operations Manager

615.557.8265
zachary.mangrum@nissan-usa.com

### 10+ YEARS OEM FIXED OPERATIONS EXPERIENCE
Includes retail and manufacturer experience.

### 2+ YEARS AFTERSALES BUSINESS DEVELOPMENT
Work with dealers to create programs and plans to drive service revenues and profits. Develop C&I for dealers to increase parts and labor sales growth.

### 3+ YEARS ANALYTICS EXPERIENCE
Compile data into actionable reports and consult based on findings. Use analysis to help sell the proposition.

## PROFESSIONAL EXPERIENCE

### NISSAN NORTH AMERICA
Fixed Operations Manager – West Region
Jan 2019 - Current
Work with dealer staff to improve upon a litany of metrics including, sales, retention, profitability, and service KPI.

Regional Aftersales Analyst – Southeast Region
Nov 2017 - Jan 2019
Support the aftersales field staff with C&I planning and tracking, dealer training and support, wholesale program growth and analysis, and claim monitoring and analysis.

Warranty Analyst / ARC Program Analyst
Apr 2016 – Nov 2017
Analyze dealer claim data, identify abnormal claim patterns and implement corrective measures with dealers

Powertrain Call Center Team Lead
Dec 2013 – Apr 2016
Provide technical claim support to dealer staff. Led quality assurance team to assist retailers with claims and policy.

### DEALER/RETAILER (Various Dealer Groups)
Technician, Express Manager, Service Advisor
2009 - 2013

## SKILLS

Proven Effective Leadership

Analytical Problem Solver

Relationship Development

Dealer Tools/Equipment Expert

Claims Quality Analysis

Dealer Process Development

## HIGHLIGHTS

Achieved Second Place at Nissan Quality Fair

Created a team and process for ARC claims adjudication in PCC

SME for PEGA Project; Resulted in millions of dollars saved

Assisted with design and application of new Citrix technologies to support our dealers

## EDUCATION

B.S. – Org. Leadership/Comm.
A.A.S. - Automotive Technology
Former ASE Master Technician
OEM Field Training Academy

**EXHIBIT**

3

CONFIDENTIAL

Nissan_002018

# Exhibit 4 to Harrison Deposition Filed Under Seal

# Exhibit 5 to Harrison Deposition

# NISSAN
## MOTOR CORPORATION

| | |
|---|---|
| **Recruiting Start Date** | 07/15/2020 - 10 months ago |
| **Target Hire Date** | 08/31/2020 - 9 months ago |
| **Primary Location** | Nissan Midwest - Aurora |



| | **Hiring Manager** |
|---|---|
| Scott Harrison | |
| Hiring Manager | |

| | **Recruiter** |
|---|---|
| Monica Carman [C] | |
| Recruiter | |

# Overview

## Overview

### Candidate Pipeline

| | |
|---|---|
| **Active Candidates** | 1 |
| **Referral** | 0 |
| **Internal** | 2 |
| **Inactive** | 2 |

```
EXHIBIT

   5
```

### Candidates by Active Stage

| Recruiting Stage Name | Count of Candidates Currently in a Stage | Drop Off | Conversion | |
|---|---|---|---|---|
| Review | 0 | 0% | 100% | |
| Screen | 0 | 0% | 100% | |
| Assessment | 0 | 0% | 100% | |
| Interview | 0 | 67% | 33% | |
| Reference Check | 0 | 0% | 100% | |
| Final Review | 0 | 0% | 100% | |
| Background Check | 0 | 0% | 100% | |

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 51 of 61 PageID #:5360

# NISSAN
## MOTOR CORPORATION

| Recruiting Stage Name | Count of Candidates Currently in a Stage | Drop Off | Conversion | |
|---|---|---|---|---|
| Ready for Hire | 1 | 0% | 0% | |

Candidates by Source

| Candidates | Recruiting Source |
|---|---|
| 2 | Current Employee |
| 1 | Corporate Website |

