# EXHIBIT F

5/8/2024
ERIC LEDIEU 30(B)(6)
DEPOSITION
TRANSCRIPT WITH
EXHIBITS

www.InDemandReporting.com                    (773) 239-6008

## Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-----------------------------------------------------

Matthew Lee Stewart,

    Plaintiff,

    vs.        Case Number 2022 CV 4734

Nissan North America Inc.,

and Nissan Motor Acceptance

Corporation,

    Defendants.

-----------------------------------------------------

Remote Videoconference Deposition of 30(b)(6) Designee

of Nissan Motor North America, Inc. and

Nissan Motor Acceptance Corporation

Eric Thomson Ledieu

May 8, 2024

-Video Recorded Remotely by-

In Demand Video Court Reporting

216 South Jefferson Street, Suite 103

Chicago, Illinois 60661

## Page 2

APPEARANCES

For the Plaintiff:

Lisa Clay

Lisa Clay, Attorney At Law, LLC

2100 Manchester Road, Suite 1603

Wheaton, Illinois 60187

Shannon M. Foley

Ashley Davenport

Foley Lyman Law Group LLP

1500 Rosecrans Avenue, Suite 500

Manhattan Beach, California 90266

For the Defendants:

Peter M. Farley

Melissa M. Weiss

McGuireWoods LLP

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601

Also present:

Susan Gritton

## Page 3

EXAMINATION INDEX

| DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- |
| 5 | -- | -- | -- |

EXHIBIT INDEX

| EXHIBIT | PAGE NUMBER |
| --- | --- |
| 1 - | 16 |
| 2 - | 77 |
| 3 - | 103 |
| 5 - | 112 |
| 6 - | 116 |
| 7 - | 121 |
| 8 - | 125 |
| 9 - | 152 |
| 10 - | 163 |
| 11 - | 167 |
| 12 - | 191 |
| 13 - | 198 |
| 15 - | 206 |
| 16 - | 215 |
| 17 - | 249 |
| 18 - | 251 |

## Page 4

THE RECORDER: Okay. Good morning. We are now on the record. Today is Wednesday, May 8th, 2024. The time is 10:11 a.m. By agreement of all parties, we are convened via remote videoconference for the video-recorded deposition in the matter of Matthew Lee Stewart v. Nissan North America, Inc. and Nissan Motor Acceptance Corporation, Case No. 22-CV-4734, in the United States District Court for the Northern District of Illinois, Eastern Division.                    0:00:33

This deposition is being recorded by In Demand Court Reporting, located at 216 South Jefferson Street, Chicago, Illinois 60661, on behalf of the Plaintiff and being taken at the instance of the Plaintiff. The witness today is Mr. Eric Thomson Ledieu.                    0:00:48

Mr. Ledieu, my name is Marina Stokes. I'm a notary public and the video recording device operator for this deposition. At this time, would you please raise your right hand for the oath?                    0:00:56

(Witness sworn.)

THE RECORDER: Thank you.

Will the attorneys please state their appearances for the record?                    0:01:07

MS. FOLEY: Shannon Foley and Ashley Davenport and Lisa Clay for the Plaintiff.

1 (Pages 1 to 4)

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

www.InDemandReporting.com                    (773) 239-6008

Page 5

MR. FARLEY: Peter Farley for the Defendants. And also present is Susan Gritton, who's in-house counsel for Nissan North America.     0:01:27

MS. WEISS: Melissa Weiss as well for the Defendants.

THE RECORDER: Thank you. That completes our required information. We can go ahead and proceed.     0:01:36

DIRECT EXAMINATION

BY MS. FOLEY:

Q. Good morning, Mr. Ledieu. Could you please state and spell your name for the record, please?

A. Eric Ledieu. E-R-I-C, L-E-D-I-E-U.     0:01:54

Q. And do you have a middle name?

A. Yes, I do.

Q. And what is your middle name?     0:01:59

A. Thomson.

Q. I didn't hear that.

A. Thomson.

Q. Thank you. Have you had your deposition taken before?     0:02:08

A. Yes.

Q. And how many times?

A. This -- I think one I did a few weeks ago would've been my second time.     0:02:17

Q. So you recently had your deposition taken

Page 6

before. Do you need me to repeat the process or how a deposition proceeds?

A. No.

Q. Was that a "no"?     0:02:34

A. That's a "no."

Q. Okay. I'm -- I'm going to repeat just a couple things, because it's important that we get audible "yes" and "no"s and -- rather than gestures so that we have a clean record for the court reporter to take down all of our words.     0:02:54

And she will be sending to you when we're done a booklet that has all of your testimony today. Is there any reason that you cannot give your best testimony today?     0:03:08

A. No.

Q. You -- do you understand that you just raised your hand to tell the truth under penalty of perjury the same as if you were in a court of law?     0:03:26

A. Yes.

Q. You're on Zoom. You have a screen in front of you. Do you have any documents or notes in front of you?     0:03:39

A. I just have a -- a booklet and my phone.

Q. And what is the booklet that you have in front of you?     0:03:47

Page 7

A. It's just my daily note journal.

Q. And in your daily note journal, do you have any notes pertaining to your deposition or any of the matters regarding Stewart versus Nissan?     0:04:08

A. No, I do not.

Q. I'd like to ask you to push your notebook away from you if --

A. Okay.

Q. -- you could. Thank you. Do you have any electronics or phones or -- other than the -- the computer screen that's in front of you?     0:04:27

Q. No.

Q. And on the computer screen in front of you, do you have any other programs that are open other than Zoom application?

A. I can't answer that. I'm just looking at the TV screen that shows a Zoom screen. So I don't know.     0:04:42

Q. Okay. So you don't have a computer in front of you as you're sitting there.

A. No.     0:04:48

Q. Okay. And in that room, is there just one screen or monitor that you are viewing?

A. Yes.     0:04:59

Q. So today we are entitled to your best testimony. And that means we're entitled to estimates

Page 8

or a list of the names of people or things or dates that you do know.     0:05:21

But we don't want you to guess. Do you know the difference between a guess and an estimate?

A. Yes.

Q. Okay. And this is a deposition called a 30(b)(6), and it's a code section, and it means that you've been designated as the person most knowledgeable.     0:05:54

If at any point on a subject matter you are not the person most knowledgeable at Nissan North America or NMAC, would you please let me know that?

A. Yes.     0:06:11

Q. And if you answer a question, I will assume that you understand the question.

You understand that?

A. Yes.     0:06:21

Q. And if you don't understand a question, please ask me. Sometimes I will ask a question that needs to be rephrased.

You understand that?     0:06:31

A. Yes.

Q. Okay. And we can take breaks if you need one. But I will ask that you answer any pending questions first.

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com          (773) 239-6008

## Page 9

Okay?                                          0:06:42

A.  Okay.

Q.  What is your education?  Did you go to college?

A.  Yes.

Q.  And what degree did you obtain?          0:06:59

A.  I have a bachelor's of science -- business administration from Villanova University.

Q.  What university?

A.  Villanova University in Villanova, Pennsylvania.                               0:07:11

Q.  Okay.  And what year did you graduate?

A.  1996.

Q.  And do you have any advanced degrees beyond the degree in business, the BS or BA?  Is it a BA or a BS?                                        0:07:33

A.  It's a BS in business administration, so it's actually a BSBA technically.

Q.  Okay.

A.  But no, I do not have a secondary degree beyond that.                              0:07:42

Q.  Okay.  So you don't have a master's or a master's in business.

A.  No.

Q.  Do you have any specialized licensing?     0:07:56

## Page 10

A.  The only licensing I have had, and I don't know if it's still current, would be motor vehicle licenses to drive a motor vehicle company car that's plated as such in those states.  But any other licenses to do certain things, no.                    0:08:17

Q.  Okay.  Any specialized training?

A.  I have tons of -- I have done a lot of training throughout my career that is relative to the auto industry or sales finance or some of the compliance rules that we have to abide by in lending.     0:08:43

So yeah, lots of training throughout my career in -- in all the divisions I've worked in, in both companies I've worked for.

Q.  So your specialized training you indicate is related to your career in sales finance, lending, compliance.  What -- with respect to compliance, is that with lending?                        0:09:17

A.  So in my current capacity at NMAC -- and really, my capacity doesn't matter.  All employees must take a training around UDAAP, unfair deceptive lending.     0:09:37

So we get re-certified every year that we understand the rules of -- of those -- for lending.  And the compliance around those lending and, you know, privacy of information.              0:09:51

And then we take regular corporate training

## Page 11

around any kind of issues around conflict of interest and bribery and all those things.  So there's all kinds of training we take throughout the year that is mandatory to all employees.                  0:10:07

Q.  And the training that you have described, sounds like related to lending practices, conflict of interest, how many hours of training do you believe that you take in a year?                        0:10:30

A.  This would be an estimate, not a guess, to your opening comment.  I'd say 15 to 20 hours would be my guess.  Or my estimate.  Sorry.           0:10:46

Q.  Do you do any training with respect to personnel issues?  Regarding managing your employees.

A.  Yes.  Although I don't know that I've taken one recently.                               0:11:13

Q.  When's the last one you took?

A.  I don't recall.

Q.  Was it within the last four years?        0:11:25

A.  I don't recall.

Q.  Have you had training regarding employment hiring and firing practices?

A.  Not to my recollection.  No.              0:11:55

Q.  You have worked at Nissan since what year?

A.  Since 2006.

Q.  And when you started there, what was your

## Page 12

first job?                                     0:12:20

A.  I was the regional after-sales manager for Infiniti in the Southeast region.

Q.  And what is your current position?

A.  I'm the director of financial products for NMAC and Infiniti -- Infiniti financial services.     0:12:49

Q.  And prior to the position that you currently hold, what was your job?

A.  I was the director of sales operations for NMAC.                                       0:13:08

Q.  And what were the years or the period of time that you were the director of sales operations for NMAC?

A.  I started that role in May of 2019 and left it in -- I guess it would be April 1st of 2023.     0:13:31

Q.  And who worked under you in sales operations when you were the director?

A.  Can you be more specific with that question?  Because there's a different answer depending on the time of my tenure.                          0:13:55

Q.  During the time period of fourth quarter 2019 to August of 2020, who worked in sales operations?

A.  And I assume this -- the fourth quarter of 2019, you mean calendar year 2019?           0:14:25

Q.  I do.

3 (Pages 9 to 12)

Page 13

A.   Okay.  So that would've been my national senior manager of sales operations, would've been Mark Lubbers.  And then our regional -- our RFSMs -- so they're senior managers as well, representing NMAC throughout the country.                    0:14:44

At that time, we had -- I'll start with the Northeast.  We had Jay Delaney up in the Northeast.  We had David Roberts in the Mid-Atlantic.                    0:14:56

We have Pearl Bailey in the Southeast.  We had John McBane in the Midwest.  We had Todd Voorhies in Central, down in Texas.  And then had Nick Hungerford in California.                    0:15:15

Q.   And those --

A.   Oh.  Sorry.  Sorry.  And we had Jamie Beck in Mountain region in Denver.                    0:15:23

Q.   Okay.  And those were all of your RFSMs.  And that stands for regional financial service managers?

A.   Yeah.  Regional financial services managers, with the exclusion of Mark Lubbers, who was at headquarters with me as the national senior director of sales operations.                    0:15:44

Q.   Okay.  Other than Mark Lubbers in the headquarters, was there anyone else at the headquarters of the sales operation?

A.   Working directly for me?                    0:15:59

Page 14

Q.   Yes.

A.   No.

Q.   Was there anyone who worked directly for Mark Lubbers?                    0:16:05

A.   Yes.

Q.   Who worked for him?

A.   At that time, it would've been I guess -- I think Ryan Martin was his analyst, Eric Diaz was his manager, and Sean -- I apologize, his last name is escaping me -- but Sean was his other manager.                    0:16:31

Sean.  Sorry.  I -- I forget his last name, but that would've been his team.

Q.   Okay.  Prior to your position as director of sales op, did you work with Nissan?                    0:16:56

A.   Yes.

Q.   And what was your position there?

A.   I was the regional vice president for the Southeast region.                    0:17:04

Q.   And what were the years of that assignment?

A.   That was 2017 to 2019.

Q.   And just prior to that position, where were you?                    0:17:28

A.   I was in -- still in Nashville.  I was the director for chief marketing management for sedans and sports cars and Murano.

Page 15

THE RECORDER:  I'm so sorry to interrupt here.  It looks like we just lost Ms. Weiss.  She dropped the call.                    0:17:47

So I don't know if we want to go off the record and wait for her or if we're fine to continue

MR. FARLEY:  You -- you can -- I'm with -- with the same firm, so we can continue.  That's okay.                    0:18:04

THE RECORDER:  Okay.  Just want to make sure.

MR. FARLEY:  And if she may be coming -- I think she had a -- like, to do a call, and then she's going to come back, so you might see her come back.                    0:18:14

THE RECORDER:  Okay.  No problem.

BY MS. FOLEY:

Q.   Okay.  So you indicated you were with -- prior to the director of sales op, you were the regional VP with Nissan division of the Southeast region.                    0:18:32

And then you were the director of marketing over several different products?

Is that right?

A.   Yes.  We have a -- a department called CMM, chief marketing management.  And there are directors that oversee current -- certain products in the lineup in that group.  Yes.                    0:18:51

Q.   Okay.  All righty.  And where are you located

Page 16

today as you're taking -- as you're providing testimony?

A.   Brentwood, Tennessee.                    0:19:11

Q.   And do you live in Tennessee?

A.   I do.

Q.   As the director of sales operations, who did you report to?                    0:19:44

A.   Jim DeTrude.

Q.   And what was his title at the time?

A.   Vice president marketing and sales for NMAC.                    0:19:55

Q.   Did you report to anyone other than Jim DeTrude when you were the director of sales operations?

A.   No.

Q.   I'm going to show you what we're marking as our Exhibit 1, which is the notice of depo of the 30(b)(6).                    0:20:37

(Exhibit No. 1 marked for identification.)

BY MS. FOLEY:

Q.   And if you could -- we'll scroll down.  Have you -- did you receive a copy of this document or a version of this?                    0:21:09

A.   Yeah, we looked at this during deposition preparation.  Yes.

Q.   Okay.  And you do know that you've been designated as the person most knowledgeable on many of

4 (Pages 13 to 16)

www.InDemandReporting.com                              (773) 239-6008

Page 17

these categories.

Correct?                                    0:21:28

A.  Yes.

Q.  Okay.  We'll be going through these documents and categories that are referenced in Exhibit 1.

Okay?                                       0:21:43

A.  Can I -- yes.  Can I maybe ask that we take a pause here?  Because we have a prompt screen that says "Personalize your toolbar" --                0:21:49

MR. FARLEY:  Let me get that.

THE WITNESS:  -- that's blocking your exhibit.  So I want to make sure that I'm able to see --

Are you able to do that?                    0:21:55

MS. FOLEY:  Okay.

THE WITNESS:  Got it.  All set.  Thank you.

BY MS. FOLEY:

Q.  Okay.  On the -- the first category, it says "The person most knowledgeable regarding restructuring and reorganization process referenced in Exhibit 1 hereto", which is the June 4 letter to Matthew Stewart, specifically the person most knowledgeable regarding how the positions that were targeted for "restructure or reorganization" were determined.         0:22:37

Are you the person most qualified at NMAC or

Page 18

Nissan to testify about the reorganization and the reasons for Plaintiff's selection for job elimination and/or termination?                          0:22:53

MR. FARLEY:  I'm going to object and just note that he's the person that's been designated to respond to questions for this category.        0:23:02

BY MS. FOLEY:

Q.  Okay.  You can answer my question.

A.  Can you restate your question, please?    0:23:11

Q.  I read what's in category 1, and I said: Are you person most qualified at NMAC/Nissan to testify about the reorganization and the reasons for Plaintiff's, Matt Stewart's, selection for job elimination and termination?                  0:23:33

MR. FARLEY:  And I'm going to assert the same objection.  He's been designated as the person to respond to this topic.                           0:23:40

BY MS. FOLEY:

Q.  Go ahead.  You can answer the question.

MS. FOLEY:  We'll -- we'll take your objection as standing.                             0:23:45

THE WITNESS:  So it's a really long question, so I'll try my best to -- to answer it.  Am I the best person to speak to the restructuring and reorganization as it impacted that district and therefore Mr. Stewart?

Page 19

Yes.                                        0:24:02

BY MS. FOLEY:

Q.  And is it your testimony that there's nobody more qualified than you at Nissan or NMAC to testify regarding this topic?

MR. FARLEY:  I'm going to object to that question.  I'm going to now state a further objection for the record.                               0:24:21

If you want the witness to step out, I'm happy to do that.  But I think the questioning is improper and I want to put it on the record.     0:24:26

MS. FOLEY:  You can go ahead.

MR. FARLEY:  Okay.  The problem is that there could be lots of people that are knowledgeable about these topics.  So one person might be more knowledgeable about another one.               0:24:39

That's not the standard for a 30(b)(6) deposition.  Mr. Ledieu has been prepared for the discussions we had with you all prior to this deposition to answer these questions about these topics.                                      0:24:50

Whether there's another person that's better or worse than him, we don't -- we don't know that.  But he's been designated to answer questions on these topics.  Not that he's the most knowledgeable person

Page 20

factually on any particular topic.           0:25:05

MS. FOLEY:  Okay.

BY MS. FOLEY:

Q.  You can answer the question.  I didn't hear an instruction not to answer.               0:25:13

A.  Yeah.  I -- I guess I would say I'm not in the position to know whether someone knows more than -- or less than me regarding these questions.  0:25:21

But I am prepared to answer the questions you might have around the reorganization and the restructuring.

MR. FARLEY:  Put that here.

THE WITNESS:  Oh, yeah, it's fine.           0:25:29

BY MS. FOLEY:

Q.  Did you make the decisions regarding Plaintiff's selection for job elimination and termination?

A.  I was part of the group that made the recommendations to restructure the organization.  But I did not solely make the decision.            0:26:00

Q.  And you reference a group --

A.  Yes.

Q.  -- who made a decision.  Was there any person -- and you said who made a recommendation.  Who is the group that made the recommendation?         0:26:24

5 (Pages 17 to 20)

Page 21

A. Well, when we first started working on the restructuring -- and the purpose for the restructuring was finding ways for us --

Q. I just -- I'm just -- I'm just asking who was in the group. What are the names of the people?        0:26:39

A. Well, the answer is there are several groups. So there was a first group, which is a smaller group, that was doing some research and analytics around the idea.        0:26:51

And then the -- the group broadened as we brought it to all affected regions. So I can give you the full group or I can give you the first group, and I'm happy to answer either one.        0:27:01

Q. Okay. Who was in the first group that did research and analytics?

A. Yeah. The first group would've been myself, Mr. Lubbers, Mr. Hungerford, Mr. McBane, and Mr. Beck.        0:27:17

And then after that, we would've brought in the other people that you asked that report to me. So the remainder of the RFSMs.        0:27:36

Q. In addition to yourself and Mr. Lubbers.

A. Yes.

Q. And at some point you said you made a recommendation. Who did you make a recommendation to?        0:28:01

A. The first person we would've made the

Page 22

recommendation to would've been Mr. DeTrude.

Q. Did Mr. DeTrude make the decision as to who to terminate -- eliminate positions and terminate employment?        0:28:26

A. I don't -- I guess -- I'm trying to understand the question. Because when we brought that to Mr. DeTrude, it was about the concept and the geography and the districts.        0:28:45

And possible impacted people. But that would've not been at that point of the recommendation, to -- to whether to proceed with the restructuring. So at that point, no one would've made any decisions about anyone. If that makes sense.        0:29:02

Q. Okay. So what -- so you had your research and analytics group, was yourself, Lubbers, Hungerford, Beck, and McBane. And when was that group meeting?        0:29:22

A. That would've been early 2020.

Q. And when you say "early 2020," are you talking January?

A. Somewhere between January and February. I don't recall specifically.        0:29:35

Q. Do you have a date from a calendar or meetings or documents that would show you when?

A. Not to my knowledge.

Q. Where did you meet?        0:29:55

Page 23

A. We met at headquarters in Franklin, Tennessee.

Q. Were you in a conference room?

A. I don't recall. But likely.        0:30:12

Q. Was there a meeting invite for this meeting in early January or February 2020?

A. A -- a meeting invite in terms of inviting those people to join, I'm sure there was. Whether it was a meeting invite on a calendar or a -- for those purposes, I don't know.        0:30:42

Q. Did you schedule the meeting for early 2020 with Mark Lubbers, Nick Hungerford, Jamie Beck, and John McBane?

A. I would've asked for the meeting. Whether I scheduled it or not, I do not know.        0:31:02

Q. When you say you asked for meeting, who did you ask for the meeting?

A. The group.

Q. Would you -- did you send an email to the group?        0:31:14

A. I don't know.

Q. How do you communicate at Nissan with your people?

A. Especially in that role, we would communicate many different ways, because everyone's spread out

Page 24

throughout the United States. So you can communicate a myriad of ways, whether email, text, telephone, conference call.        0:31:39

And -- and Zoom at that point was probably not a thing, so not likely. But at that time, we did have video equipment, but we didn't use it very much up until after the pandemic.        0:31:52

But those would've been the primary methods of communication to the team.

Q. And have you seen an email or any texts or a -- an invite to a conference call for a meeting with that group that was doing research and analytics in January/February of 2020?        0:32:16

A. I'm sure I did. But specifically, I don't recall.

Q. Did all of these people other than you and Mark Lubbers have to fly in to Nashville for this meeting at the headquarters?        0:32:42

A. Yes. John would've come from Chicago, Jamie would've come from Denver, and Nick would've come from California.

Q. Is travel arranged through the headquarters office? Or does everybody make their own travel at Nissan?        0:33:05

A. People book their own travel.

6 (Pages 21 to 24)

www.InDemandReporting.com                                    (773) 239-6008

Page 25

Q. Did --

A. Well, I'm sorry. Actually -- sorry. Let me restate that. At the senior manager level, where they don't have administrative support, they book their own travel. I do not book my own travel.          0:33:29

Q. Did any of these people who flew in to Nashville in early January/February 2020 stay at a hotel for this meeting?

A. I'm sure they did. That's the only place they could've stayed.          0:33:54

Q. Was it an overnight meeting?

A. It was two days, so yes, they would've spent at least one night, maybe two. And they may have even stayed for other meetings on their own calendars with other people in the building.          0:34:10

But our actual session was two days. So they would've at least spent one night.

Q. And who organized all the materials for this two-day meeting with Hungerford, Beck, and McBane?          0:34:30

MR. FARLEY: Objection to form.

THE WITNESS: Mr. Lubbers would've been the most -- person we relied on most for administrative support leading into that meeting.          0:34:42

BY MS. FOLEY:

Q. I didn't catch that. Lubbers would've been

Page 26

the one who organized and arranged all the -- the materials --          0:34:51

A. Yeah. Meaning any -- any data that we would have used or -- or looked at in the meeting would've been arranged by Mark.

Q. Okay. So what data was used or looked at in that meeting that was held in January/February 2020?          0:35:13

A. Yeah, the biggest thing we discussed, and I'm sure we'll talk about it throughout the day here, was around most efficient ways to do -- go to market with our team.          0:35:28

And so he pulled a lot of data around market size, geography, location. We talked a lot about current relationships with our dealers, whether they're in good standing, whether they're performing well, not performing well, whether they were doing certain kinds of business with us or with competing banks.          0:35:51

So there was a lot of data in -- in the -- in those spreadsheets that spoke to the nature of each -- literally each dealership, therefore each district, therefore each area, therefore each region.          0:36:04

Q. And this -- any other information or data that was considered other than you've testified?

MR. FARLEY: Objection to form.          0:36:20

THE WITNESS: No.

Page 27

BY MS. FOLEY:

Q. Were there PowerPoints presented in the meetings that you conducted with that research and analysis group in January/February 2020?          0:36:44

A. I don't recall.

Q. Were there any Excel spreadsheets used or put up on a screen in that meeting?

A. Yes.          0:37:01

Q. Do you remember which ones?

A. I don't specifically remember which ones. But I do know that many of those Excel documents contained a lot of what I just described relative to sales volume, penetration percentages, geographic locations of dealerships, realignments of geography.          0:37:27

Many of those different things were part of those spreadsheets.

Q. And were those Excel spreadsheets handed out to the participants or were they distributed to them electronically?          0:38:00

A. I don't recall. But not likely -- there's so much -- so in that data is I don't know how many columns times, at the time, 1300 different dealer -- up to 1300 dealerships.          0:38:15

We would've not printed all that out. So anything that would've been shared would likely be

Page 28

electronic.

Q. And it appears you only had representation from three regions.

Correct?          0:38:31

A. At -- at the beginning, yes.

Q. And why is that?

A. So the reason for that is as we were doing this work, we were made aware that Nissan division was going to be closing regions. And -- and so we needed to have I would call a fairly small group of people.          0:39:00

We didn't want too many eyes knowing that there was going to be a big restructuring coming with the regions. And while our team works for NMAC and not Nissan, we do align our regional footprint with Nissan.          0:39:14

And so it was going to impact our teams regardless. So we wanted to make sure at first, before we decided to go forward with anything, to -- to not have too many people involved given the sensitive nature of the restructuring that was going to happen.          0:39:28

Q. So what was the regional alignment that you were doing? Taking out the Mountain region?

A. And the Northwest region, where we actually did not have a regional financial services manager. So the -- the Nissan division at the time had eight regions.          0:39:47

7 (Pages 25 to 28)

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

## Page 29

They had California, they had the Pacific Northwest, they had Mountain, they had Midwest, Central, Northeast, Mid-Atlantic, and Southeast. And we're eliminating Pacific Northwest as well as Mountain.  0:40:03

Q. So in 2020, Nissan and NMAC were going to eliminate the Northwest region and the Mountain region. Correct?

A. That is correct.  0:40:22

Q. In 2016, Nissan expanded to add two regions. Correct? They had eight regions.

A. There was an expansion. When it was, I don't recall. But yes, it did expand to eight regions.  0:40:46

Q. And in 2009, they contracted to six regions. Correct?

A. I know there was a contraction. To how many, I don't know. Or I don't remember.  0:41:03

Q. In 2009, there were fewer regions before the 2016 expansion to eight regions. Correct?

MR. FARLEY: Objection to form.  0:41:22

THE WITNESS: To the best of my knowledge, yes. I was with Infiniti in 2009. And we went from four regions to two. So I remember that quite vividly but don't really recall what -- much of what happened

## Page 30

in that Nissan division.  0:41:39

BY MS. FOLEY:

Q. In each of those region expansions and contractions, is it your understanding that employees of Nissan and/or NMAC were terminated?

MR. FARLEY: Can you restate that question, please, Shannon? I didn't quite follow it.  0:42:15

BY MS. FOLEY:

Q. In each of those changes from six regions to eight regions and back, expansions/contractions, employees were terminated at Nissan. Correct?  0:42:34

MR. FARLEY: Okay. Do you have a question?

THE WITNESS: I -- I just -- I'm not -- I wasn't a part of the -- that -- I was part of the company when that happened. But I was not familiar with the ins and the outs.  0:42:49

Obviously, if you're expanding regions, I would assume we added people. But I'm not familiar with the details of the 2009 or the 2016 dates you're talking about.  0:42:59

Can we take a break?

MS. FOLEY: Sure.

THE RECORDER: Off the record at 10:54 a.m.  0:43:11

(Off the record.)

## Page 31

THE RECORDER: Okay. We are back on the record at 11:05 a.m.

BY MS. FOLEY:

Q. Mr. Ledieu, you are still under oath. Do you understand that?  0:43:26

A. Yes.

Q. So what was the criteria used for selecting people who would be impacted by this reorg by the first group that met in the end of January/early February 2020?  0:43:57

A. Yeah. The -- as we spoke through the different ideas, the -- the critical criteria at the very beginning was based upon -- for each dealership was based on sales volume.  0:44:11

And then inherent to sales volume would then be applications to a lender and therefore penetration to -- to a lender. You know, for us -- for example, if we have a dealership sell ten cars and we finance six of those cars, we say we have 60 percent penetration.  0:44:31

So the -- the first starting point was what kind of volume does a dealership do. And then from there, we extracted volume for Nissan division only, by the way.  0:44:46

I'm sure you'll see through the documents that we quickly decided as a group to not keep Infiniti

## Page 32

in scope given the nature of their dealer network, where they were in the major metropolitan areas, and their size, and the fact that they're a luxury franchise.  0:45:01

So it was Nissan only, volume, and the number we kind of came to was 480 sales a year is where that line was drawn. And the reason for that is roughly at that time we were averaging about 50 percent penetration.  0:45:19

So 40 cars a month times 50 percent is 20 cars a -- a month with NMAC. And given the 20 -- you know, roughly 20 working days in a month, we figured at least if you were sending us one contract a day every day of the month, that it was -- you would be considered a -- a large store.  0:45:42

Anything smaller than that, we should talk about whether we could call or support those dealers in a different way.

Q. So you designated them as large and small stores. Correct?  0:45:55

A. Yes.

Q. And was the designation of large and small stores done for each district?

A. It was done for the whole country, so yeah,

8 (Pages 29 to 32)

Page 33

the districts would've been impacted. Yes. 0:46:16

Q. In the initial analysis, did you just do it by region or did you do each district?

A. We did every single -- all thousand and seventy-six stores. And drew that line as a starting point for, you know, if we were going to have district realignment or support those smaller stores in a different way. 0:46:44

We did it literally -- we built it from the bottom up, not the top down. So we went rooftop by rooftop by rooftop, which then obviously impacted a district, then an area, then a region. 0:46:55

But we didn't do region by region to begin with. No.

Q. Okay. So large versus small stores based on your 480 sales a year -- 0:47:05

A. Yes.

Q. -- was your criteria.

Correct?

A. Yes. That's what we had decided. The -- yes. 0:47:12

Q. Was there any other criteria for selection --

MR. FARLEY: Objection -- sorry. Go ahead, Shannon. Did you have anything else for your question? 0:47:27

THE RECORDER: You know, it got cut off, Ms.

Page 34

Foley, would you please repeat that question?

BY MS. FOLEY:

Q. I said: You made an analysis of large and small stores by district. Was there any other criteria used to select districts to impact? 0:47:53

MR. FARLEY: Objection to form.

THE WITNESS: So as stated, we chose dealer by dealer, small or large. And then from there, once we had a number, and I believe the number was 385 small dealers throughout the country, we then did -- I would call more qualitative look at the relationship we might have with the dealership. 0:48:21

Or where they were physically located. I'll give you an example. Let's say Nissan had three dealerships in Des Moines, Iowa. And two of them were large and one of them were small on this 480 -- 480 sales scale. 0:48:39

We then said, well, if we're sending -- they represented it to Des Moines. And they're driving there and they're spending the night possibly and they're burning maybe a half a day to get there and a half a day to leave. 0:48:51

We should still keep the third store in. Right? So there were other qualitative factors. Or you know, perhaps you were trying to land a floor plan

Page 35

with a group that owns six or seven stores. 0:49:06

Or maybe some warranty business from a -- a group that may have, you know, a larger footprint than just Nissan. So there were different things that we filtered on top of just a pure quantitative starting point of 480 sales, which is ultimately how we ended up with a number smaller than 385. 0:49:26

BY MS. FOLEY:

Q. Okay. So in doing this, where you looked a large for -- and small stores, did you select the districts to be eliminated based on those that had the largest amount of small stores considering this one other qualitative factor? 0:49:51

MR. FARLEY: Objection to form.

THE WITNESS: No. Again, we weren't even remotely at the point of talking about districts at that part -- at -- at that time. 0:50:00

We were still trying to figure out what might this look like, what would be the appropriate ratio of FSM to dealership. Right? So if -- if we did all this and all of a sudden -- I'll give an example. 0:50:16

All of a sudden we chose a small market in Oregon that had maybe only 12 stores left over, and then we restructured another one in North Carolina and they had 25 stores. That wouldn't make much sense.

Page 36

Right? 0:50:32

We still had to make sure that it was a workload that was doable by one person. So we -- we looked at how many stores and which category are they, and what's the -- just the holistic ratio of dealers to FSMs, financial services managers, before we even talked about which store would end up in what district. 0:50:55

Q. Okay. So it -- are you saying that this initial group, who was the research and analysis group, was you, Lubbers, McBane, Hungerford, and Jamie Beck, who met in January or early February of 2020, did not come up with a list of which districts to eliminate? 0:51:27

A. Districts to eliminate, I can't recall, but I still feel as though that would've been very early in the process. And at that point, we were still trying to figure out are you a small store, are you a large store. 0:51:45

Oh, by the way, you used to be part of eight regions. You're now going to be part of six. If we do do this inside sales team in Dallas, what's the proper ratio for those people. 0:51:58

Can they handle 40 or 50 stores because they're sitting, you know, at a desk with --

Q. I --

A. -- a headset on -- 0:52:03

9 (Pages 33 to 36)

## Page 37

Q. I -- I don't -- I don't mean to cut you off. I'm just asking you: At that point in time, had you come up with the districts that you intended to terminate? That point in time being late January, early February. With the -- 0:52:18

A. I --

Q. -- first group.

A. I don't recall, but I'd be surprised if we had. 0:52:22

Q. Did that first group consider any other factors other than what you've testified?

MR. FARLEY: Objection to form.

THE WITNESS: There were -- like I said, there were several qualitative things we looked at when we did this project regarding the dealerships and how to support them. 0:52:43

Whether I stated all of them, I don't recall. But I know there's a presentation at a high level that really kind of states, and we'll probably talk about it here, all the kind of -- more subjective things that we put into deciding whether a dealer was small or large. 0:53:00

BY MS. FOLEY:

Q. Did you consider any of the employees' performance?

A. No.

## Page 38

Q. Did you consider the district's market? 0:53:27

A. I'm not so sure I understand the question.

Q. So did you ever rank a district and an individual in the process of this first group that was doing the research and analysis in the time period of late January/early February 2020? 0:53:48

A. The only thing we may have ranked was the size of the district. But that's just, you know, pure numbers. How many -- how many bookings do we have per year from each district throughout the country. 0:54:01

But that would've been the only thing that would've been ranked.

Q. As you sit here today, can you recall any other criteria that you used, other than what you have testified, in that first group that met to decide which districts would be eliminated? 0:54:28

MR. FARLEY: Objection to form.

THE WITNESS: As I mentioned, if we could pull up the document, I'll tell you whether we actually talked about all the possible qualitative indicators that would pass our quantitative analysis. Whether I stated them here in the last 45 minutes, I -- I don't -- I don't know. 0:54:46

Q. Okay. What was the recommendation made by the first group to DeTrude?

## Page 39

A. So the recommendation was to consolidate our smaller stores into an inside sales team that could better serve our smaller dealers in a more timely manner, make them a bigger fish in a smaller pond, in a more effective way, with having an inside sales team that would be readily available to help them out, while reassigning the remaining of the, quote/unquote, large stores to in-person FSMs, financial services managers, so that they would have better service and be able to support those stores in a more effective and efficient manner. 0:55:41

And then last but not least was to be able to find extra analytical support for the regions by adding a person in Tennessee to Mark Lubbers's sales operations headquarters team. 0:55:58

Q. Any other recommendations made to DeTrude by the first group?

A. The only other one I probably didn't mention would've been the manager who -- who would've led that group in Dallas, which was the area operations manager, leading those six inside sales team members. 0:56:19

Q. I don't know what you mean. You said "the manager." Who --

A. That'd be -- I just just mentioned -- 0:56:24

Q. Did you select the manager?

## Page 40

A. No. We said we needed someone to manage that group. Right? So the recommendation at that time was all around we see an opportunity for six jobs that are going to support these 200-some odd dealers. 0:56:41

And then at the end of the day, they need to be managed by someone at some point.

Q. Okay. And when you made this recommendation, the first group made a recommendation to DeTrude, did you have recommendations of who should be going to Dallas as the -- 0:57:02

A. No.

Q. -- inside FSMs?

A. No.

Q. What was -- was there anything else that you recommended to DeTrude? 0:57:26

MR. FARLEY: Objection to form.

THE WITNESS: Not that I recall.

BY MS. FOLEY:

Q. And that first group, did they meet with anyone other than DeTrude and make recommendations? 0:57:36

A. HR was eventually brought in. I don't know whether they would've been brought in on the early phase or the latter phase. So Jim would've been the primary, and then our small working group. 0:57:57

But I don't recall whether HR was involved

## Page 41

early or not or whether they were involved once we brought in the remainder of the RFSMs.

Q.  When you said HR was brought in in the early phase, who from HR?                              0:58:11

A.  I'm saying I don't know whether they were or weren't.  In the early phase.

Q.  Okay.  Who from HR was brought in when they were?                                    0:58:21

A.  Jeff Chambers, who was the director of human resources at the time, as well as Camille Dessaw, who was supporting in that.

Q.  And was Jim Paplexis part of it?         0:58:39

A.  Yes.  He -- he was.  Thank you for reminding me of that.  Yes.

Q.  And what role did he play?                0:58:46

A.  He was the senior manager of human resources.

Q.  What role did HR play in the work that you were doing with this committee regarding your sales operation?                                  0:59:21

MR. FARLEY:  Objection to form.

THE WITNESS:  They didn't do any work leading up to the recommendation.  They were brought in once we had a recommendation about a restructure in alignment with the Nissan reorganization.         0:59:37

But they didn't do any of the work leading up

## Page 42

to it.

Q.  And if nobody else was in those early meetings, you didn't have legal in those meetings.  Correct?                                   0:59:55

A.  That is correct.  We only brought legal in at the very end.

Q.  And when you say "at the very end," when was that?                                      1:00:07

A.  I don't recall specific dates, but it would've been before the announcement on June 4th.

Q.  So you said there was a second group that met.  When was that meeting?              1:00:33

A.  I don't recall specifically, but it would likely have been before the end of the fiscal year, which would've been March 31st.

Q.  Who was in -- and in that second group, it was all of the RSFMs [sic] as well as you and Mark Lubbers?                                    1:00:57

A.  Yeah.  So it was the initial group plus the remainder of our team.  Yes.              1:01:02

Q.  And what was the second group tasked with?

A.  Yeah, the second group was tasked really to validate our recommendation and then specifically start to really look and give us insight around all of the differing relationships we had with each individual

## Page 43

dealer or dealer group.                          1:01:32

How important the markets that we were talking about were to their regions or to their areas.  And so they did the fine turning, I'll call it, of -- I'm sure you've seen the documents.          1:01:45

Our initial list was 385.  I believe our second list was 282.  And our final list was 264 dealers.  That final list could never have been accomplished without the help of the RFSMs really understanding the nuance of our individual relationships with each and every one of those dealerships.                                1:02:05

Q.  And in that second group, is that where you made decisions as to whose jobs should -- and districts should be eliminated?

A.  We started -- yeah.  We started assigning dealerships to new district footprints.  Correct.  1:02:29

Q.  And who did that?

A.  Everyone.

Q.  And dealerships were assigned to Dallas.  Correct?  Inside --                           1:02:46

A.  When you -- yeah.  When you say Dallas, the inside sales team, yes.  Two hundred and sixty-two dealerships were assigned to the -- to the inside sales team.                                    1:02:54

## Page 44

Q.  So the small dealers for everyone were assigned to Dallas.  Correct?

MR. FARLEY:  Objection to form.       1:03:02

THE WITNESS:  The small dealers for everyone were assigned -- yeah.  When we finally came up with that 262 dealerships, yes, they were assigned to the inside sales team.                          1:03:12

BY MS. FOLEY:

Q.  Okay.  And then of the districts eliminated, those dealerships were assigned to other FSMs.  Correct?                                   1:03:24

A.  They were assigned either to Dallas or to other markets.  Yes.

Q.  To specific FSMs got this -- their dealerships.  Correct?                           1:03:36

A.  To specific districts.  Yes.

Q.  Were they assigned -- was there any documentation showing which FSMs were getting their dealer counts?                                 1:03:58

A.  There would've been documents that showed the district that the dealer was going to be assigned to, and I believe in those documents they also happened to have the FSM calling in that district, yes.   1:04:10

11 (Pages 41 to 44)

www.InDemandReporting.com                (773) 239-6008

Page 45

Q. In that second group, was there an analysis of the -- at any point in time analysis of any of the -- the dollars savings from the salaries and expense of the workers who would be losing their jobs?    1:04:44

A. Yes. We did an analysis because of the cost of the restructuring was going to be over $500,000. Our internal delegation of authority for making that size of a decision had to go before our president and CEO.                1:05:01

So we -- when we propose any financial outlay, we always give that person an initial outlay with a -- usually a five-year outlook of the impact of the decision. So yes, there would've been an analysis of the cost for relocations, the cost for severance, the cost for salaries, the cost for demonstrate -- demo vehicles, someone who was driving the car. So yes, we did that analysis.                1:05:28

Q. And did that analysis show that you would be saving over $5 million over the five years? With these --

A. Five --

Q. -- terminations?

A. Yes, it did.                1:05:42

Q. Was there actual savings realized of over $5 million?

Page 46

A. We have not gone back to try and make that assumption.                1:05:53

Q. Does Nissan not require accountability after putting projections out?

MR. FARLEY: Objection to form.

THE WITNESS: The projection was used for an approval that was needed for an outlay of over $500,000. The projection was not used to decide whether the $500,000 could be spent or not spent.    1:06:25

It was just normal form to project that out and show the positive or negative impact of the decision.

BY MS. FOLEY:

Q. As a business unit, did you -- did you go back and look at whether there was actual savings of $5 million from the terminations?                1:06:44

A. No.

Q. Do you believe there was more than 500 -- or not 500,000 -- more than $5 million in savings?

A. I have no idea.                1:06:54

Q. And that second group, did they -- were they the ones who decided who should keep their jobs and be offered positions?

A. That group started discussing who might be taking certain roles based on their ability to either

Page 47

do the job or, more importantly, to be able to move to Dallas.                1:07:43

Q. And who actually made the decisions for the company based on your recommendations?

MR. FARLEY: Objection to form. Which decisions?                1:08:00

THE WITNESS: Yeah, I was going to ask for specifics.

BY MS. FOLEY:

Q. For the districts impacted, for elimination, and who would be selected for job offers.    1:08:12

MR. FARLEY: Three -- three -- three -- those three pieces? I just want to understand the question.

THE WITNESS: Sorry, me too.    1:08:21

BY MS. FOLEY:

Q. Do you understand the question?

A. No.

Q. Okay.

A. It's -- it's got more -- it's a pretty wide question, so --                1:08:28

Q. Okay.

A. -- it -- depending on what you're specifically asking, there might be a different answer.

Q. Okay. So at some point, did you make a recommendation to someone on behalf of your committee?    1:08:42

Page 48

A. Regarding what?

Q. Regarding who would be impacted by the elimination of positions.                1:08:57

A. Yes. When the -- when the final recommendation reorganization was made, it was known who was going to be impacted by the reorganization.    1:09:07

Q. You say "it was known." By whom?

A. Those to whom it presented it. So to Jim -- when we brought him the recommendation, we say all these jobs or districts will be affected by this move.    1:09:25

All of these other jobs will be created by this decision. And so these are the -- kind of the ins and the outs. And that would've been really the foundation for how we did the analysis you were just asking about.                1:09:40

Q. Okay. So you indicated that your group made a recommendation. Who made the decision to eliminate the districts?                1:09:58

A. Jim would've approved the recommendation made by the group.

Q. And when you say Jim, you mean Jim DeTrude.    1:10:05

A. Yes. Jim DeTrude would've approved it, Kevin Cullum would've had to have approved it, as well as sign off from human resources and legal.    1:10:14

Q. And when did all that happen?

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                (773) 239-6008

Page 49

A. Prior to June 4th.

Q. Did you have approval for all of that by March 31? 1:10:32

A. I don't recall specifically, but if you're asking me to estimate, I would say likely, because original announcements were supposed to happen either in April or May. 1:10:49

They got delayed because of some of the restructuring stuff that was going on with Nissan. So we would've been pretty close to a final decision by the 31st. 1:10:58

So we probably would not have had all final names in boxes as to who was going to take what job. As I best can recall.

Q. So as of March 31, you had decided who would have job offers with their notices that their -- their positions and districts were eliminated.

Correct? 1:11:28

MR. FARLEY: Objection to form.

THE WITNESS: I don't know that we would've had decided. We may have had a estimate as to how each individual would have been impacted or accepted or not accepted the position to move to Dallas. 1:11:43

Whether it was finally decided on March -- March 31st, I don't recall.

Page 50

BY MS. FOLEY:

Q. And were there discussions of who to offer those jobs in Dallas to, the FSM jobs? 1:12:01

A. Yes.

Q. And who participated in those discussions?

A. That would've been -- I'm sure there were some discussions I was a part of. There would've been discussions that I was not a part of. 1:12:14

Mark ultimately was going to be leading that group. So I'm sure he was actively involved, talking to the RFSMs, trying to figure out who on their teams would be willing to move to Dallas. 1:12:30

So I'm sure there were several discussions throughout, but not one -- any one specific discussion that I can recall.

Q. Do you recall that -- who was going to get the Dallas FSM jobs discussed in the meeting with the RSFMs [sic]? 1:12:52

A. I recall that we had identified either three or four of the six jobs for people who had stated they were mobile but that we had not filled all positions by the time we were going to have done it.

Q. So we talked about the second meeting. When was it? 1:13:16

A. Second meeting. Oh. The second -- with the

Page 51

-- with the RFSMs?

Q. Yes. 1:13:22

A. Like I said, prior to March 30 -- 31st, likely, but other than that, I don't know the specific date.

Q. And was that second meeting in person in Nashville? 1:13:37

A. That's a good question. I don't -- I don't recall.

Q. COVID had hit first week of March. Any idea whether you met in person, whether you met by video conference? You have any recollection? 1:14:03

A. I really don't.

Q. Would there have been a meeting invite to invite the RFSMs to a meeting?

A. There may have been. 1:14:20

Q. You as their boss, would you have issued that invite to them?

A. Not necessarily. No. 1:14:34

Q. Who would have issued the invite to the RFSMs for the meeting to discuss a reorganization?

A. If there was such an invite, it could've come from me, it could've come from my administrative assistant, it could've come from Mark. 1:14:48

Q. Uh-huh.

Page 52

A. It could've been part of an already-standing meeting where we decided to discuss it in one of those meetings. So anything's possible I guess is the -- the short answer. 1:14:57

Q. Who's your administrative assistant?

A. Sondra Walker.

Q. S-A-N-D-R-A? 1:15:05

A. S-O-N-D-R-A.

Q. Does she still work at Nissan?

A. She does.

Q. Does she still work for you? 1:15:15

A. Yes. Well, she supports me. She -- she actually reports to Jim DeTrude. And then supports with a dotted line several executives on her team. 1:15:26

With administrative tasks. Travel, expense reports, calendars, that --

Q. Okay.

A. -- kind of thing. 1:15:35

Q. In this RFSM meeting that you held, was it an all-day meeting? Was it an hour meeting? Do you have any recollection? 1:15:48

A. I do not. I doubt it was an hour meeting. But I don't know if it was an all-day meeting. 1:15:55

Q. Was it more than one day?

A. I don't recall.

13 (Pages 49 to 52)

www.InDemandReporting.com

(773) 239-6008

Page 53

Q. Is -- is this one of the meetings where the RS -- RFSMs were required to sign a nondisclosure agreement?     1:16:15

A. The only nondisclosure agreement I recall was for the smaller group that met early that we just discussed. And again, that was asked for really primarily due to the sensitive nature of the overall Nissan restructuring.     1:16:33

I don't recall if the second group had to sign any NDAs.

Q. Who -- who distributed the NDAs in that first meeting?     1:16:48

A. I don't know if they were distributed or whether they were sent in advance. I do know Mark was the one who had reached out to everyone, asking for the signatures.     1:17:02

But whether they were done in advance or done in person, I -- I don't recall.

Q. Other than those two meetings, were there any other reorganization meetings?     1:17:15

A. I'm sure there were. There was a lot going on in the company at the time. So some of them may have been Nissan reorganization meetings. Some of them may have been NMAC reorganization meetings.     1:17:27

Some of them may have been -- for my

Page 54

meetings, both topics. So I guess the short answer is yes. How many or which, I don't recall.     1:17:37

Q. Okay. So you had the first meeting we discussed with the smaller group, research and analysis. The second meeting with the RFSMs.     1:17:48

You've talked about a meeting with DeTrude. Was there another separate meeting with Kevin Cullum?

A. Yes.     1:18:00

Q. And do you recall when that meeting was?

A. I do not.

Q. And were you presenting to Kevin Cullum, the president of NMAC, to obtain his approval?     1:18:13

A. Yeah. Getting his approval or -- there's two things. One, the fact that we are restructuring, and two, we needed his financial approval based on the financial outlay as estimated.     1:18:25

Q. Did you also present to Nissan North America?

A. Yes.

Q. And who at Nissan North America did you present to?     1:18:39

A. I know at a minimum, we would've presented to Mike Colleran, who was the senior vice president. Colleran's C-O-L-L-E-R-A-N.     1:18:53

We would've presented to him -- whether we presented to him prior to announcement or after

Page 55

announcement of June 4th, I don't know. But I do recall at one point us having to present to him kind of how are we going to align with the restructuring he was announcing at Nissan.     1:19:13

Q. And Nissan -- did you attend the -- any meetings to understand the Nissan restructure?

A. I believe I did. I know I was sent some of their materials. Actually, some of those materials were part of -- part of the documents that have been submitted for discovery.     1:19:39

But I don't believe I attended any of their meetings specifically, but was made informed -- was made aware and -- and likely had discussions about the structure of their -- of their -- of their reorganization.     1:19:55

But I don't remember attending any specific meetings with a -- a larger Nissan group, for -- for instance.

Q. Is it your understand that Nissan -- understanding that Nissan also eliminated the -- the Mountain district and the Northwest? Region, I mean.     1:20:17

A. Yeah. Pacific North -- yeah. The -- they were the -- yeah. So maybe I didn't make this clear earlier on.     1:20:24

When we were looking at better ways to serve

Page 56

our smaller dealers and be more effective throughout our network, we were made aware of this geographic restructuring. The last thing we wanted to do was come up with a new inside sales team that was going to call on small dealers and then we had eight regions on top of that, only to have to deal with the fact that we were now shrinking to six.     1:20:45

So it -- really the -- the -- the reorganization around inside sales and being more efficient and effective with our dealers was the work we had started. Then insert, hey, by the way, you're going from -- we -- we as the company are going from eight to six regions.     1:21:04

You should really blend those two pieces of work together. So yeah. I mean, they -- really the elimination of the Pacific Northwest and Mountain was not our recommendation.     1:21:13

It was just part of -- it ended up being part of the work we did because of what they were doing. If that makes sense.     1:21:21

Q. And in the process of that, do you have any understanding of whether Nissan North America terminated any employees in 2020?

A. I believe there were some elimination of positions. Or -- and -- and districts. But whether

14 (Pages 53 to 56)

## Page 57

that led to employee terminations, I don't recall.     1:21:51

I do vaguely remember them also offering a voluntary separation package at the time. That was not being offered at NMAC. But -- so I -- whether the -- whether those decisions led to terminations, I can't specifically speak to that.     1:22:09

Q. So -- and their voluntary separation package at Nissan North America offered three weeks for every year served.

Correct?     1:22:20

A. I --

MR. FARLEY: Objection to form and -- I don't -- I don't think this is a topic, Shannon. I mean, I'm giving you a lot of leeway, but I don't -- I don't -- I didn't prepare for Mr. Ledieu for questions about a voluntary separation.     1:22:32

MS. FOLEY: That's all right.

BY MS. FOLEY:

Q. If you know the answer, go ahead.     1:22:37

MR. FARLEY: Well, hold -- it -- it is all right to a point. Because it's a 30(b)(6) deposition, you have to stick to the topics. It's not just anything goes --     1:22:45

MS. FOLEY: It --

MR. FARLEY: -- so that's --

## Page 58

MS. FOLEY: -- it -- it's in one of the topics. It's part of No. 15 that references other terminations at the same time in 2020.     1:22:59

BY MS. FOLEY:

Q. So if you are aware of -- of what was happening with terminations at NNA, Nissan North America, do you know if they offered the three weeks for every year served?     1:23:16

A. I was not aware of what they offered in the voluntary separation at Nissan.

Q. Do you have any idea what was offered in the severance offer for the NMAC employees in their severance paperwork?     1:23:36

A. I was not made aware of the severance packages at the time. However, in preparation with Counsel, I have been made aware -- I believe it was four weeks plus one week for every year. If memory serves correctly.     1:23:55

MR. FARLEY: Yeah, I'll -- I'll -- I'm just looking back at my -- the letters we sent you. We -- we objected to this topic and -- and didn't -- didn't indicate we would provide a witness on and I've -- I've looked at both the letter and your notice.     1:24:21

So I don't -- I don't plan to let this witness ask any -- answer any more questions on this

## Page 59

topic. I don't think it's within the scope of the discovery for the case. And if you look at the letter we sent you guys on April 29th, page 2 talks about that very point.     1:24:44

MS. FOLEY: Okay. We can talk offline. I don't want to waste my --

MR. FARLEY: Okay.

MS. FOLEY: -- precious --

MR. FARLEY: That's fine.     1:24:49

MS. FOLEY: -- moments.

BY MS. FOLEY:

Q. So on the next topic. Person most knowledgeable regarding the criteria used for selection of the persons or persons for elimination, as referenced in the June 4, 2020, letters.     1:25:09

Oh. No. That's not it. That is not it. So that -- oh, yeah, that was the Exhibit 1. So on No. 2, the criteria for selection.     1:25:30

Have you told me all of the criteria for selection, the persons or positions for elimination of the 2020 NMAC reorganization?

MR. FARLEY: Objection to form.     1:25:44

THE WITNESS: Sorry. Exhibit 2 is not on the screen. I'm looking at Exhibit 1.

BY MS. FOLEY:

## Page 60

Q. Oh. It's Exhibit 1. Excuse me. But I'm talking about topic 2.     1:25:50

A. Oh. Okay. Sorry. You're asking whether I am that person?

MR. FARLEY: No, she's asking you whether you've --     1:26:04

BY MS. FOLEY:

Q. No, I'm asking you whether you have provided all of the criteria used for selection.

MR. FARLEY: And I -- I'll just reiterate my objection of form.     1:26:15

THE WITNESS: Yeah. I think I've been clear about our selection of district -- of -- of dealerships, therefore districts, therefore potential impact on the people. Yes. I'm -- I'm aware of that.     1:26:27

BY MS. FOLEY:

Q. Okay. So in that, did you notice in any of the criteria that you were looking at whether in -- there were other FSMs who had more small dealers than Mr. Matt Stewart who were not selected for elimination of their position?     1:26:58

A. I wouldn't be able to speak whether there were more or less dealers per district. I could -- the only thing I could tell you is we know the Midwest region, which Mr. Stewart was a member of, was impacted

Page 61

the most.                                   1:27:18

I believe when it was all said and done, the Midwest region -- I think we designated 81 dealerships to be considered small.

Q.   My -- my question is quite specific.  Did you evaluate if there other FSMs who had more small dealers than Mr. Matt Stewart who were not selected for elimination of their position?                    1:27:42

MR. FARLEY:  Objection to form.

THE WITNESS:  No.

BY MS. FOLEY:

Q.   In the district, even the Midwestern region, did you evaluate whether Mr. Ricardo Razo had more small dealers than Mr. Matt Stewart?          1:28:10

A.   No.

Q.   Did you evaluate whether Ms. Jennifer Burns had more or the same amount of small dealers?

A.   No.                                    1:28:25

Q.   In -- in the West district, did you evaluate whether Mr. Van Os had more small dealers --

A.   No.

Q.   -- than Mr. Leiter, who was eliminated?      1:28:44

A.   No.

Q.   Did you evaluate whether Mr. Sheridan had more small dealers than Mr. Leiter, who was eliminated?

Page 62

A.   No.                                    1:28:57

Q.   So what was the criteria that you used or Nissan used for deciding who would get -- be placed in jobs without having to apply for them?

MR. FARLEY:  Objection to form.         1:29:30

THE WITNESS:  Well, the only thing I can recall specific to who would or wouldn't be able to apply for jobs was whether that team member was willing to relocate to any job, right, whether they were applying for a job in Nashville and that was required for them to live here.                      1:29:53

In our case, clearly we were standing up a team in Dallas.  So would individuals be willing and able to move to -- to -- to -- to Dallas.  It was --      1:30:04

BY MS. FOLEY:

Q.   Okay.

A.   -- a strategic decision to -- to -- to make that whole team be located in Dallas.           1:30:11

Q.   Okay.  So those inside FSM jobs were moving to Dallas.  And so was -- who provided the information to you regarding the ability to relocate or mobility of the people whose districts were eliminated?       1:30:42

A.   I don't know that it would've been provided to me.  But I know that in discussions with the RFSMs and with Mark -- mobility is something that's very

Page 63

often discussed throughout someone's, you know, year or -- and as people talk about their career.           1:31:06

And talk about what might be next, if anything, for anyone or involved individuals.  And so whether that was formally given to us or -- or informally known, based on just career conversations, that would've probably been the starting point for whether the team thought someone was mobile or not.    1:31:30

There is a way to ask HR whether an individual has designated themselves as mobile in the system.  You know, can you move or can't you.        1:31:40

And so HR could've provided that.  I don't know if they did or didn't.  But that's another place we could've found the answer to that question.       1:31:49

Q.   And are you saying that all of the people who did not get jobs had indicated that they were not mobile?

MR. FARLEY:  Objection to form.         1:32:02

THE WITNESS:  I would have to see the list to be able to answer that.

BY MS. FOLEY:

Q.   But mobility was the reason that people were offered or not offered jobs in Dallas.

Correct?                                1:32:16

MR. FARLEY:  Object to form.

Page 64

THE WITNESS:  Mobility was the reason why people -- well, being in Dallas was one of the reasons people would be offered a job in Dallas.  Yes.       1:32:27

BY MS. FOLEY:

Q.   Okay.  Any other reason people would be offered a job or not offered a job in Dallas?

A.   Not that I know of.  No.             1:32:39

Q.   So FSMs who have been working as FSMs for a long time would be qualified for a position and the job duties as an inside FSM.

Correct?                                1:32:54

A.   As -- as -- yeah.  The job duties as described.  Yes.

Q.   And the -- a person who is considered a developmental FSM, is that someone who has less experience than someone who is designated as an FSM?    1:33:19

A.   Typically we don't designate the person, we designate the market.  Right?  So we will say we're going to send you to -- I'll use an example.          1:33:32

You know, rural Kansas and Kansas City and Des Moines, Iowa, because you're still kind of getting your feet wet.  You maybe have a little bit of experience or maybe none.                    1:33:43

Or you have a lot of experience and therefore we're sending you to Los Angeles, New York City, or

www.InDemandReporting.com                    (773) 239-6008

Page 65

Miami. Right? So we would designate the markets as developmental or not developmental.                    1:33:56

In the case of the FSM roles in Dallas, it was a great way to start someone's career as an FSM should they decide to want to call on dealers without taking a full plunge into, hey, we need you to move here, we need you to move there, can you leave Dallas and go call on dealers in person.                    1:34:16

Q. So your -- a developmental -- somebody sent to a developmental market is someone who doesn't have as much experience as a regular FSM in a large market. Correct?                    1:34:36

A. Not always. We -- we try to make it that way. But sometimes we have some senior people who stay in market longer or rotate into developmental markets for whatever reasons.                    1:34:47

Sometimes we even have overqualified people who are just trying to get field experience. And the only thing we have for them at the time is a developmental market.                    1:34:57

So there's different reasons why you may or may not put a developmental candidate or someone who doesn't have -- who has less experience into a developmental market. But we try to use or save those for people who are trying to gain experience.                    1:35:11

Page 66

Q. Was -- was Matt Stocking considered a development -- in a developmental market?

A. I don't recall. I do remember Matt had moved out to Colorado not long before we even got restructuring, so I guess by -- by -- by tenure, you could argue that he only had so much experience as an FSM.                    1:35:40

But whether he was designated as developmental, I can't recall.

Q. Was Adam Sanchez considered less experienced than a -- an FSM in a regular city market?                    1:36:12

MR. FARLEY: Objection to form.

THE WITNESS: Adam Sanchez?

BY MS. FOLEY:

Q. Mm-hmm.                    1:36:16

A. To be honest with you, I don't even recognize the name.

Q. Okay. So Simeon Taskov?                    1:36:28

A. Yes?

Q. Was he an -- a -- an experienced FSM in a big market?

MR. FARLEY: Objection to form.                    1:36:45

THE WITNESS: At what point in time would you be asking whether he was an experienced FSM in a big --

BY MS. FOLEY:

Page 67

Q. In the --

A. -- market?                    1:36:50

Q. -- time -- in the time period of 2020.

A. Well, leading up to the restructuring, Simeon was towards the end of several years in a developmental market, if memory serves, and had kind of progressed and wanted to grow his career and call on bigger markets and bigger dealers.                    1:37:13

So at the beginning of 2020, I guess I would say he was at the end of being in a developmental market but ready to assume a larger responsibility when -- when he moved.                    1:37:24

If memory serves, Simeon actually rotated into two developmental markets. I'd have to go back and look, but I believe he had several years between those two markets.                    1:37:42

Q. So there -- there were also two positions, FSM positions, that were in St. Louis and Kansas City. Do you recall that? That were created?                    1:37:56

A. Yeah.

MR. FARLEY: Objection to form. Go ahead.                    1:38:01

THE WITNESS: I do recall having to restructure that geography. I believe St. Louis was split out from Kansas City, and Kansas City inherited I

Page 68

believe Des Moines and maybe parts of Nebraska. Those --                    1:38:19

BY MS. FOLEY:

Q. Did they --

A. -- were big markets.

Q. Did --

A. Yeah.

Q. -- did they become part of the Midwest region?                    1:38:23

A. I'd have to look at a map to answer that specifically. I know that central part of the United States, over the last several years, had been part of Central, it's been part of Midwest.                    1:38:34

It's kind of bounced around, so I don't know where it ended up falling. And off the top of my head, can't remember, but it -- you know, St. Louis and Kansas City kind of are on that dividing line as to whether their markets used to be in Central versus being in Midwest.                    1:38:50

Q. What was the criteria for filling that FSM position, those two positions?

MR. FARLEY: Objection to form.

THE WITNESS: That would've been the job description for a -- a non -- I believe those were designated as non -- non-starter districts or

17 (Pages 65 to 68)

www.InDemandReporting.com                    (773) 239-6008

## Page 69

non-developmental markets.  So a requirement for some experience.                    1:39:18

BY MS. FOLEY:

Q.  So someone with 15 years' experience as an FSM would be qualified for the Kansas City or St. Louis FSM positions.

Correct?                    1:39:37

A.  Yes.

Q.  And how is it that you and/or Nissan decided who would fill the Kansas City or St. Louis FSM positions?

A.  That would've been a result of the RFSMs and Mark talking through what jobs were now either available or not filled and who were the candidates who were mobile and able to fill them.                    1:40:17

Q.  Did you fill those positions from the people who were impacted by the -- having their districts taken away?

A.  I don't know that all of those people ended up being a result of districts being taken away, but possibly districts being realigned would've likely been the reason why they moved.  Yes.                    1:40:49

Q.  Do you know who filled those positions?

A.  I know Simeon -- I'm pretty sure Simeon moved to Kansas City.  And I believe Vil Vina moved to St.

## Page 70

Louis.                    1:41:05

Q.  And who made the decisions to retain Simeon and move him to Kansas City?

A.  That would've been the hiring RFSM.

Q.  And who was that?

A.  Again, I don't recall whether Kansas City was part of Central or Midwest, but it would've either been Todd Voorhies or John McBane.                    1:41:42

Q.  And who would've made the decision to move Vil Vina to St. Louis?

A.  Same -- same answer.  Right?  Either the -- the RFSM for Central or Midwest.                    1:42:01

Q.  And is that a decision that you would have been involved in?

A.  I would've likely had discussed it with the team or they would've discussed it with me.  But I wouldn't have been involved with directing it.  No.                    1:42:18

Q.  Did those positions depend on mobility?

A.  Yes.  Well, let me restate that.  Those positions require the individual to live in their market.  So whether that requires mobility or not depends whether the individual lives in the market or not.                    1:42:38

So if they live outside of the market, then mobility's required.  If they happen to be someone from

## Page 71

NNA or another company, and they live in the market, then mobility's not required.  But they -- you are required to live in market.                    1:42:52

Q.  As you were making all of these decisions, did you have access to the Workday database?

A.  I have access to various -- I can look -- all of us have access to Workday, to the Workday database?  No.  So I can look up myself, I can look up any individual in the company.                    1:43:17

It'll tell me who they are, what their title is, who they report to.  Maybe even a physical address and a phone number.  But I'm not able to access a -- a database, no.                    1:43:27

Q.  So -- but you can look up any of your employees and see their profile?

A.  I could see -- yeah.  I could see their -- their -- yeah, their profile, their current role, who they report to.  Yes.                    1:43:43

Q.  Are you limited in what data you can see, what --

A.  Yes.

Q.  -- fields?

A.  Yes.

Q.  Can you see how long they've worked for the company?                    1:43:55

## Page 72

A.  I don't believe I can see that time and role, no.  I definitely can't see time in the company.  But usually Workday tells us time and current role, not time -- if anything.                    1:44:11

But I wouldn't be able to pull it.  HR would have to provide that to us.

Q.  So in -- in your meetings where you were discussing all of these people, did you ever put up the pictures of the people who were going to be impacted by these decisions to eliminate their districts?                    1:44:34

A.  Pictures of the people.  I don't believe so.  No.

Q.  Did you have their profile pictures up as you were talking about any of these individuals?                    1:44:43

A.  No.

Q.  During any of the collaboration meetings, did you have their pictures up?

A.  I don't believe so.  No.                    1:44:51

Q.  Or calibration meetings?  I misspoke.

A.  Well, a calibration is a very different process.  So people's pictures are part of all their profile when calibration is done.                    1:45:06

Just so we could put a face to the name.  Because the calibration goes all the way up to vice president and sometimes president.  And as you can

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

Page 73

imagine, someone like Kevin Cullum, who has a team of 1400 people, might not know exactly everyone's name but can put a face to the name.                    1:45:24

But calibration is a very different process than what we did here.

Q. So pictures are put up during that calibration process. Is it the profile picture?    1:45:35

A. It's whatever picture's been uploaded by the employee.

Q. And in that process where pictures are put up of the various people in the company, if a person is African-American or white, it would -- it -- you would be able to tell that person's race or ethnicity from their picture.

Correct?                    1:46:02

MR. FARLEY: Objection to form. I -- I don't think that's possible.

BY MS. FOLEY:

Q. Go ahead.                    1:46:09

MR. FARLEY: You can answer.

THE WITNESS: I -- yeah. Of course. I can tell who's African-American or Caucasian. Like the same for anyone.                    1:46:17

BY MS. FOLEY:

Q. And if somebody has their profile picture up

Page 74

-- if there's a profile picture up on the wall and it's somebody who's an older worker, you can tell that it's an older worker versus somebody who's in their early thirties.

Correct?                    1:46:32

MR. FARLEY: Objection to form.

THE WITNESS: No, not necessarily.

BY MS. FOLEY:

Q. Are -- are the employees required to put up a current picture, or are they allowed to put up their high school picture?                    1:46:44

A. I don't recall giving people guidelines other than trying to make the picture professional. But we've never given people, you know -- asked for certain pictures at a certain time in their lives.    1:46:57

Q. Have you seen Matt Stewart's picture? Does he have gray hair in his?

A. I have no idea.                    1:47:09

Q. And in the Workday profiles, it has the date of birth of each person too.

Correct?

A. I -- I wouldn't know that. I -- if it does, I wouldn't -- I wouldn't have access to it.    1:47:41

Q. Okay.

A. So I wouldn't be in a position to answer

Page 75

that.

Q. And it has the age.

Correct?                    1:47:48

A. I have no idea.

Q. At any point in time on any of the documents you've provided during this process, did you see data regarding the age and/or ethnicity of the employees who were impacted?                    1:48:16

MR. FARLEY: Object to form.

Go ahead.

THE WITNESS: The only information that was sent to me regarding that was after legal --    1:48:28

MR. FARLEY: I'm going to object. Don't describe anything that you did with the legal -- legal on any of that. So if it's all from interaction with legal, that's privileged. You shouldn't answer.    1:48:36

THE WITNESS: Oh, then I -- no, then -- then I don't -- I don't have anything.

BY MS. FOLEY:

Q. Your -- we'll get to some others here. There were some documents that Mark Lubbers printed out for you while in the process of your meetings that you've indicated, that you said you didn't print them, but he had them available --                    1:49:03

A. Okay.

Page 76

Q. -- and those were in the January/February timeframe.

Correct?

A. Again, I don't recall printouts. So --    1:49:12

Q. No, I didn't say printouts. I meant they were --

A. Oh.

Q. -- available in Excel format.                    1:49:18

A. Which document?

Q. On the screen. In the January/February 2020 timeframe.

Correct?

A. Can you be more specific about which documents you're referring to?                    1:49:27

Q. Well, you said he had a number of documents that you all were using to evaluate --

A. Oh. Yeah, the Excel documents with all the data around the dealerships and the market size and their location --                    1:49:40

Q. Mm-hmm.

A. -- their dealer code, their city, their size, their --

Q. Okay.

A. -- DM -- yes.

Q. I'm going to go to No. 3. And this is

## Page 77

category 3.  Person most knowledgeable regarding author, creation dates, modifications to the June 4, 2020, letters with jobs offered as referenced in Bates 2692 to 2715, with no jobs, as well as the Bates of 2716 to 2735 and 2748 to 2750.          1:50:34

So I am going to mark as the next Exhibit 2 those documents that I've referenced by Bates.

(Exhibit No. 2 marked for identification.)

MR. FARLEY:  So the whole -- so the exhibit is all those documents?          1:50:59

MS. FOLEY:  It is.

MR. FARLEY:  And it's Exhibit 2 or 3?

MS. FOLEY:  I believe it's 2.          1:51:06

MR. FARLEY:  Okay.

MS. FOLEY:  Are they -- are they -- it's one document or two?

THE WITNESS:  Well, you're showing us Exhibit 3 --          1:51:15

MS. DAVENPORT:  But it's -- hold on one second.

MS. FOLEY:  Oh.

MS. DAVENPORT:  It's called 2 but it's -- it's for category 3.          1:51:25

MS. FOLEY:  It's Exhibit 2 for category 3.

MR. FARLEY:  Okay.  So your -- your

## Page 78

representation is this PDF you're showing that's got 45 pages are those Bates labeled numbers that are in the category for topic 3?          1:51:40

MS. FOLEY:  Yes.

MR. FARLEY:  Okay.

BY MS. FOLEY:

Q.  Okay.  So it starts with Jamie Beck.  And we can look at the top here.

MR. FARLEY:  Go ahead.

BY MS. FOLEY:

Q.  And it's June 4, 2020.  And it indicates here --          1:51:56

MR. FARLEY:  Okay, wait.  Stay on this page.

BY MS. FOLEY:

Q.  That he is -- there's going to be a reorganization and his position will be eliminated or consolidated.  Is that what was happening with the reorganization?          1:52:14

A.  Yeah.  He was the RFSM for the Mountain region.  So as such, his region and position was being eliminated.

Q.  Okay.  And then he is offered another job here where it says the company believes your skills and background will be valuable to our new organization.  We are offering you a new position.          1:52:35

## Page 79

A.  Yes.

Q.  And it gives him an -- an AOM position.  Correct?

A.  Yes.

Q.  In the Central region.          1:52:46

A.  Yes.

Q.  And that his start date is August 3, 2020.  And so he, Jamie Beck, was offered a new position with his June 4th notice.  Correct?          1:53:06

A.  Yes.

Q.  All right.  And so we'll go through.  Did he accept that?

A.  Yes, he did.          1:53:16

MR. FARLEY:  Go to the next one.

BY MS. FOLEY:

Q.  And then there's Jeff Irwin.  And his Bates number is 2695.  Letter starts.  It's June 4th.  And he was being offered an FSM manager position in the inside sales region.  Was that in Dallas?          1:53:49

A.  Yes.

Q.  So it says Area TBD.  What was -- what did he end up with?

A.  I don't recall.  But he ended up with one of

## Page 80

the six positions that called on parts of the United States.          1:54:11

Q.  Okay.  So he was a financial services -- he was just an FSM, the same position as the regular FSM positions, but this was the one based in Dallas.  Correct?          1:54:29

A.  Yeah.  We call both jobs financial services manager.  Some are outside sales and some are inside sales.

Q.  Okay.  We'll go down farther.  Did he accept that position?          1:54:55

A.  Yes, he did.

Q.  And then --

MR. FARLEY:  Oh, stop.          1:55:03

BY MS. FOLEY:

Q.  This is a Bates -- this is a letter to Larry Johnson, June 4, 2020, Bates stamp 2698.  And Larry Johnson is offered an operations manager position in the inside sales region.  Do you see that?          1:55:24

A.  I do.

Q.  And did he accept that position?

A.  Yes, he did.

Q.  And what had his position been before?          1:55:39

A.  He was an area operations manager prior to

www.InDemandReporting.com (773) 239-6008

Page 81

that.

Q. In which area? Which region? 1:55:47

A. I believe -- I believe he was part of the Central region team.

Q. So he wasn't Mountain region or Northwest region.

Correct? 1:56:00

A. No. He was -- no. Correct. This was a newly created management position to run the inside sales group that we were talking about earlier. 1:56:11

Q. And would this position have been available to some of the other experienced FSMs for consideration for that position?

MR. FARLEY: Objection to form. 1:56:28

THE WITNESS: Well, FSMs are of a lower level. So if someone was considering promotion, wanting to leave a team, manage other people, could it have been available? Yes. 1:56:40

But this likely would've been sourced with people with management experience. Especially considering he was going to have to not only manage the team but get this thing stood up from -- from the word go. 1:56:52

There were no phones, there were no computers, there were no headsets. Everything was

Page 82

going have to be done from scratch. So we were looking -- I know Mark was looking for fairly experienced manager people to take this role. 1:57:04

Q. Are you saying that Dallas didn't have an office at all? There was an office in Dallas.

Correct?

A. Yes. 1:57:14

Q. And there was a building that existed, and there was a -- a consumer credit office there.

Correct?

A. Yeah. But our -- our operations are what we call NCCD, the -- well, I'll just -- just call it NCCD. I don't even know the acronym. 1:57:33

But our operations center is there in Dallas. And this team is housed in that building. Still is today. 1:57:45

Q. Okay. That NCCD team. Were any of them impacted, any of them lose jobs?

A. No. 1:58:00

Q. Did all -- did any people in that credit -- consumer credit office terminate employment in 2020?

MR. FARLEY: Objection to form. I have -- I have -- I mean, I -- we did not prepare him on that. So I have no idea if he has the answer to it. 1:58:27

THE WITNESS: I don't know.

Page 83

BY MS. FOLEY:

Q. There actually all -- were a number of people who were driven out of that office, older workers.

Correct? 1:58:37

MR. FARLEY: Objection to form.

You don't have to answer that question. We're not answering that question. Next -- 1:58:42

BY MS. FOLEY:

Q. Do you --

MR. FARLEY: -- question.

BY MS. FOLEY:

Q. -- know?

MR. FARLEY: He's not -- he's not answering the question, Shannon, so you can please move on.

Do you have another question, or would you like to take a break? 1:58:54

BY MS. FOLEY:

Q. Is consumer credit under your sales operations at all?

A. No.

Q. Okay. Going through these. Next is Matt Stocking. And it is Bates No. 2701, and it's June 4 letter to Matt Stocking. 1:59:25

And Matt Stocking is offered an FSM position in the inside sales region.

Page 84

Do you see that?

A. I do. 1:59:36

Q. And Matt Stocking. Did he accept that position?

A. He did not.

Q. Did Matt Stocking indicate that he was mobile? 1:59:52

A. Originally, yes.

Q. Why do you say "presumably"?

A. I didn't say "presumably." I said "originally." 1:59:59

Q. Oh. I'm sorry. I misheard you. Was Matt Stocking in his thirties?

A. I don't know. 2:00:14

Q. Was -- he was the developmental FSM.

Correct?

MR. FARLEY: Objection to form. 2:00:22

THE WITNESS: As I mentioned earlier on, I don't know if he was a developmental FSM. I do know his tenure as -- as an FSM was fairly short in the Mountain region. 2:00:33

BY MS. FOLEY:

Q. Okay. And who did you fill this extra inside sales FSM position with?

A. I don't recall, because when it was all said

21 (Pages 81 to 84)

## Page 85

and done, we had -- after June 4th, there were three -- because Mr. Stocking turned this position down. 2:00:57

There were still three open positions in the inside sales team. So I don't know who specifically took this actual job.

Q. Who filled -- 2:01:08

A. They were building -- sorry.

Q. Who filled -- who filled the other three positions?

A. I'd have to -- if you could provide me a list, I could tell you who they were. I -- I -- I can think of Dan Pauken off the top of my head. 2:01:20

I don't know if Rick O'Brien would've been one of the first three who actually took one or actually took an open one. I -- I'd have to take a look at the list to see -- you know, who actually took the jobs as offered versus the job that were open and actually applied for. 2:01:38

I'd have to -- yeah, I'd have to look at that to answer that properly.

Q. Okay. We'll have an opportunity to do that. Okay. We'll keep going. 2:01:50

And on Nedra Pitchford, June 4th, 2020, a Bates of 2704, she was offered an FSM position in the inside sales region in Dallas.

## Page 86

Correct? 2:02:13

A. Yes. Nedra was offered a position from FSM to FSM. Yes.

Q. And did she take the job? 2:02:20

A. She did.

Q. And was Nedra in her forties?

A. I have no idea. 2:02:32

Q. Did she indicate that she was mobile?

A. Yes.

Q. Did she have a Meets Expectations rating? 2:02:47

A. I don't know off the top of my head.

Q. Do you know if Nedra had any issues with her performance in her job? 2:03:08

MR. FARLEY: Objection to form.

THE WITNESS: I don't recall any performance items relative to doing the basics of the job. I do recall Nedra wanting to get back to the operations center in Texas. 2:03:21

BY MS. FOLEY:

Q. And this letter says to contact James Paplexis at Nissan on this particular letter.

MR. FARLEY: Where does it say that? 2:03:35

THE WITNESS: Right in the middle. It says it on all of them.

MR. FARLEY: Okay.

## Page 87

THE WITNESS: Okay.

BY MS. FOLEY:

Q. Was he -- 2:03:46

MR. FARLEY: Oh, oh, oh. Email. Yeah --

THE WITNESS: Yeah. Email, sorry, the June 19th.

MR. FARLEY: Oh.

BY MS. FOLEY:

Q. When did James Paplexis leave Nissan? 2:03:55

A. I don't remember.

Q. Was it in 2020?

A. I don't remember. 2:04:04

Q. Do you know where he is now?

A. I believe Jim is retired.

Q. Okay. All right. Next letter is to -- June 4th, 2020 to Ruben Rubalcava, and it's Bates 2707. 2:04:28

And this is a financial services manager inside sales region position that's offered to him.

Correct?

A. Yes. 2:04:40

Q. And do you know if he accepted that?

A. Yes.

Q. Did he actually accept that position? 2:04:55

A. Yes.

MR. FARLEY: Did you not hear him? Are you

## Page 88

-- are you all hearing this okay? 2:05:05

MS. DAVENPORT: Yes. It was clarification.

MR. FARLEY: It was clarification. Thank you. 2:05:09

BY MS. FOLEY:

Q. Okay. Next page. And this is to Simeon Taskov. And it is Bates 2710. June 4th, 2020. And he is offered a financial services manager position in the Midwest region, Kansas City District. 2:05:36

A. Yes. And that -- by the way, that answers whether Kansas City was in Central or Midwest. But yes. 2:05:44

Q. So he was actually in the Midwest region.

Correct?

A. Yes.

Q. And who would his regional manager be? 2:05:53

A. John McBane was the regional financial services manager for that region.

Q. And who would his area manager be?

A. Back then, it would've been either Lisa Cicchini or Terri Ciaramitaro, I believe, were the two AONs at the time. 2:06:15

Q. Okay. And he accepted that position.

Correct?

A. Yes, he did. 2:06:31

## Page 89

Q. Okay. Vil Vina. And it's Bates 2713. In his June 4th, 2020 letter, he is offered a financial services manager position in the Midwest region, St. Louis District.

Do you see that?          2:06:58

A. Yes.

Q. And did he accept that position?

A. Yes, he did.

Q. And did he stay with the company?          2:07:08

A. Yeah. I believe Bill's still on our team. Yes.

Q. Was he offered a voluntary severance plan after August 3rd, 2020?          2:07:27

A. I don't know.

Q. Does he still have this position of financial services manager?

A. I believe he is a financial services manager in Ohio today. But I'd have to check to make sure.          2:07:47

Q. Okay. And -- okay. So Brad Boland. This one is dated March 31, 2020. So -- and it has a Bates number on the bottom of 2718. This letter didn't go out March 31, did it?          2:08:24

A. No, I can't imagine it did. As we talked earlier, there was an assumption that maybe early in the fiscal year, we'd be announcing this, and it got

## Page 90

pushed out to June. So my hunch is this is probably a draft.          2:08:39

Q. Okay. And as of March 31, 2020, Brad Boland is being notified that his position is being eliminated or consolidated with another position.

Correct?          2:08:58

MR. FARLEY: Objection to form, misrepresents the record and that document.

Go ahead. You can answer.          2:09:04

THE WITNESS: Well, this is likely a draft, and I will reiterate that. And it -- as noted, yeah, that's what this document says.

BY MS. FOLEY:

Q. Okay. And when the letters went out on June 4th, was Brad Boland notified that his position was eliminated or consolidated with another position?          2:09:28

A. I believe he was.

Q. And was Brad Boland offered another job?

A. Well, I don't think so, but this is the letter that actually he eventually got.

Right?          2:09:43

Q. I'm asking you. Was he placed in another position at the June 4th time period like the other letters we just reviewed?

A. Not that I recall. No.          2:09:57

## Page 91

Q. And do you know if Brad Boland received any other job at Nissan before the August termination date?

A. I don't believe he did.          2:10:15

Q. So was Brad Boland terminated in August of 2020?

A. That just a way of asking the same thing. I -- I would assume so. Yes. But I don't believe that he was still employed and that he received a letter on June 4th.          2:10:40

I'd have to go back and look at the list as to what the final -- in these documents what the final letters were. But I don't believe he stayed with Nissan. No.          2:10:48

Q. Okay.

MR. FARLEY: Shannon, are you at a point where we could take a break?

MS. FOLEY: Yes.          2:10:55

MR. FARLEY: Five, ten minutes okay?

MS. FOLEY: Sure.

MR. FARLEY: Okay. Thanks.          2:11:01

THE RECORDER: Okay. Off the record at 12:33 p.m.

(Off the record.)

THE RECORDER: We are back on the record at 12:47 p.m.          2:11:12

## Page 92

MR. FARLEY: What time did we go off?

THE RECORDER: Sorry?

MR. FARLEY: Did we go off the record?          2:11:21

THE RECORDER: It was 12:33.

MR. FARLEY: Gotcha.

BY MS. FOLEY:

Q. We're back on the record. Mr. Ledieu, you understand you're still under oath. Yes?          2:11:34

A. Yes.

Q. We are going through what we've marked as Exhibit 2, which are the letters which were sent out on -- a draft letter of the letter sent out June 4th.          2:11:54

So we looked at Brad Boland's letter. The next letter is to Bill Dodson. And this one is Bates number 2721. And in this March 31, 2020, draft letter of the June 4th letter to Bill Dodson, it indicates that he -- his position is being eliminated or consolidated with another position.

Correct?          2:12:26

A. Yeah. The draft would say that, yes.

Q. And did his actual letter that was sent indicate to him that his position was being eliminated or consolidated with another position?          2:12:38

A. I'd have to see the June 4th letter, but I do believe Mr. Dodson was in a position that was

23 (Pages 89 to 92)

www.InDemandReporting.com (773) 239-6008

Page 93

eliminated, yes.

Q. Do you have any reason to believe that Mr. Dodson's job was eliminated? 2:12:53

A. I do not.

Q. Okay. And Mr. Dodson was not offered another position with Nissan Motor Acceptance Corporation at the time of the issuance of the June 4th, 2020, letters.

Correct? 2:13:12

A. Yes. That would be my recollection.

Q. And was Mr. Dodson offered any job by NMAC or -- or Nissan North America as of the August 2020 termination date? 2:13:32

MR. FARLEY: Objection to form.

THE WITNESS: I don't believe that Mr. Dodson found another position within the company, no. 2:13:42

BY MS. FOLEY:

Q. So Mr. Dodson was terminated by Nissan/NMAC in August of 2020.

Correct?

A. That would've been the result. Yes. 2:13:57

MS. FOLEY: Yeah. Next document, please.

BY MS. FOLEY:

Q. This is a March 31, 2020 draft of the June 4th, 2020 letter to Greg Leiter, and it has a Bates

Page 94

number of 2724. The letter that went out on June 4th to Greg Leiter, was that -- did that notify him that his position was being eliminated or consolidated with another position? 2:14:41

A. Yes. This draft would suggest that.

Q. And is it your understanding that in fact, his position was eliminated? 2:14:52

A. Yes.

Q. And was Mr. Leiter offered any job with NMAC prior to -- with the June 4th, 2020 communication that his position was eliminated or consolidated? 2:15:07

A. I don't believe he was formally offered any roles. He was offered the ability to post for roles if he wanted to. As the letter indicates. 2:15:17

Q. Okay. But in the June 4th letter, he's not offered a position like in the first letters that you looked at, where they had an exact position they were being transferred to.

Correct? 2:15:30

A. That is correct.

Q. Did you know how many dealers Mr. -- smaller dealers Mr. Leiter had? 2:15:49

A. Off the top of my head, no.

Q. Do you know he only had two small dealers?

A. I do not. 2:16:00

Page 95

Q. Okay. We'll go -- as of the August date of termination, had Mr. Leiter been offered any jobs at Nissan North America?

A. None that I'm aware of. No. 2:16:25

Q. And was Mr. Leiter's employment terminated by Nissan North America/NMAC in August of 2020?

A. Yeah, without finding a position, it would've been. Yes. 2:16:38

Q. The next document is dated March 31, 2020, to Douglas Kiernan Monohan, and it has a Bates stamp of 2727. And it's a draft of the letter that went out on June 4th to Kiernan Monohan. 2:17:15

Was Kiernan notified that his position was eliminated or consolidated with another position?

A. I can't see the date on this letter, but I assume it's a draft. Thank you. But yeah, this draft would've suggested that his position was being eliminated. 2:17:34

Q. And was his position actually eliminated or consolidated?

A. I believe it was. 2:17:47

Q. And was Kiernan Monohan offered any other position to transfer to when he was given notice of the elimination or consolidation on -- on June 4th, 2020?

A. There was no offer in the letter. No. 2:18:07

Page 96

Q. And was Kiernan Monohan terminated by NMAC/Nissan in August of 2020?

A. Yes.

Q. Was Kiernan Monohan offered any job by Nissan or NMAC during the time period of June 4th to August 2020? 2:18:39

A. No.

Q. Do you know if Kiernan Monohan applied for jobs in the period of time of June 4th to August 2020?

A. Yes. 2:18:56

Q. And how do you know he applied for jobs during that time period?

A. I was made aware by Ms. Dessaw that he had posted for some promotional opportunities within the company. 2:19:13

Q. Did you contact any of the hiring managers?

A. No.

Q. Did you contact any of the recruiters? 2:19:26

A. No.

Q. Did you do anything to help Mr. Monohan find employment?

A. The only thing I did for Mr. Monohan, at his request, was to take a phone call to see what options might be available for him and to talk about how I could help. 2:19:42

24 (Pages 93 to 96)

Page 97

Q. Other than that phone call, did you do anything to assist him in finding another position to transfer to at Nissan --

A. No.                    2:19:51

Q. -- or NMAC?

A. No.

Q. Moving to the next document. This is a March 31, 2020 draft of a letter to Matt Stewart. It has Bates No. 2730.                    2:20:17

And it is a notice to Matt Stewart that his job will be eliminated or consolidated with another position. Is this the information that was sent to Matt Stewart on or about June 4, 2020?                    2:20:39

A. This draft would be representative of the letter he would've received on the 4th. Yes.

Q. And was Matt Stewart offered another job or transfer to another job at the time of the June 4, 2020, letter?                    2:20:58

A. As evidenced by the document in front of us, no.

Q. In fact, other than this document, do you know if he was offered a transfer or another position in June 2020?                    2:21:11

A. I don't believe so.

Q. Do you have any information that he was

Page 98

offered a transfer?

A. I do not.                    2:21:19

Q. Was Matt Stewart terminated in August of 2020?

A. That would've been the result of not finding any role within the company. Yes.                    2:21:37

Q. Do you know if Matt Stewart applied for jobs in the company?

A. I was made aware that he did apply for certain roles, but which specific ones, I don't know.                    2:21:49

Q. And who made you aware that he applied for various roles in the company?

A. Ms. Dessaw.

Q. Camille Dessaw told you. Did she tell you in person or in writing?                    2:22:05

A. In reviewing documents in preparation for deposition, I've been made aware of emails that were sent to me, which I don't recall. But I do remember being made aware organically as to as the weeks went by how individuals were not receiving opportunities within the company.                    2:22:26

Q. Do you recall any of the positions that he -- that Matt Stewart was pursuing at NMAC or Nissan or Infiniti?

A. I do not.

Page 99

Q. Did you do anything at all to help Matt Stewart find employment at Nissan North America, NMAC, or Infiniti?                    2:22:54

A. I was not involved in any discussions of that nature. No.

Q. Did you ever talk to any recruiters or hiring managers regarding Matthew Stewart?                    2:23:09

A. No.

Q. Did you send any communications to any hiring managers, recruiters?

A. None that I recall. No.                    2:23:21

Q. Did you have any phone calls with any hiring managers or recruiters regarding Matthew Stewart?

A. None that I recall. No.                    2:23:32

Q. Did you see any communications from Mr. DeTrude or anyone else at NMAC or Nissan regarding any of the employees who did not get offered jobs efforts to find employment?                    2:23:54

MR. FARLEY: Objection to form.

THE WITNESS: I believe at deposition preparation, I was made aware of email between Mr. DeTrude and others regarding interviewing for certain roles. But I did not at the time remember -- recall seeing any. No.                    2:24:11

BY MS. FOLEY:

Page 100

Q. What is it that you recall or saw in your documentation review?

A. I don't exactly remember, other than it was about a certain hiring individual making an interview available for one of the individuals.                    2:24:32

Q. Say that again?

A. I believe it was an -- Mr. DeTrude asking a hiring manager to interview a certain impacted individual. Which individual, I can't remember.                    2:24:49

Q. Do you know who it -- whether it was for Matthew Stewart?

A. I do not recall.

Q. And was it just to interview them, to say they were interviewed?                    2:25:05

A. I just remember the request to interview.

Q. Okay. Okay. We'll go to the next document. It is March 31, 2020. Kasey Yost is given notice in Bates 2733 that his position will eliminated and consolidated.                    2:25:33

MR. FARLEY: I'm objecting to this -- to the reference there. This is not -- and you have said these are draft letters, and you just questioned -- your question was he was given notice on March 31st, 2020.                    2:25:44

So I'll either make a standing objection if

Page 101

you're okay with that, that these are not the letters that were sent to these people, but I'd like your questioning to be focused on what's the right information. 2:25:56

MS. FOLEY: Are you done?

MR. FARLEY: Are you done misrepresenting the documents?

MS. FOLEY: I don't want to waste my time on your objections. You can have your standing objection. That's fine. 2:26:10

MR. FARLEY: Okay.

BY MS. FOLEY:

Q. This is a letter -- this particular document has a March 31, 2020 date.

Correct? 2:26:20

A. This draft, yes, looks like draft --

Q. Oh.

A. -- of a letter. Yes. 2:26:23

Q. And actually, on June 4th, this man, Kasey Yost, was given notice that his position would be eliminated or consolidated with another position.

Correct? 2:26:33

A. That's correct.

Q. And Mr. Kasey Yost was not given another position to transfer to as of June 4th, 2020.

Page 102

Correct? 2:26:47

A. Correct.

Q. And Mr. Kasey Yost was not offered any other job from NMAC or -- or Nissan as of August 2020.

Correct? 2:26:59

A. I don't believe he pursued any. No.

Q. And Kasey Yost was terminated by NMAC/Nissan in August of 2020.

Correct? 2:27:10

A. Yes.

Q. Okay.

MS. FOLEY: Next document.

BY MS. FOLEY:

Q. This is a -- a draft with a date March 31, 2020, to Matt Stocking, Bates stamp 2748.

Correct? 2:27:30

A. Looks that way. Yes.

Q. And this is a -- a letter, a draft letter, to Matt Stocking that his position would be eliminated but -- but that he would be receiving a -- an offer for a position, which is -- is unspecified in this particular letter.

Correct? 2:27:55

A. Yes. I believe -- didn't we just look at the actual letter a few --

Page 103

Q. We did.

A. -- documents ago? 2:28:01

Q. Yes, we did.

A. Okay.

MS. FOLEY: Next document. Is that it? Okay. I'd like to put up what I have marked as Exhibit 4, and it's 3972.

MS. DAVENPORT: I think so.

MS. FOLEY: Mm-hmm. 2:28:33

THE RECORDER: I'm sorry, Ms. Foley. Did you say Exhibit 3 or 4?

MS. FOLEY: Well --

MS. DAVENPORT: It's Exhibit 3. 2:28:40

MS. FOLEY: Exhibit 3.

THE RECORDER: Okay.

(Exhibit No. 3 marked for identification.)

BY MS. FOLEY:

Q. It's a Bates stamp 3972.

A. Found it? 2:29:25

Q. Yeah. The Bates number is 3972 on this document. You can see it at the top. It's Exhibit 3.

Mr. Ledieu, do you recognize this document? It's a Nissan Excel spreadsheet. 2:30:15

A. Depending on its contents, an extraction from HR likely, with very basic information around hire

Page 104

dates, length in role, job title, all that. Yes. 2:30:30

Q. It says at the bottom on the tab "NMAC Sales."

You see that?

A. Yeah. 2:30:37

Q. Okay. And on this document, it has the employee names of the persons -- are these all the names of the people we just read who -- who are impacted by the position elimination and some of them had jobs, some of them did not? 2:31:02

A. I don't believe it is. I see Mr. Oda on there. I don't think we reviewed a letter for Mr. Oda in the -- 2:31:10

Q. Okay.

A. -- last exhibit. So it's --

Q. Okay.

A. -- pretty close, but yeah. 2:31:15

Q. Other than Mr. Oda -- he was an additional name who was terminated.

Correct?

A. He was. Yes. 2:31:23

Q. Okay. And he was not offered another position.

Correct?

A. He was not. 2:31:28

26 (Pages 101 to 104)

www.InDemandReporting.com (773) 239-6008

Page 105

Q. Yeah. So he was terminated in August.

A. Actually, I don't know if Mr. Oda was offered a position or not. But I don't think so. 2:31:37

Q. Right. So in --

A. And yes -- and yes, he was terminated.

Q. In this -- in this spreadsheet, it says Employee Name, correct, and it has the names of the people impacted by this.

Correct? 2:31:49

A. Yes.

Q. And then the next column, B, has Hire/Rehire Date.

Correct?

A. Yes. 2:32:02

Q. And to go through the people who were terminated, as you just testified, William Dodson was hired 7/5/94.

Correct?

A. Yes. 2:32:15

Q. And Matt Stewart was hired 1/3 of 2001.

Correct?

A. That -- that's what it says. Yes. 2:32:25

Q. And Monohan was hired 8/21/06.

Correct?

A. Looks that way. Yes. 2:32:34

Page 106

Q. And Greg Leiter was hired 12/3 of '01.

Correct?

A. Yes.

Q. Kasey Yost was hired 8/4/14.

Correct? 2:32:51

A. Yes.

Q. Was Oda -- was -- he was a commercial FSM. What is a commercial FSM? 2:33:02

A. Wes was brought in -- I don't -- I can't speak specifically to it, because the job was created before I arrived. But Wes was specializing his time on calling on commercial accounts, so more like businesses, as well as helping us develop relationships with Mitsubishi dealers. 2:33:27

I'm sure you're aware that Nissan has a -- an alliance partnership with Mitsubishi. And in a few locations throughout the country, we actually do support Mitsubishi dealerships. So that was really primarily what Wes was working on -- 2:33:40

Q. Okay. And then Brad Boland is a hire date of 9/29/14.

Correct?

A. Boland, Boland. Nine -- yes. 2:33:51

Q. And then the next column, C, is Length of Service?

Page 107

Correct?

A. Yes.

Q. And Dodson had 25.9 years? 2:34:01

A. That's --

Q. Right?

A. -- what it says.

Q. And Stewart had 19.4 years.

Correct? 2:34:08

A. Yes.

Q. And Monohan had 13.77 years?

Correct?

A. Yes.

Q. And Leiter had 18.49 years.

Correct? 2:34:19

A. Looks that way. Yes.

Q. And if you go over to the column I -- J, it says "Applied for Internal Roles." And it says that Dodson applies for roles.

Right? 2:34:38

A. That's what it says. Yes.

Q. And Matthew Stewart applied for roles?

A. Yes. 2:34:49

Q. And over here, it says applied for five roles as of the time -- as of this time. Do you know if that number's accurate?

Page 108

A. I don't. 2:35:01

Q. Okay. And then it says Monohan applied for roles.

Correct?

A. Yes.

Q. Is -- is internal roles -- do you take that to mean jobs? 2:35:14

A. Yeah, I -- I would interpret that as Nissan or NMAC jobs. Yes.

Q. Okay. And then -- and Leiter applied for internal jobs.

Correct? 2:35:30

A. Can you highlight that row? Because I'm having a hard time just following it all the way across. Just -- 2:35:34

Q. Okay. So Leiter is this --

A. That's --

Q. -- one. Yeah. Here -- 2:35:36

A. Yeah.

Q. -- you go.

A. Yeah. It looks that way. Yes.

Q. All right. And then where we get down to the ones past Brad Boland, at, like, lines 10 through 16, Applied for Internal Roles, it says N/A, N/A, N/A, N/A. 2:35:54

They didn't have to.

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com (773) 239-6008

Page 109

Right?

A. They were --

Q. Apply --

A. -- yeah. Their -- their letters offered them roles. Correct. 2:36:01

Q. Okay. And so if we go over a little farther, it says "Received an Internal Offer." All of these on the bottom received an internal offer.

Correct? 2:36:16

A. As did Mr. Stocking at the top.

Q. Yes. And then the Notes here. You indicate "Retirement Eligible" on this first line. Would that mean that the person, Dodson, is of a certain age? 2:36:44

A. Well, you say I indicate. I -- I didn't create -- I don't recall creating this document. It looks familiar to me. So as to what the notes are and who put them in there, I -- I -- I can't speak to that. 2:37:00

Q. Okay. Does "Retirement Eligible" have significance to you?

A. Does "Retirement Eligible" have significance. What do you mean by "significance"? 2:37:12

Q. Does it mean anything at Nissan?

A. Yes. Yeah. For instance, I know at a certain age, I can retire from Nissan and have certain benefits in retirement. Yes. 2:37:23

Page 110

Q. And what age?

A. For me, I can retire at the age of 55 and 15 years of service and receive some benefits. 2:37:36

Q. Okay. So at least as to this first one with Mr. Dodson, somebody indicated that he's retirement eligible. He's at least 55.

Correct? 2:37:48

A. Looks like that way. Yes.

Q. And then as to this one down at line 5, that person I -- I think is Leiter, is somebody else who's indicated that he's retirement eligible.

Correct? 2:38:05

A. Looks that way.

Q. And so person who filled this out knows that he's at least 55.

Correct? 2:38:15

A. Yes. They would likely know that.

Q. And then these other notes in this column are all these positions that these other workers have accepted.

Correct? 2:38:26

A. Yeah. I'm just reading through it. Looks that way. Yeah.

Q. Okay. So these reports, like, you can pull up and -- and populate different fields with

Page 111

information that's available in the system.

Correct? 2:38:50

A. I could not.

Q. So could Mark Lubbers pull up information and populate his Excel spreadsheets with data that's available?

A. No. 2:39:02

Q. Can he request information that's available to you so that he has it for his Excel spreadsheet?

A. Yeah. Certain things can be extracted. Like you say, you know, the grade level, the -- you know, who their boss is, director. Yes. It can be extracted. 2:39:22

Q. Okay. All right. Thank you.

MS. FOLEY: I have these ones at 41 that we could just put up. 2:40:05

MS. DAVENPORT: What are the Bates?

MS. FOLEY: 2767, 2833. 3112 and 3.

MS. DAVENPORT: Oh.

BY MS. FOLEY:

Q. So we just talked about the June 4th letter. But it -- this is a document that has a Bates of I think 2767. 2:41:05

And -- but it has a May 15 proposed schedule. Was this -- was this an -- a date that you originally

Page 112

planned on delivering this? 2:41:17

A. All I remember is that we had originally planned to communicate earlier and that things had gotten delayed to June 4th. What the exact date was for the original announcement, I don't recall. 2:41:32

Q. Okay. We'll look at 4 -- 40 -- or Exhibit 5, which is Bates 2833.

(Exhibit No. 5 marked for identification.)

BY MS. FOLEY:

Q. And this has the June 4th schedule for regionalization. And so was this to make announcements to various people? 2:42:15

A. Yeah, this would've been a -- a timeline for which we communicated each individually impacted employee as well as their management. And then you can see the big blocks below is announcing the larger restructuring to the company. 2:42:35

At the same time that this was going on, similar meetings were being held at Nissan Division for the restructuring of the regions.

Q. Okay. So for example, over here in Midwest region, the far right, column J -- 2:42:52

A. Yeah.

Q. See that? It says "RFSM/AOM." So was that an initial meeting with the RFSM and the AOM, notifying

28 (Pages 109 to 112)

Page 113

them of the changes?

A. (No audible response)

Q. Did you hear me?                2:43:30

A. Yeah. I said "yes." I -- I -- I -- sorry. I said "yes." Correct.

Q. Oh, okay. I -- I didn't hear your answer. Apologies. So the RFSM was McBane and the AOM would be who? Lisa Cicchini --                2:43:47

A. To --

Q. -- and Terri?

A. Yes. It would've been Terri Ciaramitaro and Lisa Cicchini at the time.                2:43:53

Q. Okay. So they were notified of the -- what was happening on June 4th?

A. Correct. Well, John would've known before. Right? Because he was part of our team.                2:44:08

Q. Right.

A. Those --

Q. Were --

A. -- were --

Q. Were the AOMs notified before this date of --                2:44:16

A. No.

Q. -- the regionalization?

A. No.

Q. Okay. Do you have any idea whether John

Page 114

McBane had discussed it with his AOMs in advance?                2:44:26

A. I do not.

Q. Okay. So then it shows a meeting of McBane with Monohan and HR.

Correct?                2:44:38

A. I see Vina and McBane and HR. And -- and then McBane and Taskov and HR. Then McBane, Monohan, and HR. And then McBane, Stewart, and HR.                2:44:51

Q. Okay. So do you know who from HR was on those calls?

A. I do not.

Q. Were you on those calls?                2:45:02

A. I believe I was in -- I -- I believe that myself and a representative from human resources was part of any discussion with a team member who was facing possible separation.                2:45:26

But I have no -- I know for a fact I didn't do all of them, and I know for a fact that the other HR person -- I think it was Camille Dessaw, I'm not for sure -- would've covered the other meetings. Because as you can see, there was not enough of us to go around given the timeline.                2:45:42

Q. Okay. You -- were you in the Stewart meeting?

A. I don't recall.                2:45:59

Page 115

Q. Were you in the Monohan meeting?

A. Don't recall.

Q. Were you in the Leiter meeting?                2:46:04

A. I -- I can tell you all of them, I don't recall.

Q. Were you in the Dodson meeting?                2:46:12

A. Just answered that. I don't recall.

Q. Okay. This "Contact Remaining Team Members to Discuss New Territory Boundaries." So the people who were told that they were losing their jobs, were they included as -- in this new territory boundary meeting?                2:46:46

A. I'm sure they would've been invited. But I don't know whether they attended or not.

Q. Okay. How do you know you're sure they were invited? Have you --                2:47:01

A. I guess I should -- maybe I should restate that. I'd be surprised if they weren't invited. But likely given the sensitivity of what they were just informed of, were also likely given the opportunity to take a day off, clear your head.

Right? It's never an easy message regardless of what's going on.                2:47:20

So I can't speak to whether they actually attended or not. No.

Page 116

Q. So you attended some of these meetings you testified.

Correct?                2:47:32

A. No. No, I didn't attend. These would've been led by their regional management. I don't recall attending any regional meetings. They were all going on at the same time.                2:47:43

Q. Okay. Were they all by Zoom?

A. I -- I have to assume they were by Zoom or by conference call, just because these team members are all over the country. So I would -- I -- I would doubt that they were in-person meetings.                2:48:05

And by the way, this was June 4th of 2020, so only a couple months into the pandemic. My -- my -- my supposition, but I don't know, would be that they would be either a conference call or a Zoom meeting.                2:48:19

Q. Okay. There's a document 41-3 that we'll mark as the next exhibit.

MS. FOLEY: What is that, 6?                2:48:32

MS. DAVENPORT: Yes.

MS. FOLEY: Exhibit 6.

(Exhibit No. 6 marked for identification.)

BY MS. FOLEY:

Q. So Exhibit 6 is Bates 2827, an Excel spreadsheet.

Page 117

Do you recognize this document?                2:49:13

A.   I understand this document.  I do not recognize it.  Other than for preparation yesterday, in the deposition preposition -- prepare -- preparation.    2:49:23

Q.   Okay.  And does this document have the employees in their current job titles and their new location?

A.   I'm just going to read it.  Looks like Larry from Oklahoma to Dallas.  Nedra from Virginia to Dallas.    2:49:53

Jeff from New York to Dallas.  Bill from Ohio to St. Louis.  Simeon -- yes.  It does.  Oh, sorry. No.  Well, these would've been what were offered.  Yes.    2:50:09

But as we've spoken before, Mr. Stocking declined his offer.

Q.   Okay.  So this was a document that must've been before June 4th, 2020.

Correct?                    2:50:22

MR. FARLEY:  Objection to form.

THE WITNESS:  I don't know that.  Likely.  As HR would've had to give each individual the details around their relocation.    2:50:34

But whether it was prior to June 4th or not, I would not be in a position to say that.

BY MS. FOLEY:

Page 118

Q.   Well, it has Matt Stocking as an employee in a current city being offered something in a new location, and he's still on the list.

Correct?                    2:50:50

A.   That's what it says.  Yes, it says that.

Q.   Okay.  And it's "NMAC Field Re-Org Relo," Relocation, "Requests"?  Is that correct?  At the bottom in the tab?                2:51:08

A.   NMAC Field Re-Org Relocation.  Yeah.  That's what that -- "Relo" would be relocation.  Yes.

Q.   Okay.  Thank you.  Did you prepare any of those documents?  Like that relo -- relocation request?    2:51:33

A.   (No audible response)

Q.   Do you know who did?

A.   I -- I don't.                2:51:37

Q.   Was it something Mark Lubbers would prepare?

A.   Not likely.  If anything, it was probably the human resources community having to get the relocation packages approved as well as scopes for -- for them to be able to answer questions when the individual might have them.                2:52:04

But I don't know who would've prepared it.

Q.   So question.  On -- who originated the idea of doing a reorg at NMAC?            2:52:21

A.   Who originated the idea of doing -- well,

Page 119

there were two originations to this whole reorg.  One was how can we do better with our dealers and be more efficient in doing so.            2:52:44

And two was the unknown, which we got -- as I told you before, we were made aware that Nissan Division was reducing its region count from eight to six and closing Mountain and Pacific Northwest.    2:52:57

So I would say the group, as we tried to figure out how to better serve and call on our dealers, would've been kind of that starting point.  And then the readdressing of boundaries and geographical assignments by region would've been really I guess the -- the catalyst would've been Nissan Division.    2:53:19

Q.   So you called these people together, you and Mark Lubbers.  So between the two -- two of you, you must've had an idea that you wanted to bring them together to discuss an NMAC reorg.        2:53:34

Who originated the idea before you even gathered the group?

A.   We did not gather the group to discuss a reorganization.  We gathered a group to find out how we could be more efficient and effective in calling on all of our markets, small, medium, and large, as well as provide our regions with analytical support, as well as discuss any other options that might be on the table.    2:54:01

Page 120

But there was no preconceived let's get together and talk about a reorg.

Q.   Did you prepare any of the PowerPoints that were part of the meetings that you had with the group?    2:54:21

MR. FARLEY:  Objection to form.

THE WITNESS:  I would've been -- been involved in the preparation of the slides.  But did I actually prepare them myself?  No.        2:54:33

BY MS. FOLEY:

Q.   Who prepared them?

A.   Different individuals, depending on what was on the slide.                2:54:38

Q.   Which individuals?  Did Mark Lubbers prepare the PowerPoint?

A.   Well, there were many PowerPoints.  Again, as a group, we were preparing materials on that PowerPoint.  But who specifically prepared what for when and how, I wouldn't be able to speak specific to who did each -- each slide or version of the PowerPoint.                2:55:09

Q.   Okay.  And the Excel documents that were prepared -- pulled into the PowerPoint, who -- who prepared those?

A.   Yeah, Mark and his -- likely his analyst would -- he would ask his analyst just to pull data.

30 (Pages 117 to 120)

Page 121

And Mark would -- would've asked for that.    2:55:27

Q. And who's Mark analyst?

A. I think at the time, it was Mr. Ryan Martin.

Q. Okay. Do you know how many versions there were of that PowerPoint?    2:55:51

A. I do not.

Q. Did you just keep adding to it, or did you delete portions?

A. I don't recall. I know we put things in different order based on the audience we were going to be talking to. But I don't recall whether we added or subtracted things from it.    2:56:15

Q. Okay. I'm going to do the next document on the next topic. The next topic is person most knowledgeable regarding the content of the PowerPoint presentations regarding NMAC reorganization 2020. Okay?    2:56:32

So I'm going to pull up as the next exhibit -- it is what I marked in there as Exhibit 7.

(Exhibit No. 7 marked for identification.)

BY MS. FOLEY:

Q. So it has a Bates stamp at the beginning of it of 4206, going from there. Do you see this? It says "M&S Optimization SVP Update."

Do you know what that is?    2:57:41

Page 122

A. Yeah, that's likely what I was talking about earlier on about sharing with Mr. Colleran, the former senior vice president of M&S. Now, whether this is their presentation to us or ours to their, I'd have to keep scrolling through the pages to be able to answer that. But this --    2:58:02

Q. Okay.

A. -- might've been their -- this might've been their regional optimization -- or M&S optimization I believe is a term that NNA was using when they were talking about that eight to six region change.    2:58:13

So this may have been their draft. I'd have to go through the rest of these pages to better answer your question.

Q. So what does M&S stand for?    2:58:21

A. Marketing and sales.

Q. Okay.

A. Yeah. Anyone who's in a region reports through marketing and sales. It's --    2:58:29

Q. Okay.

A. -- on -- on the NNA side.

Q. Okay. What -- we'll scroll through. It says Agenda, Day One, Day Two.    2:58:43

A. Okay. So that would've been ours.

Q. That would be --

Page 123

A. No, I'm sorry, sorry. One second. You just -- yeah. That -- this would've been ours. Yep.    2:58:50

Q. Okay.

MS. FOLEY: Keep going. Keep going. Okay. Is that it?    2:59:08

MR. FARLEY: Can't read that one.

THE WITNESS: Yeah.

MS. FOLEY: That's how it came. But --

THE WITNESS: But I -- I could tell you -- I mean, just looking at that, that's the -- that -- those would be Nissan documents.

Right?    2:59:28

So our regional vice president and then his area general managers and regional general managers or operations managers. So that's a --

BY MS. FOLEY:

Q. Okay.    2:59:35

A. -- Nissan -- that's a Nissan structure slide.

Q. Okay.

MS. FOLEY: Keep going.    2:59:39

THE WITNESS: And that was to be the Nissan structure. That was their before and after.

BY MS. FOLEY:

Q. All right.

MS. FOLEY: Okay. You can keep going. All

Page 124

right.    2:59:56

BY MS. FOLEY:

Q. So on this one, it goes through each region. Keep going.

So that's the end of the document that ends at 4248.

A. Yeah.    3:02:07

Q. And it's dated January 7th of 2020.

Do you think that's the date of your original meeting with --

MS. FOLEY: You can take it down.    3:02:21

BY MS. FOLEY:

Q. -- the group?

A. That sounds early, but it's possible. I -- but I don't know for sure. We would've been back from holiday at that point.    3:02:36

Q. But that is -- you say that Exhibit 7 is a document that was an NMAC PowerPoint that you used in meetings.

Correct?

A. Is that -- is 7 the one we just looked at?    3:02:58

Q. Yes.

A. Yeah. That looks like, yes, it would've been a -- a -- a -- it looks like an incomplete draft of what was used in meetings, yes.    3:03:09

Page 125

Q. Okay. And --

A. But what I don't know is -- sorry to interrupt. That lead slide says M&S VP, SVP, and I'd be surprised if we took Mike Colleran through anything that early, because we hadn't even started talking about it.                    3:03:25

So my -- my hunch is we took their deck, used a few of the slides that you saw in there were Nissan slides, and then added some of our stuff to it. Thus, the Bates stamping what it is. But I can't specifically tell you whether that's the case or not.    3:03:41

Q. Okay. I'll show you the next exhibit, Exhibit 8, which is Bates stamp 2768 to 2815.

MS. FOLEY: I have it as 4-1.    3:04:02

(Exhibit No. 8 marked for identification.)

BY MS. FOLEY:

Q. So this is later in time. It's February 21, 2020. It's from you to Jeff Chambers at Nissan. Correct?                    3:04:41

A. Yes.

Q. And it says "NMAC Regional Optimization Chambers Review PowerPoint".

A. Yes.                    3:04:51

Q. So at this -- by this point, you were presenting to Nissan's director of HR.

Page 126

Is that right?

A. Jeff had a responsibility for both Nissan and NMAC, so he was our director of HR as well as Nissan director of HR.                    3:05:16

Q. Okay. So we'll -- we'll go through the PowerPoint that's attached to this. It says "NMAC Org Discussion," starting at 2769.            3:05:39

And it has that same screen of Day One with the same Agenda that you had. Is this the agenda that you used for the meetings with your group that met in January or possibly early February?    3:06:06

A. No, it's a -- it's -- the agenda is -- as labeled, is a recounting of all the things we discussed in those two days and then ultimately summarizing to conclusions of having to address new regional geography, looking at the role of the AOM and could they support us in any different way than they currently do, regional analytical support as we discussed, and then the changing landscape around growing our business, being more effective and more efficient in the way we go to market.    3:06:41

Q. So Day One has -- you are setting expectations. What was the expectation?

A. So the agenda -- this is a -- this is a document I sent to Mr. Chambers.

Page 127

Right? So this was --                    3:07:02

Q. No, this is --

A. -- my --

Q. -- actually something that was also on the slide that was the original meeting as well. So I'm asking about the agenda at your meeting with your group that met in early -- in January or early February of 2020 that consisted of you, Lubbers, McBane, Hungerford, and --                    3:07:30

A. Right.

Q. -- Jamie Beck.

A. No, I -- okay, I'm --

MR. FARLEY: Object -- objection to form.    3:07:34 Go ahead.

THE WITNESS: Yeah, I -- whether this was an agenda leading into the meeting or it was an agenda that was published as a -- kind of a recounting of what we discussed when we were together, I can't speak to that.                    3:07:45

It's very close to what we talked about, though. If that's the question.

BY MS. FOLEY:

Q. Okay. So I just -- I was asking you a question. What were the expectations? I'm just going through it item by item.                    3:08:02

Page 128

A. The expectations were for us to address the new regional boundaries and finding a better way to call on our dealers regardless of where they are and support growth for our business so that our people could be more efficient with those dealers. And more effective.                    3:08:26

Q. And did -- did you come up with this agenda?

A. I don't recall.                    3:08:40

Q. And an "NDA and Timing Update." You have them execute NDAs?

A. Yes. As we discussed earlier, I -- I do know the first group had to sign NDAs per request of NNA given what they were going through.    3:08:58

And that came through likely -- I assume it came through HR as a request for anyone involved with its -- the closing of regions, that they sign an NDA.

Q. So you have "Dealer Ratings/Size of Business/Ratios. So the -- the key was smaller business -- or small or large dealers, as we discussed previously. Correct?                    3:09:26

A. That's one of the things we discussed. Yes.

Q. Okay. And "Solving for Ratios and Money." What is the money aspect?                    3:09:36

A. I think it would how much a dealer does for

32 (Pages 125 to 128)

Page 129

Nissan in terms of profit. So if a large dealership has really high penetration with Nissan, we made money on those loans. Right? 3:09:51

So they have a value to us beyond just selling a car. If we have a really small dealership who only sends us one contract every other month, they really don't make Nissan a whole lot of money. 3:10:04

So that would've been what we were talking about in terms of money.

Q. Okay. Creating of boundaries. "R". Is that region, area, and district? R/A/D? 3:10:16

A. Sorry. Where are you?

Q. "Creating New Boundaries." Day Two. 3:10:24

A. Ah, yes. That would've been now recognizing that Nissan is closing those two regions. What it -- what -- how is that going to impact the -- the region obviously and then, in turn, the areas and the districts. Yes. 3:10:37

Q. Okay. So you cut out two -- two regions but added another one. You added the inside sales. Correct? 3:10:48

A. NMAC did. Nissan did not. Yes.

Q. Okay. And then an ABC Exercise. What is that? 3:10:56

A. Yeah. Similar to solving for ratios and

Page 130

dollars, we rate all of our markets. At this point, this would be rating each district, not -- not each dealership. 3:11:12

That would've been the solving for the ratios and the dollars. But each district by size of importance with respect to NMAC. 3:11:20

So we know that we have a lot of leasing in New York City, and those markets are exactly important high volume sales, high volume profit. You name it. They're very important to us. 3:11:33

Sioux Falls, South Dakota might not be nearly as important in terms of that district and what the impact to Nissan's bottom line is.

Q. Okay. So in the ABC Exercise, is -- is there a number assigned to each person or district from 1 to 90? 3:11:58

A. I don't know where it ended. Because I don't think we had 90 districts. But we would've ranked the size of each district, yes, by size. 3:12:09

Q. So was there a -- was there a ranking, an overall ranking, given to each person or district of all the FSMs?

A. Well, those are two different things. So as I just said, we ranked the size of the districts. We did not rank every FSM. 3:12:33

Page 131

Q. So you did not rank FSMs. You just ranked their districts. Correct?

A. Yes.

Q. Okay. 3:12:48

A. And I think there was -- I think in this page. I don't have the information other --

Q. Is -- I can't hear you. 3:12:55

A. Sorry. I believe other documents will show that, that we ranked them based on size.

Q. When you say "we ranked them based on size," who are "them"? 3:13:07

A. Districts.

Q. Okay. And then is there any component of that ranking, of the ABC ranking, that has to do with the individual FSM? 3:13:29

A. There are components to the experience of the individual and the performance and the potential of the individual. We would designate them with an A, B, or C. Yes. 3:13:44

Q. Okay. And is "A" the best?

A. "A" is not the best. It's just usually larger market, more experience, higher potential, wants to go with the company. 3:14:02

It's -- it -- it's really those -- like I

Page 132

said, it's really based on experience, potential, and performance, and we kind of put that all together in terms of the individuals. 3:14:14

Q. Okay. And what's a -- a "C" market?

A. "C" market would be kind of what I just described. Right? Whether it's a -- a remote area that has small dealers, whether it's -- well, really that's a "C" market. Right? 3:14:33

It's kind of a smaller market defined by volume and sales.

Q. Okay. And then there is on Day Two -- it says "Assigning Talent to the New Org." So in this exercise with your group that did analysis, you actually assigned talent to the new org, correct -- 3:15:00

MR. FARLEY: Objection --

Q. -- organization?

MR. FARLEY: Objection to form.

THE WITNESS: We would've seen how each individual in the entire organization was impacted by the new boundaries. Yes. 3:15:08

BY MS. FOLEY:

Q. My question is more specific than that. People were impacted by eliminating certain districts. But you assigned talent, you gave certain people jobs, in the new structure.

Page 133

Correct?                                    3:15:32

MR. FARLEY: Objection to form.

THE WITNESS: That would've been version one of what might happen, but we didn't give jobs to anyone.                                    3:15:41

BY MS. FOLEY:

Q. You penciled out who should be placed in the new positions in Day Two --

A. No.

Q. -- of your meeting.

Correct?                                    3:15:52

A. No. We penciled out who might but not who should.

Q. Okay. We're going on semantics here. Did you place any names of any employees as to where they would be transferred next?                    3:16:15

A. There --

MR. FARLEY: Hold on.

Objection to form.                          3:16:18

THE WITNESS: There would've been names associated with each district and who might be in that district after this exercise. Yes.

BY MS. FOLEY:

Q. Okay. And some other people were not assigned any new position in the new organization.

Page 134

Correct?                                    3:16:40

A. Yes.

Q. And it was this group who was meeting in -- the smaller group that did those initial assignments of talent to the new organization.

Correct?                                    3:17:08

MR. FARLEY: Objection to form.

THE WITNESS: It is this group, and that's exactly why I was using the semantics of "might" and "should." Because if you recall, we brought in the RFSMs to have a much more holistic conversation once we came up with final geography, final district alignment, how many stores were being impacted, which districts were being impacted.                          3:17:31

And then conversation grew from there in terms of who would eventually get letters on June 4. So --

Q. Okay.

A. -- I think a --                          3:17:38

Q. On --

A. -- very important distinction here is that -- one, would those have been talked about? Likely. Were they decided? Absolutely not.           3:17:47

Q. Okay. So in the -- the part where you did the size, large versus small, of the dealers, did you

Page 135

eliminate all the districts that had more than a certain number of small dealers?          3:18:06

A. Could you restate that? I'm just trying to -- that's a long question. I'm trying to --

Q. So was there -- so did you eliminate all the districts that would have a -- had a certain number of small dealers?                           3:18:21

A. I'd say yes and no. And a lot of it had to do with what market was sitting next to them, what was the proximity of that next district, north, east, west, or south.                                 3:18:34

So in other words -- I'll give you an example. In the Northeast, our districts are very geographically small but densely populated. Right?    3:18:45

So even if we eliminated a district in there, you may have had other districts sitting there that could easily call on the store. Do --        3:18:54

Q. Okay.

A. -- that same exercise west of the Mississippi, and you might have a whole lot of open --

Q. Okay.

A. -- spaces.                               3:18:59

Q. So did you eliminate some districts that had fewer than the set criteria number of small dealers?

MR. FARLEY: Objection to form.          3:19:08

Page 136

THE WITNESS: I don't know. I don't -- I don't think I understand the question.

BY MS. FOLEY:

Q. Okay. So if -- if you were eliminating districts that had more than eight small dealers, then if a district had fewer than eight small dealers, if that was your criteria, did you eliminate -- did you eliminate any districts that had fewer than the set criteria?                                 3:19:47

A. No, it's -- we didn't eliminate districts based on how many small stores were in that district. We eliminated dealerships from districts regardless of which district they were in, based on all the criteria we talked about for several hours now, and then had to reconfigure, on top of that, the right amount of stores per FSM, the right amount of stores for inside FSMs.    3:20:16

So we didn't pick a line in the sand and say, hey, this district has so many small stores, it's -- it's staying. District has -- this district has so many stores -- small stores, it's going away.    3:20:25

It really was encompassing the entire geography, the proper ratio of FSM to dealer, as well as the size of the operation for each dealership.

Q. As of January 20th, had you, NMAC, decided which people and -- and districts would be eliminated?    3:21:00

34 (Pages 133 to 136)

www.InDemandReporting.com                    (773) 239-6008

Page 137

A. January 20th, I don't know for certain.

Q. As of February 21, had you and NMAC decided which people and/or districts were to be eliminated?    3:21:15

A. I don't know for certain based on that date.

Q. As of what date had you decided?    3:21:25

A. I don't know.

Q. Who knows?

A. I don't know.    3:21:34

Q. We asked for the person most knowledgeable who would know. And you don't know.

Correct?

A. I know what was the outcome of those decisions. On which specific date they happened, I do not know. So I would first --    3:21:55

Q. Would Mr. --

A. -- call somebody --

Q. -- would Mr. Lubbers know?

A. You'd have to ask Mr. Lubbers.    3:22:01

Q. Okay. What's the database called from which the data was retrieved regarding all of the dealers and such that Mark Lubbers was printing out?    3:22:18

MR. FARLEY: Objection to form.

THE WITNESS: Sorry.

MR. FARLEY: Go ahead. If you -- I think you know.

Page 138

THE WITNESS: Yeah, no. There -- there are -- there are probably several databases that were pulled into that -- in those spreadsheets.    3:22:31

I gotta think Siebel would've been one of them. Maybe Oracle. I'm not sure. We would've imported the Nissan dealer codes to our data spreadsheet just to make sure we go the right regional labels for the new Nissan region.    3:22:51

So it would've been pulled from several databases. Pardon me.

BY MS. FOLEY:

Q. Okay --

THE RECORDER: I'm sorry. Sorry to interrupt. What was the first one you said?    3:22:59

THE WITNESS: Siebel. I think it's spelled S-I-E-B-E-L.

THE RECORDER: Okay.

THE WITNESS: I don't know if it exists anymore. But back then, it definitely did. Oracle maybe.    3:23:13

And then we would've imported maybe from Dealer 360 or from NNA just a -- a -- a ledger coding of all their dealership codes and regional assignments for them.    3:23:28

THE RECORDER: Thank you.

Page 139

BY MS. FOLEY:

Q. So the -- we had mentioned briefly -- was the mobility or ability to relocate information pulled from Workday profiles for each employee?    3:23:48

A. It could've been. Yes.

Q. Any other source?

A. As mentioned earlier on, it would've been through managers knowing from their team whether the person was willing to or not willing to relocate.    3:24:12

Q. Okay. And the ranking, ABC ranking, where did that data come from?

A. We -- the ABC ranking of the dealerships or the --    3:24:30

Q. Yeah.

A. -- ABC ranking of people?

Q. You -- you have an ABC ranking that includes -- I -- I believe it's the people and their territories.    3:24:42

A. Right. But there's also ABC rankings of dealerships. So I'm asking you the question, which one are you asking about?    3:24:49

Q. Well, maybe you need to tell me about -- you have something indicated on your sheet that says "ABC Exercise."

What is that referring to?    3:24:58

Page 140

A. Yeah. The dealerships.

Q. Okay. In your --

A. Sorry --

Q. -- PowerPoint --    3:25:05

A. -- let me restate -- sorry. Let me restate that. The districts, not the dealerships. The districts.    3:25:09

Q. I was going to say -- so what is ABC with the dealerships?

A. Yes. It's not -- that -- that's why I'm restating my comment. It's -- it's for districts.    3:25:21

So we rank every district based on volume and impact to -- to the company. You can almost restate that small, medium, large, if you wanted to.    3:25:34

Q. So what is it based on? Who ranks it? That's my question.

A. Oh. The rankings are -- they're quantitative. It's based on volume.    3:25:44

Q. Every aspect of it is quantitative? It is all based on objective data?

MR. FARLEY: Objection to form.    3:25:57

THE WITNESS: The rankings are based on a ranking of volume in bookings to end.

BY MS. FOLEY:

Q. There's nothing in the ABC rankings that is

35 (Pages 137 to 140)

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

Page 141

subjective.

Correct?                           3:26:12

A. The dealers -- to the districts? No.

Q. The individual rankings, are they subjective or based on data?                           3:26:21

MR. FARLEY: Objection to form.

THE WITNESS: ABC rankings are -- would be more subjective, based on a -- numerous information as I discussed earlier on. High performer, high potential, experience in role, development, career path, which is all those things.                           3:26:49

So that would be more qualitative in -- in nature. Because there's not really a number you could assign to those things. But yeah, that's how the ABC moniker is labeled for individuals.                           3:27:07

BY MS. FOLEY:

Q. Is there some kind of a nine-block rating you do at Nissan?

A. We do not do a nine-block rating at Nissan.                           3:27:20

Q. Okay. So in the PowerPoint, was there any Excel spreadsheet that dealt with market penetration?

MR. FARLEY: Objection to form.                           3:27:58

THE WITNESS: Was there any Excel spreadsheet that dealt with market penetration. In -- actually produced in the PowerPoints?                           3:28:09

Page 142

BY MS. FOLEY:

Q. Yes.

A. I would have to look at each individual PowerPoint to offer up whether that was actually used or not.                           3:28:15

Q. As you sit here today, do you recall market penetration being one of the PowerPoint pages?

MR. FARLEY: Objection to form.                           3:28:29

THE WITNESS: Yeah, I do recall market penetration in preparation with Counsel yesterday, speaking about high pen, medium pen, or low pen. And penetration is another way of saying volume. Right?                           3:28:45

It's one kind of links in with the other. So maybe that's a -- a -- a nuance I should clear up. Right? Volume comes from penetration.                           3:28:59

A high-penetrating dealer gives us volume. A low-penetrating dealer gives us low volume.

Q. Isn't penetration a percentage number rather than just volume?                           3:29:09

A. It's a percent of volume.

Q. It's not the same.

Correct?                           3:29:18

A. No.

Q. I'm going to mark as the next exhibit -- actually, I'm still going through this one.

Page 143

MS. FOLEY: Keep going through that one. Sorry. What page is that? Okay. I did that one.                           3:29:54

BY MS. FOLEY:

Q. Okay. Do you know which -- where Matt Stewart's small dealers were transferred to in Dallas?                           3:30:52

A. Specifically which district? No. Would they have been transferred -- would some of them have been transferred to one of the six districts? Yes.                           3:31:02

Q. Okay. And do you know that they were transferred to Dan Pauken, P-A-U-K-E-N?

A. If you say so.                           3:31:12

MR. FARLEY: Well, she's not asking --

BY MS. FOLEY:

Q. Do you have any --

A. I don't know.

Q. -- information -- okay. I can --

MR. FARLEY: Yeah, let her --

BY MS. FOLEY:

Q. -- show you --                           3:31:18

MR. FARLEY: -- ask the --

Hold on a second.

You can let her ask the question, show you the document you need to see, or whatever, and let her do that that way. That's the best.                           3:31:25

BY MS. FOLEY:

Page 144

Q. Do you know how many accounts were transferred to Dallas for Matt Stewart?

A. In preparation with Counsel yesterday, we saw a number, and I don't recall specifically what that number was.                           3:31:45

Q. Do you recall that there were six?

A. I don't.

Q. So the -- on page 27 of this -- so if -- if --                           3:32:32

MS. FOLEY: Before that. Page 14, I'm sorry.

BY MS. FOLEY:

Q. If -- if he had a total of 21 accounts or dealers and six were sent to Dallas, that is less than the -- hmm.                           3:32:59

MS. FOLEY: Is that 14?

MS. DAVENPORT: Mm-hmm.

MS. FOLEY: Fourteen -- that's 13. Fourteen. Next one.                           3:33:07

BY MS. FOLEY:

Q. So here it says -- here. Regional distribution of small dealers. There are 18 districts with 50 percent of small dealer count.

Do you see that?                           3:33:25

A. Yup.

Q. And Matt Stewart had 21 accounts, and six

Page 145

were sent to Dallas. That's not 50 percent. Correct? 3:33:44

A. This isn't the final version of what dealerships were impacted.

Q. I'm just asking you the math. This is the math. Correct? 3:33:53

A. This is the math of version one. It says 385 dealers are small, according to this document. We --

Q. Okay.

A. -- ended up designating 262 dealers as small when it was all done. 3:34:05

Q. Okay. I'm just asking you if the number was 50 percent of the districts, 50 percent of their dealers, that would mean that he would need to have ten and a half of his dealers be considered small. Correct? 3:34:26

MR. FARLEY: Objection to form, mischaracterizes the record and the testimony.

BY MS. FOLEY:

Q. Is that correct? 3:34:33

A. No. This says 50 percent -- or 18 districts have at least 50 percent small dealers.

Q. Okay. So Matt -- Matt Stewart didn't have at least 50 percent small dealers.

Page 146

Correct? 3:34:48

A. That's -- that -- I'd have to see the data, but if he had 21 and six were only designated as small, then that is correct. 3:34:59

Q. Okay. And he didn't even have 40 percent small dealer count. Correct? 3:35:08

A. Six divided by 21 would not be 40 percent. Correct.

Q. Okay. And if someone had two of their 18 dealers that were small, they wouldn't fit the 50 percent or 40 percent small dealer count either, would they? 3:35:35

A. Simple math that would suggest no.

Q. Okay. All right. On page 27, Bates 2795 -- okay. This is AOM national. This is a -- a page --

MS. FOLEY: this is the next one. Okay. So -- right here. 3:36:06

BY MS. FOLEY:

Q. Says Midwest FSMs. Right?

A. Yup.

Q. And is this an excerpt from the ABC rankings? 3:36:19

A. It looks like it is. Yes.

Q. And this is for the Midwest region.

Page 147

Correct? 3:36:30

A. Yes.

Q. And on this page, it has the names of the FSMs in the second column. Right?

A. Correct. 3:36:42

Q. And it has their territory, I guess, and the name of a city. Right?

A. The --

Q. The --

A. -- territory. 3:36:54

Q. -- third column. You call it a territory?

A. Or district. Yeah. 3:36:59

Q. Fourth column has a letter, and then it says "Rank" and then a number.

A. Yeah.

Q. Can -- can you describe what the letter and then the ranking number means? 3:37:12

A. The letter would be the size of the market. So in this case, again, kind of small, medium, large, as I mentioned earlier on. And 54th largest market in the country is what this would suggest. District -- 3:37:31

Q. So the ranking has to do with the size, not the ranking of the person.

Page 148

Correct?

A. Correct.

Q. I couldn't hear you. 3:37:44

A. Yes.

Q. Okay. So then -- for example, if we look just at the person at the top, there -- on the next column, there is a "B" and a "B." And does that mean? 3:37:58

A. I don't know, because I don't see the label. I would assume it might be referring to the individuals. But I can't confirm that. 3:38:09

Q. Okay. And do you know what this next column means that has a date, like 12/1/17?

A. I don't, other than it looks familiar to the dates we spoke about earlier on. Actually, no, it doesn't. So no, I -- no, I don't recognize the date. 3:38:33

Q. Would that be time in position?

A. Maybe. Time in role? Maybe? 3:38:44

Q. Okay.

A. But I don't -- I don't -- I don't know.

Q. And then where it says "Y - Now," is that the mobility question? 3:38:59

A. In prior discussions, typically that was -- the label for this column would've been mobility.

Q. So yes. So this -- 3:39:10

A. Or --

37 (Pages 145 to 148)

Page 149

Q. -- column --

A. Just -- I should say the mobility questions would've had similar answers to this. So Y mobile now, or No not mobile, Y mobile in -- in fives years, or -- or Y mobile in two years. So on and --                    3:39:26

Q. Okay.

A. -- so forth.

Q. So on the mobility column, for the top person, Ray Razo, it says "▮▮▮▮." So yes, he's ▮▮▮▮. For Matt Stewart, the second name, it says -- on mobility, it says, "Y - Now."

Correct?                    3:39:47

MR. FARLEY: Objection to form.

THE WITNESS: The last -- second to the last column says "Y - Now." Yes.                    3:39:54

BY MS. FOLEY:

Q. So that indicates that Matt Stewart is mobile now.

Correct?

MR. FARLEY: Objection to form.

THE WITNESS: At the given time that it was noted, yes.                    3:40:04

BY MS. FOLEY:

Q. Okay. And what does it mean where it says mobility no?

Page 150

MR. FARLEY: Objection to form, and the document doesn't say that, Shannon. You're putting -- you're putting words on the document that don't exist.                    3:40:23

BY MS. FOLEY:

Q. If there's a ▮▮ in the column that you're indicating reflects mobility, what does that mean?

A. ▮▮▮▮                    3:40:33

Q. Okay. So it says ▮▮▮▮ as to Tip Joyce and ▮▮▮▮ as to Edward Bilotto.

Correct?                    3:40:41

MR. FARLEY: Objection to form.

THE WITNESS: Yeah, it looks as though at a given point in time -- it looks like there's two columns here. So whatever the point in time for this chart that was put together, Tip Joyce was ▮▮▮▮ the first time he was asked and he was ▮▮▮▮ the second time he was asked. That would --                    3:40:57

BY MS. FOLEY:

Q. Okay.

A. -- be my summation from this data.

Q. And then where some of these have a year indicated, what is your understanding that -- what that means?                    3:41:11

A. Yeah. There are -- oftentimes for either personal or professional reasons, if someone's not

Page 151

mobile immediately but they are mobile.                    3:41:21

I can give you an example. We have people who have, you know, teenagers in high school or, you know, just gotten the job or just -- sometimes they literally just unpacked all the boxes and they don't want to move again.                    3:41:34

Give me a couple years. Right? So there are different reasons why someone might say, hey, long-term I'm still mobile, but give me a little bit of time give my personal circumstance or professional circumstance.                    3:41:45

Q. Okay.

MS. FOLEY: Go up to the prior page and see if there's any indication in that row. There may not be. No. Okay.                    3:41:58

BY MS. FOLEY:

Q. We -- if we get the Excel spreadsheet, it will show us what's in these columns. I believe this right column says "Promote to AOM." The far right column.                    3:42:12

MR. FARLEY: Objection to form. Is that a question?

BY MS. FOLEY:

Q. Is that something that you remember having on this ABC document?                    3:42:24

A. No. I don't recall specifically that, no.

Page 152

MS. FOLEY: Okay. So I have a document that's 4178. I may still go through it. But it has that doc on it that I could get to. I had it as, like, 4.1. Bates 4178. See if you have it.                    3:43:03

BY MS. FOLEY:

Q. I'm going to put something up that does show the column, so that we can get good testimony. That would be Exhibit 9.                    3:43:14

(Exhibit No. 9 marked for identification.)

MR. FARLEY: Shannon, we've been -- we've been going for almost another hour and a half or so. Could we take a short break?                    3:43:20

MS. FOLEY: Just right after this. I'll just clarify the columns.

MR. FARLEY: Okay.

BY MS. FOLEY:

Q. Okay. So here is a document that we've marked as Exhibit 9, and it's Bates 4178. And it's the same page.

Do you see that?                    3:43:49

MR. FARLEY: Objection to form. The same page as what?

BY MS. FOLEY:

Q. Well, we were just looking at page 2795 in the PowerPoint which was marked as Exhibit 8. And it

38 (Pages 149 to 152)

Page 153

was the ABC rankings.                        3:44:04

This is substantially similar. There is another row called CDP on this. But it has the same information. It has Region, the employee name, the territory description, the market.          3:44:22

So then it says -- in column F, we were talking about that, "Market," and then "Individual" was the column G. Position Start was the dated column.

Q. Correct?                               3:44:42

A. I actually see some differences in the two documents we just went over, so --

Q. Right --

A. -- I --                                 3:44:48

Q. -- but it's -- this is a substantially similar document with the same employees listed in the first half.

Correct?

MR. FARLEY: Objection to form.           3:44:58

THE WITNESS: It is similar, but I cannot say that it's the same.

BY MS. FOLEY:

Q. Okay. So if we look at Mobility, in column J, it does say "Mobility" at the top.

Correct?                                  3:45:10

A. That's what column J says. Yes.

Page 154

Q. And column K says "AOM/Manager Potential."

Correct?                                  3:45:17

A. Okay.

Q. But on the Mobility column, as to Matt Stewart, it says "yes" now.

Correct?                                  3:45:25

A. That's what that says. Yes.

Q. Do you have any reason to believe that this document is not correct or accurate as produced by Nissan?                                  3:45:35

A. No.

Q. Okay. And I have a question. In this column that says "CDP," do you know what that means?     3:45:51

A. Career development plan.

Q. Career development plan. Okay. Where it says Matt Stewart, "Difficult to place," who -- who said that?                               3:46:05

A. I don't know.

Q. Did you ever say that?

A. No.

Q. Did you ever hear anyone else say that?    3:46:14

A. I would've heard that around Matt's varying answers to mobility. So hard to place him if he's not mobile. But no, I -- not specifically any one person, no.                                     3:46:28

Page 155

Q. But where it indicates mobility, it says "yes now" --

A. That wasn't --                          3:46:33

Q. -- correct?

A. -- the question.

Q. Pardon?

A. That wasn't the question.               3:46:39

Q. Do you have any idea who indicated "Difficult to place"?

A. No.

Q. So there are some slight differences in this document versus what was imported into the PowerPoint. But as to the points of Matt Stewart's mobility, that is the same.

Correct?                                  3:47:27

MR. FARLEY: Objection to form.

THE WITNESS: Assuming those labels are the same at the top, they would be the same, but I can't say that they are because --

BY MS. FOLEY:

Q. Okay.                                  3:47:35

A. -- they're different.

MS. FOLEY: Can you actually go on yours and see if this document has a -- under File, and if you can see when it was -- you do File, Properties,

Page 156

Statistics. See if it'll go there.            3:48:01

BY MS. FOLEY:

Q. So this doesn't indicate when it was created. It's only the date that it was sent to us, so --

MS. FOLEY: You can cancel.                3:48:14

BY MS. FOLEY:

Q. Do you have any idea when this document was created?

A. It was likely discussed during a succession planning meeting, to figure out who was mobile and what jobs they might take next.          3:48:33

Not uncommon for that to be part of discussion. But I can't say that this is exactly the form in which this was created.

Q. And when? That's my question. When --

A. No idea.

Q. -- when in --

A. I do not --

Q. -- time?

A. I do not know.                          3:48:53

Q. Okay. But it was also discussed as part of the PowerPoint in your January to February meetings with your team.

Correct?                                  3:49:09

MR. FARLEY: Objection to form.

Page 157

THE WITNESS: It looks like a similar version of a similar document was cut and pasted into PowerPoint.

BY MS. FOLEY:

Q. And it was discussed with your sales op team discussing the reorg in January to February of 2020. Correct? 3:49:32

MR. FARLEY: Objection to form.

THE WITNESS: It was likely used to discuss size of market. Yes. 3:49:37

BY MS. FOLEY:

Q. Was it also used to discuss mobility?

MR. FARLEY: Objection to form.

THE WITNESS: I don't know. 3:49:50

BY MS. FOLEY:

Q. Did you use these ABC rankings as part of your analysis for the reorganization?

A. We used the ABC rankings as part of our analysis for the reorganization of the districts. Yes. 3:50:15

Q. And how did you use them?

A. They were used as a data point to understand which markets were being impacted. 3:50:24

Q. So did you choose the markets that were the bottom quarter or the bottom ten?

A. No.

Page 158

Q. Why not? 3:50:40

A. Well, as I mentioned many times today, we used dealer information to drive up a number of stores that would be impacted, which then relayed to a district impact, which was part of a larger regional restructuring. 3:51:02

And when that was all said and done, we still had to account for the amount of stores or dealerships that would be remaining in each region, in each area, in each district, and how best to call on those. 3:51:16

So we may have had certain districts that only had a handful of small stores, but the adjoining market, because of its physical proximity or size, may have changed in a different location, and now the person who's sitting physically somewhere else has an easier time calling on those stores. 3:51:35

Q. Okay. I'm going back to Exhibit 8 -- 8. And --

MR. FARLEY: Please, I -- I -- I asked -- 3:51:42

MS. FOLEY: Oh.

MR. FARLEY: -- and you said you would take a break after the last --

MS. FOLEY: Oh.

MR. FARLEY: -- document. 3:51:44

MS. FOLEY: Yes. Definitely. We can take a

Page 159

break. What do you need, five minutes?

MR. FARLEY: Ten minutes. 3:51:49

MS. FOLEY: Ten minutes. And then time is 12:27.

MR. FARLEY: Yes.

MS. FOLEY: My time. 3:51:57

THE RECORDER: Off the record, at 2:27 p.m.

(Off the record.)

THE RECORDER: We are back on the record at 2:54 p.m. 3:52:06

BY MS. FOLEY:

Q. So I think that's the -- the page on 2800. It is another page from Exhibit 8. And it says Bill Dodson, and it says that he is mobile, according to this page. Correct? 3:52:36

MR. FARLEY: Objection to form.

THE WITNESS: This would suggest that if that column was actually called Mobility, yes, he would be mobile. 3:52:47

BY MS. FOLEY:

Q. And there are other people on this page, like this person, the third one down, Jerald Zeman, who indicates that he's ███. Correct? 3:52:59

Page 160

MR. FARLEY: Objection to form.

THE WITNESS: Assuming that that's the label of Mobility, then I would say ███. 3:53:05

BY MS. FOLEY:

Q. And ███ indicates that he's ███. Correct?

MR. FARLEY: Objection to form. 3:53:11

THE WITNESS: That's what -- yes, in this case, if that's the label, that's what it would mean.

BY MS. FOLEY:

Q. And then on this document, Matt Stocking had indicated that he was ███, that he -- that he did not take a position to move to Dallas. Correct? 3:53:37

MR. FARLEY: Objection to form.

THE WITNESS: Assuming that this is the Mobility label, yes, it says that he's ███ and yes, he did eventually turn down the offer to move. 3:53:48

BY MS. FOLEY:

Q. Okay.

MS. FOLEY: If you go down a little bit on page 27. Let me see. Maybe it's page 22. 2790. 3:54:02

BY MS. FOLEY:

Q. Okay. On this page, it says the Added Regional Structure. Is that what you talked about in

40 (Pages 157 to 160)

Page 161

the formation of the inside FSMs in Dallas?        3:54:28

A.  Yes.  On the right side, you see Texas, so that would be our operations center, and we would house them with a manager.  You see it says "AOM" in quotes.        3:54:40

It sounds as we -- as you saw in the letter, we eventually called this an operations manager, but it's the same thing.  And he or she would be supervising six inside FSMs.        3:54:49

Q.  Okay.  And it -- this is kind of fuzzy, but it says -- it's Mark Lubbers at the top of that headquarters structure in Dallas.

Correct?        3:55:05

A.  Yes.

Q.  And then --

A.  Oh, no.  No.  In -- in Nashville.  Mark's team is here in Tennessee.        3:55:13

Q.  Mark is in Tennessee.  He's not in Texas.  Okay.  And then is this Eric Diaz on the -- below Mark Lubbers?        3:55:25

A.  Yeah.  Eric Diaz and Sean Hankins, yes.

Q.  And Sean Hankins.  It's hard to see those.        3:55:32

A.  Sure.

Q.  Do you have any idea who this person is below Eric Diaz?

A.  Yeah.  I believe that would be Travis

Page 162

Carpenter.  I know earlier on we mentioned Mr. Martin.  Mr. Carpenter backfilled Mr. Martin.        3:55:46

As to when that happened, I couldn't speak to it.

Q.  Okay.

A.  That might be the linear change of a name, so to speak, for the -- the -- the analyst and sales operations.  And then TBD was going to be that second set of arms and legs that was going to be helping Mr. Diaz and Mr. Lubbers support the regions with analytical help.        3:56:08

Q.  Okay.  So Mr. Carpenter was assigned as an analyst.

Is that right?

A.  Yes.  I think the best way to look at this is any box that doesn't have someone's name or a really bad, you know, fuzzy something in it, was current state, and anything that had just words in it was going to be the future state.        3:56:33

So one analyst, six FSMs, and one manager.

Q.  Okay.  I think -- was -- was the fact that some of the older workers made more money than the younger workers considered in deciding which workers to transfer to the new jobs?        3:57:08

A.  No.

Page 163

Q.  Was the fact that older workers made more money than younger workers considered in deciding which workers in districts to eliminate?        3:57:29

A.  No.

Q.  Was there any analysis of that?

A.  The only analysis around salary would've been what we discussed earlier on -- when we had to bring Mr. Cullum the cost of severance.  But that's it.        3:57:46

Q.  So there was an analysis that it was less expensive to pay the younger workers over the next five years than the older workers.

Correct?        3:57:58

MR. FARLEY:  Objection --

THE WITNESS:  No.

MR. FARLEY:  -- to form.

THE WITNESS:  No.  There was analysis that said how much is this going to cost.  And it was done.        3:58:05

BY MS. FOLEY:

Q.  Okay.

MS. FOLEY:  If we could go to the next exhibit number, which would be 10, and it would -- it is a PowerPoint.  I have it as Nissan 3346.        3:58:26

(Exhibit No. 10 marked for identification.)

BY MS. FOLEY:

Q.  Mr. Ledieu, this is an email that starts on

Page 164

3346, followed by a PowerPoint NMAC Org.  And is this an email that you sent on March 24, 2020, to Kevin Cullum, Jim DeTrude, and Jeff Chambers?        3:59:10

A.  It appears that way.  Yes.

Q.  And it says (as read):  See the attached PowerPoint for our 11 a.m. discussion.

A.  Yes.        3:59:21

Q.  And (as read):  The meat of our discussion will center around pages 5 through 9.

Is that what you discussed in the meeting?        3:59:33

A.  I don't recall.  I know that that's what I wrote.

Q.  Okay.  Was this an in-person meeting or was this a meeting by teleconference?        3:59:47

A.  I don't remember.

Q.  In March of 2020, as of March 24, were you still going in to the office?

A.  I don't remember.        4:00:10

Q.  Okay.  If we go to page 5, which is what you are referencing there, it's Bates 3351.

MS. FOLEY:  There you go.        4:00:26

BY MS. FOLEY:

Q.  Okay.  This document is where you directed the people you sent the email to, DeTrude, Chambers, and Kevin Cullum, on financial impact.  Do you recall

Page 165

what you discussed with respect to financial impact?    4:00:55

A.  Other than the numbers on this page, no, I don't recall the specifics of the discussion.

Q.  Okay.  Did you show them the detail of where these numbers came from in the different scenarios?    4:01:16

A.  I don't remember.

Q.  Who else was in that meeting, if anyone?

A.  I don't remember anyone being a part of that meeting that I can recall.    4:01:29

Q.  Did Mark Lubbers typically attend the meetings with you?

A.  "The meetings" is a wide category.  Whether he attended this meeting or not, I don't know.    4:01:45

Q.  Would you have any calendar that would indicate who was invited to the meeting or who attended the meeting, any kind of a meeting note?

A.  Don't know that we do.  It would've been on my calendar for 11 a.m. on Sunday, which is what my email says.    4:02:12

Which date and who was invited, I would not have any details around that.

Q.  Okay.  I am -- do you recall anything specific about -- that you discussed regarding this page --    4:02:31

A.  Yes.

Page 166

Q.  -- of Exhibit 10?

A.  Yes.  As we referenced earlier on, in order for us to spend $524,000 -- $524,263, the president of the company, by delegation of authority, had to approve the expense.    4:02:51

Any expense over $500,000 at the time required his approval.  So that would've been the genesis of this presentation.    4:03:02

Q.  Other than getting his approval for spending the amount over 500,000, did you need the approval of the president to carry out this reorganization, which included terminating employees and creating new districts or creating the new regional office?    4:03:35

A.  I don't believe we needed his approval.  I think we wanted his insight and his knowledge of what was happening.  But I don't believe we needed his approval other than the -- the delegation of authority on dollars.  And --    4:03:48

Q.  Okay.

A.  -- and he would've obviously given us feedback around the whole concept.  But I don't know that we necessarily needed his approval.    4:03:57

Q.  And what feedback did you obtain from Mr. Cullum?

A.  To go ahead and -- and -- and proceed as

Page 167

proposed.    4:04:08

Q.  And in this presentation that you gave him, did you provide him with the names of the specific employees who were impacted and would likely be terminated?

MR. FARLEY:  Objection to form.    4:04:33

THE WITNESS:  I don't recall whether those were discussed.  I'm sure they're on these pages, but whether we discussed them, I do not recall.

BY MS. FOLEY:

Q.  Did you go through this entire presentation with Mr. Cullum?    4:04:46

A.  I don't remember.

Q.  Okay.  You sent this presentation to Mr. Cullum in advance of the meeting.

Correct?    4:04:57

A.  Yes.

MS. FOLEY:  Okay.  I'm going to have you open another document.  It is Bates 4432.  And we mark that as Exhibit 11.    4:05:15

(Exhibit No. 11 marked for identification.)

BY MS. FOLEY:

Q.  Does this Expenses, Savings, Net Savings number match what you put in the PowerPoint presentation that you gave to Mr. McCullum [sic]?  Or

Page 168

Mr. Cullum.    4:06:08

A.  I'd have to look at them side by side to see if the numbers are the same, but they're directionally similar.  The 524,263 is.    4:06:17

Q.  Okay.  So it appears to be the same information.

Correct?

A.  Again, I'd have to see them side by side to confirm whether it's the same information or not.    4:06:30

MS. FOLEY:  You can pull that or no?  It's okay.  There you go.

BY MS. FOLEY:

Q.  5,033,683 is the same number?

A.  Yeah.  So the 5-0 -- yeah, the bottom right-hand side is the same number.    4:07:02

Q.  Yeah.

A.  And the bottom left-hand side is the same number.  Yes.

Q.  Okay.  So it -- it is the same data.

Correct?    4:07:09

MR. FARLEY:  Objection to form.

THE WITNESS:  It's the same calculations of savings.

BY MS. FOLEY:

Q.  So the information that is in Exhibit 11 is

42 (Pages 165 to 168)

www.InDemandReporting.com (773) 239-6008

Page 169

the same information that was provided on page 5 of Exhibit 10 to -- to Mr. Cullum.

Correct?

MR. FARLEY: Objection to form.

THE WITNESS: If you want me to answer it "yes" or "no," I'd really like to see these literally -- I mean, give me two minutes to look at them, Year 1, Year 2, Year 3, Year 4, Year 5, and then I can confirm whether everything's the same. 4:07:48

Very difficult to do without having them side by side.

BY MS. FOLEY:

Q. You confirmed that the total numbers are the same.

Correct? 4:07:59

A. I did.

Q. And that Year 1 was the same.

Correct?

A. I confirmed that expense was the same. I did not look at Year 1 total net savings. 4:08:08

Q. Okay.

MS. FOLEY: All right. I'm going to have you go to Scenario. There's a tab that says Scenario, the first tab. If you'll open that. We may need to blow it up a little bit. It's kind of hard to see. 4:08:32

Page 170

BY MS. FOLEY:

Q. Okay. So this document indicates --

MR. FARLEY: It's -- it fell off on our screen, by the way. We can only see some columns. 4:08:50

MS. FOLEY: We'll --

MS. DAVENPORT: We'll get --

MS. FOLEY: -- we'll go to the others.

BY MS. FOLEY:

Q. We'll go through all the columns. But we're starting on the left columns, where it says -- column B has Positions Eliminated and Positions Created.

Do you see that? 4:09:02

A. Yes.

Q. Okay. And then Larry Johnson's outside of that. I don't know why that is. And then it has Region in column C.

Correct? 4:09:13

A. Yes.

Q. And Impact, it's either a -- looks like a negative 1 or a 1.

Correct? 4:09:23

A. Yes.

Q. And then Level. And that's the -- the person's, what, level in the company?

A. Yes. 4:09:35

Page 171

Q. Okay. And then Geo is their territory.

Is that correct? In column F?

A. Yes. With the exception of Mr. Oda, as we discussed. He oversaw commercial business in Mitsubishi, which is why it says Mitsu. 4:09:53

Q. Okay. And then there are names there of the positions eliminated.

Right?

A. There are -- yeah, those impacted by the elimination of those positions. Correct. 4:10:07

Q. So column G has the actual names of the people whose jobs or whose districts will be eliminated.

Correct?

A. Yeah. 4:10:19

Q. And then Option is column H.

Correct?

A. Yes.

Q. And what is your understanding, if you have one, of what Option means based on the information completed there? 4:10:44

A. Not knowing when this was created, I have limited knowledge as to what informed what was put in the Option or to row -- or to column H. 4:10:57

Q. Near -- No. 8, Rubalcava, says Dallas.

Page 172

Stocking says Dallas. Irwin says Dallas. Pitchford says Dallas. Stewart says None. Vina says St. Louis, STL. Do you understand that to mean St. Louis? 4:11:38

A. To the right of it says "Offer St. Louis." I would think --

Q. Okay.

A. -- that's what it stands for. 4:11:45

Q. And Taskov says KC, "Offer Kansas City."

Correct?

A. That's what that says. 4:11:52

Q. Monohan, possibly Dallas. Beck, Denver.

A. Yeah. That's what it says. 4:12:02

Q. Okay. So then it says "Position Created" in the lines 18 to 26. And --

A. Correct. 4:12:15

Q. -- where it says "Scenario" down at the bottom, where it -- it assigns positions, do you see that, to Taskov, Stocking, Johnson or Zarfi [sic], Rubalcava, Irwin, Pitchford, Hernandez, To Be Determined or Stocking. 4:12:41

A. It looks like that's what this -- this scenario says, yes.

Q. So for positions created, there are no assignments for Leiter, Dodson, Boland, Stewart, or Monohan.

In Demand Electronic Court Reporting, Inc www.InDemandReporting.com (773) 239-6008

Page 173

Correct?                              4:13:11
A.   Or Yost.  Or Oda.
Q.   Yost or Oda.
Correct?
A.   I'm just looking at the two lists.  Correct.    4:13:29
MR. FARLEY:  Beck.
BY MS. FOLEY:
Q.   Okay.  And if we go over farther in the columns, where it says -- if we go even farther, like to column O and Q --                              4:14:10
MS. FOLEY:  Here, you can keep going over to
Q.   Okay.  Yeah.  We'll just do that toward the end section.
BY MS. FOLEY:
Q.   The ones at the top there.  It does give their ongoing salaries of each of those employees listed.
Correct?                              4:14:36
A.   That's what that says.  Yes.
Q.   And it backs out the salary for those positions with the red.  Is that what it -- it indicates, that that's a savings?                      4:14:58
A.   What column are you talking about?
Q.   Q.  Where it's red.                   4:15:05
A.   Looks like Q is the same negative value as P.

Page 174

Q.   And then the ones down below the red on row Q are the ongoing salaries.
Correct?                              4:15:34
A.   Those would be -- yeah, ongoing salaries of new positions.  Yes.
Q.   New salaries for the people that got reassigned.
Correct?                              4:15:44
A.   Yes.
Q.   And those would be at their current rates?  Is that correct?  Or is that some other amount?     4:15:55
A.   I'm not so sure what dollar amount was provided and whether it was forecasted beyond this moment in time.
Q.   But indicates a savings of -- one number is 839,000, and there's a number below it of a million sixty-eight oh, oh, six.  You see that?  Ongoing salary?                              4:16:37
A.   That's what -- yes, the bottom row -- column Q says that, yes.
Q.   So in this scenario, where the people who are reassigned that are indicated on this sheet, there is a savings of that amount.                     4:16:57
Do you recall them running any other scenarios for the selection of other people for the

Page 175

positions --
MR. FARLEY:  Objection --
BY MS. FOLEY:
Q.   -- in Dallas?                        4:17:11
MR. FARLEY:  -- to form.  Objection to form.
THE WITNESS:  Well, both of them -- both moments live independently from one another.  One was a financial exercise to get the president to approve an outlay of money.                              4:17:27
By the way, I doubt it was 524,000 and whatever we just discussed.  But we knew it was going to be expensive, so we needed his approval to move forward.                              4:17:38
What finally took place with every one of these may or may not be the final version here.  I don't know.  But this -- the financial simulation was -- the -- the sole purpose is of getting the president's financial approval to make -- to -- to move forward.                              4:17:55
There was no triangulating the financial information to any other decision other than approving the 524,000.  It is made by Jim.  Earlier in my testimony, it's very common course at at Nissan when you outlay a certain amount of money, what's my cost in Year 1, what's my cost or benefit in Year 2, so on --   4:18:22

Page 176

Q.   Okay.
A.   -- and so forth.
Q.   Okay.  So --
MR. FARLEY:  Shannon, your not on our screen anymore.  I don't know if you're -- you've moved or not.  But we don't see you.                        4:18:30
MS. FOLEY:  Oh.  I -- I put my computer down so I could see my bigger screen.  So --
MR. FARLEY:  Yeah --
MS. FOLEY:  -- I'm sorry.  I'm here.  I'm here.  I'm just looking at the numbers.           4:18:41
BY MS. FOLEY:
Q.   So in row N, if you will look at that, it indicates the years of service of the employees who are impacted.
Correct?  Can we see who they are?        4:19:04
A.   Yes.  It looks like rows 4 through 17 are impacted employees.  Correct.
Q.   So Oda is███ years, Leiter 18 years, Yost██ Dodson 26.
A.   Yes.                                 4:19:25
Q.   And then down here, Stewart 19 years.  And Monohan 16 years.
Is that right?  No --
A.   Yeah.                                4:19:42

44 (Pages 173 to 176)

Page 177

Q. Is --

A. I don't know --

Q. He's 13 years.

A. Thirteen. Yeah. Row 16 is -- yeah.          4:19:48

Q. So do you know who created this document?

A. Don't know who created this document. I do know column -- if you could go to the right.          4:20:11 Just for financial simulation, HR would've provided relo estimates. It looks like relo estimates are based on assumed home ownership or rental status.          4:20:33 And then severance costs, I assume, column N, informs severance costs. And then their base salaries.

Q. And Nissan didn't pay severance costs out on several employees. Are you aware of that?          4:20:53

A. I'm not aware of that.

Q. Okay. So had -- had you seen this document before today?          4:21:05

A. Yes.

Q. And who else viewed this document on your team that was working on the reorganization?

MR. FARLEY: Objection to form.          4:21:24

THE WITNESS: I don't know.

BY MS. FOLEY:

Q. Did your whole team review it?

A. I don't know.          4:21:32

Page 178

Q. Was it available for your whole team to review?

A. I don't recall.

Q. Did DeTrude review this?          4:21:39

A. I don't know.

Q. Did you show this Excel spreadsheet to Mr. Cullum?

A. I don't know.          4:22:00

Q. Did you show this Excel spreadsheet to Mr. Chambers?

A. I don't know. Don't remember.          4:22:09

MS. FOLEY: See -- see if there's any -- when it was created, if we -- if we can see it on this document. I don't know. Some of them were produced in kind and marked out, but others it does show. No, that one doesn't show.          4:22:39

BY MS. FOLEY:

Q. Was this document -- this -- this particular page that is the regular capsulized portion was included in a presentation that you gave in February of 2020.

Correct?          4:23:08

MR. FARLEY: Objection to form. What -- what part of the document are you saying?

THE WITNESS: Yeah, there was a word you said

Page 179

that cut out.          4:23:15

MR. FARLEY: Yeah. We couldn't hear --

THE WITNESS: You say a capsulized --          4:23:16

MS. FOLEY: Oh. Go back to the -- where the -- the original page where we came on. It was probably relocation costs or whatever.          4:23:24

MR. FARLEY: Oh, the --

MS. FOLEY: That one.

BY MS. FOLEY:

Q. This page was included in the presentation that you gave to Cullum, Chambers, and DeTrude in February of 2020.

Correct?          4:23:46

MR. FARLEY: Objection. Asked and answered. And he already testified about not knowing if it was the exact same.          4:23:53

MS. FOLEY: Okay. Go back to Exhibit 10 on the first page.

BY MS. FOLEY:

Q. Okay. So this is March 24, 2020. This was presented to Cullum, DeTrude, and Chambers.          4:24:26 And in this PowerPoint, it had this cost savings scenario in it on page 5.

Correct?

A. It wasn't necessarily presented to them on

Page 180

the 24th. This was sent to them on the 24th. Yes.          4:24:45

Q. Okay. And the purpose of your meeting was centered around pages 5, which was the cost portion.

Correct?          4:25:02

MR. FARLEY: Objection, misrepresents the record and it's been asked and answered.

THE WITNESS: As previously answered, the primary reason for Mr. Cullum's attendance at this meeting and seeing this information was for financial delegation of authority.          4:25:20

MS. FOLEY: Okay. If we go down on this. Keep going. Keep going.

THE WITNESS: And just now, you scrolled through that really fast. Oh, no. There we go.          4:26:00

MS. FOLEY: Oh, wait. Stop. No, no. No. On -- on some of these -- may need -- okay.          4:26:11

BY MS. FOLEY:

Q. On this page -- it is, I think, page 15, with Bates 3361.

Do you see that?          4:26:19

A. Yes.

Q. It indicates the inside sales team, 7th Region, that would be -- a -- a pro of it would be for junior FSM development. The bench.

You see that?          4:26:36

Page 181

A. Yes.

Q. So you were looking to develop more junior people through this inside sales team.

Is that correct?

A. No.                              4:26:51

Q. Does it say "Junior FSM development"?

A. Yeah, it says that could be a benefit. It's the only reason for doing it.          4:27:02

Q. Okay. But it does say "Junior FSM development."

Correct?

A. Yeah. Anyone could rotate into one of these jobs without ever having called on a dealer in person. It'd be a great way for them to learn the job of before they do an in-person role.          4:27:18

But not necessarily what we were hoping to have in every single one of those six jobs. But it could be a benefit.                4:27:29

MS. FOLEY: So I think if I go up to -- or down to 23. Let's see if that's the right one. Maybe not. No. Okay. Wrong page.          4:27:54

BY MS. FOLEY:

Q. Yeah. Also at this March meeting, you had already decided to cut Matt Stewart. There's a line through his name.

Page 182

Correct?                              4:28:20

A. A line through the district. I don't see a line through his name.

Q. Well, line through his district.

Correct?                              4:28:29

A. Where's Mr. Stewart? Yes, there's a line through his district. Yes.            4:28:35

Q. And there's a line through Mr. Monohan's district.

Correct?

A. Yes. As well as Mr. Vina. And Mr. Taskov's.    4:28:57

Q. I didn't hear that first name you said.

A. Vina. Midwest, Columbus. Columbus. Kentucky, Wisconsin, Illinois, East Iowa, all four districts impacted by the change in geography.      4:29:18

MS. FOLEY: Could you go up a little -- there's a list of meetings. Keep going. Keep going. Keep going.                4:29:36

BY MS. FOLEY:

Q. Do you recall when the first time was that you prepared this document?

A. No.

Q. It's page 8 with Bates 3354.

A. I -- I -- I don't know if you heard me. "No" is the answer.                4:30:24

Page 183

Q. Okay. Thank you. But as of this date of the 3/24 Exhibit 10, you had -- you and NMAC had decided that you would eliminate Monohan's position.

Correct?                              4:30:49

MR. FARLEY: Objection to form.

BY MS. FOLEY:

Q. Is that --

A. We had decided which districts would be impacted and which ones would be eliminated with possible scenarios and who might fill them. Yes.    4:31:03

Q. Okay. Did you end up changing any of the -- of the decisions on this other than as to Wes -- Wesley Oda?

A. There are some names on here that -- Mr. Stocking and I'm not taking the job. Mr. Hernandez, his district barely was realigned a certain way, so he was not impacted.                4:31:36

Mr. Oda -- excuse me -- oh, see, it didn't impact Mr. Hernandez because that district ended up not changing the way we thought it would. So there are some possibilities on here that there -- but when it was actually done or -- no -- no idea.        4:31:55

Q. Where it says: "Matt Stewart, Job Eliminated, Severance Needed, Bottom 10 percent," who -- who labeled him bottom 10 percent?

Page 184

A. In this document or in general?        4:32:24

Q. Where did the label come from?

A. There was a exercise after fiscal year '19 which ended on March 31st of '31 -- March 31st of '20, where HR had asked all employees to be ranked in their jobs.                    4:32:55

Q. And who did HR ask to rank the employees? Who ranked them?

A. Their management.            4:33:09

Q. And so who -- who ranked Matt Stewart?

A. That would've been likely Mr. McBane, Ms. Cicchini, and Ms. Ciaramitaro as a management team, as they looked at all their FSMs.        4:33:26

Q. And where is the ranking document?

A. I don't know what HR would've done with that information.                4:33:38

Q. And is that a ranking of all of the FSMs?

A. I believe when it was done for the FSMs, it was all FSMs by region.          4:33:58

Q. And what metrics are used to rank the FSMs?

MR. FARLEY: Objection to form.

THE WITNESS: I don't recall.        4:34:08

BY MS. FOLEY:

Q. Do you generally know what information is used to rank employees?

46 (Pages 181 to 184)

## Page 185

MR. FARLEY: Objection to form.

THE WITNESS: We don't usually rank employees. That year, it was asked that we do so. What KPIs or qualitative indicators were used to do so, I don't know.          4:34:35

BY MS. FOLEY:

Q. And when were -- when was management asked to rank the employees?

A. At the conclusion of fiscal year '19, but I don't know exactly when.          4:34:50

Q. So the conclusion of fiscal year '19 ended March 31, 2020 --

A. Correct.

Q. -- right?

A. That would've been -- whether it was before that date or the end of that date -- or after that date, I couldn't tell you. But I know it was as calibration was wrapping up, because calibration usually happens in February or March.          4:35:17

I couldn't tell you exactly when it was at, but I do recall somewhere around that time, after the -- you know, as -- as '19 was concluding, that we were asked to rank our employees.          4:35:29

Q. Have you seen a ranking document in any of the documents produced or that you reviewed in

## Page 186

preparation for your deposition?

A. I've seen a few documents that list a handful of people, and like a tab is called Rank, but I haven't -- I don't recall seeing a full ranking document or data exercise. No.          4:35:59

Q. So who put this comment in here, "Bottom 10 percent"? Do you know? I didn't hear an answer.          4:36:22

A. Oh, I'm sorry. No, I do not know.

Q. Do you know who would have that information?          4:36:30

A. I do not.

Q. Would Mr. McBane have that information?

A. I do not know.          4:36:39

Q. Would HR have that information?

A. I do not know.

Q. Do you know when calibration meetings were held in early 2020?          4:37:02

A. No, I don't. They're usually held in the fourth quarter and sometimes bleeding into the first quarter, so for us, that would be, you know, January through March is fourth quarter, April through June is -- is -- is first quarter.          4:37:17

Specifically to that year, I don't know when calibration's held.

Q. Do you remember attending calibration meetings?

## Page 187

A. I remember attending calibration meetings throughout my career. Yes.          4:37:32

Q. Do you remember attending one in 2020?

A. Not specifically, no.          4:37:39

Q. Do you remember discussing Matt Stewart in calibration in 2020?

A. No.

Q. Do you remember discussing Kiernan Monohan in calibration in 2020?          4:37:52

A. No.

Q. Do you remember discussing Greg Leiter in calibration in 2020?

A. No. If memory serves, their -- the ratings were at least Meets Expectations. And typically when we go through calibration, if someone meets expectations, we rarely talk about each individual.          4:38:14

The team's just too big for that. So no, I don't -- I don't recall any specific conversations around those individuals.          4:38:20

Q. So Mr. Stewart had a Meets Expectations rating in 2019.

Correct?

A. I'd have to see the -- I'd have to see the information. But I'm pretty sure he did.          4:38:36

Q. And about 55 of the FSMs had Meets

## Page 188

Expectations ratings.

Isn't that correct?

MR. FARLEY: Objection to form.          4:38:48

THE WITNESS: I -- I don't know.

BY MS. FOLEY:

Q. Mr. Monohan an -- had an Above Expectations ratings.

Correct?          4:39:00

MR. FARLEY: Objection to form.

THE WITNESS: I think that's correct, but I'd have to see it.

BY MS. FOLEY:

Q. So you don't know what documentation was relied upon in putting the notation by Matt Stewart's name that he was -- it says "Bottom ten 10 percent" --          4:39:35

A. I do --

Q. -- correct?

A. I do not.

Q. I couldn't hear your answer.          4:39:39

A. No, I do not. As I mentioned, I know what would've driven that answer, but I don't know what documentation was used to put that.          4:39:48

Q. Was there any notation in Matt Stewart's Workday that he was in the bottom 10 percent?

MR. FARLEY: Objection to form.

Page 189

THE WITNESS:  Not that I'm aware of.          4:40:08

BY MS. FOLEY:

Q.  In fact, his Workday would have indicated that he was a Meets Expectations.

Correct?

MR. FARLEY:  Objection to form.          4:40:19

THE WITNESS:  That would be loaded into Workday after calibration.  Yes.

BY MS. FOLEY:

Q.  Did -- did you or anyone else in HR or on the -- your reorg committees communicate to any of the hiring managers that Matt Stewart was the bottom 10 percent?          4:40:46

A.  No.

Q.  Was Matt Stewart put on a performance improvement plan while he was a -- a -- an FSM in 2019, 2020?

A.  I don't -- I don't know.          4:41:05

Q.  Was there any record anywhere that Matt Stewart was on a performance improvement plan in 2019, 2020?

MR. FARLEY:  Objection to form.          4:41:16

THE WITNESS:  I don't know.

BY MS. FOLEY:

Q.  Do you know how many FSMs there were in

Page 190

February, March 2020?

A.  A No. 68 rings a bell, but I'm not sure that's the right number, so no, I don't know specifically the number.  Sixty-eight may be our new count.  I -- I -- I don't know.  I'd have to count them all up.          4:41:49

Q.  Was Bill Dodson a Meets Expectations performance --

A.  I don't --

Q.  -- ranking?

A.  I don't recall.          4:42:30

Q.  Was Greg Leiter a Meets Expectation performance rating?

A.  What year?  I don't recall either way.          4:42:40

Q.  2019, 2020, whatever years you were evaluating.

A.  Well, we weren't evaluating performance.  But in -- in -- in calibration, we would've evaluated performance.  And I'd have to look to see whether those two gentlemen had Meets Expectations for '19 and '20.          4:43:06

Q.  So when you say you were not evaluating performance, but then on two of these items, you say -- there's one that says "Below Expectations" and another one that says "Bottom 10 Percent," isn't that performance?          4:43:23

Page 191

MR. FARLEY:  Objection to form.

THE WITNESS:  That's a statement.  I don't know if that's an evaluation of performance other than knowing that something is there that may make it challenging for people to consider them for other roles.          4:43:40

But it wasn't a deciding factor as to why they were even on this list to begin with.

BY MS. FOLEY:

Q.  Another exhibit, and it's a 7/9/20 PowerPoint, 3982.  Exhibit 12.          4:44:19

(Exhibit No. 12 marked for identification.)

BY MS. FOLEY:

Q.  It is -- starts at 3982, goes to 4032.  And you sent this to Mr. Michael Colleran and Jim DeTrude on July 9, 2020.

Is that correct?          4:45:04

A.  Yes.

Q.  And it indicates it's an Nissan Geo Optimization NMAC Colleran Review.  So --

A.  Yes.

Q.  -- did you send to Mr. Colleran the -- a PowerPoint for his review?          4:45:23

A.  It was a PowerPoint for him for clearly a meeting that we were going to have on looks like July

Page 192

10th.

Q.  Okay.  And do you know if you met in person or by videoconference?          4:45:45

A.  I do not.

Q.  Why does it say "Do not forward"?

A.  There's still sensitive information in here relative to offers likely that were made.  And so we always ask that any sensitive information, especially to a -- a business unit outside of ours -- Mr. Colleran work -- works for Nissan North America in marketing and sales.          4:46:12

Actually recently retired.  We would want to make sure that he protected the privacy of the information of the day.

Q.  As of July 9, you had already sent out the June 4th letters informing people that their jobs were being eliminated --          4:46:39

A.  Correct.

Q.  -- or consolidated.

Correct?

A.  Yes.

Q.  What was it that you were discussing with Mr. Colleran with respect to this reorganization?          4:46:52

A.  We would've been informing him of what our portion of the reorganization looked like.  A, how does

48 (Pages 189 to 192)

www.InDemandReporting.com (773) 239-6008

Page 193

it align with his new six-region structure, and B, the nuance that was different for us, which was us standing up a brand new inside sales team.          4:47:11

That would've been likely the basis for the meeting.

Q.  Did you seek his approval?

A.  No.          4:47:22

BY MS. FOLEY:

Q.  Go ahead and just run through it.  Is this the one PowerPoint that you discussed with him?  Do you remember the specifics of any discussion?          4:47:37

A.  I do not remember specifics, but yes, this would be the PowerPoint.

Q.  Okay.  On that page --

MS. FOLEY:  Bring it back down.          4:47:59

BY MS. FOLEY:

Q.  Where it says 18 districts, 50 -- with over 50 percent small dealer count, and 26 districts with over 40 percent, that still didn't change.

Correct?  From --          4:48:15

A.  This is --

Q.  From the --

A.  -- the slide we talked about earlier on?

Q.  Right.  From the earlier --          4:48:18

A.  That --

Page 194

Q.  -- PowerPoint.  Even though now you have 385 dealers, fewer dealers.

A.  No.  That's -- this is the exact same page we were just talking about.          4:48:27

Q.  Okay.

A.  The next page is the new dealer count.  But this -- that 18 and 26 and the 50 and 40, this should be the exact same slide versus the one we talked about earlier.          4:48:38

Q.  Okay.  You didn't change it for your presentation with him.  Okay.  That's fine.

A.  No, because this would've been the back story of where we started.  What's a small dealer, what's a big dealer.          4:48:48

Q.  Okay.

A.  Right?  Where did we start and where did we end.

MS. FOLEY:  Okay.  Keep going.          4:48:54

BY MS. FOLEY:

Q.  So on this page, which is page -- Bates 3992, it has the pictures of everyone who is managing the new organization, including you in the left-hand corner.

Correct?          4:49:23

A.  Yes.  Yes.

Q.  Okay.

Page 195

MS. FOLEY:  Keep going.          4:49:41

BY MS. FOLEY:

Q.  So these -- these slide pages are different than what were in the prior one, those two in a row.

MS. FOLEY:  Okay.  Keep going.          4:49:57

BY MS. FOLEY:

Q.  And this is the same savings impact page that was presented to Mr. Cullum.

Correct?  On page 14?          4:50:07

A.  Looks similar to what we presented to Mr. Cullum.  Yes.

Q.  Okay.  And this is the same -- same map of the six region structure.  Your mission remains unchanged.  You just had a few more in there.          4:50:43

Open items.  Final NMAC president and CEO approval.  Had you already gotten that approval?          4:50:53

A.  Yeah, these look like they're appendix pages, so they're probably a -- a dump from a bunch of other presentations that were in there as backup.          4:51:02

Q.  Okay.

A.  Whether they were relevant to this meeting or not, I can't speak to that.

Q.  Okay.

MS. FOLEY:  Keep going.          4:51:08

BY MS. FOLEY:

Page 196

Q.  And these look like repeats of what we've seen.  Okay.  Is that the end?          4:51:26

A.  There's 28 more pages.

Q.  Oh.

MR. FARLEY:  I mean, for the record, this -- there's no way to review what you're doing.  You're just scrolling down, which is -- we're barely even seeing it.          4:51:37

I -- I want to get a specific question.  We can't just roll through a document and then ask questions about it.  You gotta give the witness a chance to look at what you want to ask him.          4:51:46

MS. FOLEY:  Well, I don't have a question pending.  And I will ask him when there is a new page that has new material on it.  But thank you, Peter.          4:51:57

BY MS. FOLEY:

Q.  Okay.  If there's something that grabs you and you want to bring it to my attention and it's new material, let me know.

MR. FARLEY:  I object to the form.  That's impossible for him to answer.  You scroll through pages.  We can't tell what's new, what's not new.          4:52:16

Your -- your question doesn't even make sense.  I'm not -- I'm not going to allow him to answer that question.  I'm instructing him not to answer.          4:52:22

49 (Pages 193 to 196)

Page 197

BY MS. FOLEY:

Q. Okay. Don't. And this -- this team impact page. Does that -- does that list all the -- the FSMs that you know? 4:53:05

A. I'd have to look through it. First of all, I can't really read it from here.

Q. It is -- is -- is hard -- 4:53:13

A. But given -- given the amount of lines and people, it's likely that that is probably more than the FSMs. That might even be the entire regional teams. But I'd have to go look at it one by one. 4:53:24

Q. Okay. And it has ratings and who the -- the AOMs are and their positions?

MR. FARLEY: We -- we -- we can't -- the -- the document is garbled on our screen. We can't see any of the print. 4:53:43

BY MS. FOLEY:

Q. Okay. It -- it is a Nissan document. I apologize for the poor quality of it. But as you look at it, it looks like there are some FSMs and AOMs on the page. 4:53:56

MR. FARLEY: I'm sorry. We really cannot -- we cannot read it at all. It's so --

MS. FOLEY: Okay. 4:54:00

MR. FARLEY: -- small, and when you blow it

Page 198

up, the -- the letters on the screen are all getting jumbled. I realize it might not be super legible on your end either, but it just is not even readable. 4:54:12

BY MS. FOLEY:

Q. What was the reason you put all of the AOMs or FSMs in this PowerPoint?

MR. FARLEY: Objection to form.

THE WITNESS: No idea. 4:54:23

BY MS. FOLEY:

Q. Okay. Do you know who does know?

A. No.

Q. Okay. All right.

MS. FOLEY: There is a document -- do you want to -- are you okay, or do you want a break? Huh? 4:54:44

Court Reporter, do you need a break?

THE RECORDER: I'm fine. Thank you. 4:54:52

MS. FOLEY: Okay.

3549 to 50. Yeah. Okay.

BY MS. FOLEY:

Q. Exhibit 13 will be Bates 3549 to 3550. It's called NMAC Sales Operations Displaced Employees. 4:55:43

(Exhibit No. 13 marked for identification.)

BY MS. FOLEY:

Q. And it's dated July --

MS. DAVENPORT: June.

Page 199

BY MS. FOLEY:

Q. Oh, June 2020. Do you know who created this? 4:55:54

A. I do not.

Q. Have you ever seen this?

A. Can I see the second page? 4:56:05

Q. Sure.

A. No, this does not look familiar to me.

Q. Is this a document you -- you've ever seen? No? 4:56:32

A. I remember vaguely seeing in preparation yesterday, but -- with Counsel, but the -- the document does not look familiar to me. No. 4:56:42

Q. Okay. Thank you.

MS. FOLEY: 2960. Need to make sure it's the right one. 4:57:07

BY MS. FOLEY:

Q. Okay. So this looks similar to the one that you said you could not see on the other document. Does this appear to be the same listing that was on the PowerPoint document? 4:57:56

MR. FARLEY: Objection to the form.

BY MS. FOLEY:

Q. A list of -- a list of employees, their positions?

A. This appears to --

Page 200

Q. And you -- 4:58:05

A. -- be that. Yes. Whether it's the same as what was just shown, I could not tell.

Q. Okay. So it -- it has the names of Nissan employees, their -- their two thousand -- fiscal year 2019 rating, their job title before, job title after. 4:58:26

Would that be before the August 2020 and after August 2020?

MR. FARLEY: Objection to form. 4:58:38

THE WITNESS: I'd have to read through specifically --

MR. FARLEY: We can't see the whole thing. 4:58:45

THE WITNESS: I can't see -- can you zoom out just a little bit? I -- it's actually so much clearer than the other one, so even if you zoom out, we can still kind of read it. 4:58:51

BY MS. FOLEY:

Q. Okay.

A. I can read that.

Q. And then region changes before and after -- 4:59:03

A. Yeah, so -- yeah. So, like I and J would've been -- is -- is the district now belong to the same region or a different region. Right? 4:59:15

So you can see, like, on rows 40, Mr. Rousseu, Mr. Zeman, Mr. Hufford, who were in different

Page 201

parts of the country -- that's the old Mountain region. Right?                    4:59:27

So they used to be a part of the Mountain region. And now, after the restructuring, they're part of -- two of them are part of Nissan Central and one of them is part of Nissan West. So that's what I and J is telling us.                    4:59:41

Q. So I have a question. Is this a document that is used in calibration?

A. This does not look like a calibration document.                    4:59:53

Q. It says on the bottom "Facilitate Calibration."

Do you see that?

A. Yeah.

Q. What do you think this document is used with?    5:00:02

MR. FARLEY: Objection to form.

THE WITNESS: I don't know what it was used for or with. I just know what it's telling me in terms of the information on the -- on the page.                    5:00:12

BY MS. FOLEY:

Q. Is this a document where it's the employee ranking document that you referenced?

A. I've never seen an employee ranking document. So no, it's not that.                    5:00:24

Page 202

Q. Okay. And then there are some rows over to the far right, L, M, and N. Do you know what those rows -- what was in those columns?                    5:00:37

MR. FARLEY: Objection. That calls for attorney-client privilege and work product doctrine.

Instruct the witness not to answer.                    5:00:44

MS. FOLEY: I'm just asking if he knows what was in the columns.

MR. FARLEY: That -- sorry. It's improper regarding -- it dealt with you all on this privileged designation, so I ask you to please move on to a non-privileged question.                    5:00:59

BY MS. FOLEY:

Q. Have you seen this document before?

A. In preparation for this deposition, I was shown this document. Much of the contents within it look familiar, as I just described. But the document per se does not ring any bells.                    5:01:25

Q. Okay. And where does all this information come from? What database? Is it from --

A. I --

Q. -- HR? Is it from your -- one of those other systems you referenced?                    5:01:38

A. I don't know.

Q. If you were to estimate, like, who -- who

Page 203

houses this data, where would you -- where would you go to pull these fields?                    5:02:01

A. Well, if you can go all the way to the left, I could tell you where they're likely from. But I don't know exactly whether they were pulled from there.    5:02:11

So obviously name is name. Salary Grade I believe would be something provided by HR. Where it came from, I don't know. Obviously then who their boss is.                    5:02:27

And then the ratings would be provided by HR as well. Where that was housed, I don't know. And then the labels for each one of the jobs.                    5:02:39

I don't know if that was provided or whether that was even hand-typed. I'm not really sure. But they're pretty consistent. Like, financial services manager is all I -- you know, I doubt the same, so maybe that was a -- like, a data dump from -- from HR as well.                    5:02:58

I would think that G and J were likely manually changed. Because the system can only reflect one thing. Right? Who are you, who do you work for, and what's your job title.                    5:03:16

Not what do you think your new job title's going to be in the future. So I'm sure adjustments were made here. And then Notes doesn't look familiar.    5:03:27

Page 204

And then K, column K, Stay in the Same Work Space, doesn't look familiar either. All these -- all these people don't -- you know, they're all the -- most of them lived and worked from home because they lived in market.                    5:03:43

So that's probably what that's speaking to.

Q. Okay. Do you -- do you know when this document was created?                    5:03:50

A. No.

Q. You indicated a lot of these fields were from HR. Do you think someone in HR would know?    5:04:05

A. And again, they're likely from HR. What would -- what -- what are you asking HR would know? When the document was created?                    5:04:12

Q. Right.

A. I -- I don't know.

Q. Do you think that it's a document that was pulled together by Mr. Lubbers?                    5:04:30

MR. FARLEY: Objection to form.

THE WITNESS: I don't know.

BY MS. FOLEY:

Q. So you are not the person most knowledgeable regarding this document, Exhibit 14.

Correct?                    5:04:52

MR. FARLEY: Objection to form.

Page 205

THE WITNESS: I would be the person who understands what this document is telling us. I am not privy to who created it and when it was created.          5:05:02

BY MS. FOLEY:

Q. Okay. So what does this document tell us?



Q. Okay. And what do you -- what was this document used for, if you know?          5:06:04

MR. FARLEY: Objection to form.

THE WITNESS: I don't know.

MS. FOLEY: Okay. I am going to take a very quick break and use the restroom, and then I will be

Page 206

back. If that's okay.          5:06:24

THE RECORDER: Want to go off record?

Okay. Off the record at 4:08 p.m.          5:06:33

(Off the record.)

THE RECORDER: We are back on the record at 4:27 p.m.

MS. FOLEY: Thank you.          5:06:42

BY MS. FOLEY:

Q. Mr. Ledieu, you're still under oath.

Do you understand that?

A. Yes.          5:06:49

Q. And I am going to mark as the next exhibit 14. No. Fifteen.

MS. DAVENPORT: No.

MS. FOLEY: Exhibit 15.

Correct?          5:07:03

(Exhibit No. 15 marked for identification.)

BY MS. FOLEY:

Q. A document with Bates stamp 2861.

Do you know when Exhibit 15 was created?

A. No, I do not.          5:07:58

Q. I think we can -- might be able to go to the page and see if it comes up. Some of them do. Yeah. February 21, 2020. Do --          5:08:13

A. Okay.

Page 207

Q. -- you see that?

A. Yeah.

Q. Is -- is that an accurate date of creation of this document?          5:08:20

A. It looks as though that's when it was created, according to Microsoft. But I -- I can't speak to whether that's accurate or not.          5:08:29

Q. And it says last saved by Mark Lubbers. Lubbers. Is -- that's the -- the gentleman that worked in sales ops with you.

Correct?          5:08:42

A. Yeah. Mr. Lubbers was our senior manager of sales op. Yes.

Q. Okay.

MS. FOLEY: I'm done with that piece. Thank you.          5:08:50

BY MS. FOLEY:

Q. In this document, which we've marked as Exhibit 15, it shows various districts as well as which ones are going to Direct.

Does "Direct" mean the smaller dealers going to Dallas?          5:09:23

A. Yes. That team is called a Signature Direct team.

Q. Okay. So at some point, that was renamed to

Page 208

Signature Direct or Dallas, or I guess --          5:09:35

A. That's --

Q. -- as of February 2020, it was being called Direct.

Correct?

A. Yeah. Whether we named it by then, I don't know, but it would be safe to assume that anything that says "Direct" would be inside sales.          5:09:47

Q. Okay. So the -- District 2401 has seven accounts going to Direct.

Correct?

A. That's what this says.          5:10:06

Q. And that district was not eliminated.

Correct?

A. I believe that -- well, it -- it was not eliminated, but it didn't remain as in its current form.          5:10:21

Q. District 2401 existed, still existed, after the reorganization.

Correct?

A. The code -- the district code 2401 existed afterwards yes, but it was made up of different geography.          5:10:40

Q. And the representative Ray Razo, who was in 2401, continued to be employed by NMAC after August of

52 (Pages 205 to 208)

www.InDemandReporting.com                                    (773) 239-6008

Page 209

2020.

Correct?

A. Yes.                                        5:11:00

Q. Okay. And Ray Razo, who was in 2401, took over a lot of Mr. Stewart's accounts from 2402.

Correct?                                  5:11:17

MR. FARLEY: Objection to form.

THE WITNESS: It would suggest that under this document -- whether this is the final document or not, I don't know -- but this would suggest that as this was being evaluated, that there were 11 stores in 2402 that were going to be going to what looks like a new district called Minnesota Wisconsin.          5:11:43

Q. And so 11 of Mr. Stewart's dealers were going to Mr. Razo, who was District 2401.

Correct?

A. In this simulation, whether it's the final one or not, I don't know, but yes, that would be a correct way of interpreting this.              5:12:07

Q. And Mr. -- this Exhibit 15 indicates that Mr. Stewart had six small dealers going to Direct.

Correct?

A. This would indicate yes, that 2402, that district would be having six stores -- inside sales.    5:12:36

Q. And there is a district here in 2406 in

Page 210

Indiana.

Do you see that?

A. Yes, I do.                                  5:12:50

Q. And that has eight small dealers going to Direct.

Correct?

A. Yes.

Q. And that's more small dealers going to Direct than were going -- than Mr. Stewart had.

Correct?                                  5:13:10

A. Yes. However, if you continue down the daisy chain, you can see that Mr. -- or that -- sorry, that District 2408 was going to be with 16 more stores going to district -- new district called Detroit.        5:13:37

So looks like eight out, 12 to Indianapolis and Dayton, and 16 in from what used to be Detroit, Grand Rapids.

Q. Okay. And the majority of Mr. Taskov's 15 of his 18 were moved to Direct.

Correct?                                  5:14:09

A. It looks like 15 of the 18 were moved to inside sales. Yes. And --

Q. And then he was given another job to transfer to by Nissan.

Correct?                                  5:14:19

Page 211

A. Mr. Taskov did rotate to a new district after this district was eliminated.

MS. FOLEY: Okay. If we could down on the page a little. Let's see.              5:14:32

BY MS. FOLEY:

Q. This page doesn't include the LA district. Let me see if --

MS. FOLEY: Can you push on Pivot 2? And maybe this other Pivot. I just want to see what that was.                                         5:15:04

BY MS. FOLEY:

Q. Okay. On -- this document is one that gives each district. Correct? And who -- where -- if they have accounts being transferred to Direct.

Correct?                                  5:15:33

A. I don't know. I haven't seen the whole document.

Q. Do you want me to scroll?          5:15:39

A. Yeah, I don't know that I'd be able to tell you that quickly whether it includes all the districts and --

Q. Okay.

A. -- all the --                              5:15:46

Q. Well, take a look at it. It goes through, started at 2401. It's continuing.

Page 212

A. If you want to highlight cells D16 all the way down. No, you need to highlight them. No. Oh, never mind.                                     5:16:09

Q. So here in --

MR. FARLEY: I'm going to object to the form of this question. I don't think there's a -- a --    5:16:20

BY MS. FOLEY:

Q. In -- in -- excuse me. In District 4405, right here, Sacramento, Fresno, North San Francisco, Sacramento, you see that there are two accounts going to Direct.

Correct?                                  5:16:41

A. Yes.

Q. And that -- was that Mr. Leiter's district?

A. I don't know off the top of my head. I know he was in the Bay Area. Whether he had North San Francisco, South San Francisco, or Sacramento, Fresno, I don't recall.                               5:17:08

Q. Can you tell from this who got his accounts? It looks like South San Francisco got some and North San Francisco got some. So that would go to District 4403 and 4404.

Is that correct, if I'm reading that correctly?                                   5:17:32

A. It looks like District 4405 had eight stores

53 (Pages 209 to 212)

www.InDemandReporting.com                    (773) 239-6008

Page 213

go to 4403, eight stores go to I guess a newly -- well, it's not even 4403. It's a new -- it's a new name.        5:17:53

So there's new geographic boundaries for what looks like a North San Francisco, Sacramento and a South San Francisco, Fresno. So it's not really going from one to another. It's going from one to a newly defined boundary for a district.        5:18:07

Q. Okay. But it would be going to that district, 4403 and 4404, and to the reps in those districts.

Correct? The FSMs.        5:18:20

A. It would be going to those districts. Yes.

Q. Okay. All right. Is this a document that you have seen before and that was used in any analysis in deciding which -- which positions and people to eliminate?        5:18:48

A. I only recognize this from preparation for deposition, but I do not recognize it as work -- something I would've seen during some of the work that you're asking about. No.        5:19:01

I will say the 1278 on line 4 -- 249 would suggest that it's both the Nissan and Infiniti dealers, 1,076 Nissan dealers and 202 Infiniti dealers.        5:19:19

Q. Okay. So that was during the analysis period of whether to include Nissan in the transfer of

Page 214

dealers.

Correct?        5:19:37

A. I don't know whether that was in the analysis and when this pivot table would've been used to make any kind of decision or help people get more -- gain more insights. I'm -- I'm not aware of what the timing of this document was. Or --        5:19:54

Q. Okay. And at some point, you -- did you take Infiniti out of the -- the dealer counts?

A. We took Infiniti out from realignment. But those stores were still being called on by those people.

Right?        5:20:10

So when we talk about a dealer to FSM ratio, we couldn't ignore -- you know, for example, if you're covering Southern California, you're probably going to have quite a -- actually, let me use New York City as an example.        5:20:26

If you're covering Metro New York or North New Jersey, you're going to have a lot of Infiniti stores. If you're covering the heart of the Midwest and Kansas City, you might have one or two Infiniti stores.        5:20:35

So we kept that in scope, but they were never reassigned for the reasons of being small or large.

Page 215

Q. Okay.

A. They were only reassigned for geography, and that's it.        5:20:49

Q. Was there -- you ran the numbers a lot of different ways.

Correct?

You had included Infiniti, you didn't include Infiniti, you did percentages on some things, and you didn't do percentages on other things.

Correct?        5:21:17

A. We run data a lot of different ways at Nissan, so this was no exception.

Q. Okay. Great.

MS. FOLEY: Okay. So we'll go to the next document. If you would pull, yeah -- the next exhibit number would be 16.        5:21:43

(Exhibit No. 16 marked for identification.)

BY MS. FOLEY:

Q. And it is Bates 3407. It'll be up in a moment. Mr. Ledieu, have you seen this document, which we've marked --        5:22:31

A. Yeah, I saw the document during preparation with Counsel.

Q. Did you see this document while you were doing the analysis regarding dealers?        5:22:45

Page 216

A. I don't recall it. No.

Q. Did you see documents like this one that is marked as Exhibit 16 with the listing of dealers and the FSM that's assigned to them and then a new FSM that's assigned to them?        5:23:05

MR. FARLEY: Objection to form.

THE WITNESS: No.

BY MS. FOLEY:

Q. Okay.

MS. FOLEY: Ashley, will you see if there is a date on this one?        5:23:12

BY MS. FOLEY:

Q. Oh. Interesting date. 1899. Do you know when these documents, such as these with all of the dealer information, were created?        5:23:35

MR. FARLEY: Objection to form.

THE WITNESS: No.

BY MS. FOLEY:

Q. Okay. We will go through this. At -- at line 228, we'll start. Okay. I see it here.        5:23:54

And so going across here, it indicates Matt Stewart has an account. And he is the prior FSM. And it is -- goes to a new FSM, Dan Pauken. And is Dan Pauken one of the FSMs in the inside direct in Dallas?        5:24:23

A. He was. I don't believe Dan still works for

54 (Pages 213 to 216)

Page 217

us, but he was part of that team. Yes.                5:24:30

Q. In 2020, Matt Stewart's account, which was the ████████████████, was reassigned to Dan Pauken.

Correct?

MR. FARLEY: Objection to form.

THE WITNESS: I don't know whether this is a final document or whether this is a simulation, so I can't speak to whether that ended up happening for this specific store.                5:24:57

BY MS. FOLEY:

Q. Does this document indicate that Matt Stewart was the prior FSM and Dan Pauken is the new FSM?

A. This document indicates that that might happen. Yes. I don't know that it actually says that it's going to.                5:25:14

Q. Do you know anyone who could testify about what this document represents, if you don't know?

A. I don't know what it represents relative to the focus on column K and L. What I can do is maybe give you some context for columns G, H, I, and J.

Right?                5:25:35

So ████████████

Q. Excuse me -- no. What -- what I'm asking are specific questions. Do you know who can tell me --                5:25:45

Page 218

A. No.

Q. -- whether this document is accurate regarding the representation that Matt Stewart was the prior FSM and that Dan Pauken is the new FSM?                5:25:56

A. Do I know who could do that?

Q. Yeah.

A. I could do that if you gave me time to look at other documents and tell you whether that ended up being the case or not. But off of this document, I cannot.                5:26:10

Q. What -- what else do you need to look at?

A. What was the final reconciliation of all 1,076 stores and which district did they end up in and who was their FSM on August 4th. I don't have that readily available by looking at this document.                5:26:31

Q. Okay. And do you have access to that?

A. I -- not that I know of. I'm sure we could find it.                5:26:39

MR. FARLEY: You mean access to it by right here or access to it in the company?

MS. FOLEY: At the company.

BY MS. FOLEY:

Q. I -- I think I may have another document that I could direct you to, but I'm going to walk you through this one and -- and we'll get there.                5:26:58

Page 219

MS. FOLEY: There is a document that has an email attached to it, giving those, but -- dealers assigned. Could be 49-1. Take a look at that. Oh. That's okay. I'll come back to it maybe.                5:27:53

BY MS. FOLEY:

Q. Okay. So let me walk you through a few more. So if you look at the additional lines of 229, the next line, you see that Matt Stewart has assigned to Dan Pauken as well there.

Right?                5:28:11

A. Yes.

Q. Okay. And then if you go down to line 244, it is Matt Stewart and another account assigned to Dan Pauken. At 255, there's another one where he is -- Matt Stewart dealer assigned to Dan Pauken.                5:28:37

At 259, there is another one where Matt Stewart's dealer is assigned to Dan Pauken. And 261 shows another one.

Do you see that?                5:28:50

A. I see it. Yes.

Q. Okay. And -- and do you agree that this document represents, at least at this point in time, that that was to be the assignment from the prior FSM, Matt Stewart, to the new FSM, Dan Pauken, at the Direct in Dallas.

Page 220

Correct?                5:29:11

A. No, I would suggest that that would've been a possibility, not knowing when this was produced.

Q. Okay. And you're the one who was designated as having the knowledge about this document. So if you don't know, then I'm going to need to have a witness who can testify regarding that, and I will try to help you out by get -- finding another document that has a transmittal letter on it.                5:29:38

But on -- so it appears that Dan Pauken took over Matt Stewart's accounts in Dallas, the ones that were transferred to Dallas. Do you have any information otherwise?                5:29:53

MR. FARLEY: Objection to form.

THE WITNESS: Dan Pauken, as a FSM for Signature Direct, would've taken over many different accounts that were transferred to that team --                5:30:04

BY MS. FOLEY:

Q. I --

A. -- yes.

Q. -- I'm only asking you about Matt Stewart's accounts. He took over Matt Stewart's.

Correct?                5:30:10

A. He took over Matt Stewart's and others. Yes.

Q. And is Dan Pauken a -- a person who's under



Page 221

the age of 42?                    5:30:22

A. I don't know.

MR. FARLEY: Did you say 42?

THE WITNESS: Yeah. Oh.

BY MS. FOLEY:

Q. Do you have -- do you know his age?    5:30:28

A. I do not.

Q. Okay. And do you -- I'm going to look here. Matt -- Dan Pauken have fewer years with NMAC and NNA than Matt Stewart.

Correct?                    5:30:45

A. I don't see that. Where are you?

Q. I'm just asking you a question.    5:30:51

A. Oh. I don't -- I don't know the answer to that.

Q. Is Dan Pauken younger than Matt Stewart?    5:30:58

A. I don't know.

Q. Did Dan Pauken make less salary than Matt Stewart in the time period of 2020?

A. I don't know.                    5:31:14

Q. Who would know?

A. Human resources would be able to pull that information.

Q. Okay. And then Ray Razo took over Matt Stewart's accounts. I think his name is also Riccardo

Page 222

Ray Razo.                    5:31:30

A. That --

Q. And --

A. -- he went by Ray.

Q. Okay. You know who he is? Is -- is he someone who's much younger than Matt Stewart?    5:31:39

A. I don't know.

Q. Is he in his thirties?

A. I have no idea.                    5:31:45

Q. Okay. And if you'll look at lines 269 at -- and that -- this document suggests that the ███ ███ account was the prior FSM, Matt Stewart, the new FSM is Ray Razo.

Correct?                    5:32:05

A. Correct.

Q. Okay. And then at line 271, the same. Matt Stewart, prior FSM, the new FSM Ray Razo on the ███████ dealership.

Correct?                    5:32:21

A. Yes.

Q. And on 273, it indicates that Matt Stewart was a prior FSM, his dealer was transferred to Ray Razo on the ███████ dealership.

Correct?                    5:32:39

A. On this document, it would suggest that.

Page 223

Yes.

Q. And on line 274, the -- Matt Stewart was the prior FSM and Ray Razo became the new FSM for his ███████████ dealership.

Correct?                    5:32:59

A. On this document, it would say that. Yes.

Q. And on line 276, it shows that Matt Stewart was a prior FSM and Ray Razo got the dealership on the ███████████ dealership.

Correct?                    5:33:18

A. On this document, it would say that. Yes.

Q. Okay. On line 279, Matt Stewart was the prior FSM and his dealership was given to Ray Razo on the ███████ account.

Correct?                    5:33:33

A. On this document, it would say that. Yes.

Q. Okay. And on line 281 and 282, it shows that -- 281 is the ███████████ account, and then the ███████████, those -- both of those were transferred from the prior FSM, Matt Stewart, to Ray Razo.

Correct?                    5:34:02

A. Yeah, this document does say that.

Q. And then the ███████ was transferred from Matt Stewart to Ray Razo as indicated

Page 224

on line 284.

Correct?                    5:34:18

A. Yes, 284 does say that.

Q. Okay. And then at line 288, the ███████ ███████████ was transferred to Ray Razo from the former FSM, Matt Stewart.

Correct?                    5:34:36

A. That's what 280 -- 288 -- are we talking about, or are you talking about 290 that's now highlighted?

Q. I'm talking 288 right now.    5:34:44

A. Yeah, that's what 288 says. Yes.

Q. Okay. And then 290 indicates the ███████ ███████ was transferred as well to Ray Razo from Matt Stewart.

Correct?                    5:35:00

A. Yeah, this -- this 290 -- line 290 on this document says that. Yes.

Q. And do you have any information as to whether Ray Razo made less compensation as a more junior person than Matt Stewart?    5:35:18

A. I do not.

Q. Did you -- in this document, if you go to lines 403 to 406, you'll see that Kiernan Monohan had a number of his dealerships transferred to Jennifer

56 (Pages 221 to 224)

Page 225

Burns. Do you see that in these rows 403 to 406, and then again 408, 410, 415, 417, all went to Jennifer Burns. Do you see those -- 5:36:04

A. I see the ones highlighted in yellow, because I couldn't follow along the numbers, but I assume you're talking about all the stores highlighted in yellow? 5:36:11

Q. I believe so. I don't know. I didn't do the highlights.

But is Jennifer Burns younger than Mr. Monohan? 5:36:22

A. I don't know.

Q. Is she in her thirties?

A. I don't know. 5:36:30

Q. Do you know anyone's age?

A. No.

Q. Okay. Has Jennifer Burns worked for Nissan fewer years than Mr. Monohan? 5:36:44

A. I don't know when Jennifer's start date was. I think it suggests that Mr. Monohan joined us in '06. But I don't know what her start date is off the top of my head. 5:36:56

Q. Do you think Ms. Burns started in '06 or even 2010?

A. I don't know. I'm -- I'm mentioning '06

Page 226

because you showed me that earlier on with Mr. Monohan. But I don't recall Ms. Burns's start date. 5:37:12

She was on the team when I joined the team, so I don't know when she joined it.

Q. And this document also indicates that Bill Dodson's accounts were transferred to Mr. Paul Hufford and Mr. Jerry Zeman and Ruben Rubalcava. 5:37:35

MR. FARLEY: We don't see that.

BY MS. FOLEY:

Q. They're down here, lower. 1183, 1186, 1187, are to Hufford. Rubalcava's are up higher. 5:37:56

A. I'm not able to follow along with you guys scrolling --

Q. Here you go.

MS. FOLEY: I think you gotta go higher. 5:38:03

BY MS. FOLEY:

Q. Okay. So there's Dodson to Paul Hufford. And then on 1183, 1186, 1187.

Do you see that? 5:38:16

A. Yes.

Q. Do you know what the yellow highlight means?

A. I do not. 5:38:26

Q. Okay. And then did Adam Sanchez -- was he the inside rep in Dallas?

Do --

Page 227

A. That's --

Q. -- you know? 5:38:45

A. -- the second time you've mentioned that name. I don't -- I'm sorry. I just don't recall who Adam Sanchez is. 5:38:50

Q. Okay.

MS. FOLEY: If we could go up to 135, that would be great.

BY MS. FOLEY:

Q. So it indicates here Adam Sanchez, and it's from Bill Dodson to Adam Sanchez on lines 135, on 137, 145, 152, 153, 167. 5:39:31

A. Yeah, that's what the document says. Yeah.

Q. Does -- does this document at all refresh your recollection that he was an inside person -- Ruben Rubalcava was inside sales in Dallas.

Correct? 5:39:45

MR. FARLEY: Objection to form.

THE WITNESS: It -- it really doesn't. I'm sorry. I don't -- 5:39:51

BY MS. FOLEY:

Q. Okay.

A. And -- and -- and maybe because he actually didn't do -- end up doing the job and someone else did. I -- I just don't recall Adam Sanchez as a face or a

Page 228

name. 5:40:02

Q. Okay.

A. It was -- this team was stood up during the pandemic, so maybe I never really had a chance to meet the guy. 5:40:10

Q. Okay.

A. I apologize. I don't remember Adam at all.

Q. In -- in some of the documentation, there is a notation that it says that the -- there is a top-heavy organizational structure and weak senior manager succession planning. 5:40:34

Do you at NMAC conduct succession planning? You -- you alluded to it.

MR. FARLEY: I'm going to object to the form of that question.

Go ahead. 5:40:45

THE WITNESS: Do we conduct succession planning at NMAC? Is that the question?

BY MS. FOLEY:

Q. Yes.

A. Yes, we do. 5:40:50

Q. Okay. So what is the form of succession planning? Does every manager do succession planning for the group that works under them? 5:41:02

A. Usually we would have -- at my level, I would

www.InDemandReporting.com                    (773) 239-6008

Page 229

have succession planning discussions with the senior managers about their team. That's usually how we would do it internally.                    5:41:16

Q. Okay. So when you say "the senior managers" -- so when you were the director of operations, did you do succession planning with all of your regional FSMs?    5:41:26

A. Yes. So my -- and my regional -- yeah. My regional financial services managers and Mr. Lubbers. We would've all sat down together and done succession planning.                    5:41:36

Q. And what does that mean? What would you do? Did you write it out? Did you say who was going to be progressing up the ladder, who would never progress?    5:41:46

A. No. I'll -- I'll -- I'll use a -- a -- a really simple example. Let's say Susie is our employee. And Susie has made it known to her -- to her management that she's now been in the job for three years and she wants to pursue other things.    5:42:04

And Susie then shares with her management what her career aspirations are. So maybe she wants to go to credit. Maybe she wants to go to sales. Maybe she wants to go to collections.    5:42:15

So the -- one part of the succession planning is where does Susie want to go. The second part of succession planning is, oh my gosh, congratulations,

Page 230

Susie, you got to do one of those three things you want to do. Now who is going to backfill Susie.    5:42:29

So it's really about where does the individual want to go and then who might be some good backfills for the individuals should they be let go.

Q. So was there any succession planning in place at NMAC during the period of time of 2019 and 2020?    5:42:49

A. I don't know specifically to those dates, whether it actually happened in 2019 and 2020. I know we -- we did it probably a couple of times in my tenure in the job.                    5:43:07

But which years we did it, I couldn't tell you.

Q. When's the last time you did -- you did succession planning?                    5:43:15

A. I don't know.

Q. Did you do it this year?

A. No, we have not done it for this team. I'm new to this role. I've just been the role for a year. I have a very small team, so we have not done succession planning for my team yet.    5:43:30

Q. Did you do it while you were the director of sales ops?

A. Yes. Like I said, I did it probably a couple of times. Just don't remember when.    5:43:37

Page 231

Q. Did you ever see any of the succession planning for the regional FSMs or AOMs?

A. For the -- yeah. We usually talked about the management jobs as well as the RFSM jobs. Yes.    5:43:58

Q. Okay. And did you file the succession plans with HR?

A. I -- I don't know. I know they are shared with HR. And where they're housed, I have no idea.    5:44:15

Q. So who do you --

A. Actually --

Q. -- sharing --

A. Sorry.

Q. -- your succession plans with?    5:44:21

A. It would've been HR -- and actually, now that I'm thinking about it, we did do a succession planning exercise this year with my new team in fiscal year '23.    5:44:35

Q. Okay. Other than this year, did you do it in -- while you were the director of sales ops?

A. Yeah. We definitely did. Just don't remember when. But I do remember talking about my new team this year with HR, about where some individuals may go and who might be good backfills for them if they do.                    5:44:56

Q. So in focusing on the period of time of 2019, 2020, any succession planning from any of the people

Page 232

below you, did you review any of that?

A. I don't recall.                    5:45:11

Q. Would HR be the -- the person most knowledgeable of the succession plans if people were sharing their succession plans with HR?

A. If they were kept by HR, yes, they would.    5:45:30

Q. Was there a requirement to share succession plans with HR?

A. A requirement? I don't think so. They -- we usually included them. They're a big partner of ours when we're talking about succession.    5:45:47

But I don't know if it's required. I always like to have HR.

Q. Is there an actual document that says "succession plan"? Or what do you call it?    5:45:55

A. I know this past year, we actually had documents that were filled out.

Q. What were they called?

A. I don't know.                    5:46:06

Q. What did you call it?

A. I didn't call it anything, because the template was given to us.

Q. And who was giving you the template?    5:46:15

A. HR.

Q. Who in HR?

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com          (773) 239-6008

www.InDemandReporting.com (773) 239-6008

Page 233

A. Think it would be Sidney McNinch who sent us the documents. 5:46:28

Q. Is Sidney with an S or a C?

A. S-I-D-N-E-Y, I believe.

Q. And how do you spell McNinch? 5:46:39

A. M-C-N-I-N-C-H.

Q. Is she a Nissan and NMAC HR professional?

A. I don't know if she supports Nissan. She supports us for sure. But I don't know if she has dual responsibilities. 5:47:01

Q. So are you -- do you have authority to hire and fire people at NMAC?

A. Do I have authority to hire. I can influence how we hire -- or who we hire. And I can influence who we fire. But I don't know that I have ultimate authority who we hire or fire. 5:47:33

Q. Who has ultimate authority as to hire and fire?

A. It's usually done with HR in the room, making sure that we've gone through all the right processes to hire someone or making sure we've gone through all the processes of -- that are needed for termination. 5:47:52

Q. Other than their review or approval, do you have the authority to make that decision?

A. No -- 5:48:02

Page 234

Q. This is --

A. -- I --

Q. -- who I want fired?

A. Do I have the authority to do that? I have no idea. Was I ever asked to do that? No. 5:48:08

Q. In this restructure, you terminated eight people.

A. Yes.

Q. Correct? 5:48:20

A. Yeah, we -- we -- correct. There were -- they -- well, did we terminate eight people or were there eight jobs eliminated? I don't know if we terminated eight people. Did we? 5:48:34

Q. Do you want to go through the list?

A. We can.

Q. So you terminated Matt Stewart. Correct? 5:48:48

A. Yes.

Q. You terminated Greg Leiter. Right?

A. Yes.

Q. And you terminated Kiernan Monohan. 5:49:00

A. Yes.

Q. You terminated Bill Dodson.

A. Yes.

Page 235

Q. You terminated Wes Oda. 5:49:12

A. Yes.

Q. Kasey Yost. Right?

A. Yes.

Q. Brad Boland. 5:49:21

A. Yes.

Q. And Matt Stocking. Because he didn't take another job that you offered --

A. Oh --

Q. -- him. Correct? 5:49:31

A. -- okay. He decided -- okay. Yeah, I guess that would be right if I follow along on the date, yes.

Q. Okay. So you terminated seven people who were not offered jobs. Correct? 5:49:45

A. Seven people were terminated. Yes.

Q. And you were involved in the decisions to terminate those seven people. Correct? 5:49:57

A. I was involved. Yes.

Q. And you were involved in the decisions of who to offer jobs to of the -- those who were displaced because their districts were eliminated.

Page 236

Correct? 5:50:18

MR. FARLEY: Objection to form.

THE WITNESS: Not always involved. Informed at times. But I would've been made aware, sure, of all of them. 5:50:27

BY MS. FOLEY:

Q. Are you claiming you were not involved at all? You had no -- no influence, no impact, no involvement in who was placed in the new jobs? 5:50:39

MR. FARLEY: Objection to form.

THE WITNESS: I would've been informed by the team who they wanted to place in those jobs. 5:50:45

BY MS. FOLEY:

Q. And you were actually in all the meetings where those decisions were made. Correct? Or you were in most of the meetings when the decisions were made. 5:50:53

MR. FARLEY: Objection --

THE WITNESS: No.

MR. FARLEY: -- to form.

THE WITNESS: No, I was not. 5:50:57

BY MS. FOLEY:

Q. Okay. What other meetings were there where decisions were made regarding who was being placed in Dallas?

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com (773) 239-6008

Page 237

A.  I don't know that they were always meetings. Maybe they were conversations between Mr. Lubbers and an RFSM who had a displaced employee.          5:51:13

Maybe there were informal, you know, discussions along those lines.  But not every time we talked about every one of these individuals was there a formal meeting to -- to discuss the topic.          5:51:25

Q.  Were you apprised of each of the people that were up for consideration and selected for each of the positions?

A.  Yes.

Q.  And you approved each of those decisions.          5:51:42

MR. FARLEY:  Objection to form.

THE WITNESS:  I didn't approve or disapprove. I didn't approve or disapprove.  I don't know if you heard me.          5:51:55

BY MS. FOLEY:

Q.  You did -- did you have all the information as to who was being placed and who was not being placed?

MR. FARLEY:  Objection to form.          5:52:03

THE WITNESS:  I was informed by the team where individuals would -- would go or where they were suggesting they go.  Yes.

BY MS. FOLEY:

Page 238

Q.  Okay.  And so you may -- you are not the person most knowledgeable regarding the placement of the people in the Dallas jobs.

Correct?          5:52:21

MR. FARLEY:  Objection to form.  Which topic is that?  If it --

MS. FOLEY:  It's actually --

MR. FARLEY:  -- it -- it may be --

MS. FOLEY:  It's actually --          5:52:33

MR. FARLEY:  -- one that -- it may be one that Dessaw was going to do, so that's why I'm just asking.

MS. FOLEY:  No.  It -- it's, like, topic 2. It's one of the most basic ones, jobs offered, jobs not offered.  So I'm not --          5:52:49

THE WITNESS:  So having knowledge is not the one who actually authorized.  If that's the question.

BY MS. FOLEY:

Q.  Okay.          5:52:55

A.  So your question was did I authorize it.  My answer is no.  Was I informed by the team?  Yes.          5:53:01

Q.  Okay.  So who authorized those jobs?

A.  The final --

Q.  If you know.

A.  -- authorization for this entire thing was

Page 239

authorized by Jim DeTrude.  Because --          5:53:10

Q.  Okay.

A.  -- he's the one who signed the letters.

Q.  So Jim DeTrude authorized.  You actually sent Jim DeTrude the letters to sign.

Correct?          5:53:20

A.  I'm sure -- yes.  I'm thinking at one point I -- I was asked to forward him the letters to sign. Yes.          5:53:28

Q.  So you had reviewed each of those letters of June 4th, 2020 and sent them to Mr. Jim DeTrude to sign.

Correct?

MR. FARLEY:  Objection to form.          5:53:41

THE WITNESS:  I did send him letters to sign. Yes.

BY MS. FOLEY:

Q.  And did you know what was in each of the letters that you sent to Mr. DeTrude to sign?          5:54:03

A.  Yes.

Q.  On or -- you know, before June 4th that were to go out to each of the employees who were displaced with jobs or not.

A.  Yes.          5:54:14

Q.  And so are you saying Jim DeTrude had the

Page 240

ultimate responsibility for the decisions of who was offered a job and who was not offered a job?

A.  He had the ultimate authority to approve or disapprove.          5:54:41

Q.  And did Jim DeTrude actually approve the decisions that were made regarding who to offer jobs to with transfers and who not to offer jobs to with the June 4th letters?          5:55:03

A.  Are you asking whether he was involved in each one of those --

Q.  I said --

A.  -- letters?

Q.  -- did he -- I said did he have the ultimate authority.          5:55:12

A.  He was the one to approve or disapprove the letters as proposed.

Q.  And did Jim DeTrude have the authority to issue the termination letters that were issued in August of 2020?          5:55:31

A.  I don't know who would've issued the letters in August of 2020.  I was very involved with him up to June 4th.  But I'm not apprised of how Jim and HR would've interacted leading up to final dates of employment.          5:55:58

Q.  Did you see any of the paperwork that was

www.InDemandReporting.com                    (773) 239-6008

Page 241

issued in August of 2020 to the employees who were terminated?

A. I've seen the -- some examples appear in -- in preparation for deposition. But at the time, I don't recall seeing any of it. No.     5:56:23

Q. Did you ask or get involved in whether any of the displaced employees had secured employment at Nissan or NMAC?

A. I did not necessarily ask, but I was made aware by Ms. Dessaw as we were nearing the end of the time period for them to find jobs, whether any of them had found anything or not.     5:57:02

Q. Okay. You -- you indicated that Dan Pauken was no longer at Dallas in that job. Is he still with Nissan? Or NMAC?     5:57:14

A. I don't know.

Q. But you say he's no longer in that Dallas job.
Correct?

A. I believe he's no longer in the sales role. Correct. I'm -- I'm pretty sure he's no longer with NMAC, but I can't say that for a hundred percent.     5:57:33

Q. Do you know who replaced him that Dallas service center?

A. No.

Page 242

Q. Okay. Do you know who replaced Ray Razo when he was terminated?     5:57:55

A. Not off the top of my head. I do know that the new RFSM, who was Joelle Zarfl -- Z as in zebra, A as in alpha, R as in red, F as in Frank, L as in Larry -- had hired someone in that district.     5:58:21

But off the top of my head, I don't know who that person is.

Q. Do you know who replaced Tip Joyce?

A. I believe John Leman. I don't --     5:58:46

Q. How do you spell -- how do you spell Leman?

A. I think it's L-E-M-A-N. When Tip retired, I believe that he was hired.     5:58:58

Q. When did Tip leave?

A. I don't remember.

Q. And John Leman. Do you know his approximate age?     5:59:06

A. I do not.

Q. When Ray Razo left, did -- did the accounts or dealers that he had that were Matt Stewart's go to Simeon Taskov?

A. Say that again?     5:59:25

Q. When Ray Razo left NMAC --

A. Yeah.

Q. -- who got his accounts? Do you know?     5:59:33

Page 243

A. Oh. Well, that's the same question you just asked me. I don't know who replaced him in that role.     5:59:38

Q. Well, it may have been someone else in the meantime. Do you know?

A. I don't.

Q. Okay. How many FSMs have been hired by NMAC since August of 2020?     6:00:00

A. I don't know.

Q. Have you hired FSMs? You've -- you've mentioned two, one that replaced Ray Razo and one that replaced Tip Joyce, both in the Midwest region.     6:00:14

And someone that replaced Dan Pauken, another in the Dallas region. Have you -- has NMAC hired any other FSMs since 2020?

A. Have we hired some? Yes. How many, I don't know.     6:00:31

Q. Do you know the names of any of the FSMs who have been hired since August of 2020?

A. I gave you one.

Q. Pardon?     6:00:44

A. I gave you one. John Leman.

Q. Right.

A. A gentleman by the name of Derek out in the Bay Area. I can't remember his last name. I don't know whether Dan Pauken's replacement would've been an

Page 244

internal candidate or external.     6:01:02

It might be internal or external. Whether they were from NMAC or from another company. Yeah, John Leman up in Chicago. I know Ali Bokhari has left Detroit. But I'm not sure who replaced him.     6:01:25

Sorry. I'm just kind of mentally scanning through the map of the United States. Those are the ones I can recollect off the top of my head.     6:01:38

And I'm sure since I've left the sales job, they may have hired other folks as well.

Q. Anybody in the West district? Or West region?     6:01:47

A. Yeah. Derek, the one -- the gentleman I had mentioned earlier in the Bay Area, was hired in the West. I'm thinking through Southern -- Southern California.     6:02:02

I think that team is still the same. And he might be the only new face I can remember in California. Derek Hagan I think is his last name. H-A-J -- G-A-N. Hagan I think is the last name.     6:02:22

Q. Derek Hagan?

A. Yes.

Q. After August of 2020, did anyone from Nissan reach out to try to hire any of the displaced employees, Matt Stewart, Greg Leiter, Kiernan Monohan,

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com          (773) 239-6008

Page 245

Bill Dodson, who were trying to get a job with Nissan?    6:02:45

MR. FARLEY: Objection to form.

THE WITNESS: So after the August 4th date? Is that what you're asking? Or the --    6:02:49

BY MS. FOLEY:

Q. Yes.

A. -- August 3rd date?

Q. Yes.

A. Not that I know of.

Q. Did you ever reach out to any of those employees when there were openings?    6:03:01

A. Did I personally?

Q. Yes.

A. I --

MR. FARLEY: Objection to form.

Go ahead.    6:03:09

THE WITNESS: No, I did not.

BY MS. FOLEY:

Q. Did -- was there a point in time that NMAC or Nissan hired some people who had gone out on VSPs as contractors to come back in as FSMs?    6:03:27

MR. FARLEY: Objection to form.

THE WITNESS: Yes. I believe Diane Allen [sic]-- I think is her name. She retired very shortly after I hired on to NMAC. I believe we had her in

Page 246

California filling in for a vacant district.    6:03:47

BY MS. FOLEY:

Q. Anyone else who was a VSP who was brought back as a contractor as an FSM after August of 2020?

A. Not that I know of.    6:04:18

MS. FOLEY: May I take a quick break?

MR. FARLEY: Yeah, sure. Five okay?

MS. FOLEY: Pardon?

MR. FARLEY: Five minutes, ten minutes? What do you think?    6:05:11

MS. FOLEY: Yeah, just between those probably. Thank you. I just need to run to the restroom. Thank you.    6:05:16

THE RECORDER: Off the record at 5:26 p.m.

(Off the record.)

THE RECORDER: We are back on the record at 5:38 p.m.    6:05:26

BY MS. FOLEY:

Q. Mr. Ledieu, you're still under oath. Correct?

A. Yes.

Q. Okay. Thank you. Did you contact Henry Yu at any time before -- between June 4th and August 4th?    6:05:45

A. Sorry. Who was the name?

Q. Henry Yu.

Page 247

A. No. I -- I know a Henry. But no.    6:05:57

Q. Which Henry do you know?

A. I -- it -- I think we're talking about a guy who works in after sales maybe? That might be the --

Q. Okay.

A. -- guy, but I -- no, we -- I haven't talked to Henry in years.    6:06:08

Q. When's the last time you talked to Henry?

A. I don't know. I don't recall.    6:06:20

Q. Do you recall what you talked with Henry about when you last spoke with him?

MR. FARLEY: Objection to form.

THE WITNESS: No.    6:06:28

BY MS. FOLEY:

Q. Did you ever talk to Greg Ebb, E-B-B, in that time period, June 4 to August 2020?

A. No. Not that I recall.

Q. Do you know Greg Ebb?    6:06:49

A. Yes.

Q. How do you know Greg Ebb?

A. When I was the regional vice president for the Southeast region, Greg I believe was the regional either marketing senior manager or the senior manager in charge of after sales in Chicago.    6:07:05

Q. Do you -- have you had occasion to talk to

Page 248

Greg Ebb in the last four years?

MR. FARLEY: Objection to form.

THE WITNESS: Yeah, I'm sure I've run into him at annual meetings and stuff -- stuff like that.    6:07:22

BY MS. FOLEY:

Q. Have you had any phone conversations or emails with Greg Ebb?

A. (Unintelligible response)

Q. Pardon?

A. Not that I recall. No.

Q. What -- what's Greg Ebb's job?    6:07:44

A. I don't know currently.

Q. Do you know what his job was in the time period of 2020?

A. It was one of two jobs. Either he was the regional marketing senior manager or the regional after sales manager, one of the two. Likely.    6:08:08

BY MS. FOLEY:

Q. I'm going to mark the next exhibit, which is -- well, I'm going to pull up 3407 again, which we marked as Exhibit 16. And we were looking at this document and going through which dealers were transferred to the new FSMs.

Do you recall that?    6:08:51

A. Yes.

Page 249

Q. Okay. And you indicated you did not know when this was -- when this document happened or if this was the final list.

Correct?                    6:09:05

A. That's correct.

Q. Okay. I'm going to show you an email that was sent as the transmittal email with this document. It is a document we'll mark as Exhibit 17. It's 3405 to 3406.                    6:09:25

(Exhibit No. 17 marked for identification.)

BY MS. FOLEY:

Q. And it is from Sean Hankins --

A. Sean Hankins. Yeah.                    6:09:35

Q. Hankins? Dated July 28, 2020, regarding the update region alignment master list. Would the region alignment master list be a final list?                    6:09:53

A. Whether it was a final list on July 28th, I don't know. But it would be a master list that has all the dealer codes in it. That's probably why he's calling it that.                    6:10:07

But whether it was the final list, I don't know.

Q. Okay. Where it says "To NMAC RFSMs/AOMs," would you be included in that distribution list?                    6:10:21

A. Would I be included in that? I don't know if

Page 250

I -- if I would've been on that distribution list.

Q. Would Sean Hankins have sent you this list as well?                    6:10:36

A. I don't recall.

Q. Okay. And it indicates down below that the yellow highlights are the changes from old to new.

Do you see that?                    6:10:55

A. Yes.

Q. And that he has deleted dealers that have gone out of business and new dealers that have come in. And -- so as of July 27, 2020, Exhibit 16 was the master list.

Correct?                    6:11:26

MR. FARLEY: Objection to form.

THE WITNESS: That's what Mr. Hankins is saying in this note. Yes.                    6:11:32

BY MS. FOLEY:

Q. Okay. Do you have any reason to dispute Mr. Hankins's representation that this is the master list of dealers and their assignments to FSMs?                    6:11:52

A. Mr. Hankins was pretty buttoned-up, so I wouldn't be surprised if this information as of July 28th would've been accurate as to the dealers listed in this list.                    6:12:08

Q. So you would trust that his representation is

Page 251

true.

Correct?

MR. FARLEY: Objection to form.                    6:12:15

THE WITNESS: I would trust Mr. Hankins. Yes.

BY MS. FOLEY:

Q. Okay. And then I'm going to mark as the next exhibit 7 -- 18.

MS. FOLEY: Right?                    6:12:33

MS. DAVENPORT: Yes.

(Exhibit No. 18 marked for identification.)

BY MS. FOLEY:

Q. Bates 4512. And it is a letter that was sent to Mr. Matthew Stewart August 3rd, 2020. And it has a Bates number of 4512.

Do you see that?                    6:13:06

A. Yes.

Q. Was August 3rd or August 4th -- I think some -- there -- it was reissued. Did you know anything about that? It was reissued on August 4th?                    6:13:19

A. I did not.

Q. Okay. You -- were you aware that letters were sent out to the employees who were being terminated?                    6:13:33

A. Other than in preparation of this deposition,

Page 252

no, I was not made aware.

Q. Okay. And question here. When it says "voluntary separation," Mr. Stewart did not ask to resign or separate from Nissan, did he?                    6:13:56

A. Can you say that again?

Q. Did Matthew Stewart voluntarily say he wanted to resign or be terminated from Nissan?                    6:14:15

A. Not to me he didn't.

Q. Okay. I'm just -- it just says it's a voluntary agreement. So I'm clarifying that you didn't understand that his termination was of a voluntary nature.

Correct?                    6:14:34

A. I didn't create this document. So I really can't speak to the nature of it.

Q. Okay. I'm just asking you. It wasn't your understanding that he volunteered to separate from Nissan.

Correct?                    6:14:52

A. No. His position was eliminated.

Q. And he was not offered any other jobs by Nissan.

Correct?                    6:15:05

A. That's correct.

Q. Okay. And in this letter, if we go to the

www.InDemandReporting.com                    (773) 239-6008

Page 253

Exhibit A, it says that these are the people who are affected and eligible for the separation.        6:15:39

And so it indicates that there are one, two, three, four, five, six, seven, eight people, as we had discussed before.

Correct?

A.  That's what this document says.  Yes.        6:15:52

Q.  But you testified before that there were eight people who were terminated.

Correct?

A.  Yeah.  I mean, we believe that -- yes eight as well.  One was terminated.  One decided not to accept his offer.        6:16:09

So if you want to lump that in, yes, that's what we worked -- worked through.

Q.  Okay.  And the one person who didn't accept his offer of the job in Dallas was the financial services manager developmental, who was Matt Stocking.

Correct?  It --        6:16:26

A.  I -- again, I didn't create this document, so I don't know whose names are assigned to any one of these numbers.

Q.  Was that what Matt Stocking's position was?        6:16:35

A.  I believe so.  Yes.

Q.  Okay.  So the other names before that, the

Page 254

commercial FSM and the financial service manager positions, the first seven names, are the individuals who did not voluntarily terminate.

Correct?        6:17:00

A.  Again, not knowing the names associated with the jobs, I -- I -- were there eight?  We just said yes.  Are they these eight?  I -- I don't know.        6:17:13

Q.  Do you have any reason to believe that -- you had mentioned there was a commercial FSM that was Mr. Wesley Oda.

Correct?

A.  Yes.        6:17:26

Q.  And the other people who were terminated were all FSMs.

Correct?

A.  Yes.

Q.  And you see their ages listed here, at 49, 53, 47, 56, 54, 50, and 51?        6:17:48

A.  Yes.

Q.  They're all between the ages of 49 and 56?

Is that correct?

A.  Well, I -- what I --        6:18:01

Q.  Oh, 47 --

A.  -- read was 34 and 56.

Right?

Page 255

Q.  No.  I'm saying of the ones who were not voluntarily terminating.  They were not offered positions.        6:18:15

The ones that were not offered positions are between the ages of 47 and 56.

Correct?

A.  Well, what I don't know is whether Mr. Stocking's termination was considered voluntary or not, so I can't say whether this range you're suggesting is 49 to 56 -- or 47 to 56 or whether it's 34 to 56.  I can't speak to that.        6:18:38

Q.  For the people where it indicates eligible for separation program, do you have any reason to dispute that this document is a true and correct copy of the Exhibit A that was provided to Mr. Matt Stewart with his termination paperwork?        6:18:59

MR. FARLEY:  Objection to form.

THE WITNESS:  So you're asking me whether I know that this -- including all this information was sent to Mr. Stewart as a letter with the ages included?        6:19:12

BY MS. FOLEY:

Q.  Do you have any information as to whether Nissan sent this termination letter to Mr. Stewart?

A.  Again, no, I don't.        6:19:26

Q.  Okay.  So you are obviously not the person

Page 256

most knowledgeable regarding Mr. Stewart's termination paperwork.

Correct?        6:19:36

MR. FARLEY:  Object to form.

THE WITNESS:  I would not be familiar with the paperwork for Mr. Stewart's termination.  Correct.        6:19:42

BY MS. FOLEY:

Q.  And you have no knowledge regarding his termination paperwork.

A.  Other than preparation for deposition, I do not.        6:19:50

Q.  Okay.  We -- I'm going to wrap the PMK portion.  We will take a continued depo of you as an individual.        6:20:00

MR. FARLEY:  Well, this -- this deposition is concluded.  He'll read and sign.  And then if you have a separate deposition notice, we'll deal with that later.        6:20:09

MS. FOLEY:  I will -- yeah, I will continue PMK of Ms. Dessaw.

MR. FARLEY:  Right.  Sorry.  You're right.  Thank you.        6:20:16

All right.  And you -- Marianna [sic], you have him -- you heard me say he'll read and sign?

THE RECORDER:  Yes.        6:20:23

64 (Pages 253 to 256)

www.InDemandReporting.com                    (773) 239-6008

Page 257

MR. FARLEY:  Okay.  Great.

All right.  Thank you you all very much.

Have a good rest of your day or evening.          6:20:29

MS. FOLEY:  Okay.  Just a moment with the court reporter.  Can you give us your email so we can send to you --          6:20:35

MS. DAVENPORT:  Let's go off the record for that.

MS. FOLEY:  Okay.  Yeah --

THE RECORDER:  Let me just get off the record.

Off the record at 5:53 p.m.

(Off the record.)

Page 258

CERTIFICATION

I, Marina A. Stokes, do hereby certify that the foregoing transcript of said deposition is a true, complete and correct report of the entire testimony so given by said witness, together with such other matters and things as counsel for the parties present at the taking of said deposition desire to have appear of record.

I further certify that on May 8, 2024 said witness, ERIC THOMPSON LEDIEU was first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then was recorded by audio/visual recording device, by me in the presence of said witness and thereafter transcribed into typewriting under my direction and control.

I further certify that I am not counsel for, nor attorney for any of the parties to the aforesaid cause, nor am I related to any of the parties to the aforesaid cause, nor am I interested in any manner in the said cause or in its outcome.

I further certify that the signature to the foregoing deposition was reserved by the witness.

Page 259

IN TESTIMONY WHEREOF:  I have hereunto set

my hand and affixed my notarial seal:

Marina A. Stokes

May 24, 2024

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

100

This is to certify that I, Eric Thomson Ledieu, have read the transcript of my deposition taken on 5/8/24, in the foregoing cause, and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

DocuSigned by:

*Eric Thomson Ledieu*

0E9419A05BBE431...                      _____

Eric Thomson Ledieu

No errata sheets submitted (Please initial) _____

Number of errata sheets submitted___1_____ (pgs.)

Subscribed and sworn to before me

this_____day of _____ 2024.

_____

Notary Public

DocuSign Envelope ID: 9156F93C-51E4-4F59-8F1E-7AAE7315FC4B

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 48 | 5 | "recommendation reorganization was made, it was known" to "recommendation for the reorganization was made, it was known" | Misheard/missing a word |
| 91 | 6 | "That just a way of asking the same thing" to "That is just a way of asking the same thing." | Misheard/missing a word |
| 128 | 25 | "I think it would how much a dealer does for" to "I think it would be how much a dealer does for" | Misheard/missing a word |
| 181 | 8-9 | "Yeah, it says that could be a benefit. It's the only reason for doing it." to "Yeah, it says that could be a benefit. It's not the only reason for doing it." | Misheard/missing a word |
| 183 | 15 | "Stocking and I'm not taking the job. Mr. Hernandez" to "Stocking said I'm not taking the job. Mr. Hernandez" | Misheard/wrong word |
| 210 | 11-12 | "Yes. However, if you continue down the daisy chain, you can see that Mr. - or that - sorry, that" to "Yes. However, if you continue down, you can see that Mr. - or that - sorry, that" | Misheard/word added |
| 221 | 25 | "Stewart's accounts. I think his name is also Riccardo" to "Stewart's accounts. I think his name is also Ricardo" | Misspelling |
| 233 | 13 | "Do I have authority to hire. I can influence" to "Do I have authority to hire? I can influence" | Incorrect punctuation |
| 61 | 16 | Burns to Byrnes | Misspelling |
| 25 | 1, 3, 10, 17, 23 | Burns to Byrnes | Misspelling |
| 26 | 2 | Burns to Byrnes | Misspelling |

I, the deponent, had requested a review prior to the completion of my deposition which was recorded on

_____May 8, 2024_____ (date)

This is my Statement listing changes and my reasons for making them

DocuSigned by:

*Eric Thomson Ledieu*

0E9419A05BBE431...

June 24, 2024 | 5:07 PM EDT

_____

Witness Signature                                    Date

www.InDemandReporting.com                    (773) 239-6008

Page 260

**A**

a.m 4:3 30:24
  31:2 164:6
  165:18
ABC 129:23
  130:14 131:15
  139:10,12,15
  139:16,19,23
  140:8,25 141:7
  141:14 146:23
  151:24 153:1
  157:16,18
abide 10:10
ability 46:25
  62:21 94:13
  139:3
able 17:12,14
  39:9,12 47:1
  60:22 62:7,14
  63:20 69:15
  71:12 72:5
  73:13 118:20
  120:18 122:5
  206:22 211:19
  221:22 226:12
Absolutely
  134:23
accept 79:13
  80:10,22 84:3
  87:23 89:7
  253:13,16
Acceptance 1:11
  1:17 4:7 93:6
accepted 49:22
  49:23 87:21
  88:23 110:20
access 71:5,6,7
  71:12 74:23
  218:16,19,20
accomplished
  43:9
account 158:8
  216:22 217:2
  219:13 222:12
  223:14,18
accountability
  46:3

accounts 106:12
  144:1,12,25
  208:10 209:5
  211:14 212:10
  212:19 220:11
  220:17,22
  221:25 226:6
  242:19,25
accurate 107:25
  154:9 207:3,7
  218:2 250:23
acronym 82:13
actively 50:10
actual 25:16
  45:24 46:15
  85:5 92:21
  102:25 171:11
  232:14
Adam 66:10,13
  226:23 227:5
  227:10,11,25
  228:7
add 29:10
added 30:19
  121:11 125:9
  129:20,20
  160:24
adding 39:13
  121:7
addition 21:21
additional
  104:18 219:7
address 71:11
  126:15 128:1
adjoining
  158:12
adjustments
  203:24
administration
  9:8,17
administrative
  25:4,22 51:23
  52:5,15
advance 53:14
  53:17 114:1
  167:15
advanced 9:14

affixed 259:2
aforesaid
  258:12,18,20
African-Amer...
  73:12,22
after-sales 12:2
age 75:2,7
  109:13,24
  110:1,2 221:1
  221:6 225:15
  242:17
ages 254:17,20
  255:5,20
ago 5:23 103:2
agree 219:21
agreement 4:3
  53:3,4 252:10
Ah 129:14
ahead 5:7 18:19
  19:12 33:23
  57:19 67:22
  73:19 75:10
  78:9 90:9
  127:14 137:24
  166:25 193:9
  228:16 245:16
Ali 244:4
align 28:14 55:3
  193:1
alignment 28:20
  41:23 134:12
  249:15,16
all-day 52:20,23
Allen 245:23
alliance 106:16
allow 196:24
allowed 74:10
alluded 228:13
alpha 242:5
already-stand...
  52:1
Amato 223:24
America 1:10,16

4:6 5:3 8:12
  54:17,19 56:22
  57:8 58:7
  93:12 95:3
  99:2 192:10
America/NM...
  95:6
amount 35:12
  61:17 136:15
  136:16 158:8
  166:10 174:11
  174:12,23
  175:24 197:8
analysis 27:4
  33:2 34:3 36:9
  38:5,21 45:1,2
  45:5,13,17,18
  48:14 54:5
  132:13 157:17
  157:19 163:5,6
  163:9,16
  213:14,24
  214:3 215:25
analyst 14:8
  120:24,25
  121:2 162:7,13
  162:20
analytical 39:13
  119:24 126:18
  162:11
analytics 21:8
  21:15 22:15
  24:12
and/or 18:3 30:5
  69:9 75:7
  137:3
Angeles 64:25
announcement
  42:10 54:25
  55:1 112:5
announcements
  49:6 112:11
announcing
  55:4 89:25
  112:16
annual 248:4
answer 7:16

8:14,24 12:19
  18:8,19,23
  19:20,24 20:4
  20:5,9 21:6,13
  47:23 52:4
  54:1 57:19
  58:25 63:14,20
  68:10 70:11
  73:20 74:25
  75:16 82:24
  83:6 85:20
  90:9 113:6
  118:20 122:5
  122:13 169:5
  182:25 186:7
  188:19,21
  196:21,24,25
  202:6 221:14
  238:21
answered 115:7
  179:14 180:6,7
answering 83:7
  83:13
answers 88:10
  149:3 154:23
Anybody 244:11
anymore 138:19
  176:5
anyone's 225:15
anything's 52:3
AOM 79:2
  112:25 113:7
  126:16 146:16
  151:18 161:4
AOM/Manager
  154:1
AOMs 113:21
  114:1 197:13
  197:20 198:5
  231:2
AONs 88:22
Apologies 113:7
apologize 14:9
  197:19 228:7
appear 199:19
  241:3 258:7
appearances 2:1

www.InDemandReporting.com (773) 239-6008

Page 261

4:23
appears 28:2
164:4 168:5
199:25 220:10
appendix
195:17
Appleton
223:19
application 7:15
applications
31:16
applied 85:18
96:8,11 98:7
98:11 107:17
107:21,23
108:2,10,24
applies 107:18
apply 62:4,8
98:9 109:3
applying 62:10
apprised 237:8
240:22
appropriate
35:19
approval 46:7
49:2 54:12,13
54:15 166:7,9
166:10,14,17
166:22 175:12
175:18 193:6
195:16,16
233:23
approve 166:4
175:8 237:14
237:15 240:3,5
240:15
approved 48:19
48:22,23
118:19 237:12
approving
175:21
approximate
242:16
April 12:15 49:7
59:3 186:20
area 26:21 33:12
39:20 79:23

80:25 81:2
88:19 123:14
129:11 132:6
158:9 212:16
243:24 244:14
areas 32:2 43:3
129:17
argue 66:6
arms 162:9
arranged 24:22
26:1,5
arrived 106:11
Ashley 2:11 4:24
216:10
asked 21:19
23:14,16 53:6
74:14 121:1
137:9 150:16
150:17 158:19
179:14 180:6
184:5 185:3,7
185:23 234:5
239:8 243:2
asking 21:4 37:2
47:23 48:15
49:5 53:15
60:3,5,8 66:24
90:22 91:6
100:7 127:6,23
139:20,21
143:12 145:5
145:13 202:7
204:13 213:20
217:24 220:21
221:13 238:12
240:9 245:4
252:16 255:18
aspect 128:24
140:19
aspirations
229:20
assert 18:15
assign 141:14
assigned 43:20
43:24 44:2,6,7
44:11,13,19,23
130:15 132:14

132:24 133:25
162:12 216:4,5
219:3,8,13,15
219:17 253:21
assigning 43:16
132:12
assignment
14:19 219:23
assignments
119:12 134:4
138:23 172:24
250:20
assigns 172:17
assist 97:2
assistant 51:24
52:5
associated
133:21 254:5
assume 8:14
12:23 30:19
67:11 91:7
95:16 116:9
128:14 148:9
177:11 208:7
225:5
assumed 177:10
Assuming
155:17 160:2
160:16
assumption 46:2
89:24
attached 126:6
164:5 219:2
attend 55:5
116:4 165:10
attendance
180:8
attended 55:11
115:14,25
116:1 165:13
165:15
attending 55:16
116:6 186:24
187:1,3
attention 196:18
attorney 2:6
258:18

attorney-client
202:5
attorneys 4:22
audible 6:8
113:2 118:13
audience 121:10
audio/visual
258:13
August 12:22
79:7 89:13
91:2,4 93:12
93:19 95:1,6
96:2,5,9 98:3
102:4,8 105:1
200:7,8 208:25
218:14 240:19
240:21 241:1
243:7,18
244:23 245:3,7
246:4,23
247:16 251:14
251:18,18,20
author 77:2
authority 45:7
166:4,17
180:10 233:11
233:13,16,17
233:24 234:4
240:3,14,17
authorization
238:25
authorize
238:20
authorized
238:17,22
239:1,4
auto 10:9
available 39:6
69:14 75:24
76:8 81:11,18
96:24 100:5
111:1,6,8
178:1 218:15
Avenue 2:13
averaging 32:8
aware 28:8
55:13 56:2

58:5,9,14,16
60:15 95:4
96:13 98:9,11
98:17,19 99:21
106:15 119:5
177:14,15
189:1 214:6
236:4 241:10
251:22 252:1

B

B 105:11 131:19
148:7,7 170:10
193:1
BA 9:15,15
bachelor's 9:7
back 15:11,11
30:10 31:1
46:1,15 58:20
67:14 86:17
88:20 91:10,24
92:7 124:15
138:19 158:17
159:9 179:4,17
193:15 194:12
206:1,5 219:4
245:21 246:4
246:16
backfill 230:2
backfilled 162:2
backfills 230:5
231:22
background
78:24
backs 173:20
backup 195:19
bad 162:17
Bailey 13:9
banks 26:17
barely 183:16
196:7
base 177:12
based 31:13,14
33:15 35:11
46:25 47:4
54:15 63:6
80:5 121:10

131:10,11
132:1 136:11
136:13 137:4
140:12,15,18
140:20,22
141:5,8 171:20
177:10
**basic** 103:25
238:14
**basics** 86:16
**basis** 193:4
**Bates** 77:3,4,7
78:2 79:17
80:16,17 83:22
85:24 87:16
88:7 89:1,20
92:14 93:25
95:10 97:9
100:18 102:15
103:18,20
111:17,22
112:7 116:24
121:22 125:10
125:13 146:15
152:4,18
164:20 167:19
180:19 182:23
194:20 198:20
206:19 215:19
251:13,15
**Bay** 212:16
243:24 244:14
**Beach** 2:14
**Beck** 13:14
21:17 22:16
23:12 25:19
36:10 78:7
79:8 127:11
172:11 173:6
**beginning** 28:5
31:13 67:9
121:22
**behalf** 4:12
47:25
**believe** 11:7
34:9 43:6
44:24 46:18

55:7,11 56:24
58:16 61:2
67:15,24 68:1
68:24 69:25
72:1,11,18
77:13 81:3,3
87:14 88:21
89:10,17 90:17
91:3,7,12
92:25 93:2,15
94:12 95:21
97:24 99:20
100:7 102:6,24
104:11 114:13
114:13 122:10
131:9 139:17
151:17 154:8
161:25 166:14
166:16 184:18
203:7 208:15
216:25 225:8
233:4 241:20
242:10,13
245:23,25
247:22 253:11
253:24 254:8
**believes** 78:23
**bell** 190:2
**bells** 202:18
**belong** 200:22
**bench** 180:24
**Bend** 224:5
**benefit** 175:25
181:7,18
**benefits** 109:25
110:3
**Bergstrom**
222:18 223:14
223:19
**best** 6:13 7:24
18:23,23 29:22
49:14 131:21
131:22 143:24
158:10 162:15
**better** 19:22
39:3,9 55:25
119:2,9 122:13

128:2
**beyond** 9:14,21
129:4 174:13
**big** 28:12 66:20
66:24 68:5
112:16 187:17
194:14 232:10
**bigger** 39:4 67:7
67:8 176:8
**biggest** 26:8
**Bill** 92:14,16
117:11 159:13
190:7 226:5
227:11 234:24
245:1
**Bill's** 89:10
**Bilotto** 150:9
**birth** 74:20
**bit** 64:22 151:9
160:21 169:25
200:14
**bleeding** 186:18
**blend** 56:14
**blocking** 17:11
**blocks** 112:16
**blow** 169:24
197:25
**Bokhari** 244:4
**Boland** 89:19
90:3,15,18
91:1,4 106:20
106:23,23
108:23 172:24
235:6
**Boland's** 92:13
**book** 24:25 25:4
25:5
**bookings** 38:9
140:23
**booklet** 6:12,23
6:24
**boss** 51:17
111:12 203:8
**bottom** 33:10
89:21 104:2
109:8 118:8
130:13 157:24

157:24 168:14
168:17 172:17
174:19 183:24
183:25 186:6
188:15,24
189:12 190:24
201:12
**Boucher** 223:4
223:18
**bounced** 68:14
**boundaries**
115:9 119:11
128:2 129:10
129:13 132:20
213:3
**boundary**
115:11 213:7
**box** 162:16
**boxes** 49:13
151:5
**Brad** 89:19 90:3
90:15,18 91:1
91:4 92:13
106:20 108:23
235:6
**brand** 193:3
**break** 30:22
83:16 91:16
152:12 158:22
159:1 198:14
198:15 205:25
246:6
**breaks** 8:23
**Brentwood** 16:3
**bribery** 11:2
**briefly** 139:2
**bring** 119:16
163:7 193:15
196:18
**broadened**
21:10
**brought** 21:11
21:18 22:6
40:21,22 41:2
41:3,7,22 42:5
48:9 106:9
134:10 246:3

**BS** 9:15,16,17
**BSBA** 9:18
**building** 25:15
82:8,15 85:7
**built** 33:9
**bunch** 195:18
**burning** 34:21
**Burns** 61:16
225:1,3,10,17
225:23
**Burns's** 226:2
**business** 9:7,15
9:17,23 26:17
35:2 46:14
126:20 128:4
128:19 171:4
192:9 250:10
**Business/Ratios**
128:18
**businesses**
106:13
**buttoned-up**
250:21
**by-** 1:21

——————————
C
——————————
**C** 106:24 131:20
132:4,5,8
170:16 233:3
**C-O-L-L-E-R...**
54:23
**calculations**
168:22
**calendar** 12:24
22:22 23:9
165:14,18
**calendars** 25:14
52:16
**calibration**
72:19,20,22,24
73:4,7 185:18
185:18 186:15
186:24 187:1,6
187:9,12,15
189:8 190:18
201:9,10,13
**calibration's**

186:23
**California** 2:14
13:12 24:21
29:1 214:16
244:16,19
246:1
**call** 15:3,10 24:3
24:11 28:10
32:17 34:11
43:4 56:4 65:5
65:8 67:7 80:7
82:12,12 96:23
97:1 116:10,16
119:9 128:3
135:17 137:16
147:13 158:10
232:15,20,21
**called** 8:6 15:21
77:22 80:1
119:14 137:19
153:3 159:19
161:6 181:13
186:3 198:21
207:23 208:3
209:13 210:14
214:11 232:18
**calling** 44:25
106:12 119:22
158:16 249:20
**calls** 99:12
114:10,12
202:4
**Camille** 41:10
98:14 114:19
**cancel** 156:5
**candidate** 65:22
244:1
**candidates**
69:14
**capacity** 10:18
10:19
**capsulized**
178:19 179:3
**car** 10:3 45:16
129:5
**career** 10:8,12
10:15 63:2,6

65:4 67:7
141:10 154:14
154:15 187:2
229:20
**Carolina** 35:24
**Carpenter**
162:1,2,12
**carry** 166:11
**cars** 14:25 31:18
31:19 32:10,11
**case** 1:8 4:7 59:2
62:12 65:3
125:11 147:21
160:9 218:9
**catalyst** 119:13
**catch** 25:25
**categories** 17:1
17:5
**category** 17:18
18:6,10 36:4
77:1,23,24
78:3 165:12
**Caucasian**
73:22
**cause** 258:12,19
258:20,21
**CDP** 153:3
154:13
**cells** 212:1
**center** 82:14
86:18 161:3
164:9 241:24
**centered** 180:3
**central** 13:11
29:3 68:11,13
68:18 70:7,12
79:5 81:4
88:11 201:5
**CEO** 45:9
195:15
**certain** 10:5
15:23 26:16
46:25 74:14,15
98:10 99:22
100:4,8 109:13
109:24,24
111:10 132:23

132:24 135:2,6
137:1,4 158:11
175:24 183:16
**CERTIFICA...**
258:1
**certify** 258:2,9
258:17,23
**chain** 210:12
**challenging**
191:5
**Chambers** 41:9
125:18,22
126:25 164:3
164:24 178:10
179:11,21
**chance** 196:12
228:4
**change** 122:11
162:6 182:15
193:19 194:10
**changed** 158:14
203:20
**changes** 30:9
113:1 200:20
250:6
**changing** 126:19
183:11,20
**charge** 247:24
**chart** 150:15
**check** 89:18
**Chicago** 1:25
2:22 4:12
24:19 244:4
247:24
**chief** 14:24
15:22
**choose** 157:23
**chose** 34:7 35:22
**Ciaramitaro**
88:21 113:11
184:12
**Cicchini** 88:21
113:8,12
184:12
**circumstance**
151:10,10
**city** 64:20,25

66:11 67:18,25
67:25 68:17
69:5,10,25
70:3,6 76:21
88:9,11 118:2
130:8 147:8
172:8 214:17
214:22
**claiming** 236:7
**clarification**
88:2,3
**clarify** 152:14
**clarifying**
252:10
**Clay** 2:5,6 4:25
**clean** 6:9
**clear** 55:23
60:12 115:21
142:14
**clearer** 200:14
**clearly** 62:12
191:24
**close** 49:10
104:17 127:20
**closing** 28:9
119:7 128:16
129:15
**CMM** 15:21
**code** 8:7 76:21
208:21,21
**codes** 138:6,23
249:19
**coding** 138:22
**collaboration**
72:16
**collections**
229:22
**college** 9:4
**Colleran** 54:22
122:2 125:4
191:15,20,22
192:9,23
**Colleran's** 54:23
**Colorado** 66:4
**Columbus**
182:13,13
**column** 105:11

106:24 107:16
110:18 112:22
147:4,13,15
148:7,11,23
149:1,8,15
150:5 151:18
151:19 152:7
153:6,8,8,22
153:25 154:1,4
154:12 159:19
170:10,16
171:2,11,16,24
173:10,23
174:19 177:7
177:11 204:1
217:20
**columns** 27:22
150:14 151:17
152:14 170:4,9
170:10 173:9
202:3,8 217:21
**come** 15:11,11
24:19,20,20
36:12 37:3
51:22,23,24
56:3 128:7
139:11 184:2
202:20 219:4
245:21 250:10
**comes** 142:15
206:23
**coming** 15:9
28:12
**comment** 11:10
140:11 186:6
**commercial**
106:7,8,12
171:4 254:1,9
**committee**
41:18 47:25
**committees**
189:11
**common** 175:23
**communicate**
23:22,24 24:1
112:3 189:11
**communicated**

| | | | | |
|---|---|---|---|---|
| **communication** 24:9 94:10 | 126:15 | 202:16 | 81:7,8 82:6,10 | 178:22 179:13 |
| **communicatio...** 99:9,15 | **conduct** 228:12 228:17 | **context** 217:21 | 83:4 84:16 | 179:24 180:4 |
| **community** 118:18 | **conducted** 27:3 | **continue** 15:5,7 210:11 256:19 | 86:1 87:19 | 181:4,11 182:1 |
| **companies** 10:13 | **conference** 23:3 24:3,11 51:12 | **continued** 208:25 256:13 | 88:14,24 90:6 | 182:5,10 183:4 |
| **company** 10:3 30:16 47:4 | 116:10,16 | **continuing** 211:25 | 92:19 93:9,20 | 185:13 187:22 |
| 53:22 56:12 | **confirm** 148:10 168:9 169:8 | **contract** 32:13 129:6 | 94:19,20 | 188:2,8,10,17 |
| 71:1,9,25 72:2 | **confirmed** 169:13,19 | **contracted** 29:14 | 101:15,22,23 | 189:5 191:17 |
| 73:11 78:23 | **conflict** 11:1,6 | **contraction** 29:16 | 102:1,2,5,9,16 | 192:18,20 |
| 89:9 93:16 | **congratulations** 229:25 | **contractions** 30:4 | 102:23 104:20 | 193:20 194:23 |
| 96:15 98:6,8 98:12,21 | **consider** 37:10 37:23 38:1 | **contractor** 246:4 | 104:24 105:7,9 | 195:9 204:24 |
| 112:17 131:24 | 191:5 | **contractors** 245:21 | 105:13,18,21 | 206:16 207:11 |
| 140:13 166:4 | **consideration** 81:12 237:9 | **control** 258:16 | 105:24 106:2,5 | 208:5,11,14,20 |
| 170:24 218:20 | **considered** 26:23 32:15 | **convened** 4:4 | 106:22 107:1,8 | 209:2,6,16,19 |
| 218:21 244:3 | 61:4 64:14 | **conversation** 134:11,15 | 107:11,14 | 209:22 210:6 |
| **compensation** 224:20 | 66:1,10 145:16 | **conversations** 63:6 187:18 | 108:4,12 109:5 | 210:10,20,25 |
| **competing** 26:17 | 162:23 163:2 | 237:2 248:6 | 109:9 110:7,12 | 211:13,15 |
| **complete** 258:4 | 255:8 | **copy** 16:20 255:14 | 110:16,21 | 212:12,23 |
| **completed** 171:21 | **considering** 35:12 81:16,21 | **corner** 194:22 | 111:2 113:5,15 | 213:11 214:2 |
| **completes** 5:6 | **consisted** 127:8 | **corporate** 10:25 | 114:5 116:3 | 215:6,10 217:5 |
| **compliance** 10:10,16,16,23 | **consistent** 203:15 | **Corporation** 1:12,17 4:7 | 117:18 118:4,7 | 220:1,23 |
| **component** 131:14 | **consolidate** 39:1 | 93:6 | 124:20 125:19 | 221:11 222:14 |
| **components** 131:17 | **consolidated** 78:17 90:5,16 | **correct** 17:2 28:4 29:8,9,11 | 128:21 129:21 | 222:15,19,24 |
| **computer** 7:11 7:13,18 176:7 | 92:18,23 94:3 | 29:15,20 30:12 | 131:3 132:14 | 223:5,10,15,22 |
| **computers** 81:25 | 94:11 95:14,20 | 32:21 33:19 | 133:1,11 134:1 | 224:2,7,16 |
| **concept** 22:7 166:21 | 97:11 100:19 | 42:4,5 43:17 | 134:6 137:11 | 227:17 234:9 |
| **concluded** 256:16 | 101:21 192:19 | 43:21 44:3,12 | 141:2 142:22 | 234:10,17 |
| **concluding** 185:22 | **consolidation** 95:24 | 44:17 49:18 | 145:2,7,17,21 | 235:12,17,21 |
| **conclusion** 185:9,11 | **consumer** 82:9 82:21 83:18 | 57:10 63:24 | 146:1,4,7,9 | 236:1,16 238:4 |
| **conclusions** | **contact** 86:20 96:16,18 115:8 | 64:11 65:12 | 147:1,6 148:1 | 239:6,13 |
| | 246:22 | 69:7 73:15 | 148:2 149:12 | 241:19,21 |
| | **contained** 27:12 | 74:5,21 75:3 | 149:19 150:10 | 246:20 249:4,5 |
| | **content** 121:15 | 76:3,12 79:3 | 153:9,17,24 | 250:13 251:2 |
| | **contents** 103:24 | 79:10 80:6 | 154:2,6,9 | 252:13,19,23 |
| | | | 155:4,15 | 252:24 253:6 |
| | | | 156:24 157:7 | 253:10,19 |
| | | | 159:16,25 | 254:4,11,15,21 |
| | | | 160:6,14 | 255:6,14 256:3 |
| | | | 161:12 163:12 | 256:6 258:4 |
| | | | 167:16 168:7 | **correctly** 58:18 |
| | | | 168:20 169:3 | 212:24 |
| | | | 169:15,18 | **cost** 45:5,14,14 |
| | | | 170:17,21 | 45:15,15 163:8 |
| | | | 171:2,10,14,17 | 163:17 175:24 |
| | | | 172:9,15 173:1 | 175:25 179:22 |
| | | | 173:4,5,18 | 180:3 |
| | | | 174:3,8,11 | **costs** 177:11,12 |
| | | | 176:16,18 | 177:13 179:6 |

could've 25:10
51:22,23,24
52:1 63:12,14
139:5
counsel 5:3
58:16 142:10
144:3 199:11
215:23 258:6
258:17
count 119:6
144:22 146:6
146:12 190:5,5
193:18 194:6
country 13:5
32:25 34:10
38:10 106:17
116:11 147:23
201:1
counts 44:21
214:9
couple 6:7
116:14 151:7
230:10,24
course 73:21
175:23
court 1:1,23 4:8
4:11 6:9,18
198:15 257:5
covered 114:20
covering 214:16
214:19,21
COVID 51:10
create 109:15
252:14 253:20
created 48:11
67:19 81:9
106:10 156:3,8
156:14 170:11
171:22 172:13
172:23 177:5,6
178:13 199:2
204:8,14 205:3
205:3 206:20
207:6 216:15
creating 109:15
129:10,13
166:12,13

creation 77:2
207:3
credit 82:9,20
82:21 83:18
229:21
criteria 31:7,12
33:18,22 34:5
38:14 59:13,18
59:19 60:9,18
62:2 68:20
135:24 136:7,9
136:13
critical 31:12
CROSS 3:3
Cullum 48:23
54:7,11 73:1
163:8 164:3,25
166:24 167:12
167:15 168:1
169:2 178:7
179:11,21
195:8,11
Cullum's 180:8
current 10:2,18
12:4 15:23
26:14 71:17
72:3 74:10
117:6 118:2
162:17 174:10
205:13 208:16
currently 12:7
126:18 248:12
cut 33:25 37:1
129:19 157:2
179:1 181:24
CV 1:8

————
D
————
D16 212:1
daily 7:1,2
daisy 210:11
Dakota 130:11
Dallas 36:20
39:20 40:10
43:20,22 44:2
44:13 47:2
49:23 50:3,12

50:17 62:13,14
62:18,20 63:23
64:2,3,6 65:3,7
79:21 80:5
82:4,5,14
85:25 117:9,10
117:11 143:5
144:2,13 145:1
160:13 161:1
161:11 171:25
172:1,1,2,11
175:4 207:22
208:1 216:24
219:25 220:11
220:12 226:24
227:16 236:25
238:3 241:14
241:17,23
243:13 253:17
Dan 85:12
143:10 216:23
216:23,25
217:4,13 218:4
219:8,13,15,17
219:24 220:10
220:15,25
221:9,16,18
241:13 243:12
243:25
Darrow 223:9
224:4
data 26:3,6,12
26:18,22 27:21
71:19 75:6
76:18 111:5
120:25 137:20
138:6 139:11
140:20 141:5
146:2 150:20
157:21 168:19
186:5 203:1,17
215:11
database 71:5,7
71:13 137:19
202:20
databases 138:2
138:10

date 22:22 51:5
74:19 79:7
91:2 93:13
95:1,15 101:14
102:14 105:12
106:20 111:25
112:4 113:21
124:9 137:4,5
137:13 148:12
148:15 156:4
165:20 183:1
185:16,16,17
207:3 216:11
216:13 225:19
225:21 226:2
235:14 245:3,7
dated 89:20 95:9
124:8 153:8
198:24 249:14
dates 8:1 30:20
42:9 77:2
104:1 148:14
230:8 240:23
Davenport 2:11
4:25 77:19,22
88:2 103:8,13
111:17,19
116:20 144:16
170:6 198:25
206:14 251:10
257:7
David 13:8
day 26:9 32:13
32:14 34:21,22
40:5 52:24
115:21 122:23
122:23 126:8
126:22 129:13
132:11 133:8
192:14 257:3
days 25:12,16
32:12 126:14
Dayton 210:16
deal 56:6 256:17
dealer 27:22
32:1 34:7,8
37:21 43:1,1

44:21,23 76:21
128:17,25
136:22 138:6
138:22 142:16
142:17 144:22
146:6,12 158:3
181:13 193:18
194:6,13,14
214:9,14
216:15 219:15
219:17 222:22
249:19
dealers 26:14
32:17 34:10
36:5 39:3 40:4
43:8 44:1,5
56:1,5,10
60:19,23 61:6
61:14,17,20,25
65:5,8 67:8
94:21,22,24
106:14 119:2,9
128:3,5,19
132:7 134:25
135:2,7,24
136:5,6 137:20
141:3 143:5
144:13,21
145:9,11,15,16
145:23,25
146:11 194:2,2
207:21 209:14
209:21 210:4,8
213:22,23,23
214:1 215:25
216:3 219:2
242:20 248:22
250:9,10,20,23
dealership
26:20 31:13,18
31:21 34:12
35:20 129:1,5
130:3 136:23
138:23 222:18
222:23 223:4,8
223:9,13
dealerships

27:14,23 34:15 37:15 43:12,17 43:20,24 44:7 44:11,16 60:14 61:3 76:18 106:18 136:12 139:12,20 140:1,6,9 145:4 158:8 224:25

**dealt** 141:21,24 202:10

**deceptive** 10:20

**decide** 38:15 46:8 65:5

**decided** 28:17 31:25 33:20 46:22 49:15,21 49:24 52:2 69:9 134:23 136:24 137:2,5 181:24 183:2,8 235:13 253:12

**deciding** 37:21 62:3 162:23 163:2 191:7 213:15

**decision** 20:20 20:23 22:2 45:8,13 46:12 48:12,17 49:10 62:17 70:9,13 175:21 214:5 233:24

**decisions** 20:15 22:12 43:14 47:3,6 57:5 70:2 71:4 72:10 137:13 183:12 235:19 235:23 236:15 236:17,24 237:12 240:1,6

**deck** 125:7

**declined** 117:15

**Defendants** 1:13 2:16 5:1,5

**defined** 132:9 213:7

**definitely** 72:2 138:19 158:25 231:19

**degree** 9:6,15,20

**degrees** 9:14

**Delaney** 13:7

**delayed** 49:8 112:4

**delegation** 45:7 166:4,17 180:10

**delete** 121:8

**deleted** 250:9

**delivering** 112:1

**Demand** 1:23 4:11

**demo** 45:15

**demonstrate** 45:15

**densely** 135:14

**Denver** 13:15 24:20 172:11

**department** 15:21

**depend** 70:18

**depending** 12:19 47:22 103:24 120:11

**depends** 70:22

**depo** 16:15 256:13

**deposition** 1:15 4:5,10,18 5:19 5:25 6:2 7:3 8:6 16:22 19:18,20 57:21 98:17 99:20 117:4 186:1 202:15 213:18 241:4 251:25 256:10,15,17 258:3,7,24

**Derek** 243:23 244:13,19,21

**Des** 34:15,19

64:21 68:1

**describe** 75:14 147:18

**described** 11:5 27:12 64:13 132:6 202:17

**description** 68:24 153:5

**designate** 64:17 64:18 65:1 131:19

**designated** 8:8 16:25 18:5,16 19:24 32:19 61:3 63:10 64:16 66:8 68:25 146:3 220:4

**designating** 145:11

**designation** 32:23 202:11

**Designee** 1:15

**desire** 258:7

**desk** 36:23

**Dessaw** 41:10 96:13 98:13,14 114:19 238:11 241:10 256:20

**detail** 165:4

**details** 30:20 117:21 165:21

**determined** 17:24 172:20

**Detroit** 210:14 210:16 244:5

**DeTrude** 16:8 16:12 22:1,2,7 38:25 39:16 40:8,15,20 48:21,22 52:13 54:6 99:16,22 100:7 164:3,24 178:4 179:11 179:21 191:15 239:1,4,5,11 239:19,25

240:5,17

**develop** 106:13 181:2

**development** 66:2 141:10 154:14,15 180:24 181:6 181:10

**developmental** 64:15 65:2,2,9 65:10,15,20,22 65:24 66:2,9 67:5,10,14 84:15,19 253:18

**device** 4:17 258:13

**Diane** 245:23

**Diaz** 14:8 161:18,20,24 162:10

**difference** 8:4

**differences** 153:10 155:11

**different** 12:19 15:19 23:25 27:15,22 31:12 32:18 33:8 35:4 47:23 65:21 72:20 73:4 110:25 120:11 121:10 126:17 130:23 151:8 155:22 158:14 165:5 193:2 195:3 200:23,25 208:22 215:5 215:11 220:16

**differing** 42:25

**difficult** 154:16 155:8 169:10

**direct** 3:3 5:8 207:20,21,23 208:1,4,8,10 209:21 210:5,8 210:19 211:14

212:11 216:24 218:24 219:24 220:16

**directed** 164:23

**directing** 70:17

**direction** 258:15

**directionally** 168:3

**directly** 13:25 14:3

**director** 12:5,9 12:12,17 13:20 14:13,24 15:15 15:18 16:6,12 41:9 111:12 125:25 126:3,4 229:5 230:22 231:18

**directors** 15:22

**disapprove** 237:14,15 240:4,15

**discovery** 55:10 59:2

**discuss** 51:21 52:2 115:9 119:17,20,25 157:9,12 237:7

**discussed** 26:8 50:17 53:6 54:4 63:1 70:15,16 114:1 126:13,19 127:18 128:11 128:19,22 141:9 156:9,21 157:5 163:7 164:10 165:1 165:23 167:8,9 171:4 175:11 193:10 253:5

**discussing** 46:24 72:8 157:6 187:5,8,11 192:22

**discussion** 50:14 114:15 126:7

156:13 164:6,9 165:3 193:11

**discussions** 19:19 50:2,5,7 50:8,13 55:13 62:24 99:4 148:22 229:1 237:5

**displaced** 198:21 235:24 237:3 239:22 241:7 244:24

**dispute** 250:18 255:14

**distinction** 134:21

**distributed** 27:18 53:11,13

**distribution** 144:21 249:24 250:1

**district** 1:1,2 4:8 4:8 18:25 26:20 32:24 33:3,6,12 34:4 36:7 38:3,8,10 43:17 44:23,25 55:21 60:13,23 61:12,19 88:9 89:4 129:11 130:2,5,12,15 130:19,21 133:21,22 134:12 135:10 135:15 136:6 136:11,13,18 136:19,19 140:12 143:6 147:14,23 158:5,10 182:2 182:4,7,9 183:16,19 200:22 208:9 208:13,18,21 209:13,15,24 209:25 210:13 210:14,14

211:1,2,6,13 212:8,14,21,25 213:7,9 218:13 242:6 244:11 246:1

**district's** 38:1

**districts** 22:8 33:1 34:5 35:11,16 36:12 36:13 37:3 38:16 43:14 44:10,18 47:10 48:10,18 49:17 56:25 60:14 62:22 68:25 69:17,20,21 72:10 129:18 130:18,24 131:2,13 132:23 134:13 135:1,6,13,16 135:23 136:5,8 136:10,12,25 137:3 140:6,7 140:11 141:3 143:8 144:21 145:14,22 157:19 158:11 163:3 166:13 171:12 182:15 183:8 193:17 193:18 207:19 211:20 213:10 213:12 235:25

**divided** 146:8

**dividing** 68:17

**division** 1:3 4:9 15:16 28:8,24 30:1 31:22 112:19 119:6 119:13

**divisions** 10:12

**DM** 76:24

**doable** 36:3

**doc** 152:3

**doctrine** 202:5

**document** 16:20

38:19 76:9 77:16 90:8,12 93:22 95:9 97:7,19,21 100:16 101:13 102:12 103:5 103:21,22 104:6 109:15 111:22 116:17 117:1,2,5,16 121:13 124:5 124:18 126:25 143:23 145:9 150:2,3 151:24 152:1,17 153:15 154:9 155:12,24 156:7 157:2 158:24 160:11 164:23 167:19 170:2 177:5,6 177:16,19 178:14,18,24 182:21 184:1 184:14 185:24 186:4 196:10 197:15,18 198:13 199:8 199:11,18,20 201:8,11,16,22 201:23,24 202:14,16,17 204:8,14,17,23 205:2,5,21 206:19 207:4 207:18 209:9,9 211:12,17 213:13 214:7 215:15,20,22 215:24 217:8 217:12,14,18 218:2,9,15,23 219:1,22 220:5 220:8 222:11 222:25 223:6 223:11,16,23 224:18,23

226:5 227:13 227:14 232:14 248:22 249:2,7 249:8 252:14 253:7,20 255:14

**documentation** 44:20 100:2 188:13,22 228:8

**documents** 6:21 17:4 22:23 27:11 31:24 43:5 44:22,24 55:9 75:5,21 76:14,15,17 77:7,10 91:11 98:16 101:7 103:2 118:12 120:21 123:11 131:9 153:11 185:25 186:2 216:2,14 218:8 232:17 233:2

**Dodson** 92:14 92:16,25 93:5 93:11,15,18 105:16 107:3 107:18 109:13 110:5 115:6 159:14 172:24 176:20 190:7 226:17 227:11 234:24 245:1

**Dodson's** 93:3 226:6

**doing** 21:8 24:12 26:16 28:7,21 35:9 38:5 41:18 56:19 86:16 118:24 118:25 119:3 181:8 196:6 215:25 227:24

**dollar** 174:12

**dollars** 45:3 130:1,5 166:18

**dotted** 52:14

**doubt** 52:22 116:11 175:10 203:16

**Douglas** 95:10

**draft** 90:2,10 92:12,15,20 93:24 94:5 95:11,16,16 97:8,14 100:22 101:16,16 102:14,18 122:12 124:24

**drawn** 32:7

**drew** 33:5

**drive** 2:21 10:3 158:3

**driven** 83:3 188:21

**driving** 34:19 45:16

**dropped** 15:3

**dual** 233:9

**due** 53:7

**duly** 258:10

**dump** 195:18 203:17

**duties** 64:10,12

_____

**E**

**E-B-B** 247:15

**E-R-I-C** 5:12

**earlier** 55:24 81:10 84:18 89:24 112:3 122:2 128:11 139:7 141:9 147:22 148:14 162:1 163:7 166:2 175:22 193:23,24 194:9 226:1 244:14

**early** 22:17,18 23:6,11 25:7 36:11,14 37:5 40:22 41:1,3,6

42:2 53:5 74:3 89:24 124:14 125:5 126:11 127:7,7 186:16
**ease** 205:6
**easier** 158:16
**easily** 135:17
**east** 135:10 182:14
**Eastern** 1:3 4:9
**easy** 115:22
**Ebb** 247:15,18 247:20 248:1,7
**Ebb's** 248:11
**education** 9:3
**Edward** 150:9
**effective** 39:5,10 56:1,10 119:22 126:20 128:6
**efficient** 26:10 39:10 56:10 119:3,22 126:21 128:5
**efforts** 99:17
**eight** 28:24 29:11,13,19 30:10 36:18 56:5,13 119:6 122:11 136:5,6 210:4,15 212:25 213:1 234:6,11,12,13 253:4,9,11 254:6,7
**either** 21:13 44:13 46:25 49:6 50:19 69:13 70:7,11 88:20 100:25 116:16 146:12 150:24 170:19 190:14 198:3 204:2 247:23 248:15
**electronic** 28:1
**electronically** 27:19

**electronics** 7:10
**eligible** 109:12 109:18,20 110:6,11 253:2 255:12
**eliminate** 22:3 29:7 36:12,13 48:17 72:10 135:1,5,23 136:7,8,10 163:3 183:3 213:16
**eliminated** 35:11 38:16 43:15 44:10 49:17 55:20 61:22,25 62:22 78:16,21 90:4 90:16 92:17,22 93:1,3 94:3,7 94:11 95:14,18 95:19 97:11 100:18 101:21 102:19 135:15 136:12,25 137:3 170:11 171:7,13 183:9 183:23 192:17 208:13,16 211:2 234:12 235:25 252:20
**eliminating** 29:4 132:23 136:4
**elimination** 18:2 18:14 20:16 47:10 48:3 56:16,24 59:14 59:20 60:20 61:8 95:24 104:9 171:10
**email** 23:19 24:2 24:10 87:4,5 99:21 163:25 164:2,24 165:19 219:2 249:6,7 257:5
**emails** 98:17

248:7
**employed** 91:8 208:25
**employee** 57:1 73:9 104:7 105:7 112:15 118:1 139:4 153:4 201:22 201:24 229:16 237:3
**employees** 10:19 11:4,13 30:4 30:11 56:23 58:12 71:15 74:9 75:7 99:17 117:6 133:15 153:15 166:12 167:4 173:16 176:14 176:18 177:14 184:5,7,25 185:3,8,23 198:21 199:23 200:5 239:22 241:1,7 244:25 245:11 251:23
**employees'** 37:23
**employment** 11:20 22:4 82:21 95:5 96:21 99:2,18 240:24 241:7
**encompassing** 136:21
**ended** 35:6 56:18 68:15 69:19 79:25 130:17 145:11 183:19 184:4 185:11 217:9 218:8
**ends** 124:5
**entire** 132:19 136:21 167:11 197:10 238:25 258:4

**entitled** 7:24,25
**equipment** 24:6
**Eric** 1:18 4:14 5:12 14:8 161:18,20,24 258:10
**escaping** 14:10
**especially** 23:24 81:20 192:8
**estimate** 8:4 11:9,11 49:5 49:21 202:25
**estimated** 54:16
**estimates** 7:25 177:9,9
**ethnicity** 73:13 75:7
**evaluate** 61:6,13 61:16,19,24 76:16
**evaluated** 190:18 209:11
**evaluating** 190:16,17,21
**evaluation** 191:3
**evening** 257:3
**eventually** 40:21 90:20 134:16 160:18 161:6
**everybody** 24:23
**everyone's** 23:25 73:2
**everything's** 169:9
**evidenced** 97:19
**exact** 94:17 112:4 179:16 194:3,8
**exactly** 73:2 100:3 130:8 134:9 156:13 185:10,20 203:5
**EXAMINATI...** 3:1 5:8

**example** 31:17 34:14 35:21 64:19 112:21 135:13 148:5 151:2 214:15 214:18 229:15
**examples** 241:3
**Excel** 27:6,11,17 76:8,17 103:23 111:5,9 116:24 120:21 141:21 141:23 151:16 178:6,9
**exception** 171:3 215:12
**excerpt** 146:23
**exclusion** 13:19
**excuse** 60:1 183:18 212:8 217:24
**execute** 128:10
**executives** 52:14
**exercise** 129:23 130:14 132:13 133:22 135:19 139:24 175:8 184:3 186:5 205:7 231:16
**exhibit** 3:6,7 16:15,17 17:5 17:12,20 59:17 59:23,24 60:1 77:6,8,9,12,17 77:24 92:11 103:6,11,13,14 103:16,21 104:15 112:6,8 116:18,21,22 116:24 121:18 121:19,20 124:17 125:12 125:13,15 142:24 152:8,9 152:18,25 158:17 159:13 163:21,23 166:1 167:20

www.InDemandReporting.com (773) 239-6008

167:21 168:25
169:2 179:17
183:2 191:10
191:11,12
198:20,22
204:23 206:12
206:15,17,20
207:19 209:20
215:15,17
216:3 248:19
248:21 249:8
249:10 250:11
251:8,11 253:1
255:15
**exist** 150:3
**existed** 82:8
208:18,18,21
**exists** 138:18
**expand** 29:13
**expanded** 29:10
**expanding**
30:18
**expansion** 29:12
29:19
**expansions** 30:3
**expansions/co...**
30:10
**expectation**
126:23 190:12
**expectations**
86:10 126:23
127:24 128:1
187:14,16,20
188:1,6 189:4
190:7,20,23
205:9
**expense** 45:3
52:15 166:5,6
169:19
**Expenses**
167:23
**expensive**
163:10 175:12
**experience**
64:16,23,24
65:11,18,23,25
66:6 69:2,4

81:20 131:17
131:23 132:1
141:10
**experienced**
66:10,20,24
81:12 82:2
**external** 244:1,2
**extra** 39:13
84:23
**extracted** 31:22
111:10,13
**extraction**
103:24
**eyes** 28:11

___

**F**

**F** 153:6 171:2
242:5
**face** 72:23 73:3
227:25 244:18
**Facilitate**
201:12
**facing** 114:16
**fact** 32:3 54:14
56:6 94:6
97:21 114:17
114:18 162:21
163:1 189:3
**factor** 35:13
191:7
**factors** 34:24
37:11
**factually** 20:1
**fairly** 28:10 82:2
84:20
**falling** 68:15
**Falls** 130:11
**familiar** 30:16
30:19 109:16
148:13 199:7
199:12 202:17
203:25 204:2
256:5
**far** 112:22
151:18 202:2
**Farley** 2:18 5:1
5:1 15:6,9

17:10 18:4,15
19:6,13 20:12
25:20 26:24
29:21 30:6,13
33:23 34:6
35:14 37:12
38:17 40:16
41:20 44:4
46:5 47:5,12
49:19 57:12,20
57:25 58:19
59:7,9,22 60:5
60:10 61:9
62:5 63:18,25
66:12,22 67:21
68:22 73:16,20
74:6 75:9,13
77:9,12,14,25
78:5,9,13
79:15 80:14
81:14 82:22
83:5,10,13
84:17 86:14,22
86:25 87:4,7
87:25 88:3
90:7 91:15,18
91:20 92:1,3,5
93:14 99:19
100:20 101:6
101:11 117:19
120:5 123:6
127:13 132:15
132:17 133:2
133:18 134:7
135:25 137:22
137:24 140:21
141:6,22 142:8
143:12,17,20
145:18 149:13
149:20 150:1
150:11 151:20
152:10,15,21
153:18 155:16
156:25 157:8
157:13 158:19
158:21,24
159:2,5,17

160:1,7,15
163:13,15
167:6 168:21
169:4 170:3
173:6 175:2,5
176:4,9 177:21
178:23 179:2,7
179:14 180:5
183:5 184:21
185:1 188:3,9
188:25 189:6
189:22 191:1
196:5,20
197:14,22,25
198:7 199:21
200:9,12
201:17 202:4,9
204:19,25
205:22 209:7
212:5 216:6,16
217:6 218:19
220:14 221:3
226:8 227:18
228:14 236:2
236:10,18,20
237:13,21
238:5,8,10
239:14 245:2
245:15,22
246:7,9 247:12
248:2 250:14
251:3 255:17
256:4,15,21
257:1
**farther** 80:10
109:6 173:8,9
**fast** 180:14
**February** 22:20
23:6 31:9
36:11 37:5
38:6 125:17
126:11 127:7
137:2 156:22
157:6 178:20
179:12 185:19
190:1 206:24
208:3

**feedback** 166:21
166:23
**feel** 36:14
**feet** 64:22
**fell** 170:3
**fewer** 29:18
135:24 136:6,8
194:2 221:9
225:18
**field** 65:18 118:6
118:9
**fields** 71:22
110:25 203:2
204:10
**Fifteen** 206:13
**figure** 35:18
36:16 50:11
119:9 156:10
**figured** 32:12
**file** 155:24,25
231:5
**fill** 69:10,15,16
84:23 183:10
**filled** 50:21
69:14,23 85:6
85:8,8 110:14
232:17
**filling** 68:20
246:1
**filtered** 35:5
**final** 43:7,8 48:4
49:10,12 91:11
91:11 134:12
134:12 145:3
175:15 195:15
209:9,17 217:8
218:12 238:23
240:23 249:3
249:16,17,21
**finally** 44:6
49:24 175:14
**finance** 10:9,15
31:18
**financial** 12:5,6
13:17,18 28:23
36:6 39:8
45:10 54:15,16

80:3,7 87:17 88:8,17 89:2 89:15,17 164:25 165:1 175:8,16,18,20 177:8 180:9 203:15 205:10 205:11,12 229:8 253:17 254:1
**find** 39:13 96:20 99:2,18 119:21 218:18 241:11
**finding** 21:3 95:7 97:2 98:5 128:2 220:8
**fine** 15:5 20:13 43:4 59:9 101:10 194:11 198:16
**fire** 233:12,15 233:16,18
**fired** 234:3
**firing** 11:21
**firm** 15:7
**first** 8:25 12:1 17:18 21:1,7 21:12,14,16,25 28:16 31:8,20 37:7,10 38:4 38:15,25 39:17 40:8,19 51:10 53:11 54:3 85:14 94:16 109:12 110:4 128:12 137:14 138:14 150:16 153:16 169:24 179:18 182:12 182:20 186:18 186:21 197:5 254:2 258:10
**fiscal** 42:14 89:25 184:3 185:9,11 200:5 205:8 231:16
**fish** 39:4

**fit** 146:11
**five** 45:19,21 91:18 107:23 159:1 163:10 176:20 246:7,9 253:4
**five-year** 45:12
**fives** 149:4
**flew** 25:6
**floor** 34:25
**fly** 24:17
**focus** 217:20
**focused** 101:3
**focusing** 231:24
**Foley** 2:10,12 4:24,24 5:9 15:13 16:18 17:15,17 18:7 18:18,20 19:2 19:12 20:2,3 20:14 25:24 27:1 30:2,8,23 31:3 34:1,2 35:8 37:22 40:18 44:9 46:13 47:9,15 50:1 57:17,18 57:24 58:1,4 59:5,8,10,11 59:25 60:7,16 61:11 62:15 63:21 64:4 66:14,25 68:3 69:3 73:18,24 74:8 75:19 77:11,13,15,21 77:24 78:4,6 78:10,14 79:16 80:15 83:1,8 83:11,17 84:22 86:19 87:2,8 88:5 90:13 91:17,19 92:6 93:17,22,23 99:25 101:5,8 101:12 102:12 102:13 103:5,9

103:10,12,14 103:17 111:15 111:18,20 112:9 116:19 116:21,23 117:25 120:9 121:21 123:4,8 123:16,20,23 123:25 124:2 124:11,12 125:14,16 127:22 132:21 133:6,23 136:3 138:11 139:1 140:24 141:16 142:1 143:1,3 143:13,18,25 144:10,11,15 144:17,19 145:20 146:17 146:19 149:16 149:23 150:4 150:18 151:12 151:15,22 152:1,5,13,16 152:23 153:21 155:20,23 156:2,5,6 157:4,11,15 158:20,23,25 159:3,6,11,21 160:4,10,19,21 160:23 163:18 163:20,24 164:21,22 167:10,18,22 168:10,12,24 169:12,22 170:1,5,7,8 173:7,11,14 175:3 176:7,10 176:12 177:23 178:12,17 179:4,8,9,17 179:19 180:11 180:15,17 181:19,22

182:16,19 183:6 184:23 185:6 188:5,12 189:2,9,24 191:9,13 193:8 193:15,16 194:18,19 195:1,2,5,6,24 195:25 196:13 196:16 197:1 197:17,24 198:4,9,13,17 198:19,23 199:1,14,16,22 200:17 201:21 202:7,13 204:21 205:4 205:24 206:7,8 206:15,18 207:15,17 211:3,5,8,11 212:7 215:14 215:18 216:8 216:10,12,18 217:11 218:21 218:22 219:1,5 220:18 221:5 226:9,15,16 227:7,9,21 228:19 236:6 236:13,22 237:17,25 238:7,9,13,18 239:17 245:5 245:18 246:2,6 246:8,11,18 247:14 248:5 248:18 249:11 250:17 251:6,9 251:12 255:21 256:7,19 257:4 257:9
**folks** 244:10
**follow** 30:7 225:5 226:12 235:14
**followed** 164:1

**following** 108:14 205:6
**footprint** 28:14 35:3
**footprints** 43:17
**forecasted** 174:13
**foregoing** 258:3 258:24
**forget** 14:11
**form** 25:20 26:24 29:21 34:6 35:14 37:12 38:17 40:16 41:20 44:4 46:5,10 47:5 49:19 57:12 59:22 60:11 61:9 62:5 63:18,25 66:12,22 67:21 68:22 73:16 74:6 75:9 81:14 82:22 83:5 84:17 86:14 90:7 93:14 99:19 117:19 120:5 127:13 132:17 133:2,19 134:7 135:25 137:22 140:21 141:6 141:22 142:8 145:18 149:13 149:20 150:1 150:11 151:20 152:21 153:18 155:16 156:14 156:25 157:8 157:13 159:17 160:1,7,15 163:15 167:6 168:21 169:4 175:5,5 177:21 178:23 183:5 184:21 185:1 188:3,9,25

189:6,22 191:1
196:20 198:7
199:21 200:9
201:17 204:19
204:25 205:22
208:17 209:7
212:5 216:6,16
217:6 220:14
227:18 228:14
228:22 236:2
236:10,20
237:13,21
238:5 239:14
245:2,15,22
247:12 248:2
250:14 251:3
255:17 256:4
**formal** 237:7
**formally** 63:5
  94:12
**format** 76:8
**formation** 161:1
**former** 122:2
  224:6
**forth** 149:7
  176:2
**forties** 86:6
**forward** 28:17
  175:13,19
  192:5 239:8
**found** 63:14
  93:16 103:19
  241:12
**foundation**
  48:14
**four** 11:18 29:24
  50:20 58:17
  182:14 248:1
  253:4
**Fourteen** 144:17
  144:17
**fourth** 12:21,23
  147:15 186:18
  186:20
**franchise** 32:4
**Francisco** 212:9
  212:17,17,20

212:21 213:4,5
**Frank** 242:5
**Franklin** 23:1
**Fresno** 212:9,17
  213:5
**front** 6:20,21,25
  7:11,13,18
  97:19
**FSM** 35:20
  44:25 50:3,17
  62:19 64:10,15
  64:16 65:3,4
  65:11 66:7,11
  66:20,24 67:18
  68:20 69:5,6
  69:10 79:19
  80:4,4 83:24
  84:15,19,20,24
  85:24 86:2,3
  106:7,8 130:25
  131:16 136:16
  136:22 180:24
  181:6,9 189:16
  214:14 216:4,4
  216:22,23
  217:13,13
  218:4,4,14
  219:23,24
  220:15 222:12
  222:13,17,17
  222:22 223:3,3
  223:8,13,20
  224:6 246:4
  254:1,9
**FSMs** 36:6 39:8
  40:12 44:11,15
  44:20 60:19
  61:6 64:8,8
  81:12,15
  130:22 131:1
  136:16 146:20
  147:4 161:1,8
  162:20 184:13
  184:17,18,19
  184:20 187:25
  189:25 197:3
  197:10,20

198:6 213:11
216:24 229:6
231:2 243:6,9
243:14,17
245:21 248:23
250:20 254:14
**full** 21:12 65:6
  186:4
**further** 19:7
  258:9,17,23
**future** 162:19
  203:24
**fuzzy** 161:9
  162:17

————————
**G**
**G** 153:8 171:11
  203:19 217:21
**G-A-N** 244:20
**gain** 65:25 214:5
**Gandrud**
  222:23
**garbled** 197:15
**gather** 119:20
**gathered** 119:19
  119:21
**general** 123:14
  123:14 184:1
**generally**
  184:24
**genesis** 166:8
**gentleman**
  207:9 243:23
  244:13
**gentlemen**
  190:20
**Geo** 171:1
  191:19
**geographic**
  27:13 56:2
  213:3
**geographical**
  119:11
**geographically**
  135:14
**geography** 22:8
  26:13 27:14

67:24 126:16
134:12 136:22
182:15 208:23
215:2
**gestures** 6:8
**getting** 44:20
  54:13 64:21
  166:9 175:17
  198:1
**give** 6:13 21:11
  21:12 34:14
  35:21 42:24
  45:11 117:21
  133:4 135:12
  151:2,7,9,9
  169:7 173:15
  196:11 217:21
  257:5
**given** 28:18 32:1
  32:11 63:5
  74:14 95:23
  100:17,23
  101:20,24
  114:22 115:19
  115:20 128:13
  130:21 149:21
  150:13 166:20
  197:8,8 210:23
  223:13 232:22
  258:5
**gives** 79:2
  142:16,17
  211:12
**giving** 57:14
  74:12 219:2
  232:23
**Glenn** 205:8
**go** 5:7 9:3 15:4
  18:19 19:12
  26:10 28:17
  33:23 45:8
  46:14 57:19
  65:8 67:14,22
  73:19 75:10
  76:25 78:9
  79:12,15 80:10
  81:23 89:21

90:9 91:10
92:1,3 95:1
100:16 105:15
107:16 108:20
109:6 114:21
122:13 126:5
126:21 127:14
131:24 137:24
138:7 151:12
152:2 155:23
156:1 160:21
163:20 164:19
164:21 166:25
167:11 168:11
169:23 170:7,9
173:8,9 177:7
179:4,17
180:11,14
181:19 182:16
187:15 193:9
197:11 203:1,3
205:6 206:2,22
212:21 213:1,1
215:14 216:19
219:12 224:23
226:14,15
227:7 228:16
229:21,21,22
229:24 230:4,5
231:22 234:14
237:23,24
239:22 242:20
245:16 252:25
257:7
**goes** 57:23 72:24
  124:3 191:14
  211:24 216:23
**going** 6:6 15:11
  16:14 17:4
  18:4,15 19:6,7
  28:9,12,15,19
  29:6 33:6
  36:19 40:4,9
  44:23 45:6
  47:7 48:6 49:9
  49:13 50:9,16
  50:22 53:21

55:3 56:4,12
56:12 64:19
72:9 75:13
76:25 77:6
78:15 81:21
82:1 83:21
85:22 92:10
112:18 115:23
116:6 117:8
121:10,13,18
121:23 123:4,4
123:20,25
124:4 127:24
128:13 129:16
133:14 136:20
140:8 142:24
142:25 143:1
152:6,11
158:17 162:8,9
162:18 163:17
164:17 167:18
169:22 173:11
175:11 180:12
180:12 182:17
182:17,18
191:25 194:18
195:1,5,24
196:24 203:24
205:24 206:12
207:20,21
208:10 209:12
209:12,14,21
210:4,8,9,13
210:13 212:5
212:10 213:5,6
213:8,12
214:16,20
216:21 217:16
218:24 220:6
221:8 228:14
229:12 230:2
238:11 248:19
248:20,22
249:6 251:7
256:12
**good** 4:1 5:10
26:15 51:8

152:7 230:4
231:22 257:3
**Gordie** 223:4
**gosh** 229:25
**Gotcha** 92:5
**Gotcher** 205:7
**gotta** 138:4
196:11 226:15
**gotten** 112:4
151:4 195:16
**grabs** 196:17
**grade** 111:11
203:6 205:7
**graduate** 9:12
**Grand** 210:17
**gray** 74:17
**great** 65:4
181:14 215:13
227:8 257:1
**Greg** 93:25 94:2
106:1 187:11
190:12 234:19
244:25 247:15
247:18,20,22
248:1,7,11
**grew** 134:15
**Gritton** 2:25 5:2
**group** 2:12
15:24 20:18,21
20:25 21:5,7,7
21:10,12,12,14
21:16 22:15,16
23:18,20 24:12
27:4 28:10
31:9,25 35:1,3
36:9,9 37:7,10
38:4,15,25
39:17,20 40:2
40:8,19,24
42:11,16,19,21
42:22 43:1,13
45:1 46:21,24
48:16,20 50:10
53:5,9 54:4
55:17 81:10
119:8,19,20,21
120:4,16

124:13 126:10
127:6 128:12
132:13 134:3,4
134:8 228:24
**groups** 21:6
**grow** 67:7
**growing** 126:20
**growth** 128:4
**guess** 8:3,4 11:9
11:11 12:15
14:7 20:6 22:5
52:3 54:1 66:5
67:9 115:17
119:12 147:7
208:1 213:1
235:13
**guidelines** 74:12
**guy** 228:5 247:3
247:6
**guys** 59:3
226:12

———————
**H**
———————
**H** 171:16,24
217:21
**H-A-J** 244:20
**Hagan** 244:19
244:20,21
**hair** 74:17
**half** 34:21,22
145:16 152:11
153:16
**hand** 4:19 6:17
259:2
**hand-typed**
203:14
**handed** 27:17
**handful** 158:12
186:2
**handle** 36:22
**Hankins** 161:20
161:21 249:12
249:13,14
250:2,15,21
251:4
**Hankins's**
250:19

**happen** 28:19
48:25 49:6
70:25 133:4
217:15
**happened** 29:25
30:16 44:24
137:13 162:3
230:9 249:2
**happening** 58:6
78:17 113:14
166:16 217:9
**happens** 185:19
**happy** 19:10
21:13
**hard** 108:14
154:23 161:21
169:25 197:7
**he'll** 256:16,24
**head** 68:15
85:12 86:11
94:23 115:21
212:15 225:22
242:3,7 244:8
**headquarters**
13:20,23,23
23:1 24:18,22
39:15 161:11
**headset** 36:25
**headsets** 81:25
**hear** 5:17 20:4
87:25 113:3,6
131:8 148:3
154:21 179:2
182:12 186:7
188:19
**heard** 154:22
182:24 237:16
256:24
**hearing** 88:1
**heart** 214:21
**held** 26:7 52:19
112:19 186:16
186:17,23
**help** 39:6 43:9
96:20,25 99:1
162:11 214:5
220:7

**helping** 106:13
162:9
**Hendricks**
205:8
**Henry** 246:22
246:25 247:1,2
247:7,8,10
**hereto** 17:21
**hereunto** 259:1
**Hernandez**
172:19 183:15
183:19
**hey** 56:11 65:6
136:18 151:8
**high** 37:18 74:11
129:2 130:9,9
141:9,9 142:11
151:3
**high-penetrati...**
142:16
**higher** 131:23
226:11,15
**highlight** 108:13
212:1,2 226:21
**highlighted**
224:10 225:4,6
**highlights** 225:9
250:6
**hire** 103:25
106:20 233:11
233:13,14,14
233:16,17,21
244:24
**Hire/Rehire**
105:11
**hired** 105:17,20
105:23 106:1,4
242:6,13 243:6
243:9,13,15,18
244:10,14
245:20,25
**hiring** 11:21
70:4 96:16
99:6,9,12
100:4,8 189:12
**hit** 51:10
**hmm** 144:14

**hold** 12:8 57:20 77:19 133:18 143:21
**holiday** 124:16
**holistic** 36:5 134:11
**home** 177:10 204:4
**honest** 66:16
**hoping** 181:16
**Horn** 217:3,23
**hotel** 25:8
**hour** 52:20,22 152:11
**hours** 11:7,10 136:14
**house** 161:3 205:19
**housed** 82:15 203:11 231:8
**houses** 203:1
**HR** 40:21,25 41:3,4,7,17 63:9,12 72:5 103:25 114:4,6 114:7,8,8,9,18 117:21 125:25 126:3,4 128:15 177:8 184:5,7 184:15 186:13 189:10 202:22 203:7,10,17 204:11,11,12 204:13 231:6,8 231:14,21 232:3,5,6,8,13 232:24,25 233:7,19 240:22
**Hufford** 200:25 226:6,11,17
**Huh** 198:14
**human** 41:9,16 48:24 114:14 118:18 221:22
**hunch** 90:1 125:7

**hundred** 43:23 241:22
**Hungerford** 13:12 21:17 22:15 23:12 25:19 36:10 127:9

**I**

**idea** 21:9 46:20 51:10 58:11 74:18 75:4 82:24 86:7 113:25 118:23 118:25 119:16 119:18 155:8 156:7,16 161:23 183:22 198:8 222:9 231:8 234:5
**ideas** 31:12
**identification** 16:17 77:8 103:16 112:8 116:22 121:20 125:15 152:9 163:23 167:21 191:12 198:22 206:17 215:17 249:10 251:11
**identified** 50:19
**ignore** 214:15
**Illinois** 1:2,25 2:8,22 4:9,12 182:14
**imagine** 73:1 89:23
**immediately** 151:1
**impact** 28:15 34:5 45:12 46:11 60:15 129:16 130:13 140:13 158:5 164:25 165:1 170:19 183:19 195:7 197:2

236:8
**impacted** 18:25 22:9 31:8 33:1 33:11 47:10 48:2,6 49:22 60:25 69:17 72:9 75:8 82:18 100:8 104:9 105:8 112:14 132:19 132:23 134:13 134:14 145:4 157:22 158:4 167:4 171:9 176:15,18 182:15 183:9 183:17
**importance** 130:6
**important** 6:7 43:2 130:8,10 130:12 134:21
**importantly** 47:1
**imported** 138:6 138:21 155:12
**impossible** 196:21
**improper** 19:11 202:9
**improvement** 189:16,20
**in-house** 5:2
**in-person** 39:8 116:12 164:13 181:15
**include** 211:6 213:25 215:7
**included** 115:11 166:12 178:20 179:10 215:7 232:10 249:24 249:25 255:20
**includes** 139:16 211:20
**including** 194:22 255:19

**incomplete** 124:24
**independently** 175:7
**INDEX** 3:1,6
**Indiana** 210:1
**Indianapolis** 210:15
**indicate** 10:14 58:22 84:6 86:8 92:22 109:11,14 156:3 165:15 209:23 217:12
**indicated** 15:14 48:16 63:16 75:23 110:5,11 139:23 150:22 155:8 160:12 174:22 189:3 204:10 223:25 241:13 249:1
**indicates** 78:11 92:16 94:14 149:17 155:1 159:24 160:5 170:2 173:22 174:15 176:14 180:22 191:19 209:20 216:21 217:14 222:21 224:13 226:5 227:10 250:5 253:3 255:12
**indicating** 150:6
**indication** 151:13
**indicators** 38:20 185:4
**individual** 38:4 42:25 43:10 49:22 63:10 70:20,22 71:9 100:4,9,9 117:21 118:20 131:16,18,19 132:19 141:4

142:3 153:7 187:16 230:4 256:14
**individually** 112:14
**individuals** 62:13 63:4 72:14 98:20 100:5 120:11 120:13 132:3 141:15 148:10 187:19 230:5 231:21 237:6 237:23 254:2
**industry** 10:9
**Infiniti** 12:3,6,6 29:23 31:25 98:24 99:3 213:22,23 214:9,10,20,22 215:7,8 222:18 224:13
**influence** 233:13 233:14 236:8
**informal** 237:4
**informally** 63:6
**information** 5:7 10:24 26:22 62:20 75:11 97:12,25 101:4 103:25 111:1,4 111:8 131:7 139:3 141:8 143:16 153:4 158:3 168:6,9 168:25 169:1 171:20 175:21 180:9 184:16 184:24 186:9 186:11,13 187:24 192:6,8 192:14 201:20 202:19 216:15 220:13 221:23 224:19 237:18 250:22 255:19 255:22

**informed** 55:12
115:20 171:23
236:3,11
237:22 238:21
**informing**
192:16,24
**informs** 177:12
**inherent** 31:15
**inherited** 67:25
**initial** 33:2 36:9
42:19 43:6
45:11 112:25
134:4
**ins** 30:17 48:12
**insert** 56:11
**inside** 36:20
39:2,5,21
40:12 43:21,23
43:24 44:8
56:4,9 62:19
64:10 79:19
80:8,19 81:9
83:25 84:23
85:4,25 87:18
129:20 136:16
161:1,8 180:22
181:3 193:3
208:8 209:24
210:22 216:24
226:24 227:15
227:16
**insight** 42:24
166:15
**insights** 214:6
**instance** 4:13
55:18 109:23
**Instruct** 202:6
**instructing**
196:25
**instruction** 20:5
**intended** 37:3
**interacted**
240:23
**interaction**
75:15
**interest** 11:1,7
**interested**

258:20
**Interesting**
216:13
**internal** 45:7
107:17 108:6
108:11,24
109:7,8 244:1
244:2
**internally** 229:3
**interpret** 108:8
**interpreting**
209:19
**interrupt** 15:1
125:3 138:14
**interview** 100:4
100:8,13,15
**interviewed**
100:14
**interviewing**
99:22
**invite** 23:5,7,9
24:11 51:14,15
51:18,20,22
**invited** 115:13
115:16,18
165:15,20
**inviting** 23:7
**involved** 28:18
40:25 41:1
50:10 63:4
70:14,17 99:4
120:7 128:15
235:19,22,23
236:3,7 240:9
240:21 241:6
**involvement**
236:9
**Iowa** 34:15
64:21 182:14
**Irwin** 79:17
172:1,19
**issuance** 93:7
**issue** 240:18
**issued** 51:17,20
240:18,20
241:1
**issues** 11:1,13

86:12
**It'd** 181:14
**it'll** 71:10 156:1
215:19
**item** 127:25,25
**items** 86:16
190:22 195:15

---

**J**

**J** 107:16 112:22
153:23,25
200:21 201:6
203:19 217:21
**James** 86:20
87:9
**Jamie** 13:14
23:12 24:19
36:10 78:7
79:8 127:11
**January** 22:19
22:20 23:6
36:11 37:4
124:8 126:11
127:7 136:24
137:1 156:22
157:6 186:19
**January/early**
31:9 38:6
**January/Febr...**
24:13 25:7
26:7 27:4 76:1
76:10
**Jay** 13:7
**Jeff** 41:9 79:17
117:11 125:18
126:2 164:3
**Jefferson** 1:24
4:11
**Jennifer** 61:16
224:25 225:2
225:10,17
**Jennifer's**
225:19
**Jerald** 159:23
**Jerry** 205:7
226:7
**Jersey** 214:20

**Jim** 16:8,11
40:23 41:12
48:8,19,21,21
48:22 52:13
87:14 164:3
175:22 191:15
239:1,4,5,11
239:25 240:5
240:17,22
**job** 12:1,8 18:2
18:13 20:16
47:1,11 49:13
49:16 62:9,10
64:3,6,6,9,12
68:23 78:22
85:5,17 86:4
86:13,16 90:18
91:2 93:3,11
94:9 96:4
97:11,16,17
102:4 104:1
106:10 117:6
151:4 181:14
183:15,23
200:6,6 203:22
203:23 210:23
227:24 229:17
230:11 235:9
240:2,2 241:14
241:18 244:9
245:1 248:11
248:13 253:17
**jobs** 40:3 43:14
45:4 46:22
48:10,11 50:3
50:3,17,20
62:4,8,19
63:16,23 69:13
77:3,4 80:7
82:18 85:17
95:2 96:9,11
98:7 99:17
104:10 108:7,9
108:11 115:10
132:24 133:4
156:11 162:24
171:12 181:13

181:17 184:6
192:16 203:12
231:4,4 234:12
235:16,24
236:9,12 238:3
238:14,14,22
239:23 240:6,7
241:11 248:15
252:21 254:6
**Joelle** 242:4
**John** 13:10
23:13 24:19
70:8 88:17
113:15,25
223:24 242:10
242:16 243:21
244:4
**Johnson** 80:17
80:18 172:18
**Johnson's**
170:14
**join** 23:8
**joined** 225:20
226:3,4
**journal** 7:1,2
**Joyce** 150:8,15
242:9 243:11
**July** 191:16,25
192:15 198:24
249:14,17
250:11,22
**jumbled** 198:2
**June** 17:21
42:10 49:1
55:1 59:15
77:2 78:11
79:9,18 80:17
83:22 85:1,23
87:5,15 88:7
89:2 90:1,14
90:23 91:9
92:12,16,24
93:7,24 94:1
94:10,15 95:12
95:24 96:5,9
97:13,17,23
101:19,25

111:21 112:4
112:10 113:14
116:13 117:17
117:23 134:16
186:20 192:16
198:25 199:2
239:11,21
240:8,22
246:23 247:16
**junior** 180:24
181:2,6,9
224:20

**K**

**K** 154:1 204:1,1
217:20
**Kansas** 64:20,20
67:18,25,25
68:17 69:5,10
69:25 70:3,6
88:9,11 172:8
214:22
**Kasey** 100:17
101:19,24
102:3,7 106:4
235:3
**KC** 172:8
**keep** 31:25
34:23 46:22
85:22 121:7
122:5 123:4,4
123:20,25
124:4 143:1
173:11 180:12
180:12 182:17
182:17,18
194:18 195:1,5
195:24
**Kentucky**
182:14
**kept** 214:24
232:6
**Kevin** 48:22
54:7,11 73:1
164:2,25
**key** 128:18
**Kiernan** 95:10

95:12,13,22
96:1,4,8 187:8
224:24 234:22
244:25
**kind** 11:1 31:21
32:6 37:19,20
48:12 52:18
55:2 64:21
67:6 68:14,17
119:10 127:17
132:2,5,9
141:17 142:13
147:21 161:9
165:16 169:25
178:15 200:16
214:5 244:6
**kinds** 11:2 26:16
**knew** 175:11
**know** 7:17 8:2,3
8:12 10:2,23
11:14 15:4
16:24 19:23
20:7 23:10,15
23:21 27:11,21
29:16,17 31:17
32:12 33:6,25
34:25 35:3
36:23 37:18
38:8,23 39:22
40:21 41:5
49:20 51:4
52:23 53:13,14
54:21 55:1,7
57:19 58:7
60:24 62:23,24
63:1,11,13
64:7,20 68:11
68:14,16 69:19
69:23,24 73:2
74:14,22 82:2
82:13,25 83:12
84:14,19,19
85:4,13,16
86:11,12 87:13
87:21 89:14
91:1 94:21,24
96:8,11 97:22

98:7,10 100:10
105:2 107:24
109:23 110:17
111:11,11
114:9,17,18
115:14,15
116:15 117:20
118:14,22
121:4,9,25
124:15 125:2
128:11 130:7
130:17 136:1
137:1,4,6,8,10
137:10,12,14
137:17,25
138:18 143:4,9
143:15 144:1
148:8,11,19
151:3,4 154:13
154:18 156:20
157:14 162:1
162:17 164:11
165:13,17
166:21 170:15
175:16 176:5
177:2,5,6,7,22
177:25 178:5,8
178:11,14
182:24 184:15
184:24 185:5
185:10,17,22
186:7,8,9,12
186:14,15,19
186:22 188:4
188:13,20,21
189:18,23,25
190:3,5 191:3
192:2 196:19
197:4 198:10
198:10 199:2
201:18,19
202:2,24 203:5
203:8,11,13,16
204:3,7,11,13
204:16,20
205:14,21,23
206:20 208:7

209:10,18
211:16,19
212:15,15
214:3,15
216:13 217:7
217:15,17,18
217:19,25
218:5,17 220:6
221:2,6,14,17
221:20,21
222:5,7 225:8
225:12,14,15
225:19,21,25
226:4,21 227:2
230:8,9,16
231:7,7 232:12
232:16,19
233:8,9,15
234:12 237:1,4
237:15 238:24
239:18,21
240:20 241:16
241:23 242:1,3
242:7,9,16,25
243:2,4,8,16
243:17,25
244:4 245:9
246:5 247:1,2
247:9,18,20
248:12,13
249:1,18,22,25
251:19 253:21
254:7 255:7,19
**knowing** 28:11
139:8 171:22
179:15 191:4
220:3 254:5
**knowledge**
22:24 29:22
166:15 171:23
220:5 238:16
256:8
**knowledgeable**
8:9,11 16:25
17:19,22 19:14
19:16,25 59:13
77:1 121:15

137:9 204:22
232:4 238:2
256:1
**known** 48:5,7
63:6 113:15
229:16
**knows** 20:7
110:14 137:7
202:7
**KPIs** 185:4

**L**

**L** 202:2 217:20
242:5
**L-E-D-I-E-U**
5:12
**L-E-M-A-N**
242:12
**LA** 211:6
**label** 148:8,23
160:2,9,17
184:2
**labeled** 78:2
126:13 141:15
183:25
**labels** 138:8
155:17 203:12
**ladder** 229:13
**land** 34:25
**landscape**
126:19
**large** 32:15,19
32:23 33:15
34:3,8,16
35:10 36:16
37:21 39:7
65:11 119:23
128:19 129:1
134:25 140:14
147:21 214:25
**larger** 35:3
55:17 67:11
112:16 131:23
158:5
**largest** 35:12
147:22
**Larry** 80:16,17

117:8 170:14 242:5
**late** 37:4 38:6
**law** 2:6,12 6:18
**lead** 125:3
**leading** 25:23 39:21 41:21,25 50:9 67:4 127:16 240:23
**learn** 181:14
**leasing** 130:7
**leave** 34:22 65:7 81:17 87:9 242:14
**led** 39:19 57:1,5 116:5
**ledger** 138:22
**Ledieu** 1:18 4:15,16 5:10 5:12 19:18 31:4 57:15 92:7 103:22 163:25 206:9 215:20 246:19 258:10
**Lee** 1:5 4:5
**leeway** 57:14
**left** 12:14 35:23 170:10 203:3 242:19,23 244:4,9
**left-hand** 168:17 194:22
**legal** 42:3,5 48:24 75:12,14 75:14,16
**legible** 198:2
**legs** 162:9
**Leiter** 61:22,25 93:25 94:2,9 94:22 95:2 106:1 107:13 108:10,16 110:10 115:3 172:24 176:19 187:11 190:12 234:19 244:25

**Leiter's** 95:5 212:14
**Leman** 242:10 242:11,16 243:21 244:4
**lender** 31:16,17
**lending** 10:10,15 10:17,20,22,23 11:6
**length** 104:1 106:24
**let's** 34:14 120:1 181:20 205:6 211:4 229:15 257:7
**letter** 17:21 58:23 59:2 79:18 80:16 83:23 86:20,21 87:15 89:2,21 90:20 91:8 92:12,12,13,14 92:15,16,21,24 93:25 94:1,14 94:15 95:11,15 95:25 97:8,15 97:18 101:13 101:18 102:18 102:18,22,25 104:12 111:21 147:15,18,20 161:5 220:9 251:13 252:25 255:20,23
**letters** 58:20 59:15 77:3 90:14,24 91:12 92:11 93:8 94:16 100:22 101:1 109:4 134:16 192:16 198:1 239:3,5 239:8,10,15,19 240:8,12,16,18 240:20 251:22
**level** 25:3 37:18 81:16 111:11

170:23,24 228:25
**licenses** 10:3,4
**licensing** 9:25 10:1
**limited** 71:19 171:23
**line** 32:7 33:5 52:14 68:17 109:12 110:9 130:13 136:17 181:24 182:2,3 182:4,6,8 205:6 213:21 216:20 219:8 219:12 222:16 223:2,7,12,17 224:1,4,17
**linear** 162:6
**lines** 108:23 172:14 197:8 219:7 222:10 224:24 227:11 237:5
**lineup** 15:23
**links** 142:13
**Lisa** 2:5,6 4:25 88:20 113:8,12
**list** 8:1 36:12 43:6,7,7,8 63:19 85:11,16 91:10 118:3 182:17 186:2 191:8 197:3 199:23,23 234:14 249:3 249:15,16,16 249:17,18,21 249:24 250:1,2 250:12,19,24
**listed** 153:15 173:17 250:23 254:17
**listing** 199:19 216:3
**lists** 173:5
**literally** 26:20

33:9 151:5 169:6
**little** 64:22 109:6 151:9 160:21 169:25 182:16 200:14 211:4
**live** 16:4 62:11 70:20,24 71:1 71:3 175:7
**lived** 204:4,4
**lives** 70:22 74:15
**LLC** 2:6
**LLP** 2:12,20
**loaded** 189:7
**loans** 129:3
**located** 4:11 15:25 34:13 62:18
**location** 26:13 76:19 117:7 118:3 158:14
**locations** 27:14 106:17
**long** 18:22 64:9 66:4 71:24 135:4
**long-term** 151:8
**longer** 65:15 241:14,17,20 241:21
**look** 34:11 35:19 42:24 46:15 59:2 67:15 68:10 71:6,8,8 71:14 78:8 85:16,19 91:10 102:24 112:6 142:3 148:5 153:22 162:15 168:2 169:7,20 176:13 190:19 195:17 196:1 196:12 197:5 197:11,19 199:7,12 201:10 202:17

203:25 204:2 211:24 218:7 218:11 219:3,7 221:8 222:10
**looked** 16:22 26:4,6 35:9 36:4 37:14 58:23 92:13 94:17 124:21 184:13 192:25
**looking** 7:16 55:25 58:20 59:24 60:18 82:1,2 123:10 126:16 152:24 173:5 176:11 181:2 218:15 248:21
**looks** 15:2 101:16 102:17 105:25 107:15 108:21 109:16 110:8,13,22 117:8 124:23 124:24 146:24 148:13 150:12 150:13 157:1 170:19 172:21 173:25 176:17 177:9 191:25 195:10 197:20 199:17 205:18 207:5 209:12 210:15,21 212:20,25 213:4
**Los** 64:25
**lose** 82:18
**losing** 45:4 115:10
**lost** 15:2
**lot** 10:7 26:12,13 26:18 27:12 53:21 57:14 64:24 129:7 130:7 135:8,20 204:10 209:5

214:20 215:4 215:11
**lots** 10:11 19:14
**Louis** 67:18,24 68:16 69:5,10 70:1,10 89:4 117:12 172:2,3 172:4
**low** 142:11,17
**low-penetrating** 142:17
**lower** 81:15 226:10
**Lubbers** 13:3,19 13:22 14:4 21:17,21 22:15 23:12 24:17 25:21,25 36:10 42:18 75:21 111:4 118:16 119:15 120:13 127:8 137:17 137:18,21 161:10,19 162:10 165:10 204:18 207:8,9 207:12 229:8 237:2
**Lubbers's** 39:14
**lump** 253:14
**luxury** 32:3
**Lyman** 2:12

**M**

**M** 2:10,18,19 202:2
**M-C-N-I-N-C...** 233:6
**M&S** 121:24 122:3,9,15 125:3
**major** 32:2
**majority** 210:18
**making** 45:7 71:4 100:4 233:19,21
**man** 101:19

**manage** 40:1 81:17,21
**managed** 40:6
**management** 14:24 15:22 81:9,20 112:15 116:5 184:9,12 185:7 229:17 229:19 231:4
**manager** 12:2 13:2 14:9,10 25:3 28:23 39:19,20,23,25 41:16 79:19 80:8,18,25 82:3 87:17 88:8,16,18,19 89:3,16,17 100:8 161:4,6 162:20 203:16 205:11,12 207:12 228:11 228:23 247:23 247:23 248:16 248:17 253:18 254:1
**managers** 13:4 13:17,18 36:6 39:8 96:16 99:7,10,13 123:14,14,15 139:8 189:12 229:2,4,8
**managing** 11:13 194:21
**Manchester** 2:7
**mandatory** 11:4
**Manhattan** 2:14
**manner** 39:4,11 258:20
**manually** 203:20
**map** 68:10 195:12 244:7
**March** 42:15 49:3,15,24,25 51:3,10 89:20

89:22 90:3 92:15 93:24 95:9 97:7 100:17,23 101:14 102:14 164:2,16,16 179:20 181:23 184:4,4 185:12 185:19 186:20 190:1
**Marianna** 256:23
**Marina** 4:16 258:2 259:5
**mark** 13:2,19,22 14:3 23:12 24:17 26:5 39:14 42:17 50:9 51:24 53:14 62:25 69:13 75:21 77:6 82:2 111:4 116:18 118:16 119:15 120:13,24 121:1,2 137:21 142:24 161:10 161:17,18 165:10 167:19 206:12 207:8 248:19 249:8 251:7
**Mark's** 161:15
**marked** 16:17 77:8 92:10 103:6,16 112:8 116:22 121:19 121:20 125:15 152:9,18,25 163:23 167:21 178:15 191:12 198:22 206:17 207:18 215:17 215:21 216:3 248:21 249:10 251:11
**market** 26:10,12

35:22 38:1 64:18 65:10,11 65:15,20,24 66:2,11,21 67:2,6,11 70:21,22,24 71:1,3 76:18 126:21 131:23 132:4,5,8,9 135:9 141:21 141:24 142:6,9 147:20,22 153:5,7 157:10 158:13 204:5
**marketing** 14:24 15:18,22 16:10 122:16 122:19 192:10 247:23 248:16
**markets** 43:2 44:14 65:1,15 67:8,14,16 68:5,18 69:1 119:23 130:1,8 157:22,23
**marking** 16:14
**Martin** 14:8 121:3 162:1,2
**master** 249:15 249:16,18 250:12,19
**master's** 9:22,23
**match** 167:24
**material** 196:15 196:19
**materials** 25:18 26:2 55:8,8 120:16
**math** 145:5,6,8 146:14
**Matt** 18:13 60:20 61:7,14 66:1,3 74:16 83:21,23,24 84:3,6,12 97:8 97:10,13,16 98:3,7,23 99:1

102:15,19 105:20 118:1 143:4 144:2,25 145:24,24 149:10,17 154:4,16 155:13 160:11 181:24 183:23 184:10 187:5 188:14,23 189:12,15,19 216:21 217:2 217:12 218:3 219:8,13,15,16 219:24 220:11 220:21,22,24 221:9,10,16,18 221:24 222:6 222:12,16,21 223:2,7,12,20 223:25 224:6 224:14,21 234:16 235:8 242:20 244:25 253:18,23 255:15
**Matt's** 154:22
**matter** 4:5 8:10 10:19
**matters** 7:4 258:5
**Matthew** 1:5 4:5 17:21 99:7,13 100:11 107:21 251:14 252:6
**McBane** 13:10 21:17 22:16 23:13 25:19 36:10 70:8 88:17 113:7 114:1,3,6,7,7,8 127:8 184:11 186:11
**McCullum** 167:25
**McGuireWoods** 2:20

McNinch 233:1
  233:5
mean 12:24 37:1
  39:22 48:21
  55:21 56:15
  57:13 82:23
  108:7 109:13
  109:21,22
  123:10 145:15
  148:7 149:24
  150:6 160:9
  169:7 172:3
  196:5 207:21
  218:19 229:11
  253:11
Meaning 26:3
means 7:25 8:7
  147:19 148:12
  150:23 154:13
  171:20 205:14
  226:21
meant 76:5
meat 164:8
medium 119:23
  140:14 142:11
  147:21
meet 22:25
  40:19 228:4
meeting 22:16
  23:5,5,7,9,11
  23:14,16,17
  24:11,18 25:8
  25:11,19,23
  26:4,7 27:7
  42:12 50:17,23
  50:25 51:6,14
  51:15,21 52:2
  52:19,20,20,22
  52:23 53:12
  54:3,5,6,7,9
  112:25 114:3
  114:24 115:1,3
  115:6,12
  116:16 124:10
  127:5,6,16
  133:10 134:3
  156:10 164:10

164:13,14
  165:7,9,13,15
  165:16,16
  167:15 180:2,9
  181:23 191:25
  193:5 195:21
  237:7
meetings 22:23
  25:14 27:3
  42:3,3 52:3
  53:1,19,20,23
  53:24 54:1
  55:6,12,17
  72:7,16,19
  75:22 112:19
  114:20 116:1,6
  116:12 120:4
  124:19,25
  126:10 156:22
  165:11,12
  182:17 186:15
  186:25 187:1
  236:14,16,23
  237:1 248:4
meets 86:10
  187:14,15,20
  187:25 189:4
  190:7,12,20
Melissa 2:19 5:4
member 60:25
  62:8 114:15
members 39:21
  115:8 116:10
memory 58:17
  67:6,13 187:13
mentally 244:6
mention 39:18
mentioned
  38:18 39:24
  84:18 139:2,7
  147:22 158:2
  162:1 188:20
  227:3 243:10
  244:14 254:9
mentioning
  225:25
message 115:22

met 23:1 31:9
  36:11 38:15
  42:12 51:11,11
  53:5 126:10
  127:7 192:2
methods 24:8
metrics 184:20
Metro 214:19
metropolitan
  32:2
Miami 65:1
Michael 191:15
Microsoft 207:6
Mid-Atlantic
  13:8 29:3
  205:16,18
middle 5:13,15
  86:23
Midwest 13:10
  29:2 60:24
  61:3 68:8,13
  68:19 70:7,12
  88:9,11,13
  89:3 112:21
  146:20,25
  182:13 214:21
  243:11
Midwestern
  61:12
might've 122:8
  122:8
Mike 54:22
  125:4
million 45:19,25
  46:16,19
  174:16
Milwaukee
  224:14
mind 212:3
minimum 54:21
Minnesota
  209:13
minutes 38:22
  91:18 159:1,2
  159:3 169:7
  246:9,9
mischaracteri...

145:19
misheard 84:12
misrepresenting
  101:6
misrepresents
  90:7 180:5
mission 195:13
Mississippi
  135:20
misspoke 72:19
Mitsu 171:5
Mitsubishi
  106:14,16,18
  171:5
Mm-hmm 66:15
  76:20 103:9
  144:16
mobile 50:21
  63:8,10,17
  69:15 84:7
  86:8 149:3,4,4
  149:5,10,17
  150:7,8,9,15
  150:16 151:1,1
  151:9 154:24
  156:10 159:14
  159:20,24
  160:5,12,17
mobility 62:21
  62:25 63:22
  64:1 70:18,21
  139:3 148:21
  148:23 149:2,8
  149:11,25
  150:6 153:22
  153:23 154:4
  154:23 155:1
  155:13 157:12
  159:19 160:3
  160:17
mobility's 70:25
  71:2
modifications
  77:2
Moines 34:15,19
  64:21 68:1
moment 174:14

215:20 257:4
moments 59:10
  175:7
money 128:23
  128:24 129:2,7
  129:9 162:22
  163:2 175:9,24
moniker 141:15
monitor 7:22
Monohan 95:10
  95:12,22 96:1
  96:4,8,20,22
  105:23 107:10
  108:2 114:4,7
  115:1 172:11
  172:25 176:23
  187:8 188:6
  224:24 225:11
  225:18,20
  226:1 234:22
  244:25
Monohan's
  182:8 183:3
month 32:10,11
  32:12,14 129:6
months 116:14
morning 4:1
  5:10
motor 1:11,16
  1:17 4:6 10:2,3
  93:6
Mountain 13:15
  28:21 29:2,5,7
  55:21 56:16
  78:19 81:5
  84:21 119:7
  201:1,3
move 47:1 48:10
  49:23 50:12
  62:14 63:11
  65:6,7 70:3,9
  83:14 151:6
  160:13,18
  175:12,18
  202:11
moved 66:3
  67:12 69:22,24

69:25 176:5 210:19,21
**moving** 62:19 97:7
**Murano** 14:25
**must've** 117:16 119:16
**myriad** 24:2

——————— **N** ———————

**N** 176:13 177:11 202:2
**N/A** 108:24,24 108:24,24
**name** 4:16 5:11 5:13,15 14:9 14:11 66:17 72:23 73:2,3 104:19 105:7 130:9 147:8 149:10 153:4 162:6,16 181:25 182:3 182:12 188:15 203:6,6 213:2 221:25 227:4 228:1 243:23 243:24 244:19 244:20 245:24 246:24
**named** 208:6
**names** 8:1 21:5 49:13 104:7,8 105:7 133:15 133:20 147:3 167:3 171:6,11 183:14 200:4 243:17 253:21 253:25 254:2,5
**Nashville** 14:23 24:17 25:7 51:7 62:10 161:15
**national** 13:1,20 146:16
**nature** 26:19 28:19 32:1

53:7 99:5 141:13 252:12 252:15
**NCCD** 82:12,12 82:17
**NDA** 128:9,16
**NDAs** 53:10,11 128:10,12
**Near** 171:25
**nearing** 241:10
**nearly** 130:11
**Nebraska** 68:1
**necessarily** 51:19 74:7 166:22 179:25 181:16 241:9
**Nedra** 85:23 86:2,6,12,17 117:9
**need** 6:1 8:23 40:5 65:6,7 139:22 143:23 145:15 159:1 166:10 169:24 180:16 198:15 199:14 212:2 218:11 220:6 246:12
**needed** 28:9 40:1 46:7 54:15 166:14 166:16,22 175:12 183:24 233:22
**needs** 8:20
**negative** 46:11 170:20 173:25
**net** 167:23 169:20
**network** 32:1 56:2
**never** 43:8 74:14 115:22 201:24 212:3 214:24 228:4 229:13
**new** 43:17 56:4 64:25 78:24,25

79:8 115:9,11 117:6,11 118:2 126:15 128:2 129:13 130:8 132:12,14,20 132:25 133:8 133:25,25 134:5 138:8 162:24 166:12 166:13 174:5,6 190:4 193:1,3 194:6,21 196:14,15,18 196:22,22 203:23 209:13 210:14 211:1 213:2,2,3 214:17,19,20 216:4,23 217:13 218:4 219:24 222:12 222:17 223:3 230:19 231:16 231:20 236:9 242:4 244:18 248:23 250:6 250:10
**newly** 81:9 213:1,6
**Nick** 13:11 23:12 24:20
**night** 25:13,17 34:20
**Nine** 106:23
**nine-block** 141:17,19
**Nissan** 1:10,11 1:16,17 4:6,6 5:3 7:4 8:11 11:23 14:14 15:16 18:1 19:4 23:22 24:24 28:8,14 28:14,24 29:6 29:10 30:1,5 30:11 31:22 32:5 34:14

35:4 41:24 46:3 49:9 52:9 53:8,23 54:17 54:19 55:4,5,6 55:17,19,20 56:22 57:8 58:6,10 62:3 69:9 86:21 87:9 91:2,13 93:6,12 95:3,6 96:4 97:3 98:23 99:2,16 102:4 103:23 106:15 108:8 109:22,24 112:19 119:5 119:13 123:11 123:18,18,21 125:8,18 126:2 126:3 129:1,2 129:7,15,22 138:6,8 141:18 141:19 154:10 163:22 175:23 177:13 191:19 192:10 197:18 200:4 201:5,6 210:24 213:22 213:23,25 215:12 217:3 217:23 222:12 222:23 223:4,9 223:14,18,19 223:24 224:5 225:17 233:7,8 241:8,15 244:23 245:1 245:20 252:4,7 252:18,22 255:23
**Nissan's** 125:25 130:13
**Nissan/NMAC** 93:18
**NMAC** 8:12 10:18 12:6,10 12:13 13:4

16:10 17:25 19:4 28:13 29:6 30:5 32:11 53:24 54:12 57:4 58:12 59:21 93:11 94:9 96:5 97:5 98:23 99:2,16 102:4 104:2 108:9 118:6,9 118:24 119:17 121:16 124:18 125:21 126:3,6 129:22 130:6 136:24 137:2 164:1 183:2 191:20 195:15 198:21 208:25 221:9 228:12 228:18 230:7 233:7,12 241:8 241:15,22 242:23 243:6 243:13 244:3 245:19,25 249:23
**NMAC/Nissan** 18:11 96:2 102:7
**NNA** 58:6 71:1 122:10,21 128:12 138:22 221:9
**no"s** 6:8
**non** 68:24,25
**non-developm...** 69:1
**non-privileged** 202:12
**non-starter** 68:25
**nondisclosure** 53:2,4
**normal** 46:10
**north** 1:10,16 4:6 5:3 8:11

35:24 54:17,19 55:22 56:22 57:8 58:6 93:12 95:3,6 99:2 135:10 192:10 212:9 212:16,20 213:4 214:19
**Northeast** 13:7 13:7 29:3 135:13
**Northern** 1:2 4:8
**Northwest** 28:22 29:2,4,7 55:21 56:16 81:5 119:7
**notarial** 259:2
**notary** 4:17
**notation** 188:14 188:23 228:9
**note** 7:1,2 18:5 165:16 250:16
**notebook** 7:6
**noted** 90:11 149:22
**notes** 6:21 7:3 109:11,16 110:18 203:25
**notice** 16:15 58:23 60:17 79:9 95:23 97:10 100:17 100:23 101:20 256:17
**notices** 49:16
**notified** 90:4,15 95:13 113:13 113:21
**notify** 94:2
**notifying** 112:25
**nuance** 43:10 142:14 193:2
**number** 1:8 3:7 32:5 34:9,9 35:7 71:12 76:15 79:18

83:2 89:21 92:15 94:1 103:20 130:15 135:2,6,24 141:13 142:18 144:4,5 145:13 147:16,19 158:3 163:21 167:24 168:13 168:15,18 174:15,16 190:3,4 205:7 215:16 224:25 251:15
**number's** 107:25
**numbers** 38:9 78:2 165:2,5 168:3 169:13 176:11 215:4 225:5 253:22
**numerous** 141:8

———————
**O**
**O** 173:10
**O'Brien** 85:13
**oath** 4:19 31:4 92:8 206:9 246:19
**object** 18:4 19:6 63:25 75:9,13 127:13 196:20 212:5 228:14 256:4
**objected** 58:21
**objecting** 100:20
**objection** 18:16 18:21 19:7 25:20 26:24 29:21 33:23 34:6 35:14 37:12 38:17 40:16 41:20 44:4 46:5 47:5 49:19 57:12 59:22 60:11

61:9 62:5 63:18 66:12,22 67:21 68:22 73:16 74:6 81:14 82:22 83:5 84:17 86:14 90:7 93:14 99:19 100:25 101:9 117:19 120:5 127:13 132:15 132:17 133:2 133:19 134:7 135:25 137:22 140:21 141:6 141:22 142:8 145:18 149:13 149:20 150:1 150:11 151:20 152:21 153:18 155:16 156:25 157:8,13 159:17 160:1,7 160:15 163:13 167:6 168:21 169:4 175:2,5 177:21 178:23 179:14 180:5 183:5 184:21 185:1 188:3,9 188:25 189:6 189:22 191:1 198:7 199:21 200:9 201:17 202:4 204:19 204:25 205:22 209:7 216:6,16 217:6 220:14 227:18 236:2 236:10,18 237:13,21 238:5 239:14 245:2,15,22 247:12 248:2 250:14 251:3 255:17
**objections** 101:9

**objective** 140:20
**obtain** 9:6 54:12 166:23
**offline** 59:5
**oftentimes** 150:24
**oh** 13:14 20:13 36:18 50:25 59:16,17 60:1 60:3 75:17 76:7,17 77:21 80:14 84:12 87:4,4,4,7 101:17 111:19 113:6 117:12 140:17 158:20 158:23 161:15 174:17,17 176:7 179:4,7 180:14,15 183:18 186:8 196:4 199:2 212:2 216:13 219:3 221:4,14 229:25 235:10 243:1 254:23
**Ohio** 89:18 117:11
**okay** 4:1 6:6 7:8 7:18,21 8:6,23 9:1,2,12,19,22 10:6 13:1,16 13:22 14:13 15:7,8,12,14 15:25 16:24 17:4,6,15,18 18:8 19:13 20:2 21:14 22:14 26:6 30:13 31:1 33:15 35:9 36:8 38:24 40:7 41:7 44:10 47:18,21 47:24 48:16 52:17 54:3 59:5,7 60:3,17 62:16,19 64:5

**obviously** 30:18 33:11 129:17 166:20 203:6,8 255:25
**occasion** 247:25
**Oda** 104:11,12 104:18 105:2 106:7 171:3 173:2,3 176:19 183:13,18 235:1 254:10
**odd** 40:4
**offer** 50:2 58:12 95:25 102:20 109:7,8 117:15 142:4 160:18 172:4,8 235:24 240:6,7 253:13 253:17
**offered** 46:23 57:4,8 58:7,9 58:11 63:23,23 64:3,6,6 77:3 78:22 79:8,19 80:18 83:24 85:17,24 86:2 87:18 88:8 89:2,12 90:18 93:5,11 94:9 94:12,13,16 95:2,22 96:4 97:16,22 98:1 99:17 102:3 104:22 105:2 109:4 117:13 118:2 235:9,16 238:14,15 240:2,2 252:21 255:2,4
**offering** 57:2 78:25
**offers** 47:11 49:16 192:7
**office** 24:23 82:5

82:5,9,21 83:3 164:17 166:13

66:18 74:24
75:25 76:23
77:14,25 78:5
78:7,13,22
80:3,10 82:17
83:21 84:23
85:21,22 86:25
87:1,15 88:1,6
88:23 89:1,19
89:19 90:3,14
91:14,18,20,21
93:5 94:15
95:1 100:16,16
101:1,11
102:11 103:4,6
103:15 104:6
104:14,16,22
106:20 108:2
108:10,16
109:6,18 110:4
110:24 111:14
112:6,21 113:6
113:13,25
114:3,9,23
115:8,15 116:8
116:17 117:5
117:16 118:6
118:11 120:21
121:4,13,17
122:7,17,20,22
122:24 123:3,4
123:17,19,25
125:1,12 126:5
127:12,23
128:23 129:10
129:19,23
130:14 131:5
131:14,21
132:4,11
133:14,24
134:18,24
135:18,21
136:4 137:19
138:12,17
139:10 140:2
141:20 143:2,4
143:9,16

145:10,13,24
146:5,10,15,16
146:17 148:5
148:11,18
149:6,24 150:8
150:19 151:11
151:14 152:1
152:15,17
153:22 154:3
154:12,15
155:21 156:21
158:17 160:20
160:24 161:9
161:18 162:5
162:12,21
163:19 164:13
164:19,23
165:4,22
166:19 167:14
167:18 168:5
168:11,19
169:21 170:2
170:14 171:1,6
172:6,13 173:8
173:12 176:1,3
177:16 179:17
179:20 180:2
180:11,16
181:9,21 183:1
183:11 192:2
193:14 194:5
194:10,11,15
194:18,25
195:5,12,20,23
196:2,17 197:2
197:12,18,24
198:10,12,14
198:17,18
199:13,17
200:4,18 202:1
202:19 204:7
205:5,20,24
206:1,3,25
207:14,25
208:9 209:4
210:18 211:3
211:12,22

213:8,13,24
214:8 215:1,13
215:14 216:9
216:19,20
218:16 219:4,6
219:12,21
220:4 221:8,24
222:5,10,16
223:12,17
224:4,13
225:17 226:17
226:23 227:6
227:22 228:2,6
228:22 229:4
231:5,17
235:13,13,15
236:23 238:1
238:19,22
239:2 241:13
242:1 243:6
246:7,22 247:5
249:1,6,23
250:5,18 251:7
251:22 252:2,9
252:16,25
253:16,25
255:25 256:12
257:1,4,9
**Oklahoma**
117:9
**old** 201:1 250:6
**older** 74:2,3
83:3 162:22
163:1,11
**once** 34:8 41:1
41:22 134:11
**ones** 27:9,10
46:22 98:10
108:23 111:15
173:15 174:1
183:9 207:20
220:11 225:4
238:14 244:8
255:1,4
**ongoing** 173:16
174:2,4,17
**op** 14:14 15:15

157:5 207:13
**open** 7:14 85:3
85:15,17
135:20 167:18
169:24 195:15
**opening** 11:10
**openings** 245:11
**operation** 13:24
41:19 136:23
**operations** 12:9
12:12,16,22
13:2,21 16:6
16:12 39:15,20
80:18,25 82:11
82:14 83:19
86:17 123:15
161:3,6 162:8
198:21 229:5
**operator** 4:17
**opportunities**
96:14 98:20
**opportunity**
40:3 85:21
115:20
**ops** 207:10
230:23 231:18
**optimization**
121:24 122:9,9
125:21 191:20
**Option** 171:16
171:20,24
**options** 96:23
119:25
**Oracle** 138:5,19
**order** 121:10
166:2
**Oregon** 35:23
**org** 126:6
132:12,14
164:1
**organically**
98:19
**organization**
20:19 78:24
132:16,19
133:25 134:5
194:22

**organizational**
228:10
**organized** 25:18
26:1
**original** 49:6
112:5 124:9
127:5 179:5
**originally** 84:8
84:11 111:25
112:2
**originated**
118:23,25
119:18
**originations**
119:1
**Os** 61:20
**outcome** 137:12
258:21
**outlay** 45:11,11
46:7 54:16
175:9,24
**outlook** 45:12
**outs** 30:17 48:13
**outside** 70:24
80:8 170:14
192:9
**overall** 53:7
130:21
**overnight** 25:11
**overqualified**
65:17
**oversaw** 171:4
**oversee** 15:23
**ownership**
177:10
**owns** 35:1

---

**P**

**P** 173:25
**P-A-U-K-E-N**
143:10
**p.m** 91:22,25
159:7,10 206:3
206:6 246:14
246:17 257:12
**Pacific** 29:1,4
55:22 56:16

119:7
package 57:3,7
packages 58:15
  118:19
page 3:7 59:3
  78:13 88:6
  131:7 143:2
  144:8,10
  146:15,16
  147:3 151:12
  152:19,22,24
  159:12,13,15
  159:22 160:22
  160:22,24
  164:19 165:2
  165:24 169:1
  178:19 179:5
  179:10,18,23
  180:18,18
  181:21 182:23
  193:14 194:3,6
  194:20,20
  195:7,9 196:14
  197:3,21 199:5
  201:20 206:23
  211:4,6
pages 78:2 122:5
  122:13 142:7
  164:9 167:8
  180:3 195:3,17
  196:3,22
pandemic 24:7
  116:14 228:4
paperwork
  58:13 240:25
  255:16 256:2,6
  256:9
Paplexis 41:12
  86:21 87:9
Pardon 138:10
  155:6 243:20
  246:8 248:9
part 20:18 27:15
  30:15,15 35:17
  36:18,19 41:12
  50:7,8 52:1
  55:9,9 56:18

56:18 58:2
68:8,11,12,13
70:7 72:21
81:3 113:16
114:15 120:4
134:24 156:12
156:21 157:16
157:18 158:5
165:8 178:24
201:3,4,5,6
205:15,15,17
217:1 229:23
229:24
participants
  27:18
participated
  50:5
particular 20:1
  86:21 101:13
  102:21 178:18
parties 4:3
  258:6,18,19
partner 232:10
partnership
  106:16
parts 68:1 80:1
  201:1
pass 38:21
pasted 157:2
path 141:11
Pauken 85:12
  143:10 216:23
  216:24 217:4
  217:13 218:4
  219:9,14,15,17
  219:24 220:10
  220:15,25
  221:9,16,18
  241:13 243:12
Pauken's 243:25
Paul 226:6,17
pause 17:8
pay 163:10
  177:13
PDF 78:1
Pearl 13:9
pen 142:11,11

142:11
penalty 6:17
penciled 133:7
  133:12
pending 8:24
  196:14
penetration
  27:13 31:16,19
  32:9 129:2
  141:21,24
  142:7,10,12,15
  142:18
Pennsylvania
  9:11
people 8:1 19:14
  21:5,19 22:9
  23:8,23 24:16
  24:25 25:6,15
  28:10,18 30:19
  31:8 36:21
  50:20 60:15
  62:22 63:2,15
  63:22 64:2,3,5
  65:14,17,25
  69:16,19 72:8
  72:9,11 73:2
  73:11 74:12,14
  81:17,20 82:3
  82:20 83:2
  101:2 104:8
  105:8,15
  112:12 115:9
  119:14 128:4
  132:23,24
  133:24 136:25
  137:3 139:15
  139:17 151:2
  159:22 164:24
  171:12 174:6
  174:21,25
  181:3 186:3
  191:5 192:16
  197:9 204:3
  213:15 214:5
  214:12 231:25
  232:4 233:12
  234:7,11,13

235:15,18,20
237:8 238:3
245:20 253:1,4
253:9 254:13
255:12
people's 72:21
percent 31:19
  32:8,10 142:20
  144:22 145:1
  145:14,14,22
  145:23,25
  146:5,8,12,12
  183:24,25
  186:7 188:15
  188:24 189:13
  190:24 193:18
  193:19 241:22
percentage
  142:18
percentages
  27:13 215:8,9
performance
  37:24 86:13,15
  131:18 132:2
  189:15,20
  190:8,13,17,19
  190:22,25
  191:3
performer
  141:9
performing
  26:15,16
period 12:11,21
  38:5 67:3
  90:23 96:5,9
  96:12 213:24
  221:19 230:7
  231:24 241:11
  247:16 248:14
perjury 6:17
person 8:8,11
  16:25 17:19,22
  17:25 18:5,11
  18:16,24 19:15
  19:22,25 20:23
  21:25 25:22
  36:3 39:14

45:11 51:6,11
53:18 59:12
60:4 64:14,17
65:8 73:11
74:20 77:1
98:15 109:13
110:10,14
114:19 121:14
130:15,21
137:9 139:9
147:25 148:6
149:9 154:24
158:15 159:23
161:23 181:13
192:2 204:22
205:1 220:25
224:20 227:15
232:3 238:2
242:8 253:16
255:25
person's 73:13
  170:24
personal 150:25
  151:10
Personalize 17:9
personally
  245:12
personnel 11:13
persons 59:14
  59:14,20 104:7
pertaining 7:3
Peter 2:18 5:1
  196:15
phase 40:23,23
  41:4,6
phone 6:23
  71:12 96:23
  97:1 99:12
  248:6
phones 7:10
  81:24
physical 71:11
  158:13
physically 34:13
  158:15
pick 136:17
picture 73:7,14

73:25 74:1,10
74:11,13,16
picture's 73:8
pictures 72:9,11
72:13,17,21
73:6,10 74:15
194:21
piece 207:15
pieces 47:13
56:14
Pitchford 85:23
172:1,19
pivot 211:8,9
214:4
place 25:9 63:13
133:15 154:16
154:23 155:9
175:14 230:6
236:12
placed 62:3
90:22 133:7
236:9,24
237:19,20
placement 238:2
Plaintiff 1:6 2:3
4:13,14,25
Plaintiff's 18:2
18:13 20:16
plan 34:25 58:24
89:12 154:14
154:15 189:16
189:20 232:15
planned 112:1,3
planning 156:10
228:11,12,18
228:23,23
229:1,6,10,23
229:25 230:6
230:15,21
231:2,15,25
plans 231:5,13
232:4,5,8
plated 10:4
play 41:15,17
please 4:18,22
5:10,11 8:12
8:19 18:9 30:7

34:1 83:14
93:22 158:19
202:11
plunge 65:6
plus 42:19 58:17
PMK 256:12,20
point 8:10 21:23
22:10,12 24:4
31:20 33:6
35:6,16 36:15
37:2,4 40:6
45:2 47:24
55:2 57:21
59:4 63:7
66:23 75:5
91:15 119:10
124:16 125:24
130:1 150:13
150:14 157:21
207:25 214:8
217:3 219:22
239:7 245:19
points 155:13
pond 39:4
poor 197:19
populate 110:25
111:5
populated
135:14
portion 178:19
180:3 192:25
256:13
portions 121:8
position 12:4,7
14:13,16,21
20:7 49:23
60:21 61:8
64:9 68:21
74:25 78:16,20
78:25 79:2,8
79:19 80:4,11
80:18,22,24
81:9,11,13
83:24 84:4,24
85:2,24 86:2
87:18,23 88:8
88:23 89:3,7

89:15 90:4,5
90:15,16,23
92:17,18,22,23
92:25 93:6,16
94:3,4,7,11,16
94:17 95:7,13
95:14,17,19,23
97:2,12,22
100:18 101:20
101:21,25
102:19,21
104:9,23 105:3
117:24 133:25
148:16 153:8
160:13 172:13
183:3 252:20
253:23
positions 17:23
22:3 46:23
48:3 49:17
50:21 56:25
59:20 67:17,18
68:21 69:6,11
69:16,23 70:18
70:20 80:1,5
85:3,9 98:22
110:19 133:8
170:11,11
171:7,10
172:17,23
173:21 174:5
175:1 197:13
199:24 213:15
237:10 254:2
255:3,4
positive 46:11
possibilities
183:21
possibility 220:3
possible 22:9
38:20 52:3
73:17 114:16
124:14 183:10
possibly 34:20
69:21 126:11
172:11
post 94:13

posted 96:14
potential 60:14
131:18,23
132:1 141:10
154:1
PowerPoint
120:14,17,20
120:22 121:5
121:15 124:18
125:22 126:6
140:4 141:20
142:4,7 152:25
155:12 156:22
157:3 163:22
164:1,6 167:24
179:22 191:11
191:23,24
193:10,13
194:1 198:6
199:20
PowerPoints
27:2 120:3,15
141:25
practices 11:6
11:21
precious 59:8
preconceived
120:1
preparation
16:23 58:15
98:16 99:21
117:3,4 120:7
142:10 144:3
186:1 199:10
202:15 213:17
215:22 241:4
251:25 256:10
prepare 57:15
82:23 117:4
118:11,16
120:3,8,13
prepared 19:18
20:9 118:22
120:10,17,22
120:23 182:21
preparing
120:16

preposition
117:4
presence 258:14
present 2:24 5:2
54:17,20 55:2
258:6
presentation
37:18 122:4
166:8 167:2,11
167:14,25
178:20 179:10
194:11
presentations
121:16 195:19
presented 27:2
48:8 54:21,24
54:25 179:21
179:25 195:8
195:10
presenting
54:11 125:25
president 14:17
16:10 45:8
54:12,22 72:25
72:25 122:3
123:13 166:3
166:11 175:8
195:15 247:21
president's
175:18
presumably
84:9,10
pretty 47:19
49:10 69:24
104:17 187:24
203:15 241:21
250:21
previously
128:20 180:7
primarily 53:7
106:19
primary 24:8
40:24 180:8
print 75:23
197:16
printed 27:24
75:21

**printing** 137:21
**printouts** 76:4,5
**prior** 12:7 14:13
　14:21 15:15
　19:19 49:1
　51:3 54:25
　80:25 94:10
　117:23 148:22
　151:12 195:4
　216:22 217:13
　218:4 219:23
　222:12,17,22
　223:3,8,13,20
**privacy** 10:24
　192:13
**privilege** 202:5
**privileged** 75:16
　202:10
**privy** 205:3
**pro** 180:23
**probably** 24:4
　37:19 39:18
　49:12 63:7
　90:1 118:17
　138:2 179:5
　195:18 197:9
　204:6 214:16
　230:10,24
　246:12 249:19
**problem** 15:12
　19:13
**proceed** 5:7
　22:11 166:25
**proceeds** 6:2
**process** 6:1
　17:20 36:15
　38:4 56:21
　72:21 73:4,7
　73:10 75:6,22
**processes**
　233:20,22
**produced**
　141:25 154:9
　178:14 185:25
　220:3
**product** 202:5
**products** 12:5

15:19,23
**professional**
　74:13 150:25
　151:10 233:7
**profile** 71:15,17
　72:13,22 73:7
　73:25 74:1
**profiles** 74:19
　139:4
**profit** 129:1
　130:9
**program** 255:13
**programs** 7:14
**progress** 229:13
**progressed** 67:6
**progressing**
　229:13
**project** 37:15
　46:10
**projection** 46:6
　46:8
**projections** 46:4
**Promote** 151:18
**promotion**
　81:16
**promotional**
　96:14
**prompt** 17:8
**proper** 36:20
　136:22
**properly** 85:20
**Properties**
　155:25
**propose** 45:10
**proposed**
　111:24 167:1
　240:16
**protected**
　192:13
**provide** 58:22
　72:6 85:10
　119:24 167:3
**provided** 60:8
　62:20,23 63:12
　75:6 169:1
　174:13 177:9
　203:7,10,13

255:15
**providing** 16:1
**proximity**
　135:10 158:13
**public** 4:17
**published**
　127:17
**pull** 38:19 72:5
　110:24 111:4
　120:25 121:18
　168:10 203:2
　215:15 221:22
　248:20
**pulled** 26:12
　120:22 138:3,9
　139:3 203:5
　204:18
**pure** 35:5 38:8
**purpose** 21:2
　175:17 180:2
**purposes** 23:10
**pursue** 229:18
**pursued** 102:6
**pursuing** 98:23
**push** 7:6 211:8
**pushed** 90:1
**put** 19:11 20:12
　27:6 37:21
　65:22 72:8,23
　73:3,6,10 74:9
　74:10 103:6
　109:17 111:16
　121:9 132:2
　150:15 152:6
　167:24 171:23
　176:7 186:6
　188:22 189:15
　198:5
**putting** 46:4
　150:2,3 188:14

**Q**

**qualified** 17:25
　18:11 19:4
　64:9 69:5
**qualitative**
　34:11,24 35:13

37:14 38:20
　141:12 185:4
**quality** 197:19
**quantitative**
　35:5 38:21
　140:18,19
**quarter** 12:21
　12:23 157:24
　186:18,19,20
　186:21
**question** 8:14,15
　8:18,19 12:18
　18:8,9,19,22
　19:7 20:4 22:6
　30:6,13 33:24
　34:1 38:2
　47:13,16,20
　51:8 61:5
　63:14 83:6,7
　83:10,14,15
　100:23 118:23
　122:14 127:21
　127:24 132:22
　135:4 136:2
　139:20 140:16
　143:22 148:21
　151:21 154:12
　155:5,7 156:15
　196:9,13,23,25
　201:8 202:12
　212:6 221:13
　228:15,18
　238:17,20
　243:1 252:2
**questioned**
　100:22
**questioning**
　19:10 101:3
**questions** 8:25
　18:6 19:20,24
　20:8,9 57:15
　58:25 118:20
　149:2 196:11
　217:25
**quick** 205:25
　246:6
**quickly** 31:25

211:20
**quite** 29:24 30:7
　61:5 214:17
**quote/unquote**
　39:7
**quotes** 161:4

**R**

**R** 129:10 242:5
**R/A/D** 129:11
**race** 73:13
**raise** 4:19
**raised** 6:16
**ran** 215:4
**range** 255:9
**rank** 38:3
　130:25 131:1
　140:12 147:16
　184:7,20,25
　185:2,8,23
　186:3
**ranked** 38:7,12
　130:18,24
　131:1,10,11
　184:5,8,10
**ranking** 130:20
　130:21 131:15
　131:15 139:10
　139:10,12,15
　139:16 140:23
　147:19,24,25
　184:14,17
　185:24 186:4
　190:10 201:23
　201:24
**rankings** 139:19
　140:17,22,25
　141:4,7 146:23
　153:1 157:16
　157:18
**ranks** 140:15
**Rapids** 210:17
**rarely** 187:16
**rate** 130:1
**rates** 174:10
**rating** 86:10
　130:2 141:17

141:19 187:21 190:13 200:6 205:9
**ratings** 187:13 188:1,7 197:12 203:10
**Ratings/Size** 128:17
**ratio** 35:19 36:5 36:21 136:22 214:14
**ratios** 128:23 129:25 130:4
**Ray** 149:9 208:24 209:4 221:24 222:1,4 222:13,17,22 223:3,8,13,21 223:25 224:5 224:14,20 242:1,19,23 243:10
**Razo** 61:13 149:9 208:24 209:4,15 221:24 222:1 222:13,17,22 223:3,8,13,21 223:25 224:5 224:14,20 242:1,19,23 243:10
**re-certified** 10:21
**Re-Org** 118:6,9
**reach** 244:24 245:10
**reached** 53:15
**read** 18:10 104:8 117:8 123:6 164:5,8 197:6,23 200:10,16,19 254:24 256:16 256:24
**readable** 198:3
**readdressing**

119:11
**readily** 39:6 218:15
**reading** 110:22 212:23
**ready** 67:11
**realigned** 69:21 183:16
**realignment** 33:7 214:10
**realignments** 27:14
**realize** 198:2
**realized** 45:24
**really** 10:19 18:22 29:25 37:19 42:22,24 43:9 48:13 51:13 53:6 56:8,14,15 106:18 119:12 129:2,5,7 131:25 132:1,7 136:21 141:13 162:16 169:6 180:14 197:6 197:22 203:14 213:5 227:19 228:4 229:15 230:3 252:14
**reason** 6:13 28:7 32:7 63:22 64:1,5 69:22 93:2 154:8 180:8 181:8 198:5 250:18 254:8 255:13
**reasons** 18:2,12 64:2 65:16,21 150:25 151:8 214:25
**reassigned** 174:7,22 214:25 215:2 217:3
**reassigning** 39:7
**recall** 11:17,19

22:21 23:4 24:15 27:5,20 29:13,25 36:13 37:8,17 38:13 40:17,25 42:9 42:13 49:4,14 49:25 50:15,16 50:19 51:9 52:25 53:4,9 53:18 54:2,9 55:2 57:1 62:7 66:3,9 67:19 67:23 70:6 74:12 76:4 79:25 84:25 86:15,17 90:25 98:18,22 99:11 99:14,23 100:1 100:12 109:15 112:5 114:25 115:2,5,7 116:5 121:9,11 128:8 134:10 142:6,9 144:4 144:6 151:25 164:11,25 165:3,9,22 167:7,9 174:24 178:3 182:20 184:22 185:21 186:4 187:18 190:11,14 212:18 216:1 226:2 227:4,25 232:2 241:5 247:9,10,17 248:10,24 250:4
**receive** 16:20 110:3
**received** 91:1,8 97:15 109:7,8
**receiving** 98:20 102:20
**recognize** 66:16 103:22 117:1,3 148:15 213:17

213:18
**recognizing** 129:14
**recollect** 244:8
**recollection** 11:22 51:12 52:21 93:10 227:15
**recommendat...** 20:24,25 21:24 21:24 22:1,10 38:24 39:1 40:2,7,8 41:22 41:23 42:23 47:25 48:5,9 48:17,19 56:17
**recommendat...** 20:19 39:16 40:9,20 47:4
**recommended** 40:15
**reconciliation** 218:12
**reconfigure** 136:15
**record** 4:2,23 5:11 6:9 15:5 19:8,11 30:24 30:25 31:2 90:8 91:21,23 91:24 92:3,7 145:19 159:7,8 159:9 180:6 189:19 196:5 206:2,3,4,5 246:14,15,16 257:7,11,12,13 258:8
**recorded** 1:21 4:10 258:13
**RECORDER** 4:1,21 5:6 15:1 15:8,12 30:24 31:1 33:25 91:21,24 92:2 92:4 103:10,15 138:13,17,25

159:7,9 198:16 206:2,5 246:14 246:16 256:25 257:10
**recording** 4:17 258:13
**recounting** 126:13 127:17
**RECROSS** 3:3
**recruiters** 96:18 99:6,10,13
**red** 173:21,24 174:1 242:5
**REDIRECT** 3:3
**reducing** 119:6
**reference** 20:21 100:21
**referenced** 17:5 17:20 59:15 77:3,7 166:2 201:23 202:23
**references** 58:2
**referencing** 164:20
**referring** 76:14 139:25 148:9
**reflect** 203:20
**reflects** 150:6
**refresh** 227:14
**regarding** 7:4 11:13,20 17:19 17:22 19:5 20:8,15 37:15 41:18 48:1,2 59:13 62:21 75:7,12 77:1 99:7,13,16,22 121:15,16 137:20 165:23 202:10 204:23 215:25 218:3 220:7 236:24 238:2 240:6 249:14 256:1,8
**regardless** 28:16 115:22 128:3 136:12

region 12:3
13:15 14:18
15:17 26:21
28:21,22 29:7
29:7 30:3 33:3
33:12,13,13
55:21 60:25
61:3,12 68:9
78:20,20 79:5
79:20 80:19
81:2,4,5,6
83:25 84:21
85:25 87:18
88:9,13,18
89:3 112:22
119:6,12
122:11,18
124:3 129:11
129:16 138:8
146:25 153:4
158:9 170:16
180:23 184:19
195:13 200:20
200:23,23
201:1,4 205:14
243:11,13
244:12 247:22
249:15,15
regional 12:2
13:3,17,18
14:17 15:16
28:14,20,23
88:16,17 116:5
116:6 122:9
123:13,14
125:21 126:15
126:18 128:2
138:7,23
144:20 158:5
160:25 166:13
197:10 229:6,7
229:8 231:2
247:21,22
248:16,16
regionalization
112:11 113:23
regions 21:11

28:3,9,13,25
29:10,11,13,14
29:18,19,24
30:9,10,18
36:19 39:13
43:3 56:5,13
112:20 119:24
128:16 129:15
129:19 162:10
regular 10:25
65:11 66:11
80:4 178:19
reissued 251:19
251:20
reiterate 60:10
90:11
related 10:15
11:6 258:19
relationship
34:11
relationships
26:14 42:25
43:11 106:13
relative 10:8
27:12 86:16
192:7 217:19
relayed 158:4
relevant 195:21
relied 25:22
188:14
relo 118:6,10,12
177:9,9
relocate 62:9,21
139:3,9
relocation
117:22 118:7,9
118:10,12,18
179:6
relocations
45:14
remain 208:16
remainder
21:20 41:2
42:20
remaining 39:7
115:8 158:9
remains 195:13

remember 27:9
27:10 29:17,24
55:16 57:2
66:3 68:16
87:10,12 98:18
99:23 100:3,9
100:15 112:2
151:23 164:15
164:18 165:6,8
167:13 178:11
186:24 187:1,3
187:5,8,11
193:11,12
199:10 228:7
230:25 231:20
231:20 242:15
243:24 244:18
reminding
41:13
remote 1:15 4:4
132:6
remotely 1:21
35:16
renamed 207:25
rental 177:10
reorg 31:8
118:24 119:1
119:17 120:2
157:6 189:11
reorganization
17:20,24 18:1
18:12,24 20:10
41:24 48:5,6
51:21 53:20,23
53:24 55:15
56:9 59:21
78:16,18
119:21 121:16
157:17,19
166:11 177:20
192:23,25
208:19
rep 226:24
repeat 6:1,6
34:1
repeats 196:1
rephrased 8:20

replaced 241:23
242:1,9 243:2
243:10,11,12
244:5
replacement
243:25
report 16:7,11
21:19 71:11,18
258:4
reporter 6:9
198:15 257:5
Reporting 1:23
4:11
reports 52:13,16
110:24 122:18
representation
28:2 78:1
218:3 250:19
250:25
representative
97:14 114:14
208:24
represented
34:19
representing
13:4
represents
217:18,19
219:22
reps 213:9
request 96:23
100:15 111:8
118:12 128:12
128:15
Requests 118:7
require 46:3
70:20
required 5:7
53:2 62:10
70:25 71:2,3
74:9 166:7
232:12
requirement
69:1 232:7,9
requires 70:21
research 21:8,15
22:14 24:12

27:3 36:9 38:5
54:4
reserved 258:24
resign 252:4,7
resources 41:10
41:16 48:24
114:14 118:18
221:22
respect 10:16
11:12 130:6
165:1 192:23
respond 18:6,17
response 113:2
118:13 248:8
responsibilities
233:10
responsibility
67:11 126:2
240:1
rest 122:13
257:3
restate 18:9 25:3
30:6 70:19
115:17 135:3
140:5,5,13
restating 140:11
restroom 205:25
246:13
restructure
17:23 20:19
41:23 55:6
67:24 234:6
restructured
35:24
restructuring
17:19 18:24
20:11 21:2,2
22:11 28:12,19
45:6 49:9 53:8
54:14 55:3
56:3 66:5 67:4
112:17,20
158:6 201:4
205:10,12,15
205:17
result 69:12,20
93:21 98:5

**retain** 70:2
**retire** 109:24
  110:2
**retired** 87:14
  192:12 242:12
  245:24
**retirement**
  109:12,18,20
  109:25 110:5
  110:11
**retrieved** 137:20
**review** 100:2
  125:22 177:24
  178:2,4 191:20
  191:23 196:6
  232:1 233:23
**reviewed** 90:24
  104:12 185:25
  239:10
**reviewing** 98:16
**RFSM** 52:19
  70:4,12 78:19
  112:25 113:7
  231:4 237:3
  242:4
**RFSM/AOM**
  112:24
**RFSMs** 13:3,16
  21:20 41:2
  43:9 50:11
  51:1,15,20
  53:2 54:5
  62:24 69:12
  134:11
**RFSMs/AOMs**
  249:23
**Ricardo** 61:13
**Riccardo** 221:25
**Rick** 85:13
**right** 4:19 15:20
  34:24 35:20
  36:1 40:2
  57:17,21 62:9
  64:18 65:1
  70:11 79:12
  86:23 87:15
  90:21 101:3

105:4 107:5,19
108:22 109:1
111:14 112:22
113:16,17
115:22 123:12
123:24 124:1
126:1 127:1,10
129:3 132:6,8
135:14 136:15
136:16 138:7
139:19 142:12
142:15 146:15
146:18,21
147:5,9 151:7
151:18,18
152:13 153:12
161:2 162:14
169:22 171:8
172:4 176:24
177:7 181:20
185:14 190:3
193:24 194:16
198:12 199:15
200:23 201:2
202:2 203:21
204:15 212:9
213:13 214:13
217:22 218:19
219:10 224:11
233:20 234:20
235:4,14
243:22 251:9
254:25 256:21
256:21,23
257:2
**right-hand**
  168:15
**righty** 15:25
**ring** 202:18
**rings** 190:2
**Road** 2:7
**Roberts** 13:8
**role** 12:14 23:24
  41:15,17 71:17
  72:1,3 82:3
  98:6 104:1
  126:16 141:10

148:17 181:15
230:19,19
241:20 243:2
**roles** 46:25 65:3
  94:13,13 98:10
  98:12 99:23
  107:17,18,21
  107:23 108:3,6
  108:24 109:5
  191:6
**roll** 196:10
**rooftop** 33:10,11
  33:11
**room** 7:21 23:3
  233:19
**Rosecrans** 2:13
**Rosen** 222:11
**rotate** 65:15
  181:12 211:1
**rotated** 67:13
**roughly** 32:7,12
**Rousseu** 200:25
**row** 108:13
  151:13 153:3
  171:24 174:1
  174:19 176:13
  177:4 195:4
**rows** 176:17
  200:24 202:1,3
  225:1
**RS** 53:2
**RSFMs** 42:17
  50:18
**Rubalcava**
  87:16 171:25
  172:19 226:7
  227:16
**Rubalcava's**
  226:11
**Ruben** 87:16
  226:7 227:15
**rules** 10:10,22
**run** 81:9 193:9
  215:11 246:12
  248:3
**running** 174:24
**rural** 64:20

**Russ** 223:9
  224:4
**Ryan** 14:8 121:3

———————
**S**
———————

**S** 233:3
**S-A-N-D-R-A**
  52:7
**S-I-D-N-E-Y**
  233:4
**S-I-E-B-E-L**
  138:16
**S-O-N-D-R-A**
  52:8
**Sacramento**
  212:9,10,17
  213:4
**safe** 208:7
**salaries** 45:3,15
  173:16 174:2,4
  174:6 177:12
**salary** 163:6
  173:20 174:18
  203:6 205:7
  221:18
**sales** 10:9,15
  12:9,12,16,22
  13:2,21,24
  14:14 15:15
  16:6,10,12
  27:13 31:14,15
  32:6 33:16
  34:17 35:6
  36:20 39:2,5
  39:14,21 41:18
  43:23,24 44:8
  56:4,9 79:20
  80:8,9,19
  81:10 83:18,25
  84:24 85:4,25
  87:18 104:3
  122:16,19
  129:20 130:9
  132:10 157:5
  162:7 180:22
  181:3 192:11
  193:3 198:21

207:10,13
208:8 209:24
210:22 227:16
229:21 230:23
231:18 241:20
244:9 247:4,24
248:17
**San** 212:9,16,17
  212:20,21
  213:4,5
**Sanchez** 66:10
  66:13 226:23
  227:5,10,11,25
**sand** 136:17
**sat** 229:9
**save** 65:24
**saved** 207:8
**saving** 45:19
**savings** 45:3,24
  46:15,19
  167:23,23
  168:23 169:20
  173:22 174:15
  174:23 179:23
  195:7
**saw** 100:1 125:8
  144:3 161:5
  215:22
**saying** 36:8 41:5
  63:15 82:4
  142:12 178:24
  239:25 250:16
  255:1
**says** 17:8,18
  78:23 79:23
  86:20,23 90:12
  104:2 105:6,22
  107:6,17,17,20
  107:23 108:2
  108:24 109:7
  112:24 118:5,5
  121:24 122:22
  125:3,21 126:6
  132:12 139:23
  144:20 145:8
  145:22 146:20
  147:15 148:20

149:9,10,11,15
149:24 150:8
151:18 153:6
153:25 154:1,5
154:7,13,16
155:1 159:13
159:14 160:17
160:24 161:4
161:10 164:5
165:19 169:23
170:10 171:5
171:25 172:1,1
172:2,2,2,4,8
172:10,12,13
172:16,22
173:9,19
174:20 181:7
183:23 188:15
190:23,24
193:17 201:12
205:13 207:8
208:8,12
217:15 224:12
224:18 227:13
228:9 232:14
249:23 252:2,9
253:1,7
**scale** 34:17
**scanning** 244:6
**scenario** 169:23
169:23 172:16
172:22 174:21
179:23
**scenarios** 165:5
174:25 183:10
**schedule** 23:11
111:24 112:10
**scheduled** 23:15
**school** 74:11
151:3
**science** 9:7
**scope** 32:1 59:1
214:24
**scopes** 118:19
**scratch** 82:1
**screen** 6:20 7:11
7:13,17,17,22

17:8 27:7
59:24 76:10
126:8 170:4
176:4,8 197:15
198:1
**scroll** 16:19
122:22 196:21
211:18
**scrolled** 180:13
**scrolling** 122:5
196:7 226:13
**se** 202:18
**seal** 259:2
**Sean** 14:9,10,11
161:20,21
249:12,13
250:2
**second** 5:24
42:11,16,21,22
43:7,13 45:1
46:21 50:23,25
50:25 51:6
53:9 54:5
77:20 123:1
143:21 147:4
149:10,14
150:17 162:8
199:5 227:3
229:24
**secondary** 9:20
**section** 8:7
173:13
**secured** 241:7
**sedans** 14:24
**see** 15:11 17:12
31:24 40:3
63:19 71:15,16
71:16,19,24
72:1,2 75:6
80:20 84:1
85:16 89:5
92:24 95:15
96:23 99:15
103:21 104:4
104:11 112:16
112:24 114:6
114:21 121:23

143:23 144:23
146:2 148:8
151:12 152:4
152:20 153:10
155:24,25
156:1 160:22
161:2,4,21
164:5 168:2,8
169:6,25 170:4
170:12 172:17
174:17 176:6,8
176:16 178:12
178:12,13
180:20,25
181:20 182:2
183:18 187:23
187:23 188:11
190:19 197:15
199:5,18
200:12,13,24
201:14 206:23
207:1 210:2,12
211:4,7,9
212:10 215:24
216:2,10,20
219:8,19,20
221:12 224:24
225:1,3,4
226:8,19 231:1
240:25 250:7
251:16 254:17
**seeing** 99:24
180:9 186:4
196:8 199:10
241:5
**seek** 193:6
**seen** 24:10 43:5
74:16 132:18
177:16 185:24
186:2 196:2
199:4,8 201:24
202:14 211:16
213:14,19
215:20 241:3
**select** 34:5 35:10
39:25
**selected** 47:11

60:20 61:7
237:9
**selecting** 31:7
**selection** 18:2,13
20:16 33:22
59:13,18,20
60:9,13 174:25
**sell** 31:18
**selling** 129:5
**semantics**
133:14 134:9
**send** 23:19
64:19 99:9
191:22 239:15
257:6
**sending** 6:11
32:13 34:18
64:25
**sends** 129:6
**senior** 13:2,4,20
25:3 41:16
54:22 65:14
122:3 207:12
228:10 229:1,4
247:23,23
248:16
**sense** 22:13
35:25 56:20
196:24
**sensitive** 28:18
53:7 192:6,8
**sensitivity**
115:19
**sent** 53:14 55:7
58:20 59:3
65:9 75:12
92:11,12,21
97:12 98:18
101:2 126:25
144:13 145:1
156:4 164:2,24
167:14 180:1
191:15 192:15
233:1 239:4,11
239:19 249:7
250:2 251:13
251:23 255:20

255:23
**separate** 54:7
252:4,17
256:17
**separation** 57:3
57:7,16 58:10
114:16 252:3
253:2 255:13
**serve** 39:3 55:25
119:9
**served** 57:9 58:8
**serves** 58:18
67:6,13 187:13
**service** 13:17
39:9 106:25
110:3 176:14
241:24 254:1
**services** 12:6
13:18 28:23
36:6 39:8 80:3
80:7 87:17
88:8,18 89:3
89:16,17
203:15 205:11
205:12 229:8
253:18
**session** 25:16
**set** 17:16 135:24
136:8 162:9
259:1
**setting** 126:22
**seven** 35:1 208:9
235:15,18,20
253:4 254:2
**seventy-six** 33:5
**severance** 45:14
58:12,13,14
89:12 163:8
177:11,12,13
183:24
**Shannon** 2:10
4:24 30:7
33:24 57:13
83:14 91:15
150:2 152:10
176:4
**share** 232:7

shared 27:25 231:7
shares 229:19
sharing 122:2 231:11 232:5
sheet 139:23 174:22
Sheridan 61:24
short 52:4 54:1 84:20 152:12
shortly 245:24
show 16:14 22:23 45:18 46:11 125:12 131:9 143:19 143:22 151:17 152:6 165:4 178:6,9,15,16 249:6
showed 44:22 226:1
showing 44:20 77:17 78:1
shown 200:3 202:16
shows 7:17 114:3 207:19 219:18 223:7 223:17
shrinking 56:7
sic 42:17 50:18 167:25 172:18 256:23
sic]-- 245:24
side 122:21 161:2 168:2,2 168:8,8,15,17 169:10,11
Sidney 233:1,3
Siebel 138:4,15
sign 48:24 53:2 53:10 128:12 128:16 239:5,8 239:12,15,19 256:16,24
signature 207:23 208:1

220:16 258:23
signatures 53:16
signed 239:3
significance 109:19,20,21
Simeon 66:18 67:4,13 69:24 69:24 70:2 88:6 117:12 242:21
similar 112:19 129:25 149:3 153:2,15,19 157:1,2 168:4 195:10 199:17
simple 146:14 229:15
simulation 175:16 177:8 209:17 217:8
single 33:4 181:17
Sioux 130:11
sit 38:13 142:6
sitting 7:19 36:23 135:9,16 158:15
six 29:14 30:9 31:18 35:1 36:19 39:21 40:3 50:20 56:7,13 80:1 119:7 122:11 143:8 144:6,13 144:25 146:3,8 161:8 162:20 174:17 181:17 195:13 209:21 209:24 253:4
six-region 193:1
sixty-eight 174:17 190:4
sixty-two 43:23
size 26:13 32:3 38:8 45:8 76:18,21 130:5 130:19,19,24

131:10,11
134:25 136:23
147:20,24
157:10 158:13
skills 78:23
slide 120:12,19 123:18 125:3 127:5 193:23 194:8 195:3
slides 120:7 125:8,9
slight 155:11
small 28:10 32:19,23 33:15 34:4,8,9,16 35:10,12,22 36:16 37:21 40:24 44:1,5 56:5 60:19 61:4,6,14,17 61:20,25 94:24 119:23 128:19 129:5 132:7 134:25 135:2,7 135:14,24 136:5,6,11,18 136:20 140:14 143:5 144:21 144:22 145:9 145:11,16,23 145:25 146:3,6 146:11,12 147:21 158:12 193:18 194:13 197:25 209:21 210:4,8 214:25 230:20
smaller 21:7 32:16 33:7 35:7 39:2,3,4 53:5 54:4 56:1 94:21 128:18 132:9 134:4 207:21
sole 175:17
solely 20:20
solving 128:23

129:25 130:4
somebody 65:9 73:25 74:2,3 110:5,10 137:16
someone's 63:1 65:4 150:25 162:16
Sondra 52:6
sorry 11:11 13:14,14 14:11 15:1 25:2,2 33:23 47:14 59:23 60:3 84:12 85:7 87:5 92:2 103:10 113:4 117:12 123:1,1 125:2 129:12 131:9 137:23 138:13,13 140:3,5 143:2 144:10 176:10 186:8 197:22 202:9 210:12 227:4,20 231:12 244:6 246:24 256:21
sounds 11:6 124:14 161:5
source 139:6
sourced 81:19
south 1:24 4:11 130:11 135:11 212:17,20 213:5
Southeast 12:3 13:9 14:18 15:16 29:3 247:22
Southern 214:16 244:15 244:15
Space 204:2
spaces 135:22
speak 18:24 57:6 60:22

106:10 109:17
115:24 120:18
127:18 162:3,7
195:22 207:7
217:9 252:15
255:11
speaking 142:11 204:6
specialized 9:25 10:6,14
specializing 106:11
specific 12:18 42:9 44:15,18 50:14 51:4 55:16 61:5 62:7 76:13 98:10 120:18 132:22 137:13 165:23 167:3 187:18 196:9 217:10,25
specifically 17:22 22:21 24:14 27:10 42:13,23 47:23 49:4 55:12 57:6 68:11 85:4 106:10 120:17 125:11 143:6 144:4 151:25 154:24 186:22 187:4 190:4 200:11 230:8
specifics 47:8 165:3 193:11 193:12
spell 5:11 233:5 242:11,11
spelled 138:15
spend 166:3
spending 34:20 166:9
spent 25:12,17 46:9,9
split 67:25

spoke 26:19 31:11 148:14 247:11
spoken 117:14
sports 14:25
spread 23:25
spreadsheet 103:23 105:6 111:9 116:25 138:7 141:21 141:23 151:16 178:6,9
spreadsheets 26:19 27:6,16 27:17 111:5 138:3
St 67:18,24 68:16 69:5,10 69:25 70:10 89:3 117:12 172:2,3,4
stamp 80:17 95:10 102:15 103:18 121:22 125:13 206:19
stamping 125:10
stand 122:15
standard 19:17
standing 18:21 26:15 62:12 100:25 101:9 193:2
stands 13:17 172:7
start 13:6 42:23 65:4 79:7 153:8 194:16 216:20 225:19 225:21 226:2
started 11:25 12:14 21:1 43:16,16 46:24 56:11 125:5 194:13 211:25 225:23
starting 31:20

33:5 35:5 63:7 119:10 126:7 170:10
starts 78:7 79:18 163:25 191:14
state 4:22 5:11 19:7 162:18,19
stated 34:7 37:17 38:22 50:20
statement 191:2
states 1:1 4:8 10:4 24:1 37:19 68:12 80:2 244:7
Statistics 156:1
status 177:10
stay 25:7 65:14 78:13 89:9 204:1 205:18
stayed 25:10,14 91:12
staying 136:19
step 19:9
Stevens 217:3
Stewart 1:5 4:6 7:4 17:21 18:25 60:20,25 61:7,14 97:8 97:10,13,16 98:3,7,23 99:2 99:7,13 100:11 105:20 107:7 107:21 114:8 114:23 144:2 144:25 145:24 149:10,17 154:5,16 172:2 172:24 176:22 181:24 182:6 183:23 184:10 187:5,20 189:12,15,20 209:21 210:9 216:22 217:12 218:3 219:8,13 219:15,24

221:10,16,19 222:6,12,17,21 223:2,7,12,21 223:25 224:6 224:15,21 234:16 244:25 251:14 252:3,6 255:15,20,23
Stewart's 18:13 74:16 143:5 155:13 188:14 188:23 209:5 209:14 217:2 219:17 220:11 220:21,22,24 221:25 242:20 256:1,6
stick 57:22
STL 172:3
Stocking 66:1 83:22,23,24 84:3,6,13 85:2 102:15,19 109:10 117:14 118:1 160:11 172:1,18,20 183:15 235:8 253:18
Stocking's 253:23 255:8
Stokes 4:16 258:2 259:5
stood 81:22 228:3
stop 80:14 180:15
store 32:15 34:23 36:7,16 36:17 135:17 217:10
stores 32:20,24 33:5,7,15 34:4 35:1,10,12,23 35:25 36:4,22 39:2,8,10 134:13 136:11 136:15,16,18

136:20,20 158:3,8,12,16 209:11,24 210:13 212:25 213:1 214:11 214:21,23 218:13 225:6
story 194:12
strategic 62:17
Street 1:24 4:12
structure 55:14 123:18,22 132:25 160:25 161:11 193:1 195:13 228:10
stuff 49:9 125:9 248:4,4
subject 8:10
subjective 37:20 141:1,4,8
submitted 55:10
substantially 153:2,14
subtracted 121:12
succession 156:9 228:11,12,17 228:22,23 229:1,6,9,23 229:25 230:6 230:15,21 231:1,5,13,15 231:25 232:4,5 232:7,11,15
sudden 35:21,22
suggest 94:5 146:14 147:23 159:18 209:8 209:10 213:22 220:2 222:25
suggested 95:17
suggesting 237:24 255:9
suggests 222:11 225:20
Suite 1:24 2:7 2:13,21

summarizing 126:14
summation 150:20
Sunday 165:18
super 198:2
supervising 161:8
support 25:4,23 32:17 33:7 37:16 39:10,13 40:4 106:18 119:24 126:17 126:18 128:4 162:10
supporting 41:11
supports 52:12 52:13 233:8,9
supposed 49:6
supposition 116:15
sure 15:8 17:12 23:8 24:14 25:9 26:9 28:16 30:23 31:24 36:2 38:2 43:5 50:6 50:10,13 53:21 69:24 89:18 91:19 106:15 114:20 115:13 115:15 124:15 138:5,7 161:22 167:8 174:12 187:24 190:2 192:13 199:6 199:14 203:14 203:24 218:17 233:9,20,21 236:4 239:7 241:21 244:5,9 246:7 248:3
surprised 37:8 115:18 125:4 250:22
Susan 2:25 5:2

Susie 229:15,16
  229:19,24
  230:1,2
SVP 121:24
  125:3
sworn 4:20
  258:10
system 63:11
  111:1 203:20
systems 202:23

_____

**T**

tab 104:2 118:8
  169:23,24
  186:3
table 119:25
  214:4
take 6:10 8:23
  10:20,25 11:3
  11:8 17:7
  18:20 30:22
  49:13 82:3
  83:16 85:15
  86:4 91:16
  96:23 108:6
  115:21 124:11
  152:12 156:11
  158:21,25
  160:13 205:24
  211:24 214:8
  219:3 235:8
  246:6 256:13
taken 4:13 5:20
  5:25 11:14
  69:18,20
  220:16
talent 132:12,14
  132:24 134:5
talk 26:9 32:16
  37:19 59:5
  63:2,3 96:24
  99:6 120:2
  187:16 214:14
  247:15,25
talked 26:13
  36:7 38:20
  50:23 54:6

89:23 111:21
127:20 134:22
136:14 160:25
193:23 194:8
231:3 237:6
247:6,8,10
talking 22:19
  30:21 35:16
  43:3 50:10
  60:2 69:13
  72:14 81:10
  121:11 122:1
  122:11 125:5
  129:8 153:7
  173:23 194:4
  224:8,9,11
  225:6 231:20
  232:11 247:3
talks 59:3
targeted 17:23
tasked 42:21,22
Taskov 66:18
  88:7 114:7
  172:8,18 211:1
  242:21
Taskov's 182:11
  210:18
tasks 52:15
TBD 79:23
  162:8
team 14:12 24:9
  26:11 28:13
  36:20 39:2,5
  39:15,21 42:20
  43:23,25 44:8
  52:14 56:4
  62:8,13,18
  63:8 70:16
  73:1 81:4,17
  81:22 82:15,17
  85:4 89:10
  113:16 114:15
  115:8 116:10
  139:8 156:23
  157:5 161:16
  177:20,24
  178:1 180:22

181:3 184:12
193:3 197:2
207:23,24
217:1 220:17
226:3,3 228:3
229:2 230:18
230:20,21
231:16,21
236:12 237:22
238:21 244:17
team's 187:17
teams 28:15
  50:11 197:10
technically 9:18
teenagers 151:3
teleconference
  164:14
telephone 24:2
tell 6:17 38:19
  60:24 71:10
  73:13,22 74:2
  85:11 98:14
  115:4 123:9
  125:11 139:22
  185:17,20
  196:22 200:3
  203:4 205:5
  211:19 212:19
  217:25 218:8
  230:12
telling 201:7,19
  205:2
tells 72:3
template 232:22
  232:23
ten 31:18 91:18
  145:15 157:24
  159:2,3 188:15
  246:9
Tennessee 16:3
  16:4 23:2
  39:14 161:16
  161:17
tenure 12:20
  66:5 84:20
  230:10
term 122:10

terminate 22:3,3
  37:4 82:21
  234:11 235:20
  254:3
terminated 30:5
  30:11 56:23
  91:4 93:18
  95:5 96:1 98:3
  102:7 104:19
  105:1,5,16
  167:5 234:6,13
  234:16,19,22
  234:24 235:1
  235:15,18
  241:2 242:2
  251:24 252:7
  253:9,12
  254:13
terminating
  166:12 255:2
termination
  18:3,14 20:17
  91:2 93:13
  95:2 233:22
  240:18 252:11
  255:8,16,23
  256:1,6,9
terminations
  45:22 46:16
  57:1,5 58:3,6
terms 23:7
  129:1,9 130:12
  132:3 134:16
  201:19
Terri 88:21
  113:10,11
territories
  139:18
territory 115:9
  115:11 147:7
  147:12,13
  153:5 171:1
testified 26:23
  37:11 38:15
  105:16 116:2
  179:15 253:8
testify 18:1,11

19:4 217:17
  220:7 258:11
testimony 6:12
  6:14 7:25 16:2
  19:3 145:19
  152:7 175:23
  258:4,12 259:1
Texas 13:11
  86:18 161:2,17
text 24:2
texts 24:10
thank 4:21 5:6
  5:19 7:9 17:16
  41:13 88:3
  95:16 111:14
  118:11 138:25
  183:1 196:15
  198:16 199:13
  206:7 207:15
  246:12,13,22
  256:22 257:2
Thanks 91:20
That'd 39:24
thing 24:5 26:8
  38:7,11 52:18
  56:3 60:24
  62:6 65:19
  81:22 91:6
  96:22 161:7
  200:12 203:21
  238:25
things 6:7 8:1
  10:5 11:2
  27:15 35:4
  37:14,20 54:14
  111:10 112:3
  121:9,12
  126:13 128:22
  130:23 141:11
  141:14 215:8,9
  229:18 230:1
  258:6
think 5:23 14:8
  15:10 19:10
  57:13 59:1
  60:12 61:3
  73:17 85:12

www.InDemandReporting.com                    (773) 239-6008

Page 292

90:19 103:8
104:12 105:3
110:10 111:23
114:19 121:3
124:9 128:25
130:18 131:6,6
134:19 136:2
137:24 138:4
138:15 159:12
162:15,21
166:15 172:5
180:18 181:19
188:10 201:16
203:19,23
204:11,17
206:22 212:6
218:23 221:25
225:20,23
226:15 232:9
233:1 242:12
244:17,19,20
245:24 246:10
247:3 251:18
**thinking** 231:15
239:7 244:15
**third** 34:23
147:13 159:23
**Thirteen** 177:4
**thirties** 74:4
84:13 222:8
225:13
**THOMPSON**
258:10
**Thomson** 1:18
4:14 5:16,18
**thought** 63:8
183:20
**thousand** 33:4
200:5
**three** 28:3 34:14
47:12,12,12,13
50:19 57:8
58:7 85:1,3,8
85:14 229:17
230:1 253:4
**time** 4:3,18 5:24
12:11,20,21

13:6 14:7 16:9
24:5 27:22
28:24 32:8
35:17 37:2,4
38:5 40:2
41:10 45:2
50:22 53:22
57:3 58:3,15
64:9 65:19
66:23 67:3,3
72:1,2,3,4
74:15 75:5
88:22 90:23
92:1 93:7 96:5
96:9,12 97:17
99:23 101:8
106:11 107:24
107:24 108:14
112:18 113:12
116:7 121:3
125:17 148:16
148:17 149:21
150:13,14,16
150:17 151:9
156:19 158:16
159:3,6 166:6
174:14 182:20
185:21 218:7
219:22 221:19
227:3 230:7,14
231:24 237:5
241:4,11
245:19 246:23
247:8,16
248:13
**timeframe** 76:2
76:11
**timeline** 112:13
114:22
**timely** 39:3
**times** 5:22 27:22
32:10 158:2
230:10,25
236:4
**timing** 128:9
214:6
**Tip** 150:8,15

242:9,12,14
243:11
**title** 16:9 71:10
104:1 200:6,6
203:22
**title's** 203:23
**titles** 117:6
**today** 4:2,14
6:12,14 7:24
16:1 38:13
82:16 89:18
142:6 158:2
177:17
**Todd** 13:10 70:8
**told** 59:19 98:14
115:10 119:5
**tons** 10:7
**toolbar** 17:9
**top** 33:10 35:5
56:5 68:15
78:8 85:12
86:11 94:23
103:21 109:10
136:15 148:6
149:8 153:23
155:18 161:10
173:15 212:15
225:21 242:3,7
244:8
**top-heavy**
228:10
**topic** 18:17 19:5
20:1 57:13
58:21 59:1,12
60:2 78:3
121:14,14
237:7 238:5,13
**topics** 19:15,21
19:25 54:1
57:22 58:2
**total** 144:12
169:13,20
**training** 10:6,8
10:11,14,20,25
11:3,5,7,12,20
**transcribed**
258:15

**transcript** 258:3
**transfer** 95:23
97:3,17,22
98:1 101:25
162:24 210:23
213:25
**transferred**
94:18 133:16
143:5,7,8,10
144:2 211:14
220:12,17
222:22 223:20
223:25 224:5
224:14,25
226:6 248:23
**transfers** 240:7
**transmittal**
220:9 249:7
**travel** 24:22,23
24:25 25:5,5
52:15
**Travis** 161:25
**triangulating**
175:20
**tried** 119:8
**true** 251:1
255:14 258:3
**trust** 250:25
251:4
**truth** 6:17
258:11,11,12
**try** 18:23 46:1
65:13,24 220:7
244:24
**trying** 22:5
34:25 35:18
36:15 50:11
65:18,25 74:13
135:3,4 245:1
**turn** 129:17
160:18
**turned** 85:2
**turning** 43:4
**TV** 7:17
**two** 25:12,13,16
29:10,24 34:15
43:23 53:19

54:13,15 56:14
67:14,16,17
68:21 77:16
88:21 94:24
119:1,4,15,15
122:23 126:14
129:13,15,19
129:19 130:23
132:11 133:8
146:10 149:5
150:13 153:10
169:7 173:5
190:20,22
195:4 200:5
201:5 212:10
214:22 243:10
248:15,17
253:3
**two-day** 25:19
**typewriting**
258:15
**typically** 64:17
148:22 165:10
187:14

_____
U
_____
**UDAAP** 10:20
**Uh-huh** 51:25
**ultimate** 233:15
233:17 240:1,3
240:13
**ultimately** 35:6
50:9 126:14
**unchanged**
195:14 205:13
**uncommon**
156:12
**understand** 6:16
8:15,16,18,21
10:22 22:6
31:5 38:2
47:13,16 55:6
55:19 92:8
117:2 136:2
157:21 172:3
206:10 252:11
**understanding**

30:4 43:10 55:20 56:22 94:6 150:22 171:19 252:17
**understands** 205:2
**unfair** 10:20
**Unintelligible** 248:8
**unit** 46:14 192:9
**United** 1:1 4:8 24:1 68:11 80:1 244:7
**university** 9:8,9 9:10
**unknown** 119:4
**unpacked** 151:5
**unspecified** 102:21
**update** 121:24 128:9 249:15
**uploaded** 73:8
**use** 24:6 64:19 65:24 157:16 157:20 205:25 214:17 229:14
**usually** 45:12 72:3 131:22 185:2,19 186:17 228:25 229:2 231:3 232:10 233:19

———— **V** ————

**v** 4:6
**vacant** 246:1
**vaguely** 57:2 199:10
**validate** 42:23
**valuable** 78:24
**value** 129:4 173:25
**Van** 61:20 217:3 217:23
**various** 71:6 73:11 98:12 112:12 207:19

**varying** 154:22
**vehicle** 10:2,3
**vehicles** 45:16
**version** 16:21 120:19 133:3 145:3,8 157:1 175:15
**versions** 121:4
**versus** 7:4 33:15 68:18 74:3 85:17 134:25 155:12 194:8
**vice** 14:17 16:10 54:22 72:24 122:3 123:13 247:21
**video** 1:21,23 4:17 24:6 51:11
**video-recorded** 4:5
**videoconference** 1:15 4:4 192:3
**viewed** 177:19
**viewing** 7:22
**Vil** 69:25 70:10 89:1
**Villanova** 9:8,10 9:10
**Vina** 69:25 70:10 89:1 114:6 172:2 182:11,13
**Virginia** 117:9
**vividly** 29:24
**volume** 27:13 31:14,15,21,22 32:5 130:9,9 132:10 140:12 140:18,23 142:12,15,16 142:17,19,20
**voluntarily** 252:6 254:3 255:2
**voluntary** 57:3,7 57:16 58:10

89:12 252:3,10 252:11 255:8
**volunteered** 252:17
**Voorhies** 13:10 70:8
**VP** 15:16 125:3
**vs** 1:8
**VSP** 246:3
**VSPs** 245:20

———— **W** ————

**Wacker** 2:21
**wait** 15:5 78:13 180:15
**walk** 218:24 219:6
**Walker** 52:6
**wall** 74:1
**want** 8:3 15:4,8 17:12 19:9,11 28:11 47:13 59:6 65:5 101:8 151:6 169:5 192:12 196:9,12,18 198:14,14 206:2 211:9,18 212:1 229:24 230:1,4 234:3 234:14 253:14
**wanted** 28:16 56:3 67:7 94:14 119:16 140:14 166:15 236:12 252:6
**wanting** 81:17 86:17
**wants** 131:23 229:18,20,21 229:22
**warranty** 35:2
**wasn't** 30:15 81:5 155:3,7 179:25 191:7 252:16
**waste** 59:6 101:8

**Waukesha** 223:18
**way** 31:23 32:18 33:8 36:18 39:5 56:11 63:9 65:4,14 72:24 88:10 91:6 102:17 105:25 107:15 108:14,21 110:8,13,23 116:13 126:17 126:21 128:2 142:12 143:24 162:15 164:4 170:4 175:10 181:14 183:16 183:20 190:14 196:6 203:3 209:19 212:2
**ways** 21:3 23:25 24:2 26:10 55:25 215:5,11
**we'll** 16:19 17:4 18:20,20 26:9 37:19 75:20 79:12 80:10 85:21,22 95:1 100:16 112:6 116:17 122:22 126:5,5 170:5 170:6,7,9 173:12 215:14 216:20 218:25 249:8 256:17
**we're** 6:11 7:25 15:5 16:14 29:4 34:18 64:18,25 83:7 92:7 133:14 170:9 196:7 232:11 247:3
**we've** 74:14 92:10 117:14 152:10,10,17 196:1 207:18 215:21 233:20

233:21
**weak** 228:10
**Wednesday** 4:2
**week** 51:10 58:17
**weeks** 5:23 57:8 58:7,17 98:19
**Weiss** 2:19 5:4,4 15:2
**went** 29:23 33:10 90:14 94:1 95:11 98:19 153:11 222:4 225:2
**weren't** 35:15 41:6 115:18 190:17
**Wes** 106:9,11,19 183:12 235:1
**Wesley** 183:12 254:10
**west** 2:21 61:19 135:10,19 201:6 224:5 244:11,11,15
**wet** 64:22
**Wheaton** 2:8
**When's** 11:16 230:14 247:8
**WHEREOF** 259:1
**white** 73:12
**wide** 47:19 165:12
**William** 105:16
**willing** 50:12 62:8,13 139:9 139:9
**Wisconsin** 182:14 209:13
**witness** 4:14,20 17:11,16 18:22 19:9 20:13 25:21 26:25 29:22 30:14 34:7 35:15 37:13 38:18

44:5 46:6 47:7
47:14 49:20
58:22,25 59:23
60:12 61:10
62:6 63:19
64:1 66:13,23
67:23 68:23
73:21 74:7
75:11,17 77:17
81:15 82:25
84:18 86:15,23
87:1,5 90:10
93:15 99:20
117:20 120:6
123:7,9,21
127:15 132:18
133:3,20 134:8
136:1 137:23
138:1,15,18
140:22 141:7
141:23 142:9
149:14,21
150:12 153:19
155:17 157:1,9
157:14 159:18
160:2,8,16
163:14,16
167:7 168:22
169:5 175:6
177:22 178:25
179:3 180:7,13
184:22 185:2
188:4,10 189:1
189:7,23 191:2
196:11 198:8
200:10,13
201:18 202:6
204:20 205:1
205:23 209:8
216:7,17 217:7
220:6,15 221:4
227:19 228:17
236:3,11,19,21
237:14,22
238:16 239:15
245:3,17,23
247:13 248:3

250:15 251:4
255:18 256:5
258:5,10,14,24
**word** 81:22
  178:25
**words** 6:10
  135:12 150:3
  162:18
**work** 14:14 28:8
  41:17,21,25
  52:9,11 56:10
  56:15,19
  192:10 202:5
  203:21 204:1
  213:18,19
**Workday** 71:5,7
  71:7 72:3
  74:19 139:4
  188:24 189:3,8
**worked** 10:12
  10:13 11:23
  12:16,22 14:3
  14:6 71:24
  204:4 207:9
  225:17 253:15
  253:15
**worker** 74:2,3
**workers** 45:4
  83:3 110:19
  162:22,23,23
  163:1,2,3,10
  163:11
**working** 13:25
  21:1 32:12
  40:24 64:8
  106:19 177:20
  205:8
**workload** 36:3
**works** 28:13
  192:10 216:25
  228:24 247:4
**workspace**
  205:19
**worse** 19:23
**would've** 5:24
  13:1,2 14:7,12
  21:16,18,25

22:1,10,12,17
23:14 24:8,19
24:20,20 25:12
25:17,21,25
26:4 27:24,25
33:1 36:14
38:11,12 39:19
39:19 40:22,23
42:10,15 44:22
45:13 48:13,19
48:22,23 49:10
49:20 50:6,7
54:21,24 62:23
63:7 68:23
69:12,21 70:4
70:7,9,15,16
81:19 85:13
88:20 93:21
95:7,17 97:15
98:5 112:13
113:11,15
114:20 115:13
116:4 117:13
117:21 118:22
119:10,12,13
120:6 121:1
122:24 123:2
124:15,23
129:8,14 130:4
130:18 132:18
133:3,20 138:4
138:5,9,21
139:7 148:23
149:3 154:22
163:6 165:17
166:7,20 177:8
184:11,15
185:15 188:21
190:18 192:24
193:4 194:12
200:21 213:19
214:4 220:2,16
229:9 231:14
236:4,11
240:20,23
243:25 250:1
250:23

**wouldn't** 35:25
  60:22 62:7
  70:17 72:5
  74:22,23,23,25
  120:18 146:11
  250:22
**wrap** 256:12
**wrapping**
  185:18
**write** 229:12
**writing** 98:15
**Wrong** 181:21
**wrote** 164:12

_____

**X**

_____

**Y**

**Y** 148:20 149:3
  149:4,5,9,11
  149:15
**yeah** 10:11
  13:18 16:22
  20:6,13 21:16
  26:3,8 31:11
  32:25 42:19,22
  43:16,22 44:6
  47:7 54:13
  55:22,22,23
  56:15 58:19
  59:17 60:12
  64:12 67:20
  68:7 71:16,17
  73:21 76:17
  78:19 80:7
  82:11 85:19
  87:4,5 89:10
  90:11 92:20
  93:22 95:7,16
  103:20 104:5
  104:17 105:1
  108:8,18,19,21
  109:4,23
  110:22,23
  111:10 112:13
  112:23 113:4
  118:9 120:24
  122:1,18 123:2
  123:7 124:7,23

127:15 129:25
138:1 139:14
140:1 141:14
142:9 143:17
147:14,17
150:12,24
161:20,25
168:14,14,16
171:9,15
172:12 173:12
174:4 176:9,25
177:4,4 178:25
179:2 181:7,12
181:23 195:17
198:18 200:21
200:21 201:15
206:23 207:2
207:12 208:6
211:19 215:15
215:22 218:6
221:4 223:23
224:12,17
227:13,13
229:7 231:3,19
234:10 235:13
242:24 244:3
244:13 246:7
246:11 248:3
249:13 253:11
256:19 257:9
**year** 9:12 10:21
  11:3,8,23
  12:24 32:6
  33:16 38:10
  42:14 57:9
  58:8,17 63:1
  89:25 150:21
  169:7,8,8,8,8
  169:17,20
  175:25,25
  184:3 185:3,9
  185:11 186:22
  190:14 200:5
  205:8 230:17
  230:19 231:16
  231:16,17,21
  232:16

**years** 11:18
  12:11 14:19
  45:19 67:5,15
  68:12 107:3,7
  107:10,13
  110:3 149:4,5
  151:7 163:11
  176:14,19,19
  176:22,23
  177:3 190:15
  221:9 225:18
  229:18 230:12
  247:7 248:1
**years'** 69:4
**yellow** 225:4,7
  226:21 250:6
**Yep** 123:2
**yesterday** 117:3
  142:10 144:3
  199:11
**York** 64:25
  117:11 130:8
  214:17,19
**Yost** 100:17
  101:20,24
  102:3,7 106:4
  173:2,3 176:19
  235:3
**younger** 162:23
  163:2,10
  221:16 222:6
  225:10
**Yu** 246:22,25
**Yup** 144:24
  146:22

**Z**

**Z** 242:4
**Zarfi** 172:18
**Zarfl** 242:4
**zebra** 242:4
**Zeman** 159:23
  200:25 226:7
**zoom** 6:20 7:15
  7:17 24:4
  116:8,9,16
  200:13,15

**0**

**0:00:33** 4:9
**0:00:48** 4:15
**0:00:56** 4:19
**0:01:07** 4:23
**0:01:27** 5:3
**0:01:36** 5:7
**0:01:54** 5:12
**0:01:59** 5:15
**0:02:08** 5:20
**0:02:17** 5:24
**0:02:34** 6:4
**0:02:54** 6:10
**0:03:08** 6:14
**0:03:26** 6:18
**0:03:39** 6:22
**0:03:47** 6:25
**0:04:08** 7:4
**0:04:27** 7:11
**0:04:42** 7:17
**0:04:48** 7:20
**0:04:59** 7:23
**0:05:21** 8:2
**0:05:54** 8:9
**0:06:11** 8:13
**0:06:21** 8:17
**0:06:31** 8:21
**0:06:42** 9:1
**0:06:59** 9:6
**0:07:11** 9:11
**0:07:33** 9:16
**0:07:42** 9:21
**0:07:56** 9:25
**0:08:17** 10:5
**0:08:43** 10:10
**0:09:17** 10:17
**0:09:37** 10:20
**0:09:51** 10:24
**0:10:07** 11:4
**0:10:30** 11:8
**0:10:46** 11:11
**0:11:13** 11:15
**0:11:25** 11:18
**0:11:55** 11:22
**0:12:20** 12:1
**0:12:49** 12:6
**0:13:08** 12:10

**0:13:31** 12:15
**0:13:55** 12:20
**0:14:25** 12:24
**0:14:44** 13:5
**0:14:56** 13:8
**0:15:15** 13:12
**0:15:23** 13:15
**0:15:44** 13:21
**0:15:59** 13:25
**0:16:05** 14:4
**0:16:31** 14:10
**0:16:56** 14:14
**0:17:04** 14:18
**0:17:28** 14:22
**0:17:47** 15:3
**0:18:04** 15:7
**0:18:14** 15:11
**0:18:32** 15:17
**0:18:51** 15:24
**0:19:11** 16:3
**0:19:44** 16:7
**0:19:55** 16:10
**0:20:37** 16:16
**0:21:09** 16:21
**0:21:28** 17:2
**0:21:43** 17:6
**0:21:49** 17:9
**0:21:55** 17:14
**0:22:37** 17:24
**0:22:53** 18:3
**0:23:02** 18:6
**0:23:11** 18:9
**0:23:33** 18:14
**0:23:40** 18:17
**0:23:45** 18:21
**0:24:02** 19:1
**0:24:21** 19:8
**0:24:26** 19:11
**0:24:39** 19:16
**0:24:50** 19:21
**0:25:05** 20:1
**0:25:13** 20:5
**0:25:21** 20:8
**0:25:29** 20:13
**0:26:00** 20:20
**0:26:24** 20:25
**0:26:39** 21:5

**0:26:51** 21:9
**0:27:01** 21:13
**0:27:17** 21:17
**0:27:36** 21:20
**0:28:01** 21:24
**0:28:26** 22:4
**0:28:45** 22:8
**0:29:02** 22:13
**0:29:22** 22:16
**0:29:35** 22:21
**0:29:55** 22:25
**0:30:12** 23:4
**0:30:42** 23:10
**0:31:02** 23:15
**0:31:14** 23:20
**0:31:39** 24:3
**0:31:52** 24:7
**0:32:16** 24:13
**0:32:42** 24:18
**0:33:05** 24:24
**0:33:29** 25:5
**0:33:54** 25:10
**0:34:10** 25:15
**0:34:30** 25:19
**0:34:42** 25:23
**0:34:51** 26:2
**0:35:13** 26:7
**0:35:28** 26:11
**0:35:51** 26:17
**0:36:04** 26:21
**0:36:20** 26:24
**0:36:44** 27:4
**0:37:01** 27:8
**0:37:27** 27:14
**0:38:00** 27:19
**0:38:15** 27:23
**0:38:31** 28:4
**0:39:00** 28:10
**0:39:14** 28:14
**0:39:28** 28:19
**0:39:47** 28:25
**0:40:03** 29:5
**0:40:22** 29:9
**0:40:46** 29:13
**0:41:03** 29:17
**0:41:22** 29:21
**0:41:39** 30:1

**0:42:15** 30:7
**0:42:34** 30:12
**0:42:49** 30:17
**0:42:59** 30:21
**0:43:11** 30:24
**0:43:26** 31:5
**0:43:57** 31:10
**0:44:11** 31:14
**0:44:31** 31:19
**0:44:46** 31:23
**0:45:01** 32:4
**0:45:19** 32:9
**0:45:42** 32:15
**0:45:55** 32:21
**0:46:16** 33:1
**0:46:44** 33:8
**0:46:55** 33:12
**0:47:05** 33:16
**0:47:12** 33:21
**0:47:27** 33:24
**0:47:53** 34:5
**0:48:21** 34:12
**0:48:39** 34:17
**0:48:51** 34:22
**0:49:06** 35:1
**0:49:26** 35:7
**0:49:51** 35:13
**0:50:00** 35:17
**0:50:16** 35:21
**0:50:32** 36:1
**0:50:55** 36:7
**0:51:27** 36:12
**0:51:45** 36:17
**0:51:58** 36:21
**0:52:03** 36:25
**0:52:18** 37:5
**0:52:22** 37:9
**0:52:43** 37:16
**0:53:00** 37:21
**0:53:27** 38:1
**0:53:48** 38:6
**0:54:01** 38:10
**0:54:28** 38:16
**0:54:46** 38:23
**0:55:41** 39:11
**0:55:58** 39:15
**0:56:19** 39:21

0:56:24 39:24
0:56:41 40:4
0:57:02 40:10
0:57:26 40:15
0:57:36 40:20
0:57:57 40:24
0:58:11 41:4
0:58:21 41:8
0:58:39 41:12
0:58:46 41:15
0:59:21 41:19
0:59:37 41:24
0:59:55 42:4
01 106:1
06 225:20,23,25

**1**

1 3:8 16:15,17
 17:5,20 18:10
 59:17,24 60:1
 130:15 169:7
 169:17,20
 170:20,20
 175:25
1,076 213:23
 218:13
1/3 105:20
1:00:07 42:8
1:00:33 42:12
1:00:57 42:18
1:01:02 42:20
1:01:32 43:1
1:01:45 43:5
1:02:05 43:12
1:02:29 43:17
1:02:46 43:21
1:02:54 43:25
1:03:02 44:4
1:03:12 44:8
1:03:24 44:12
1:03:36 44:17
1:03:58 44:21
1:04:10 44:25
1:04:44 45:4
1:05:01 45:9
1:05:28 45:17
1:05:42 45:23

1:05:53 46:2
1:06:25 46:9
1:06:44 46:16
1:06:54 46:20
1:07:43 47:2
1:08:00 47:6
1:08:12 47:11
1:08:21 47:14
1:08:28 47:20
1:08:42 47:25
1:08:57 48:3
1:09:07 48:6
1:09:25 48:10
1:09:40 48:15
1:09:58 48:18
1:10:05 48:21
1:10:14 48:24
1:10:32 49:3
1:10:49 49:7
1:10:58 49:11
1:11:28 49:18
1:11:43 49:23
1:12:01 50:3
1:12:14 50:8
1:12:30 50:12
1:12:52 50:18
1:13:16 50:24
1:13:22 51:2
1:13:37 51:7
1:14:03 51:12
1:14:20 51:16
1:14:34 51:19
1:14:48 51:24
1:14:57 52:4
1:15:05 52:7
1:15:15 52:11
1:15:26 52:14
1:15:35 52:18
1:15:48 52:21
1:15:55 52:23
1:16:15 53:3
1:16:33 53:8
1:16:48 53:12
1:17:02 53:16
1:17:15 53:20
1:17:27 53:24
1:17:37 54:2

1:17:48 54:5
1:18:00 54:8
1:18:13 54:12
1:18:25 54:16
1:18:39 54:20
1:18:53 54:23
1:19:13 55:4
1:19:39 55:10
1:19:55 55:15
1:20:17 55:21
1:20:24 55:24
1:21:04 56:7
1:21:04 56:13
1:21:13 56:17
1:21:21 56:20
1:21:51 57:1
1:22:09 57:6
1:22:20 57:10
1:22:32 57:16
1:22:37 57:19
1:22:45 57:23
1:22:59 58:3
1:23:16 58:8
1:23:36 58:13
1:23:55 58:18
1:24:21 58:23
1:24:44 59:4
1:24:49 59:9
1:25:09 59:15
1:25:30 59:18
1:25:44 59:22
1:25:50 60:2
1:26:04 60:6
1:26:15 60:11
1:26:27 60:15
1:26:58 60:21
1:27:18 61:1
1:27:42 61:8
1:28:10 61:14
1:28:25 61:18
1:28:44 61:22
1:28:57 62:1
1:29:30 62:5
1:29:53 62:11
1:30:04 62:14
1:30:11 62:18
1:30:42 62:22

1:31:06 63:2
1:31:30 63:8
1:31:40 63:11
1:31:49 63:14
1:32:02 63:18
1:32:16 63:24
1:32:27 64:3
1:32:39 64:7
1:32:54 64:11
1:33:19 64:16
1:33:32 64:19
1:33:43 64:23
1:33:56 65:2
1:34:16 65:8
1:34:36 65:12
1:34:47 65:16
1:34:57 65:20
1:35:11 65:25
1:35:40 66:7
1:36:12 66:11
1:36:16 66:15
1:36:28 66:18
1:36:45 66:22
1:36:50 67:2
1:37:13 67:8
1:37:24 67:12
1:37:42 67:16
1:37:56 67:19
1:38:01 67:22
1:38:19 68:2
1:38:23 68:9
1:38:34 68:13
1:38:50 68:19
1:39:18 69:2
1:39:37 69:7
1:40:17 69:15
1:40:49 69:22
1:41:05 70:1
1:41:42 70:8
1:42:01 70:12
1:42:18 70:17
1:42:38 70:23
1:42:52 71:3
1:43:17 71:9
1:43:27 71:13
1:43:43 71:18
1:43:55 71:25

1:44:11 72:4
1:44:34 72:10
1:44:43 72:14
1:44:51 72:18
1:45:06 72:22
1:45:24 73:3
1:45:35 73:7
1:46:02 73:15
1:46:09 73:19
1:46:17 73:23
1:46:32 74:5
1:46:44 74:11
1:46:57 74:15
1:47:09 74:18
1:47:41 74:23
1:47:48 75:3
1:48:16 75:8
1:48:28 75:12
1:48:36 75:16
1:49:03 75:24
1:49:12 76:4
1:49:18 76:8
1:49:27 76:14
1:49:40 76:19
1:50:34 77:5
1:50:59 77:10
1:51:06 77:13
1:51:15 77:18
1:51:25 77:23
1:51:40 78:3
1:51:56 78:12
1:52:14 78:18
1:52:35 78:25
1:52:46 79:5
1:53:06 79:10
1:53:16 79:14
1:53:49 79:21
1:54:11 80:2
1:54:29 80:6
1:54:55 80:11
1:55:03 80:14
1:55:24 80:20
1:55:39 80:24
1:55:47 81:2
1:56:00 81:7
1:56:11 81:10
1:56:28 81:14

**1:56:40** 81:18
**1:56:52** 81:23
**1:57:04** 82:3
**1:57:14** 82:7
**1:57:33** 82:13
**1:57:45** 82:16
**1:58:00** 82:19
**1:58:27** 82:24
**1:58:37** 83:4
**1:58:42** 83:7
**1:58:54** 83:16
**1:59:25** 83:23
**1:59:36** 84:2
**1:59:52** 84:7
**1:59:59** 84:11
**10** 3:16 108:23
  163:21,23
  166:1 169:2
  179:17 183:2
  183:24,25
  186:6 188:15
  188:24 189:12
  190:24
**10:11** 4:3
**10:54** 30:24
**103** 1:24 3:10
**10th** 192:1
**11** 3:17 164:6
  165:18 167:20
  167:21 168:25
  205:8 209:11
  209:14
**11:05** 31:2
**112** 3:11
**116** 3:12
**1183** 226:10,18
**1186** 226:10,18
**1187** 226:10,18
**12** 3:18 35:23
  191:11,12
  210:15
**12/1/17** 148:12
**12/3** 106:1
**12:27** 159:4
**12:33** 91:21 92:4
**12:47** 91:25
**121** 3:13

**125** 3:14
**1278** 213:21
**13** 3:19 144:17
  177:3 198:20
  198:22
**13.77** 107:10
**1300** 27:22,23
**135** 227:7,11
**137** 227:11
**14** 144:10,15
  195:9 204:23
  206:13
**1400** 73:2
**145** 227:12
**15** 3:20 11:10
  58:2 69:4
  110:2 111:24
  180:18 206:15
  206:17,20
  207:19 209:20
  210:18,21
**1500** 2:13
**152** 3:15 227:12
**153** 227:12
**16** 3:8,21 108:23
  176:23 177:4
  210:13,16
  215:16,17
  216:3 248:21
  250:11
**1603** 2:7
**163** 3:16
**167** 3:17 227:12
**17** 3:22 176:17
  249:8,10
**18** 3:23 144:21
  145:22 146:10
  172:14 176:19
  176:19 193:17
  194:7 210:19
  210:21 251:8
  251:11
**18.49** 107:13
**1899** 216:13
**19** 176:22 184:3
  185:9,11,22
  190:20 205:9

**19.4** 107:7
**191** 3:18
**198** 3:19
**1996** 9:13
**19th** 87:6
**1st** 12:15

---

**2**

**2** 3:9 59:3,17,23
  60:2 77:6,8,12
  77:13,22,24
  92:11 169:8
  175:25 211:8
  238:13
**2:00:14** 84:14
**2:00:22** 84:17
**2:00:33** 84:21
**2:00:57** 85:2
**2:01:08** 85:6
**2:01:20** 85:12
**2:01:38** 85:18
**2:01:50** 85:22
**2:02:13** 86:1
**2:02:20** 86:4
**2:02:32** 86:7
**2:02:47** 86:10
**2:03:08** 86:13
**2:03:21** 86:18
**2:03:35** 86:22
**2:03:46** 87:3
**2:03:55** 87:9
**2:04:04** 87:12
**2:04:28** 87:16
**2:04:40** 87:20
**2:04:55** 87:23
**2:05:05** 88:1
**2:05:09** 88:4
**2:05:36** 88:9
**2:05:44** 88:12
**2:05:53** 88:16
**2:06:15** 88:22
**2:06:31** 88:25
**2:06:58** 89:5
**2:07:08** 89:9
**2:07:27** 89:13
**2:07:47** 89:18
**2:08:24** 89:22

**2:08:39** 90:2
**2:08:58** 90:6
**2:09:04** 90:9
**2:09:28** 90:16
**2:09:43** 90:21
**2:09:57** 90:25
**2:10:15** 91:3
**2:10:40** 91:9
**2:10:48** 91:13
**2:10:55** 91:17
**2:11:01** 91:20
**2:11:12** 91:25
**2:11:21** 92:3
**2:11:34** 92:8
**2:11:54** 92:12
**2:12:26** 92:19
**2:12:38** 92:23
**2:12:53** 93:3
**2:13:12** 93:9
**2:13:32** 93:13
**2:13:42** 93:16
**2:13:57** 93:21
**2:14:41** 94:4
**2:14:52** 94:7
**2:15:07** 94:11
**2:15:17** 94:14
**2:15:30** 94:19
**2:15:49** 94:22
**2:16:00** 94:25
**2:16:25** 95:4
**2:16:38** 95:8
**2:17:15** 95:12
**2:17:34** 95:18
**2:17:47** 95:21
**2:18:07** 95:25
**2:18:39** 96:6
**2:18:56** 96:10
**2:19:13** 96:15
**2:19:26** 96:18
**2:19:42** 96:25
**2:19:51** 97:4
**2:20:17** 97:9
**2:20:39** 97:13
**2:20:58** 97:18
**2:21:11** 97:23
**2:21:19** 98:2
**2:21:37** 98:6

**2:21:49** 98:10
**2:22:05** 98:15
**2:22:26** 98:21
**2:22:54** 99:3
**2:23:09** 99:7
**2:23:21** 99:11
**2:23:32** 99:14
**2:23:54** 99:18
**2:24:11** 99:24
**2:24:32** 100:5
**2:24:49** 100:9
**2:25:05** 100:14
**2:25:33** 100:19
**2:25:44** 100:24
**2:25:56** 101:4
**2:26:10** 101:10
**2:26:20** 101:15
**2:26:23** 101:18
**2:26:33** 101:22
**2:26:47** 102:1
**2:26:59** 102:5
**2:27** 159:7
**2:27:10** 102:9
**2:27:30** 102:16
**2:27:55** 102:23
**2:28:01** 103:2
**2:28:33** 103:9
**2:28:40** 103:13
**2:29:25** 103:19
**2:30:15** 103:23
**2:30:30** 104:1
**2:30:37** 104:5
**2:31:02** 104:10
**2:31:10** 104:13
**2:31:15** 104:17
**2:31:23** 104:21
**2:31:28** 104:25
**2:31:37** 105:3
**2:31:49** 105:9
**2:32:02** 105:14
**2:32:15** 105:19
**2:32:25** 105:22
**2:32:34** 105:25
**2:32:51** 106:5
**2:33:02** 106:8
**2:33:27** 106:14
**2:33:40** 106:19

| | | | | |
|---|---|---|---|---|
| **2:33:51** 106:23 | **2:46:46** 115:12 | 32:11,12 184:4 | 186:16 187:3,6 | **24th** 180:1,1 |
| **2:34:01** 107:3 | **2:47:01** 115:16 | 190:20 | 187:9,12 | **25** 35:25 |
| **2:34:08** 107:8 | **2:47:20** 115:23 | **200-some** 40:4 | 189:17,21 | **25.9** 107:3 |
| **2:34:19** 107:14 | **2:47:32** 116:3 | **2001** 105:20 | 190:1,15 | **251** 3:23 |
| **2:34:38** 107:19 | **2:47:43** 116:7 | **2006** 11:24 | 191:16 199:2 | **255** 219:14 |
| **2:34:49** 107:22 | **2:48:05** 116:12 | **2009** 29:14,18 | 200:7,8 206:24 | **259** 219:16 |
| **2:35:01** 108:1 | **2:48:19** 116:16 | 29:23 30:20 | 208:3 209:1 | **26** 172:14 |
| **2:35:14** 108:7 | **2:48:32** 116:19 | **2010** 225:24 | 217:2 221:19 | 176:20 193:18 |
| **2:35:30** 108:12 | **2:49:13** 117:1 | **2016** 29:10,19 | 230:7,9 231:25 | 194:7 |
| **2:35:34** 108:15 | **2:49:23** 117:4 | 30:20 | 239:11 240:19 | **261** 219:17 |
| **2:35:36** 108:18 | **2:49:53** 117:10 | **2017** 14:20 | 240:21 241:1 | **262** 44:7 145:11 |
| **2:35:54** 108:24 | **2:50:09** 117:13 | **2019** 12:14,21 | 243:7,14,18 | **264** 43:7 |
| **2:36:01** 109:5 | **2:50:22** 117:18 | 12:24,24 14:20 | 244:23 246:4 | **269** 222:10 |
| **2:36:16** 109:9 | **2:50:34** 117:22 | 187:21 189:16 | 247:16 248:14 | **2692** 77:4 |
| **2:36:44** 109:13 | **2:50:50** 118:4 | 189:20 190:15 | 249:14 250:11 | **2695** 79:18 |
| **2:37:00** 109:17 | **2:51:08** 118:8 | 200:6 230:7,9 | 251:14 | **2698** 80:17 |
| **2:37:12** 109:21 | **2:51:33** 118:12 | 231:24 | **2022** 1:8 | **27** 144:8 146:15 |
| **2:37:23** 109:25 | **2:51:37** 118:15 | **202** 213:23 | **2023** 12:15 | 160:22 250:11 |
| **2:37:36** 110:3 | **2:52:04** 118:21 | **2020** 12:22 | **2024** 1:19 4:2 | **2701** 83:22 |
| **2:37:48** 110:7 | **2:52:21** 118:24 | 22:17,18 23:6 | 258:9 259:6 | **2704** 85:24 |
| **2:38:05** 110:12 | **2:52:44** 119:3 | 23:11 24:13 | **206** 3:20 | **2707** 87:16 |
| **2:38:15** 110:16 | **2:52:57** 119:7 | 25:7 26:7 27:4 | **20th** 136:24 | **271** 222:16 |
| **2:38:26** 110:21 | **2:53:19** 119:13 | 29:6 31:10 | 137:1 | **2710** 88:7 |
| **2:38:50** 111:2 | **2:53:34** 119:17 | 36:11 38:6 | **21** 125:17 137:2 | **2713** 89:1 |
| **2:39:02** 111:7 | **2:54** 159:10 | 56:23 58:3 | 144:12,25 | **2715** 77:4 |
| **2:39:22** 111:13 | **2:54:01** 119:25 | 59:15,21 67:3 | 146:3,8 206:24 | **2716** 77:5 |
| **2:40:05** 111:16 | **2:54:21** 120:4 | 67:9 76:10 | **2100** 2:7 | **2718** 89:21 |
| **2:41:05** 111:23 | **2:54:33** 120:8 | 77:3 78:11 | **215** 3:21 | **2721** 92:15 |
| **2:41:17** 112:1 | **2:54:38** 120:12 | 79:7 80:17 | **216** 1:24 4:11 | **2724** 94:1 |
| **2:41:32** 112:5 | **2:55:09** 120:20 | 82:21 85:23 | **22** 160:22 | **2727** 95:11 |
| **2:42:15** 112:12 | **2:55:27** 121:1 | 87:11,16 88:7 | **22-CV-4734** 4:7 | **273** 222:21 |
| **2:42:35** 112:17 | **2:55:51** 121:5 | 89:2,13,20 | **228** 216:20 | **2730** 97:9 |
| **2:42:52** 112:22 | **2:56:15** 121:12 | 90:3 91:5 | **229** 219:7 | **2733** 100:18 |
| **2:43:30** 113:3 | **2:56:32** 121:17 | 92:15 93:7,12 | **23** 181:20 | **2735** 77:5 |
| **2:43:47** 113:8 | **2:57:41** 121:25 | 93:19,24,25 | 231:16 | **274** 223:2 |
| **2:43:53** 113:12 | **2:58:02** 122:6 | 94:10 95:6,9 | **24** 164:2,16 | **2748** 77:5 |
| **2:44:08** 113:16 | **2:58:13** 122:11 | 95:24 96:2,6,9 | 179:20 259:6 | 102:15 |
| **2:44:16** 113:21 | **2:58:21** 122:15 | 97:8,13,18,23 | **2401** 208:9,18 | **2750** 77:5 |
| **2:44:26** 114:1 | **2:58:29** 122:19 | 98:4 100:17,24 | 208:21,25 | **276** 223:7 |
| **2:44:38** 114:5 | **2:58:43** 122:23 | 101:14,25 | 209:4,15 | **2767** 111:18,23 |
| **2:44:51** 114:8 | **2:58:50** 123:2 | 102:4,8,15 | 211:25 | **2768** 125:13 |
| **2:45:02** 114:12 | **2:59:08** 123:5 | 116:13 117:17 | **2402** 209:5,12 | **2769** 126:7 |
| **2:45:26** 114:16 | **2:59:28** 123:12 | 121:16 124:8 | 209:23 | **279** 223:12 |
| **2:45:42** 114:22 | **2:59:35** 123:17 | 125:18 127:8 | **2406** 209:25 | **2790** 160:22 |
| **2:45:59** 114:25 | **2:59:39** 123:20 | 157:6 164:2,16 | **2408** 210:13 | **2795** 146:15 |
| **2:46:04** 115:3 | **2:59:56** 124:1 | 178:21 179:12 | **244** 219:12 | 152:24 |
| **2:46:12** 115:6 | **20** 11:10 32:10 | 179:20 185:12 | **249** 3:22 213:21 | **28** 196:3 249:14 |

**280** 224:8
**2800** 159:12
**281** 223:17,18
**2815** 125:13
**282** 43:7 223:17
**2827** 116:24
**2833** 111:18
  112:7
**284** 224:1,3
**2861** 206:19
**288** 224:4,8,11
  224:12
**28th** 249:17
  250:23
**290** 224:9,13,17
  224:17
**2960** 199:14
**29th** 59:3

___

**3**

**3** 3:10 76:25
  77:1,12,18,23
  77:24 78:3
  79:7 103:11,13
  103:14,16,21
  111:18 169:8
**3/24** 183:2
**3:02:07** 124:7
**3:02:21** 124:11
**3:02:36** 124:16
**3:02:58** 124:21
**3:03:09** 124:25
**3:03:25** 125:6
**3:03:41** 125:11
**3:04:02** 125:14
**3:04:41** 125:19
**3:04:51** 125:23
**3:05:16** 126:4
**3:05:39** 126:7
**3:06:06** 126:11
**3:06:41** 126:21
**3:07:02** 127:1
**3:07:30** 127:9
**3:07:34** 127:13
**3:07:45** 127:19
**3:08:02** 127:25
**3:08:26** 128:6

**3:08:40** 128:8
**3:08:58** 128:13
**3:09:26** 128:21
**3:09:36** 128:24
**3:09:51** 129:3
**3:10:04** 129:7
**3:10:16** 129:11
**3:10:24** 129:13
**3:10:37** 129:18
**3:10:48** 129:21
**3:10:56** 129:24
**3:11:12** 130:3
**3:11:20** 130:6
**3:11:33** 130:10
**3:11:58** 130:16
**3:12:09** 130:19
**3:12:33** 130:25
**3:12:48** 131:5
**3:12:55** 131:8
**3:13:07** 131:12
**3:13:29** 131:16
**3:13:44** 131:20
**3:14:02** 131:24
**3:14:14** 132:3
**3:14:33** 132:8
**3:15:00** 132:14
**3:15:08** 132:20
**3:15:32** 133:1
**3:15:41** 133:5
**3:15:52** 133:11
**3:16:15** 133:16
**3:16:18** 133:19
**3:16:40** 134:1
**3:17:08** 134:6
**3:17:31** 134:14
**3:17:38** 134:19
**3:17:47** 134:23
**3:18:06** 135:2
**3:18:21** 135:7
**3:18:34** 135:11
**3:18:45** 135:14
**3:18:54** 135:17
**3:18:59** 135:22
**3:19:08** 135:25
**3:19:47** 136:9
**3:20:16** 136:16
**3:20:25** 136:20

**3:21:00** 136:25
**3:21:15** 137:3
**3:21:25** 137:5
**3:21:34** 137:8
**3:21:55** 137:14
**3:22:01** 137:18
**3:22:18** 137:21
**3:22:31** 138:3
**3:22:51** 138:8
**3:22:59** 138:14
**3:23:13** 138:20
**3:23:28** 138:24
**3:23:48** 139:4
**3:24:12** 139:9
**3:24:30** 139:13
**3:24:42** 139:18
**3:24:49** 139:21
**3:24:58** 139:25
**3:25:05** 140:4
**3:25:09** 140:7
**3:25:21** 140:11
**3:25:34** 140:14
**3:25:44** 140:18
**3:25:57** 140:21
**3:26:12** 141:2
**3:26:21** 141:5
**3:26:49** 141:11
**3:27:07** 141:15
**3:27:20** 141:19
**3:27:58** 141:22
**3:28:09** 141:25
**3:28:15** 142:5
**3:28:29** 142:8
**3:28:45** 142:12
**3:28:59** 142:15
**3:29:09** 142:19
**3:29:18** 142:22
**3:29:54** 143:2
**3:30:52** 143:5
**3:31:02** 143:8
**3:31:12** 143:11
**3:31:18** 143:19
**3:31:25** 143:24
**3:31:45** 144:5
**3:32:32** 144:9
**3:32:59** 144:14
**3:33:07** 144:18

**3:33:25** 144:23
**3:33:44** 145:2
**3:33:53** 145:7
**3:34:05** 145:12
**3:34:26** 145:17
**3:34:33** 145:21
**3:34:48** 146:1
**3:34:59** 146:4
**3:35:08** 146:7
**3:35:35** 146:13
**3:36:06** 146:18
**3:36:19** 146:23
**3:36:30** 147:1
**3:36:42** 147:6
**3:36:54** 147:12
**3:36:59** 147:14
**3:37:12** 147:19
**3:37:31** 147:23
**3:37:44** 148:3
**3:37:58** 148:7
**3:38:09** 148:10
**3:38:33** 148:15
**3:38:44** 148:17
**3:38:59** 148:21
**3:39:10** 148:24
**3:39:26** 149:5
**3:39:47** 149:12
**3:39:54** 149:15
**3:40:04** 149:22
**3:40:23** 150:3
**3:40:33** 150:7
**3:40:41** 150:10
**3:40:57** 150:17
**3:41:11** 150:23
**3:41:21** 151:1
**3:41:34** 151:6
**3:41:45** 151:10
**3:41:58** 151:14
**3:42:12** 151:19
**3:42:24** 151:24
**3:43:03** 152:4
**3:43:14** 152:8
**3:43:20** 152:12
**3:43:49** 152:20
**3:44:04** 153:1
**3:44:22** 153:5
**3:44:42** 153:9

**3:44:48** 153:13
**3:44:58** 153:18
**3:45:10** 153:24
**3:45:17** 154:2
**3:45:25** 154:6
**3:45:35** 154:10
**3:45:51** 154:13
**3:46:05** 154:17
**3:46:14** 154:21
**3:46:28** 154:25
**3:46:33** 155:3
**3:46:39** 155:7
**3:47:27** 155:15
**3:47:35** 155:21
**3:48:01** 156:1
**3:48:14** 156:5
**3:48:33** 156:11
**3:48:53** 156:20
**3:49:09** 156:24
**3:49:32** 157:7
**3:49:37** 157:10
**3:49:50** 157:14
**3:50:15** 157:19
**3:50:24** 157:22
**3:50:40** 158:1
**3:51:02** 158:6
**3:51:16** 158:10
**3:51:35** 158:16
**3:51:42** 158:19
**3:51:44** 158:24
**3:51:49** 159:2
**3:51:57** 159:6
**3:52:06** 159:10
**3:52:36** 159:16
**3:52:47** 159:20
**3:52:59** 159:25
**3:53:05** 160:3
**3:53:11** 160:7
**3:53:37** 160:14
**3:53:48** 160:18
**3:54:02** 160:22
**3:54:28** 161:1
**3:54:40** 161:4
**3:54:49** 161:8
**3:55:05** 161:12
**3:55:13** 161:16
**3:55:25** 161:19

| | | | | |
|---|---|---|---|---|
| **3:55:32** 161:21 | 103:20 | **4:09:13** 170:17 | **4:23:15** 179:1 | **4:37:32** 187:2 |
| **3:55:46** 162:2 | **3982** 191:11,14 | **4:09:23** 170:21 | **4:23:16** 179:3 | **4:37:39** 187:4 |
| **3:56:08** 162:11 | **3992** 194:20 | **4:09:35** 170:25 | **4:23:24** 179:6 | **4:37:52** 187:9 |
| **3:56:33** 162:19 | **3rd** 89:13 245:7 | **4:09:53** 171:5 | **4:23:46** 179:13 | **4:38:14** 187:16 |
| **3:57:08** 162:24 | 251:14,18 | **4:10:07** 171:10 | **4:23:53** 179:16 | **4:38:20** 187:19 |
| **3:57:29** 163:3 | | **4:10:19** 171:15 | **4:24:26** 179:21 | **4:38:36** 187:24 |
| **3:57:46** 163:8 | **4** | **4:10:44** 171:21 | **4:24:45** 180:1 | **4:38:48** 188:3 |
| **3:57:58** 163:12 | **4** 17:21 59:15 | **4:10:57** 171:24 | **4:25:02** 180:4 | **4:39:00** 188:8 |
| **3:58:05** 163:17 | 77:2 78:11 | **4:11:38** 172:3 | **4:25:20** 180:10 | **4:39:35** 188:15 |
| **3:58:26** 163:22 | 80:17 83:22 | **4:11:45** 172:7 | **4:26:00** 180:14 | **4:39:39** 188:19 |
| **3:59:10** 164:3 | 97:13,17 103:7 | **4:11:52** 172:10 | **4:26:11** 180:16 | **4:39:48** 188:22 |
| **3:59:21** 164:7 | 103:11 112:6 | **4:12:02** 172:12 | **4:26:19** 180:20 | **4:40:08** 189:1 |
| **3:59:33** 164:10 | 134:16 169:8 | **4:12:15** 172:15 | **4:26:36** 180:25 | **4:40:19** 189:6 |
| **3:59:47** 164:14 | 176:17 205:6,7 | **4:12:41** 172:20 | **4:26:51** 181:5 | **4:40:46** 189:13 |
| **30** 51:3 | 213:21 247:16 | **4:13:11** 173:1 | **4:27** 206:6 | **4:41:05** 189:18 |
| **30(b)(6)** 1:15 8:7 | **4-1** 125:14 | **4:13:29** 173:5 | **4:27:02** 181:8 | **4:41:16** 189:22 |
| 16:16 19:17 | **4.1** 152:4 | **4:14:10** 173:10 | **4:27:18** 181:15 | **4:41:49** 190:6 |
| 57:21 | **4:00:10** 164:18 | **4:14:36** 173:18 | **4:27:29** 181:18 | **4:42:30** 190:11 |
| **31** 49:3,15 89:20 | **4:00:26** 164:21 | **4:14:58** 173:22 | **4:27:54** 181:21 | **4:42:40** 190:14 |
| 89:22 90:3 | **4:00:55** 165:1 | **4:15:05** 173:24 | **4:28:20** 182:1 | **4:43:06** 190:20 |
| 92:15 93:24 | **4:01:16** 165:5 | **4:15:34** 174:3 | **4:28:29** 182:5 | **4:43:23** 190:25 |
| 95:9 97:8 | **4:01:29** 165:9 | **4:15:44** 174:8 | **4:28:35** 182:7 | **4:43:40** 191:6 |
| 100:17 101:14 | **4:01:45** 165:13 | **4:15:55** 174:11 | **4:28:57** 182:11 | **4:44:19** 191:11 |
| 102:14 184:4 | **4:02:12** 165:19 | **4:16:37** 174:18 | **4:29:18** 182:15 | **4:45:04** 191:17 |
| 185:12 | **4:02:31** 165:24 | **4:16:57** 174:23 | **4:29:36** 182:18 | **4:45:23** 191:23 |
| **3112** 111:18 | **4:02:51** 166:5 | **4:17:11** 175:4 | **4:30:24** 182:25 | **4:45:45** 192:3 |
| **31st** 42:15 49:11 | **4:03:02** 166:8 | **4:17:27** 175:9 | **4:30:49** 183:4 | **4:46:12** 192:11 |
| 49:25 51:3 | **4:03:35** 166:13 | **4:17:38** 175:13 | **4:31:03** 183:10 | **4:46:39** 192:17 |
| 100:23 184:4,4 | **4:03:48** 166:18 | **4:17:55** 175:19 | **4:31:36** 183:17 | **4:46:52** 192:23 |
| **3346** 163:22 | **4:03:57** 166:22 | **4:18:22** 175:25 | **4:31:55** 183:22 | **4:47:11** 193:3 |
| 164:1 | **4:04:08** 167:1 | **4:18:30** 176:6 | **4:32:24** 184:1 | **4:47:22** 193:7 |
| **3351** 164:20 | **4:04:33** 167:6 | **4:18:41** 176:11 | **4:32:55** 184:6 | **4:47:37** 193:11 |
| **3354** 182:23 | **4:04:46** 167:12 | **4:19:04** 176:16 | **4:33:09** 184:9 | **4:47:59** 193:15 |
| **3361** 180:19 | **4:04:57** 167:16 | **4:19:25** 176:21 | **4:33:26** 184:13 | **4:48:15** 193:20 |
| **34** 254:24 | **4:05:15** 167:20 | **4:19:42** 176:25 | **4:33:38** 184:16 | **4:48:18** 193:24 |
| 255:10 | **4:06:08** 168:1 | **4:19:48** 177:4 | **4:33:58** 184:19 | **4:48:27** 194:4 |
| **3405** 249:8 | **4:06:17** 168:4 | **4:20:11** 177:7 | **4:34:08** 184:22 | **4:48:38** 194:9 |
| **3406** 249:9 | **4:06:30** 168:9 | **4:20:33** 177:10 | **4:34:35** 185:5 | **4:48:48** 194:14 |
| **3407** 215:19 | **4:07:02** 168:15 | **4:20:53** 177:14 | **4:34:50** 185:10 | **4:48:54** 194:18 |
| 248:20 | **4:07:09** 168:20 | **4:21:05** 177:17 | **4:35:17** 185:19 | **4:49:23** 194:23 |
| **3549** 198:18,20 | **4:07:48** 169:9 | **4:21:24** 177:21 | **4:35:29** 185:23 | **4:49:41** 195:1 |
| **3550** 198:20 | **4:07:59** 169:15 | **4:21:32** 177:25 | **4:35:59** 186:5 | **4:49:57** 195:5 |
| **360** 138:22 | **4:08** 206:3 | **4:21:39** 178:4 | **4:36:22** 186:7 | **4:50:07** 195:9 |
| **385** 34:9 35:7 | **4:08:08** 169:20 | **4:22:00** 178:8 | **4:36:30** 186:9 | **4:50:43** 195:14 |
| 43:6 145:8 | **4:08:32** 169:25 | **4:22:09** 178:11 | **4:36:39** 186:12 | **4:50:53** 195:16 |
| 194:1 | **4:08:50** 170:4 | **4:22:39** 178:16 | **4:37:02** 186:16 | **4:51:02** 195:19 |
| **3972** 103:7,18 | **4:09:02** 170:12 | **4:23:08** 178:22 | **4:37:17** 186:21 | **4:51:08** 195:24 |

**4:51:26** 196:2
**4:51:37** 196:8
**4:51:46** 196:12
**4:51:57** 196:15
**4:52:16** 196:22
**4:52:22** 196:25
**4:53:05** 197:4
**4:53:13** 197:7
**4:53:24** 197:11
**4:53:43** 197:16
**4:53:56** 197:21
**4:54:00** 197:24
**4:54:12** 198:3
**4:54:23** 198:8
**4:54:44** 198:14
**4:54:52** 198:16
**4:55:43** 198:21
**4:55:54** 199:2
**4:56:05** 199:5
**4:56:32** 199:9
**4:56:42** 199:12
**4:57:07** 199:15
**4:57:56** 199:20
**4:58:05** 200:1
**4:58:26** 200:6
**4:58:38** 200:9
**4:58:45** 200:12
**4:58:51** 200:16
**4:59:03** 200:20
**4:59:15** 200:23
**4:59:27** 201:2
**4:59:41** 201:7
**4:59:53** 201:11
**40** 32:10 36:22
   112:6 146:5,8
   146:12 193:19
   194:7 200:24
**403** 224:24
   225:1
**4032** 191:14
**406** 224:24
   225:1
**408** 225:2
**41** 111:15
**41-3** 116:17
**410** 225:2
**4100** 2:21

**415** 225:2
**417** 225:2
**4178** 152:2,4,18
**42** 221:1,3
**4206** 121:23
**4248** 124:6
**4403** 212:22
   213:1,2,9
**4404** 212:22
   213:9
**4405** 212:8,25
**4432** 167:19
**45** 38:22 78:1
**4512** 251:13,15
**47** 254:18,23
   255:5,10
**4734** 1:8
**480** 32:6 33:16
   34:16,16 35:6
**49** 254:17,20
   255:10
**49-1** 219:3
**4th** 42:10 49:1
   55:1 79:9,18
   85:1,23 87:16
   88:7 89:2
   90:15,23 91:9
   92:12,16,24
   93:7,25 94:1
   94:10,15 95:12
   95:24 96:5,9
   97:15 101:19
   101:25 111:21
   112:4,10
   113:14 116:13
   117:17,23
   192:16 218:14
   239:11,21
   240:8,22 245:3
   246:23,23
   251:18,20

---
**5**
---

**5** 3:4,11 45:19
   45:24 46:15,19
   110:9 112:6,8
   164:9,19 169:1

169:8 179:23
180:3
**5-0** 168:14
**5,033,683**
   168:13
**5:00:02** 201:16
**5:00:12** 201:20
**5:00:24** 201:25
**5:00:37** 202:3
**5:00:44** 202:6
**5:00:59** 202:12
**5:01:25** 202:18
**5:01:38** 202:23
**5:02:01** 203:2
**5:02:11** 203:5
**5:02:27** 203:9
**5:02:39** 203:12
**5:02:58** 203:18
**5:03:16** 203:22
**5:03:27** 203:25
**5:03:43** 204:5
**5:03:50** 204:8
**5:04:05** 204:11
**5:04:12** 204:14
**5:04:30** 204:18
**5:04:52** 204:24
**5:05:02** 205:3
**5:05:24** 205:9
**5:05:38** 205:12
**5:05:51** 205:16
**5:06:04** 205:21
**5:06:24** 206:1
**5:06:33** 206:3
**5:06:42** 206:7
**5:06:49** 206:11
**5:07:03** 206:16
**5:07:58** 206:21
**5:08:13** 206:24
**5:08:20** 207:4
**5:08:29** 207:7
**5:08:42** 207:11
**5:08:50** 207:16
**5:09:23** 207:22
**5:09:35** 208:1
**5:09:47** 208:8
**5:10:06** 208:12
**5:10:21** 208:17

**5:10:40** 208:23
**5:11:00** 209:3
**5:11:17** 209:6
**5:11:43** 209:13
**5:12:07** 209:19
**5:12:36** 209:24
**5:12:50** 210:3
**5:13:10** 210:10
**5:13:37** 210:14
**5:14:09** 210:20
**5:14:19** 210:25
**5:14:32** 211:4
**5:15:04** 211:10
**5:15:33** 211:15
**5:15:39** 211:18
**5:15:46** 211:23
**5:16:09** 212:3
**5:16:20** 212:6
**5:16:41** 212:12
**5:17:08** 212:18
**5:17:32** 212:24
**5:17:53** 213:2
**5:18:07** 213:7
**5:18:20** 213:11
**5:18:48** 213:16
**5:19:01** 213:20
**5:19:19** 213:23
**5:19:37** 214:2
**5:19:54** 214:7
**5:20:10** 214:13
**5:20:26** 214:18
**5:20:35** 214:23
**5:20:49** 215:3
**5:21:17** 215:10
**5:21:43** 215:16
**5:22:31** 215:21
**5:22:45** 215:25
**5:23:05** 216:5
**5:23:12** 216:11
**5:23:35** 216:15
**5:23:54** 216:20
**5:24:23** 216:24
**5:24:30** 217:1
**5:24:57** 217:10
**5:25:14** 217:16
**5:25:35** 217:22
**5:25:45** 217:25

**5:25:56** 218:4
**5:26** 246:14
**5:26:10** 218:10
**5:26:31** 218:15
**5:26:39** 218:18
**5:26:58** 218:25
**5:27:53** 219:4
**5:28:11** 219:10
**5:28:37** 219:15
**5:28:50** 219:19
**5:29:11** 220:1
**5:29:38** 220:9
**5:29:53** 220:13
**5:30:04** 220:17
**5:30:10** 220:23
**5:30:22** 221:1
**5:30:28** 221:6
**5:30:45** 221:11
**5:30:51** 221:13
**5:30:58** 221:16
**5:31:14** 221:20
**5:31:30** 222:1
**5:31:39** 222:6
**5:31:45** 222:9
**5:32:05** 222:14
**5:32:21** 222:19
**5:32:39** 222:24
**5:32:59** 223:5
**5:33:18** 223:10
**5:33:33** 223:15
**5:34:02** 223:22
**5:34:18** 224:2
**5:34:36** 224:7
**5:34:44** 224:11
**5:35:00** 224:16
**5:35:18** 224:21
**5:36:04** 225:3
**5:36:11** 225:7
**5:36:22** 225:11
**5:36:30** 225:14
**5:36:44** 225:18
**5:36:56** 225:22
**5:37:12** 226:2
**5:37:35** 226:7
**5:37:56** 226:11
**5:38** 246:17
**5:38:03** 226:15

| | | | | |
|---|---|---|---|---|
| **5:38:16** 226:19 | **5:49:12** 235:1 | 145:14,14,22 | **6:06:08** 247:7 | **6:19:42** 256:6 |
| **5:38:26** 226:22 | **5:49:21** 235:6 | 145:23,25 | **6:06:20** 247:9 | **6:19:50** 256:11 |
| **5:38:45** 227:2 | **5:49:31** 235:12 | 146:11 193:17 | **6:06:28** 247:13 | **6:20:00** 256:14 |
| **5:38:50** 227:5 | **5:49:45** 235:17 | 193:18 194:7 | **6:06:49** 247:18 | **6:20:09** 256:18 |
| **5:39:31** 227:12 | **5:49:57** 235:21 | 198:18 254:18 | **6:07:05** 247:24 | **6:20:16** 256:22 |
| **5:39:45** 227:17 | **5:50:18** 236:1 | **500** 2:13 46:18 | **6:07:22** 248:4 | **6:20:23** 256:25 |
| **5:39:51** 227:20 | **5:50:27** 236:5 | **500,000** 45:6 | **6:07:44** 248:11 | **6:20:29** 257:3 |
| **5:40:02** 228:1 | **5:50:39** 236:9 | 46:8,9,19 | **6:08:08** 248:17 | **6:20:35** 257:6 |
| **5:40:10** 228:5 | **5:50:45** 236:12 | 166:6,10 | **6:08:51** 248:24 | **60** 31:19 |
| **5:40:34** 228:11 | **5:50:53** 236:17 | **51** 254:18 | **6:09:05** 249:4 | **60187** 2:8 |
| **5:40:45** 228:16 | **5:50:57** 236:21 | **524,000** 166:3 | **6:09:25** 249:9 | **60601** 2:22 |
| **5:40:50** 228:21 | **5:51:13** 237:3 | 175:10,22 | **6:09:35** 249:13 | **60661** 1:25 4:12 |
| **5:41:02** 228:24 | **5:51:25** 237:7 | **524,263** 166:3 | **6:09:53** 249:16 | **68** 190:2 |
| **5:41:16** 229:3 | **5:51:42** 237:12 | 168:4 | **6:10:07** 249:20 | |
| **5:41:26** 229:6 | **5:51:55** 237:16 | **53** 254:18 | **6:10:21** 249:24 | **7** |
| **5:41:36** 229:10 | **5:52:03** 237:21 | **54** 254:18 | **6:10:36** 250:3 | **7** 3:13 121:19,20 |
| **5:41:46** 229:13 | **5:52:21** 238:4 | **54th** 147:22 | **6:10:55** 250:7 | 124:17,21 |
| **5:42:04** 229:18 | **5:52:33** 238:9 | **55** 110:2,6,15 | **6:11:26** 250:13 | 251:8 |
| **5:42:15** 229:22 | **5:52:49** 238:15 | 187:25 | **6:11:32** 250:16 | **7/5/94** 105:17 |
| **5:42:29** 230:2 | **5:52:55** 238:19 | **56** 254:18,20,24 | **6:11:52** 250:20 | **7/9/20** 191:10 |
| **5:42:49** 230:7 | **5:53** 257:12 | 255:5,10,10,10 | **6:12:08** 250:24 | **77** 2:21 3:9 |
| **5:43:07** 230:11 | **5:53:01** 238:21 | | **6:12:15** 251:3 | **7th** 124:8 180:22 |
| **5:43:15** 230:15 | **5:53:10** 239:1 | **6** | **6:12:33** 251:9 | |
| **5:43:30** 230:21 | **5:53:20** 239:6 | **6** 3:12 116:19,21 | **6:13:06** 251:16 | **8** |
| **5:43:37** 230:25 | **5:53:28** 239:9 | 116:22,24 | **6:13:19** 251:20 | **8** 1:19 3:14 |
| **5:43:58** 231:4 | **5:53:41** 239:14 | **6:00:00** 243:7 | **6:13:33** 251:24 | 125:13,15 |
| **5:44:15** 231:8 | **5:54:03** 239:19 | **6:00:14** 243:11 | **6:13:56** 252:4 | 152:25 158:17 |
| **5:44:21** 231:13 | **5:54:14** 239:24 | **6:00:31** 243:16 | **6:14:15** 252:7 | 158:17 159:13 |
| **5:44:35** 231:16 | **5:54:41** 240:4 | **6:00:44** 243:20 | **6:14:34** 252:13 | 171:25 182:23 |
| **5:44:56** 231:23 | **5:55:03** 240:8 | **6:01:02** 244:1 | **6:14:52** 252:19 | 258:9 |
| **5:45:11** 232:2 | **5:55:12** 240:14 | **6:01:25** 244:5 | **6:15:05** 252:23 | **8/21/06** 105:23 |
| **5:45:30** 232:6 | **5:55:31** 240:19 | **6:01:38** 244:8 | **6:15:39** 253:2 | **8/4/14** 106:4 |
| **5:45:47** 232:11 | **5:55:58** 240:24 | **6:01:47** 244:12 | **6:15:52** 253:7 | **81** 61:3 |
| **5:45:55** 232:15 | **5:56:23** 241:5 | **6:02:02** 244:16 | **6:16:09** 253:13 | **839,000** 174:16 |
| **5:46:06** 232:19 | **5:57:02** 241:12 | **6:02:22** 244:20 | **6:16:26** 253:19 | **8th** 4:2 |
| **5:46:15** 232:23 | **5:57:14** 241:15 | **6:02:45** 245:1 | **6:16:35** 253:23 | |
| **5:46:28** 233:2 | **5:57:33** 241:22 | **6:02:49** 245:4 | **6:17:00** 254:4 | **9** |
| **5:46:39** 233:5 | **5:57:55** 242:2 | **6:03:01** 245:11 | **6:17:13** 254:7 | **9** 3:15 152:8,9 |
| **5:47:01** 233:10 | **5:58:21** 242:6 | **6:03:09** 245:16 | **6:17:26** 254:12 | 152:18 164:9 |
| **5:47:33** 233:16 | **5:58:46** 242:10 | **6:03:27** 245:21 | **6:17:48** 254:18 | 191:16 192:15 |
| **5:47:52** 233:22 | **5:58:58** 242:13 | **6:03:47** 246:1 | **6:18:01** 254:22 | **9/29/14** 106:21 |
| **5:48:02** 233:25 | **5:59:06** 242:17 | **6:04:18** 246:5 | **6:18:15** 255:3 | **90** 130:16,18 |
| **5:48:08** 234:5 | **5:59:25** 242:22 | **6:05:11** 246:10 | **6:18:38** 255:11 | **90266** 2:14 |
| **5:48:20** 234:9 | **5:59:33** 242:25 | **6:05:16** 246:13 | **6:18:59** 255:16 | |
| **5:48:34** 234:13 | **5:59:38** 243:2 | **6:05:26** 246:17 | **6:19:12** 255:20 | |
| **5:48:48** 234:17 | **50** 32:8,10 36:22 | **6:05:45** 246:23 | **6:19:26** 255:24 | |
| **5:49:00** 234:22 | 144:22 145:1 | **6:05:57** 247:1 | **6:19:36** 256:3 | |

# EXHIBITS TO LEDIEU 30(B)(6) DEPOSITION

# EXHIBITS 1-18

# Exhibit 1 to Ledieu 30(b)(6) Deposition

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MATTHEW LEE STEWART,

     Plaintiff,

                                Case No. 22-cv-4734

v.

                                District Judge Jorge L. Alonso

NISSAN NORTH AMERICA,
INC., and NISSAN MOTOR          Magistrate Sheila M. Finnegan
ACCEPTANCE
CORPORATION,

     Defendants.

## NOTICE OF 30(b)(6) DEPOSITION (Second Amended)

To: Nissan North America, Inc. and Nissan Motor Acceptance Corporation

| | |
|---|---|
| Peter N. Farley | Melissa M. Weiss |
| McGuireWoods LLP | McGuireWoods LLP |
| 1230 Peachtree Street NE, Suite 2100 | 77 West Wacker Drive, Suite 4100 |
| Atlanta, GA 30309 | Chicago, IL 60601-1818 |
| pfarley@mcguirewoods.com | mweiss@mcguirewoods.com |

    YOU ARE HEREBY NOTIFIED THAT ON May 8, 2024 at 10:00 a.m., CST we shall take the deposition of the persons designated to testify by Defendants on their behalf as to the following matters, pursuant to Fed. R. Civ. P. 30(b)(6), before a Notary Public and Videographer, via video link. The deposition will be recorded by audio and audio-visual means by an operator of In Demand Electronic Court Reporting, Inc. located in Chicago, Illinois. The deposition will be used for purposes of discovery and may be introduced as evidence at trial or otherwise in the above-entitled action.

    This Notice is served upon you in conformity with the Federal Rules of Civil Procedure and is intended to require the presence of the party, identified herein, at said time and place.

1

**EXHIBIT**

**1**

**MATTERS FOR EXAMINATION**

(1)     The person(s) most knowledgeable regarding the "restructuring and reorganization process" referenced in Exhibit 1 hereto, specifically the person most knowledgeable regarding how the positions that were targeted for "restructure or reorganization" were determined.

(2)     The person(s) most knowledgeable regarding the criteria used for selection of the positions or persons for elimination in the 2020 NMAC Reorganization including the reasons why some individuals whose positions were eliminated were offered new positions for which they did not apply (as referenced in June 4, 2020 letters) while others, including Plaintiff, were not offered new positions.

(3)     The person(s) most knowledgeable regarding the author, creation dates, and any modifications to the June 4, 2020 letters with jobs offered as referenced in documents Bates labeled 2692-2715, and with no jobs offered as referenced in documents Bates labeled 2716-2735 and 2748-2750.

(4)     The person(s) most knowledgeable regarding the content of the power point presentations regarding NMAC Reorganization 2020.

(5)     The person(s) most knowledgeable regarding dates, attendees and content  of Reorganization 2020 planning and/ or selection meeting(s) in person or online.

(6)     The person(s) most knowledgeable regarding January and February 2020 small v large dealer analysis, if any.

(7)     The person(s) most knowledgeable regarding the 2020 ranking of NMAC FSM's.

(8)      The person most knowledgeable  regarding mobility or ability to relocate as a criteria for termination or elimination of position and the mobility of FSM's, including Ed Bilotto, Thomas Tip Joyce, Rudy Gullien, Jerald Zeman, Vincent Rousseau, Fernando Hernandez, Thomas Kenney, and any others who claimed not to be able to relocate or move.

(9)     The person(s) most knowledgeable regarding which accounts or metrics were evaluated to determine criteria for 2020 Reorganization or restructure elimination selection.

(10)    The person(s) most knowledgeable regarding NMAC or Nissan policies on Age Discrimination.

(11)    The person(s) most knowledgeable regarding NMAC or Nissan policies on Retaliation.

(12)    The person(s) most knowledgeable regarding NMAC or Nissan Reorganizations and Restructures from 2009 to present.

(13)    The person(s) most knowledgeable regarding the reasons for Plaintiff's position elimination (i.e. how and why his position was targeted for "restructure and reorganization") and the identity of all individuals who made the decision to terminate Plaintiff.

2

(14) The person(s) most knowledgeable regarding NMAC and/ or Nissan's decision to eliminate the position and terminate Plaintiff, Greg Leiter, Bill Dodson, Douglas McKiernan Monohan, Wes Oda, Kasey Yost, Brad Boland.

(15) The person(s) most knowledgeable regarding any other individuals who were terminated by NMAC or Nissan at or about the time that Plaintiff was terminated in August 2020.

(16) The person(s) most knowledgeable regarding the cost savings component of the restructuring plan that led to NMAC or Nissan's elimination of Plaintiff and other's positions.

(17) The person(s) most knowledgeable regarding the recruitment process for the ten (10) positions for which Plaintiff applied between June 1, 2020 and August 3, 2020; specifically, the person who can explain the candidate pipeline, candidate and related documents used by Nissan personnel to track applicants and interviews, the individuals with access to those systems, and the manner in which those documents are maintained. (An example of the records at issue has been produced by Defendants at NISSAN_000267-348.)

(18) The person(s) most knowledgeable regarding the reason(s) why Plaintiff was not interviewed for the positions for which he applied between June 1, 2020 and August 3, 2020 and was not offered an interview.

(19) The person(s) most knowledgeable regarding the identity of all individuals who made the decision(s) not to interview Plaintiff for the positions for which he applied, but was not interviewed, between June 1, 2020 and August 3, 2020.

(20) The person(s) most knowledgeable regarding the reason(s) why Plaintiff was not offered one of the positions for which he interviewed for between June 1, 2020 and August 3, 2020. The six positions at issue are Consumer Credit Manager in Dallas, Commercial Sales Manager for NV, Utah, NM, CO and AZ, Senior Dealer Operations Manager for Infiniti WI/MN, Upstream Remarketing Sales Manager in Dallas, Planner, Recalls & Campaigns in Franklin TN, and Senior Fixed Operations Manager Iowa.

(21) The person(s) most knowledgeable regarding the identity of all individuals who made the decision(s) not to hire Plaintiff for the positions for which he interviewed between June 1, 2020 and August 3, 2020.

(22) The person(s) most knowledgeable regarding communications between recruiter and hiring managers for positions Plaintiff applied at NMAC and Nissan in 2020.

(23) The person(s) most knowledgeable regarding communications between Human Resources, Camille Dessaw and/or hiring managers or recruiters.

(24) Persons most knowledgeable regarding communications from Jim DeTrude, Eric Ledieu and or Human Resources with any recruiters or hiring managers for positions applied for by Plaintiff.

(25) The person(s) most knowledgeable regarding how Plaintiff's FSM position and the duties of that position were reallocated from August 3, 2020 to the present, and the identity of the individual(s) that were given those duties, including their name(s), address(es), age(s), years of service with Nissan and titles.

3

(26)    The person(s) most knowledgeable regarding the nature and terms of Plaintiff's compensation plan with NMAC as of January 2020 and the salary and benefits he would receive to present if he was still employed.

(27)    The person(s) most knowledgeable in salary and benefits for Plaintiff and for all the individuals who were offered the positions for which he interviewed between June 1, 2020 and August 3, 2020, specifically addressing how the salary and benefits offered to the individuals who received the jobs for which Plaintiff applied were determined, and how the salary and benefits offered to those individuals has been increased since August 3, 2020.

(28)    The person(s) most knowledgeable of FSM names and cities and dealers assigned to each NMAC district in January 20 August 2020 and the new NMAC districts after August 4, 2020.

(29)    The person(s) most knowledgeable regarding the identity of each NISSAN employee who has had access to Plaintiff's workday profile December 2019 to August 2020.

(30)    The person(s) most knowledgeable about the succession planning by VP's, Ops Team, AOMs, RFSMs in National and in the West, MidWest, and NorthWest Regions.

(31)    The person(s) most knowledgeable regarding the name, age, gender, title, qualifications and salary of any FSM hired by NMAC since August of 2020.

(32)    The person most knowledgeable regarding the FSM's name and age as well as name and number of dealers and accounts acquired from Matt Stewart's former district 2402 large and small signature direct dealers in August 2020.

(33)    The person(s) most knowledgeable regarding Ricardo Razo and Thomas "Tip" Joyce's termination from NMAC or Nissan.

(34)    The person(s) most knowledgeable regarding which FSM took over Ricardo "Rey" Razo dealers (formerly Matt Stewart dealers) after Ricardo Razo's termination from NMAC or Nissan.

(35)    The person(s) most knowledgeable regarding Simeon Taskov's taking over of Matt Stewart's former accounts after Ricardo "Rey" Razo's termination.

(36)    The person(s) most knowledgeable regarding the ages, qualifications, and compensation of FSMs Ricardo Razo, Simeon Taskov, Dan Pauken, Jennifer Byrnes, Phillip Hayes, Nedra Pitchford, Matthew Sheridan, Michael Strasser, Michael Van Os and Oz Wroe.

(37)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 821-56, 3347-88, 3982-4032, 4033-63, 4250-91, 4299-4340, 4342-71, and 4717-47.

(38)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2817, 2960, 2962, and 3017.

(39)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 1958, 1981, 2000, 2016, 2021, 2022, 2327, and 2618.

(40)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2650-2667.

4

(41)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2767-2833.

(42)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 3549-50.

(43)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2849, 2850, 2851, 2855, 2857, 2861, 2862, 3408, and 3409.

(44)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 3551 and 3552.

(45)     The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of document Bates labeled 3972.

(46)    The person(s) most knowledgeable regarding the A B and C ratings/rankings in documents including, but not limited to, those Bates labeled 4010 including date, process for rating market, individual and person.

(47)    The person(s) most knowledgeable regarding calibration process and performance ratings and date of 2020 Calibration meeting(s).

(48)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 4178, 4205, 4249, 4341, 4372, and 4432.

(49)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 3389, 3407, 3544-3546, 3548.

(50)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2817, 2960, 2962, and 3017.

(51)    The person(s) most knowledgeable regarding the author, creation date, use and subsequent modification of documents Bates labeled 2827, 2844, 2846, 2857, 2861, 2862, 3347-3388, 3389, and 3546.

Dated: April 30, 2024


_____ /s/ _____ Lisa L. Clay
One of the Attorneys for Plaintiff


Shannon M. Foley                         Lisa L. Clay Attorney at Law, Ltd.
*Pro Hac Vice*                           (ARDC No. 6277257)
Foley Lyman Law Group LLP                2100 Manchester Rd., Suite 1603
1500 Rosecrans Avenue, Suite 500         Wheaton, IL 60187
Manhattan Beach, CA 90266                630.456.4818
310.706.4050                             Email: lisa@clayatlaw.com
Email: shannon@foleylymanlaw.com

5

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this **Second Amended Notice of 30(b)(6) Deposition** to the parties listed above by sending same to the email addresses listed below on April 30, 2024.

*/s/ Lisa L. Clay*

6

# Exhibit 2 to Ledieu 30(b)(6) Deposition

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Jamie Beck
14138 Double Dutch Cir.
Parker, CO 80134

Dear Jamie:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position: Area Operations Manager
Region: Central Region
Area/District: Dallas & Mountain Area
Annual Base Salary and Salary Grade: No change in base salary ▮▮▮▮▮▮
Annual Success Share Bonus Target: No change in success share bonus eligibility
Quarterly Bonus Target (if applicable): No change in quarterly bonus target
Relocation Eligibility: N/A
Vehicle Eligibility: Yes
Start Date: August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

EXHIBIT

2

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

Nissan_002693

June 4, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,



Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**



_____          _____

Jamie Beck                                          Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**



_____          _____

Jamie Beck                                          Date

CONFIDENTIAL                                          Nissan_002694

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Jeff Irwin
665 Saratoga Road (Unit 134)
Wilton, NY 12831

Dear Jeff:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:           Financial Services Manager
Region:           Inside Sales Region
Area/District (if applicable):   TBD
Annual Base Salary and Salary Grade:  No change in Base Salary, █████████
Annual Success Share Bonus Target:    No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable):  No change in Quarterly Bonus Eligibility
Relocation Eligibility:  Eligible for Relocation Benefits
Vehicle Eligibility:  Eligible for ████████ Vehicle Allowance
Start Date:   August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.   Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

CONFIDENTIAL                                                                    Nissan_002695

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

Nissan_002696

June 4, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,



Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**



_____       _____

Jeff Irwin                                                                      Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**



_____       _____

Jeff Irwin                                                                      Date

Nissan_002697

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Larry Johnson
1866 Casey's Court
Edmond, OK 73025

Dear Larry:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:   Operations Manager
Region:   Inside Sales Region
Area/District (if applicable):  National Area
Annual Base Salary and Salary Grade:  No change in Salary
Annual Success Share Bonus Target:  No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable): No change in Quarterly Bonus Eligibility
Relocation Eligibility:   Eligible for Relocation Benefit
Vehicle Eligibility:   Eligible for Vehicle Allowance at ████████ Rate
Start Date: August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

    Nissan_002698

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

June 4, 2020
Page 3

If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.

Very truly yours,

Jim DeTrude
VP NMAC Sales & Marketing

**My signature below indicates that I ACCEPT the position.**

_____          _____
Larry Johnson                                                              Date

**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**

_____          _____
Larry Johnson                                                              Date

CONFIDENTIAL

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Matt Stocking
3498 E. Ellsworth Avenue
Unit 610C
Denver, CO 80209

Dear Matt:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:    Financial Services Manager
Region:    Inside Sales Region
Area/District (if applicable):  District TBD
Annual Base Salary and Salary Grade: No change in Salary, ███████
Annual Success Share Bonus Target:  No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable): No change in Quarterly Bonus Eligibility
Relocation Eligibility:  Eligible for Relocation Benefits
Vehicle Eligibility: Eligible for one-time $5,000 Lump Sum Payment in lieu of demo car
Start Date:  August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a

June 4, 2020
Page 2

comparable position by your Employment Separation Date, because the Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II.  **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1.  **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2.  **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3.  **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4.  **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

CONFIDENTIAL

June 4, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,



Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**



_____         _____
Matt Stocking                                     Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**



_____         _____
Matt Stocking                                     Date

CONFIDENTIAL

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Nedra Pitchford
1015 Still Meadow Crossing
Charlottesville, VA 22901

Dear Nedra:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:     Financial Services Manager
Region:        Inside Sales Region
Area/District (if applicable):  TBD
Annual Base Salary and Salary Grade: No change in Base Salary, ████████
Annual Success Share Bonus Target: No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable):  No change in Quarterly Bonus Eligibility
Relocation Eligibility:   Eligible for Relocation Benefit
Vehicle Eligibility:  Eligible for one-time $5,000 Vehicle Payment in lieu of demo car
Start Date:  August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

Nissan_002704

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

June 4, 2020
Page 3

If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.

Very truly yours,


Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**


_____       _____

Nedra Pitchford          Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**


_____       _____

Nedra Pitchford          Date

CONFIDENTIAL

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Ruben Rubalcava
4132 Kyndra Circle
Richardson, TX 75082

Dear Ruben:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:    Financial Services Manager
Region:    Inside Sales Region
Area/District (if applicable): TBD
Annual Base Salary and Salary Grade:  No change in Base Salary, ▮▮▮▮▮
Annual Success Share Bonus Target: No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable):  No chane in Quarterly Bonus Eligibility
Relocation Eligibility:  Eligible for Relocation Benefit
Vehicle Eligibility:   Eligible for one-time $5,000 Vehicle Payment in lieu of demo car
Start Date:  August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date.  If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

CONFIDENTIAL                                                                                                  Nissan_002707

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

Nissan_002708

June 4, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,


Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**


_____          _____
Ruben Rubalcava                                           Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**


_____          _____
Ruben Rubalcava                                           Date


CONFIDENTIAL                                                                          Nissan_002709

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Simeon Taskov
300 N. State Street, #2924
Chicago, IL 60654

Dear Simeon:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position: Financial Services Manager
Region: Midwest Region
Area/District (if applicable): Kansas City District
Annual Base Salary and Salary Grade: ▮▮▮▮▮▮
Annual Success Share Bonus Target: Eligible for Success Share Bonus
Quarterly Bonus Target (if applicable): No change in Quarterly Bonus Eligibility
Relocation Eligibility: Eligible for Relocation Benefit
Vehicle Eligibility: Eligible for demo vehicle
Start Date: August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

## I.    Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

CONFIDENTIAL

Nissan_002710

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

June 4, 2020
Page 3

If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.

Very truly yours,

Jim DeTrude
VP NMAC Sales & Marketing

**My signature below indicates that I ACCEPT the position.**

_____          _____
Simeon Taskov                                          Date

**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**

_____          _____
Simeon Taskov                                          Date

# NISSAN

*Delivered via hand delivery or electronic mail*

June 4, 2020

Vil Vina
1335 Bingham Mills Drive
New Albany, OH 43054

Dear Vil:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position:   Financial Services Manager
Region:   Midwest Region
Area/District (if applicable):  St. Louis District
Annual Base Salary and Salary Grade:  No change in salary, ███████
Annual Success Share Bonus Target:  No change in Success Share Bonus Eligibility
Quarterly Bonus Target (if applicable):  No change in Quarterly Bonus Eligibility
Relocation Eligibility:   Eligible for Relocation Benefit
Vehicle Eligibility:  Eligible for demo vehicle
Start Date: August 3, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to james.papalexis@nissan-usa.com no later than the close of business on **June 19, 2020**.

If you do not choose to accept this position, you will have the following options:

**I.    Options.**

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

Nissan_002713

June 4, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until August 3, 2020, you will maintain health coverage through the end of August. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to james.papalexis@nissan-usa.com by **June 19, 2020**.

CONFIDENTIAL                                                                                          Nissan_002714

June 4, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,



Jim DeTrude
VP NMAC Sales & Marketing


**My signature below indicates that I ACCEPT the position.**



_____          _____
Vil Vina                                                    Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**



_____          _____
Vil Vina                                                    Date

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Brad Boland
2006 Greenview Trail
Hoover, AL 35226

Dear Brad,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

## I. Options.

1. **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

   If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

## II. Severance Benefits.
Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay

March 31, 2020
Page 2

        is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

CONFIDENTIAL
Nissan_002719

March 31, 2020
Page 3


**My signature below indicates that I have received this notice.**


_____          _____
Brad  Boland                                              Date

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Bill Dodson
7683 W. Angels Lane
Peoria, AZ 85383

Dear Bill,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

I.    **Options.**

1.  **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

2.  **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

    If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

II.   **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1.  **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay

Nissan_002721

March 31, 2020
Page 2

is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

CONFIDENTIAL

Nissan_002722

March 31, 2020
Page 3


**My signature below indicates that I have received this notice.**


_____    _____

Bill Dodson                                                  Date

CONFIDENTIAL                                                                 Nissan_002723

**NISSAN**

*Delivered via hand delivery or electronic mail*

March 31, 2020

Gregory Leiter
1259 Whispering Oaks Drive
Danville, CA 94506

Dear Gregory,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

I. **Options.**

    1. **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

    2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

    If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

    1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay

March 31, 2020
Page 2

is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

CONFIDENTIAL

Nissan_002725

March 31, 2020
Page 3


**My signature below indicates that I have received this notice.**


_____          _____
Gregory  Leiter                                           Date

CONFIDENTIAL                                                    Nissan_002726

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Douglas Kiernan Monohan
552 Ball Hollow Branch Road
Lynnville, TN 38472

Dear Kiernan,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

## I.     Options.

1. **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

   If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

## II.  Severance Benefits.  

Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.**  Separating employees will be eligible for Severance Pay based on length of service to the Company.  Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year.  Such Separation Pay

CONFIDENTIAL

Nissan_002727

March 31, 2020
Page 2

is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

Nissan_002728

March 31, 2020
Page 3

**My signature below indicates that I have received this notice.**

_____                          _____
Douglas  Kiernan  Monohan                                                Date

CONFIDENTIAL                                                                Nissan_002729

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Matthew Stewart
S71W32673 Sandie Lane
Mukwonago, WI 53149

Dear Matthew,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

## I.     Options.

1. **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

   If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

## II.  Severance Benefits.

Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.**   Separating employees will be eligible for Severance Pay based on length of service to the Company.  Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay

March 31, 2020
Page 2

is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

March 31, 2020
Page 3


**My signature below indicates that I have received this notice.**


_____          _____
Matthew Stewart                                                               Date

CONFIDENTIAL

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Kasey Yost
12014 SE 288th Street
Auburn, WA 98092

Dear Kasey,

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

## I. Options.

1. **Voluntary separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you will **NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position from NNA by your Employment Separation Date, you **WILL** be eligible for Severance Benefits.

   If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

## II. Severance Benefits.

Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay

CONFIDENTIAL

Nissan_002733

March 31, 2020
Page 2

is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

You are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures.

**Please confirm your receipt of this notice by signing this letter and submitting a copy to Human Resources at _____@nissan-usa.com no later than the close of business, _____, 2020. You will receive confirmation of receipt from Human Resources within 24 hours of submission.**

Very truly yours,

(title)
Nissan North America, Inc.

CONFIDENTIAL

Nissan_002734

March 31, 2020
Page 3

**My signature below indicates that I have received this notice.**

_____ _____

Employee's Signature                                        Date

CONFIDENTIAL                                        Nissan_002735

# NISSAN

*Delivered via hand delivery or electronic mail*

March 31, 2020

Matt Stocking
3498 E. Ellsworth Avenue
Unit 610C
Denver, CO 80209

Dear Matt:

The Sales Operations organization at Nissan Motor Acceptance Corporation ("NMAC") is undergoing a restructuring and reorganization process. As part of the reorganization, your position will be eliminated or consolidated with another position(s) at the close of business on July 1, 2020 ("Employment Separation Date"). The Company is announcing the transition now to allow you plenty of opportunity to consider your options and make any necessary decisions.

The Company believes that your skills and background will be valuable to our new organization. As a result, we would like to offer you a position as outlined below:

Position: Job Title
Region: Region Name
Area/District (if applicable): <Area/District>
Annual Base Salary and Salary Grade: <New Base Salary>, <Salary Grade>
Annual Success Share Bonus Target: <Success Share Bonus Eligibility>%
Quarterly Bonus Target (if applicable): <Quarterly Bonus Eligibility>
Relocation Eligibility: <Relocation Eligibility>
Vehicle Eligibility: <Vehicle Eligibility>
Start Date: July 1, 2020

If you choose to accept this position, please sign below where appropriate and return a signed copy of this notice via email to _____@nissan-usa.com no later than the close of business on **May 1, 2020**.

If you do not choose to accept this position, you will have the following options:

## I. Options.

1. **Voluntarily separation.** You may elect to separate voluntarily from the Company now, or any time between now and your Employment Separation Date. If you choose this option, you **WILL NOT** be eligible for Severance Benefits as defined below.

2. **Continue in Current Position.** You may elect to remain in your current position until your Employment Separation Date. While in your current position, you may apply for open positions at NNA. If, prior to your Employment Separation Date, you receive an offer from NNA for a comparable position (defined as a position that is the same grade level as your current position and is located no more than 50 miles from your current assigned work location, which for those employees who primarily work from home is their home address), you will **NOT** be eligible for Severance Benefits, irrespective of whether you accept that position. If you do not receive an offer for a comparable position by your Employment Separation Date, because the

CONFIDENTIAL

Nissan_002748

March 31, 2020
Page 2

Company acknowledges that the position offered above is not comparable to your current role, you **WILL** be eligible for Severance Benefits.

II. **Severance Benefits.** Provided that you: (a) remain an employee of the Company in your current role and in good standing until your Employment Separation Date; (b) do not receive an offer from NNA for a comparable position; and (c) sign and do not revoke the Company's Confidential Separation Agreement and Release in a format to be provided by the Company, you will be eligible for the following benefits:

1. **Severance Pay.** Separating employees will be eligible for Severance Pay based on length of service to the Company. Employees will receive 4 weeks of pay for the first year, and 1 additional week of Severance Pay for each additional full or partial year of service beyond 1 year. Such Separation Pay is subject to any deductions authorized by you, any set-off or reimbursement in accordance with the Company's standard employee policies, and all deductions and withholding authorized by law.

2. **Continuation of Company Paid Health Benefits**. Your Company group health coverage will end the last day of the month that your termination date falls within, so if you are employed until July 1, 2020, you will maintain health coverage through the end of July. The Company will pay you a COBRA allowance equal to the cost of COBRA for one (1) additional month of your current coverage. This COBRA allowance will be considered taxable income to you. You may use this COBRA allowance to pay for COBRA coverage or for any other purpose. You may continue health coverage at your own expense through COBRA for up to 18 months.

3. **Outplacement.** You will be provided with an allowance that you may use towards outplacement assistance. Nissan has a preferred vendor, Right Management, Inc., to provide outplacement services, but you may use any vendor of your choice. Additional information and contact information from Right Management will be made available to those employees who leave Nissan. Impacted employees may obtain more information on the services provided by Right Management at www.right.com.

4. **Vehicle Purchase Allowance.** Provided that you are not eligible to retire under Nissan's retirement plans, separated employees will be eligible for a $5,000 allowance which may be used toward the purchase of a new Nissan or Infiniti vehicle. This allowance will be considered taxable income to you. You may use this allowance toward a new vehicle purchase or for any other purpose. In addition, if you purchase a Nissan or Infiniti vehicle, you are eligible for a VPP benefit that allows you to purchase a vehicle from a participating Nissan or Infiniti dealership at dealer invoice minus the model applicable VPP discounts, subject to the rules of that program. Program rules and discounts are reviewed monthly and may be modified at NNA's sole discretion. You must request this benefit no later than December 1, 2020.

If you do not accept the above employment offer and you wish to pursue another option, please confirm your receipt of this notice by signing below where appropriate and submitting a copy to _____@nissan-usa.com by **May 1, 2020**.

March 31, 2020
Page 3


If you accept a new position, you may not post for an open position until the end of one year after you begin your new assignment. In other words, the Company will not consider a posting application from an employee that elects to transfer to a new assignment as part of this restructuring plan until the end of the first year after the new assignment begins.

Regardless of whether you accept or decline any position offered, you are reminded that your employment with Nissan is at will and may be terminated by you or by Nissan at any time, for any reason, with or without cause, and with or without notice. Throughout your employment with Nissan, you must continue to comply with Company policies and procedures for continued employment.


Very truly yours,




Nissan North America, Inc.


**My signature below indicates that I ACCEPT the position.**




_____            _____
Matt Stocking                                        Date


**My signature below indicates that I DO NOT ACCEPT the position offered in this letter.**




_____            _____
Matt Stocking                                        Date

CONFIDENTIAL                                                    Nissan_002750

# Exhibit 3 to Ledieu 30(b)(6) Deposition
# Filed Under Seal

# Exhibit 4 to Ledieu 30(b)(6) Deposition

**Proposed schedule for Regionalization**

*Friday 15-May*

| CST | Meeting Cadence | NER | MAR | SER | MTN | CR | WR/NWR | MWR |
|---|---|---|---|---|---|---|---|---|
| 9:00 | | | | | | | | |
| 9:30 | | | | | Ledieu/Beck/HR | | | |
| 10:00 | All NMAC Zoom Meeting - Ledieu Lead on New Org Structure | | | | | | | |
| 10:15 | | | | BLOCK | | | | |
| 10:30 | | Delaney/Irwin/HR | RFSM/AOM | RFSM/AOM | Beck/Stocking/HR | Voorhies/Johnson/HR | RFSM/AOM | RFSM/AOM |
| 10:45 | | RFSM/AOM | Roberts/Pitchford/HR | | Beck/Dodson/HR | Voorhies/Rubalcava/HR | | |
| 11:00 | | | | Boland/Pitchford/HR | | RFSM/AOM | Hungerford/Yost/HR | McBane/Vina/HR |
| 11:15 | | | | | | | Hungerford/Leiter/HR | McBane/Taskov/HR |
| 11:30 | | | | | | | Hungerford/Oda/HR | McBane/Monohan/HR |
| 11:45 | | | | | | | | McBane/Stewart/HR |
| 12:00 | Regional Meetings | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries |
| 12:15 | | | | | | | | |
| 12:30 | | | | | | | | |
| 12:45 | | | | | | | | |
| 13:00 | | | | | | | | |
| 13:15 | | | | | | | | |
| 13:30 | | | | | | | | |
| 13:45 | | | | | | | | |
| 14:00 | | | | | | | | |

Case: 1:22-cv-04734 Document #: 123 Filed: 11/15/24 Page 168 of 264 PageID #:5538

# Exhibit 5 to Ledieu 30(b)(6) Deposition

**Proposed schedule for Regionalization**

*Friday    4-Jun*

| CST | Meeting Cadence | NER | MAR | SER | MTN | CR | WR/NWR | MWR |
|---|---|---|---|---|---|---|---|---|
| 9:00 | | | | | | Ledieu Voorhies 1:1 | | |
| 9:30 | | | | | Ledieu/Beck/HR | | | |
| 10:00 | All NMAC Zoom Meeting - Ledieu Lead on New Org Structure | | | | | | | |
| 10:15 | | | | BLOCK | | | | |
| 10:30 | | Delaney/Irwin/HR | RFSM/AOM | RFSM/AOM | Beck/Stocking/HR | Voorhies/Johnson/HR | RFSM/AOM | RFSM/AOM |
| 10:45 | | RFSM/AOM | Roberts/Pitchford/HR | | Beck/Dodson/HR | Voorhies/Rubalcava/HR | | |
| 11:00 | | | | Boland/Bailey/HR | | RFSM/AOM | Hungerford/Yost/HR | McBane/Vina/HR |
| 11:15 | | | | | | | Hungerford/Leiter/HR | McBane/Taskov/HR |
| 11:30 | | | | | | | Hungerford/Oda/HR | McBane/Monohan/HR |
| 11:45 | | | | | | | | McBane/Stewart/HR |
| 12:00 | Regional Meetings | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries | Contact Remaining Team Members to Discuss New Territory Boundaries |
| 12:15 | | | | | | | | |
| 12:30 | | | | | | | | |
| 12:45 | | | | | | | | |
| 13:00 | | | | | | | | |
| 13:15 | | | | | | | | |
| 13:30 | | | | | | | | |
| 13:45 | | | | | | | | |
| 14:00 | | | | | | | | |

Case: 1:22-cv-04734 Document #: 123 Filed: 11/15/24 Page 170 of 264 PageID #:5540

# Exhibit 6 to Ledieu 30(b)(6) Deposition

| Workday Employee ID | Employee Name | Current Job Title | Current Salary Grade | Current Location (City, State) | New Job Title | New Salary Grade | New Location (City, State) | Homeowner or Renter? | Effective Date |
|---|---|---|---|---|---|---|---|---|---|
| 62116843 | Larry Johnson | Area Operations Manager | 12 | Edmond, OK | | | Dallas, TX | | 8/1/2020 |
| 62102532 | Nedra Pitchford | Fin Svcs Mgr Developmental | 10 | Charlottesville, VA | | | Dallas, TX | | 8/1/2020 |
| 88161982 | Jeffrey Irwin | Financial Svcs Mgr | 11 | Wilton, NY | | | Dallas, TX | | 8/1/2020 |
| 88174639 | Vil Vina | Financial Svcs Mgr | 11 | New Albany, OH | | | St. Louis, MO | | 8/1/2020 |
| 62048257 | Simeon Taskov | Fin Svcs Mgr Developmental | 10 | Chicago, IL | | | Kansas City, MO | | 8/1/2020 |
| 88129876 | Matthew Stocking | Fin Svcs Mgr Developmental | 10 | Denver, CO | | | Dallas, TX | | 8/1/2020 |

# Exhibit 7 to Ledieu 30(b)(6) Deposition
# Filed Under Seal

# Exhibit 8 to Ledieu 30(b)(6) Deposition

| | |
|---|---|
| **From:** | Ledieu, Eric <Eric.Ledieu@Nissan-Usa.com> |
| **Sent:** | Friday, February 21, 2020 3:28 PM |
| **To:** | Chambers, Jeff <Jeff.Chambers@Nissan-Usa.com> |
| **Subject:** | NMAC Regional Optimization - Chambers Review.pptx |
| **Attach:** | NMAC Regional Optimization - Chambers Review.pptx |

**EXHIBIT**

**8**

exhibitsticker.com

CONFIDENTIAL

Nissan_002768



CONFIDENTIAL

Nissan_002769



CONFIDENTIAL

Nissan_002770



CONFIDENTIAL

Nissan_002771



CONFIDENTIAL

Nissan_002772



CONFIDENTIAL

Nissan_002773



CONFIDENTIAL

Nissan_002774



CONFIDENTIAL

Nissan_002775



CONFIDENTIAL

Nissan_002776



CONFIDENTIAL

Nissan_002777



CONFIDENTIAL

Nissan_002778



CONFIDENTIAL

Nissan_002779



CONFIDENTIAL

Nissan_002780



CONFIDENTIAL

Nissan_002781



CONFIDENTIAL

Nissan_002782



CONFIDENTIAL

Nissan_002783



CONFIDENTIAL

Nissan_002784



CONFIDENTIAL

Nissan_002785



CONFIDENTIAL

Nissan_002786



CONFIDENTIAL

Nissan_002787



CONFIDENTIAL

Nissan_002788



CONFIDENTIAL

Nissan_002789



CONFIDENTIAL

Nissan_002790



CONFIDENTIAL

Nissan_002791



CONFIDENTIAL

Nissan_002792



CONFIDENTIAL

Nissan_002793



CONFIDENTIAL

Nissan_002794



CONFIDENTIAL

Nissan_002795



CONFIDENTIAL

Nissan_002796



CONFIDENTIAL

Nissan_002797



CONFIDENTIAL

Nissan_002798



CONFIDENTIAL

Nissan_002799



Nissan_002800



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

Nissan_002803



CONFIDENTIAL

Nissan_002804



CONFIDENTIAL

Nissan_002805



CONFIDENTIAL

Nissan_002806



CONFIDENTIAL

Nissan_002807



CONFIDENTIAL

Nissan_002808



CONFIDENTIAL

Nissan_002809



CONFIDENTIAL

Nissan_002810



CONFIDENTIAL

Nissan_002811



CONFIDENTIAL

Nissan_002812



CONFIDENTIAL

Nissan_002813



CONFIDENTIAL

Nissan_002814

# Exhibit 9 to Ledieu 30(b)(6) Deposition Filed Under Seal

# Exhibit 10 to Ledieu 30(b)(6) Deposition

Message

| | |
|---|---|
| **From:** | Ledieu, Eric [Eric.Ledieu@Nissan-Usa.com] |
| **Sent:** | 3/24/2020 11:18:06 AM |
| **To:** | Cullum, Kevin [kevin.cullum@nissan-usa.com]; DeTrude, Jim [detrudj@NMAC.com]; Chambers, Jeff [Jeff.Chambers@Nissan-Usa.com] |
| **Subject:** | NMAC Regional Discussion |

Please see the attached PPT for our 11AM discussion. The first few slides are a refresher...the meat of our discussion will center around pages 5-9.

Talk soon.

Regards,

Eric

_____

Eric Ledieu
Director, Sales Operations
Nissan Motor Acceptance Corporation and Infiniti Financial Services
Email: eric.ledieu@nissan-usa.com
Mobile: +1 (615) 268-8634

EXHIBIT

10

CONFIDENTIAL

Nissan_003346



CONFIDENTIAL

Nissan_003347



CONFIDENTIAL

Nissan_003348



CONFIDENTIAL

Nissan_003349



CONFIDENTIAL

Nissan_003350



CONFIDENTIAL

Nissan_003351



CONFIDENTIAL



CONFIDENTIAL

Nissan_003353



CONFIDENTIAL

Nissan_003354



CONFIDENTIAL

Nissan_003355



CONFIDENTIAL

Nissan_003356

CONFIDENTIAL

Nissan_003357



CONFIDENTIAL

Nissan_003358



CONFIDENTIAL

Nissan_003359



CONFIDENTIAL

Nissan_003360



CONFIDENTIAL

Nissan_003361



CONFIDENTIAL

Nissan_003362



CONFIDENTIAL

Nissan_003363

Case: 1:22-cv-04734 Document #: 123 Filed: 11/15/24 Page 242 of 264 PageID #:5612



CONFIDENTIAL

Nissan_003364



CONFIDENTIAL

Nissan_003365



CONFIDENTIAL

Nissan_003366



CONFIDENTIAL

Nissan_003367



CONFIDENTIAL

Nissan_003368



CONFIDENTIAL

Nissan_003369



CONFIDENTIAL

Nissan_003370



CONFIDENTIAL

Nissan_003371



CONFIDENTIAL

Nissan_003372



CONFIDENTIAL

Nissan_003373



CONFIDENTIAL

Nissan_003374



CONFIDENTIAL

Nissan_003375



CONFIDENTIAL

Nissan_003376

# Exhibit 11 to Ledieu 30(b)(6) Deposition Filed Under Seal

Exhibit 12 to
Ledieu 30(b)(6)
Deposition Filed
Under Seal

# Exhibit 13 to Ledieu 30(b)(6) Deposition Filed Under Seal

# Exhibit 14 to Ledieu 30(b)(6) Deposition Filed Under Seal

# Exhibit 15 to Ledieu 30(b)(6) Deposition Filed Under Seal

# Exhibit 16 to Ledieu 30(b)(6) Deposition Filed Under Seal

# Exhibit 17 to Ledieu 30(b)(6) Deposition

Message
_____

**From:**     Hankins, Sean (Chounessey) [/O=NMCORP/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=HANKINC]
**Sent:**     7/28/2020 11:15:28 AM
**To:**       *NMAC - RFSMs/AOMs [nmacrfsmsaoms@nissan-usa.com]
**Subject:**  **UPDATED** NMAC July 2020 Region Alignment Master List

Good Morning Management Team,

Added some information to the Master Dealer List per request:

> NNA DLR #
> NNA REGION
> DMR
> FLOORPLAN (Y/N)
> VSC PROVIDER
> VSC Support (<35% Non-Supportive, >35% Semi-Supportive, >60% Supportive) Based on period Apr – Jun.

Thank You!

**Sean Hankins**
Manager
Sales Operations
Nissan Motor Acceptance Corporation

Nissan Group of North America
Phone: +1 615-725-3484
Mobile: +1 630-346-4821



_____

**From:** Hankins, Sean (Chounessey)
**Sent:** Monday, July 27, 2020 4:45 PM
**To:** *NMAC-RFSMS/AOMS <nmacrfsmsaoms@nissan-usa.com>
**Subject:** NMAC July 2020 Region Alignment Prior and New FSM

Management Team,

Attached is a listing of all dealers. I have included New/Old…. FSM, Region, Area, District. Changes are highlighted in "Yellow".

There have been dealers that have gone "lights out" and "new dealers" since the file originally went to IS. We will address those once the initial download is completed.

Please let me know if you have any questions.

Thank You!

**Sean Hankins**
Manager
Sales Operations
Nissan Motor Acceptance Corporation

EXHIBIT

17

CONFIDENTIAL

Nissan_003405

Nissan Group of North America
Phone: +1 615-725-3484
Mobile: +1 630-346-4821



CONFIDENTIAL

Nissan_003406

# Exhibit 18 to Ledieu 30(b)(6) Deposition Filed Under Seal