# Details

## Details

### Requisition Details

| | |
|---|---|
| Job Requisition | R00064494 Senior Fixed Operations Manager, Iowa (Filled) |
| Supervisory Organization | MCAP Nissan Midwest Region (Scott Harrison) |
| Number of Openings | 0 available \| 0 unavailable \| 1 filled \| 1 total |
| Position | Fixed Ops Mgr Sr - ERIK ANDERBERG |
| Referral Payment Plan | |
| Inbound Process | Hire: ERIK ANDERBERG |
| Available For Hire | No |
| Hiring Freeze | No |
| Requester | Christina Mayfield |
| Job Application Template | Job Application Default Template effective 11/15/2019 15:48 |
| Primary Internal Questionnaire | NNA Internal Candidate Questionnaire v2 |
| Secondary Internal Questionnaire | |
| Primary External Questionnaire | NNA External Candidate Questionnaire v2 |
| Secondary External Questionnaire | |
| Recruiting Self-Schedule Calendars | |
| Reference Template | |
| Replacement For | |
| Recruiting Instruction | Post Internally Only |
| Job Posting Title | Senior Fixed Operations Manager, Iowa |
| Job Description Summary | Life at Nissan encompasses everything that inspires both the quality of our vehicles and the quality of our people. Company-wide, you'll find fast learners and self-starting engines as well as people who are quick to embrace change and take an idea into overdrive. At Nissan, minds race. Imagination gets a green light. Each opportunity is the fuel that drives an idea from inspiration to real-life.<br><br>REVIEW AND EDIT THIS JOB SUMMARY BEFORE POSTING |

Hiring Requirements

CONFIDENTIAL

Nissan_000660

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 53 of 61 PageID #:5362

**NISSAN**
**MOTOR CORPORATION**

Job Details

| | |
|---|---|
| Job Profile | MC-NA_Fixed Ops Mgr Sr |
| Job Families for Job Profiles | Sales |
| Worker Sub-Type | a - Regular (no fixed end date) |
| Worker Type | Employee |
| Time Type | Full time |
| Compensation Grade | |
| Primary Location | Nissan Midwest - Aurora |
| Primary Job Posting Location | Nissan Midwest - Aurora |
| Additional Locations | |
| Additional Job Posting Locations | |
| Scheduled Weekly Hours | 40 |
| Work Shift | Day (United States of America) |
| Recruiting Start Date | 07/15/2020 |
| Target Hire Date | 08/31/2020 |
| Target End Date | |

Additional Information

| | |
|---|---|
| Union Membership from Job Profile | |
| Allowed Unions from Job Profile | |

Job Description

With a focus on Mobility, Operational Excellence, Value to our Customers and the Electrification of vehicles, you can expect to be part of something exciting. From the sleek design of our vehicles to the unique opportunities we offer around the globe, Nissan exemplifies ingenuity in everything we do. Our people are what drive the business forward.

We're currently looking for a **Senior Fixed Operations Manager** (FOM) to join our team in the **Iowa area**

Supports assigned dealerships' Parts & Service Operations to achieve district's sales objectives for parts, service and wholesale sales targets. Assesses parts and service operations through routine contact and site visits. Identifies areas of improvement and convinces dealership P&S management to make improvements and take corrective actions to drive P&S sales. Helps identify best in class dealerships' practices and recommends incorporation into programs and policies. Supports AGM with local logistical support for market representation decisions and related dealership implications. Works with Dealer Operations Manager counterpart to synergize operations. Cooperates with other districts to maximize regional and national P&S sales efforts.
Districts consists of 11 Nissan dealerships in Iowa and Southern Minnesota.

**Job functions Include but are not limited to:**

- Conducts routine dealership visits to review operations and meet with vehicle sales staff, management and Dealer Principal to assess all aspects of sales operations.

- Routinely reviews P&S sales reports and financial statements with P&S management to monitor financial strength of P&S operations and compliance with company standards and agreements.
- Monitors cash flow, inventory, and capital.  Questions accuracy and accounting if needed.  Assists AGM and dealership management to improve financial strength through increased P&S sales and operations.
- Works with Dealer Principal to establish Fixed Absorption Rate and ROS goal and plans to achieve them.
- Reviews and monitors marketing and advertising plans for dealerships and assesses current effectiveness of their efforts. Suggests new marketing programs and techniques providing proven results.
- Demonstrates potential positive impact to dealerships financial statements to achieve dealership "buy-in" and support. Routinely reviews P&S sales reports demonstrating success or failure of marketing efforts and expenditures.
- Encourages use of Nissan approved parts vendors to improve dealer costs and supply.  Demonstrate reasons and business case of Nissan programs and advice in comparison.
- Educates and enlightens dealership personal on current incentive programs for customers, sales associates and dealership.
- Assists management with implementation and proper applications of programs.  Ensures that they comply with rules and requirements for incentive payments.
- Analyze reports and sales results and demonstrate programs' financial impacts on dealerships to management.
- Monitors parts inventories and understands dealership tracking systems.  Ensures inventory levels are efficient to provide timely service for customers.
- Ensures that service operations are ready to support commercial vehicles, fleet vehicles, electric vehicles and other specialty lines. Coordinates with Rgl Customer Experience team on analysis of quality of customer interface and service practices in dealerships' P&S operations.
- Participates in CSS reviews and addresses identified issues with dealerships.  Identifies and clones best practices.  Develops action plans with dealerships to enhance customer satisfaction and correct poor habits. Monitors staff performance through real time technology tools and customer satisfaction scores.
- Coordinates with Service Development Manager on aftersales training and program implementation.  Monitor levels and amount of service staff training and expertise.  Promote Technician certification training and supports recognition and in achievements. Understands sources of customer complaints and addresses with management.
- Identifies and evaluates human resource issues in dealerships.   Advises and assists management with correcting management and staff performance through plans for documentation, feedback, coaching, and training.  Recommends staff changes and terminations as appropriate. Identify causes for high levels of staff turnover and addresses issues with appropriate level of

Nissan_000662

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 54 of 61 PageID #:5363

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 55 of 61 PageID #:5364

management.

**Minimum Qualifications:**

- Education: Bachelor's Degree in Business or related field required.
- Experience: A minimum of 6 years of progressive Marketing and Sales experience for the senior level, including a minimum of 4 years of analytical experience in various specialties of the automotive industry. Prior work may be a combination within a dealership, region, headquarters, or manufacturing facility and may be at the Analyst or Regional Manager level or similar type of position. At least 2 or more years of experience within a previous dealer contact support role such as WDM, FOM, FSM or DOM role (or equivalent dealer contact) is required for the senior level. Previous experience supervising others and previous experience in a sales capacity is desirable.
- Working knowledge of word processor, spreadsheet, other PC applications, or mainframe applications to produce non-standard, creative products. Additional knowledge of sales related systems. Ability to present ideas and analysis in an effective manner.
- Ability to prioritize own schedules and organize workload effectively with minimal daily supervision. Ability to function effectively and remain  productive in a virtual office environment
- Ability to focus on the best interests of the dealership and Nissan.  Can remain objective in the course of building relationships. Dedication to meeting the expectations and requirements of internal and external customers.
- Ability to influence the actions of others by building credibility through dealership knowledge, effective recommendations, clear communications, honesty, and demonstrated follow-up on promises.
- Result driven even in the face of resistance or setbacks. Ability to understand the complexities of situations and solicit assistance from others as needed.
- Travel: 50-70% travel by car and maybe some overnight depending on location

Welcome to an open lane of possibility. Drive your career forward and join the company leading the technology and business evolution of the automotive industry by applying today.

*Nissan is committed to a drug-free workplace.  All employment is contingent upon successful completion of a drug screen for roles based in the United States and background screening for all positions.*

*All of us at Nissan – regardless of functional area or expertise – share a passion to design, manufacture, and sell high-performance vehicles. It is Nissan's policy to provide Equal Employment Opportunity (EEO) to all persons regardless of race, gender, military status, disability, or any other status protected by law. Candidates for this position must be legally authorized to work in the United States and will be required to provide proof of employment eligibility at the time of hire; Nissan uses E-Verify to validate employment eligibility. \*\*Visa sponsorship for this position is not available at this time.\*\**

# NISSAN
## MOTOR CORPORATION

### Additional Job Description

Attachments
Attachments

| Job Requisition Attachment | File Name | Updated By | Upload Date |
|---|---|---|---|
| Launch 64494-Sr FOM- Iowa.docx | Launch 64494-Sr FOM- Iowa.docx | Sabrina Sutcliffe [C] (Contract Ended) | 08/13/2020 09:46:07 AM |
| Approval for External Hire 64494-Sr FOM Iowa.docx | Approval for External Hire 64494-Sr FOM Iowa.docx | Sabrina Sutcliffe [C] (Contract Ended) | 08/24/2020 02:30:36 PM |

Business Process History
Business Process

| Effective Date | Business Process | Initiated On | Completed On | Status |
|---|---|---|---|---|
| 07/15/2020 | Job Requisition Change: R00064494 Senior Fixed Operations Manager, Iowa | 08/24/2020 02:30:46 PM | 08/24/2020 02:30:46 PM | Successfully Completed |
| 07/15/2020 | Job Requisition Change: R00064494 Senior Fixed Operations Manager, Iowa | 08/13/2020 09:46:11 AM | 08/13/2020 09:46:11 AM | Successfully Completed |
| 07/15/2020 | Job Requisition Change: R00064494 Senior Fixed Operations Manager, Iowa | 07/21/2020 09:20:13 AM | 07/21/2020 09:20:13 AM | Successfully Completed |
| 07/15/2020 | Job Requisition Change: R00064494 Senior Fixed Operations Manager, Iowa | 07/15/2020 03:28:28 PM | 07/15/2020 03:28:28 PM | Successfully Completed |
| 07/14/2020 | Job Requisition: R00064494 Senior Fixed Operations Manager, Iowa | 07/14/2020 08:01:53 AM | 07/14/2020 10:58:48 AM | Successfully Completed |

## Interview Team

There is no interview team available for this job requisition.

## Organizations

Organizations

| Organization Type | Organization |
|---|---|
| Company | Nissan North America, Inc. (NNA) |
| Cost Center | USA_20024000 Nissan Region Midwest |

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 56 of 61 PageID #:5365

Case: 1:22-cv-04734 Document #: 122 Filed: 11/15/24 Page 57 of 61 PageID #:5366

## NISSAN
### MOTOR CORPORATION

| Organization Type | Organization |
|---|---|
| Region | N - North America |
| Nissan Brand | Nissan |
| Nissan Functional Organization | Marketing & Sales |
| Nissan Americas Business Unit | NNA - Headquarters |
| Nissan GHRDW Coding | 0047-0043 |
| Nissan Primary Function | Nissan Division |

## Qualifications

### Qualifications

There are no qualifications available for this job requisition

## Job Postings

### Current

| Job Posting Details | Job Posting | Type | Posting Start Date | Posting End Date | Primary Posting | Posting Cost | Action |
|---|---|---|---|---|---|---|---|

### Historical

| Job Posting | Type | Posting Start Date | Posting End Date | Job Application Template | Posting Cost | Job Posting Details |
|---|---|---|---|---|---|---|
| Nissan Private External Career Site | External | 08/11/2020 | 08/14/2020 | Job Application Default Template effective 11/15/2019 15:48 | 0 | Nissan Private External Career Site: Senior Fixed Operations Manager, Iowa |
| Internal | Internal | 07/15/2020 | 07/30/2020 | Job Application Default Template effective 11/15/2019 15:48 | 0 | Internal: Senior Fixed Operations Manager, Iowa |

CONFIDENTIAL

# Exhibit 6 to Harrison Deposition Filed Under Seal

# Exhibit 9 to Harrison Deposition

# ERIK ANDERBERG

Greater Minneapolis Area, MN | 612-274-8567 | berger1307@gmail.com

https://www.linkedin.com/in/erik-anderberg-1307/

## FLEET COORDINATOR

Results oriented Fleet Coordinator with expertise in the automotive industry. Proven success with collaborating with dealer networks to achieve common revenue goals. Accomplished in dealer management, customer experience, one on one and group training facilitation.

## CORE SKILLS

Customer Service | Management | Corporate Training/Facilitation | Microsoft Office | Call Center Operations | Adaptability

## PROFESSIONAL EXPERIENCE

**General Motors** - Chicago, IL
**Maven Market Fleet Coordinator**                                  August 2018 to Present
Assist with the development, launch and growth of Maven business operations.

- Maintain audit process of in-person oversight for a fleet of vehicles for shared use by Maven Members in the Chicago metro. Focus: interior/exterior appearance, mechanical operation/condition, dynamics of surrounding environment such as station locations, appearance, safety and other key factors.
- Assist in negotiating and managing vendor service contracts to ensure vehicles are properly maintained, repaired and cleaned to Maven's high standard.
- Utilize reporting data to understand market trends and analyze areas of opportunity as it relates to station utilization, fraud and member satisfaction.
- Serve as direct liaison for in-fleeting/de-fleeting new vehicles to Chicago market. Oversaw installation, troubleshooting and removal of Maven technology.
- Coordinate and oversee vehicle reservations and operations to ensure all aspects of the fleet meet the needs of the city and its base of consumers.

**General Motors** - Fargo, ND
**District Manager of Aftersales**                                  July 2016 to July 2018
Served as Subject Matter Expert (SME) to identify, present and support initiatives to strengthen and grow dealership service lane revenue to support business objectives and goals.

- Investigated customer buy-back scenarios to help mitigate frequency and serve as primary contact for BBB arbitrations.
- Managed district of 9 dealerships to meet and exceed service lane and parts department monthly and annual sales objectives.
- Reviewed, adjusted and implemented processes to aid productivity and profitability within service and parts departments.
- Served as primary contact for dealership Fixed Operations department for concerns related to excess warranty, customer escalations, parts delays and inventory management.
- Educated, trained and assisted dealerships on improving processes related to customer retention, satisfaction and service traffic.
- Analyzed marketing and merchandising plan against GM brand direction, current market trends and dealership's customer needs to identify business opportunities.

**EXHIBIT**

**9**

exhibitsticker.com

Erik Anderberg                    berger1307@gmail.com                    Page 2

**General Motors** - Detroit, MI
**Connected Customer Specialist Lead**                    April 2015 to July 2016
Conducted all duties outlined by previous Connected Customer Specialist role.
- Served as primary production talent for required corporate training modules and videos.
- Scheduled and hosted joint-contact "ride along" with Corporate Office management (engineers, program managers, etc.).
- Served as primary SME for onboarding of new Connect Customer Specialist team members for the North Central Region.
- Assisted with the launch and implementation of local pilot programs related to technology initiatives and cultural changes within nation's largest volume dealerships.

**General Motors** - Milwaukee, WI
**Connected Customer Specialist**                    June 2014 to April 2015
Conducted regional technology and infotainment certification training to technical experts, sales consultants and service advisors.
- Organized and executed regional training expos for range of GM and non-GM personnel.
- Engaged General Motors branded dealerships in developing an effective new and used vehicle delivery process that creates an optimal customer experience.
- Achieved and exceeded new vehicle and used vehicle customer engagement/retention goals.
- Combined efforts with regional zone teams to improve key metrics and continued to build the General Motors brand.
- Effectively assisted a region of 45+ dealerships with information and insights related to infotainment, OnStar and other new emerging in-vehicle technologies.

**Cognizant Technology Solutions** - Des Moines, IA
**Team Lead & Primary Offshore Trainer**                    October 2011 to April 2014
Co-managed the process of contacting, scheduling and performing interviews for prospective employees while assigning projects, duties and tasks for current contact center representatives.
- Served as primary manager and SME for all life insurance related questions as well as escalated customer calls and scenarios.
- Documented, analyzed and presented reports on contact center performance and objectives to managerial staff.
- Effectively managed a team of 15 representatives and assist with quality assurance while actively "coaching" new employees.
- Served as primary SME during call center transition to offshore site (Cebu, Philippines).
- Relocated to offshore site for extended assignment focused on training new call center representatives (Cebu, Philippines).
- Provided one on one coaching, QA feedback and voice skill training for up to 95 Cebu representatives.
- Mentored and trained leadership in process workflow, queue management, escalation resolution and day to day duties.
- Acted as primary contact between onshore and offshore operation centers regarding transition status, required materials and testing results.

## EDUCATION

**Bachelor of Fine Arts, Integrated Studio Arts Adaptability**
Iowa State University- Ames, IA

CONFIDENTIAL                    Nissan_001573